# Exhibit H

Collecting in Alphabetical Order
Orders Issuing Preliminary Injunction
Requiring 30 Days' Advance Notice of Transfer

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
(Cite as: 2005 WL 711814 (D.D.C.))

**H**
Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Mahmoad ABDAH, et al., Petitioners,
v.
George W. BUSH, et al., Respondents.
**No. Civ.A. 04-1254(HHK).**

March 29, 2005.

David H. Remes, Covington & Burling, Washington, DC, Marc D. Falkoff, Covington & Burling, New York, NY, for Petitioners.

Lisa Ann Olson, Preeya M. Noronha, Robert J. Katerberg, Terry Marcus Henry, U.S. Department of Justice, Civil Division, Washington, DC, for Respondents.

MEMORANDUM OPINION

KENNEDY, J.

*1 Petitioners are aliens who are being held by the United States military at Guantánamo Bay Naval Base in Cuba and who have petitioned this court for a writ of habeas corpus. While the merits of their individual claims have not yet been adjudicated, this court (Green, J.) has determined that some of the causes of action set forth in their habeas petition survive Respondents' motion to dismiss. This ruling is currently on appeal. Presently before the court is Petitioners' motion for a preliminary injunction. Asserting that Respondents have contemplated or are contemplating transferring them to the custody of foreign nations to be further detained and possibly tortured, Petitioners seek an order from this court that would require Respondents to provide their counsel and this court with 30 days' advance notice of any Petitioner's removal from Guantánamo. Upon consideration of the briefing of the parties, the submissions that accompany the briefing, and the arguments of counsel at a hearing, the court concludes that Petitioners' motion should be granted.

I. BACKGROUND

Petitioners are thirteen [FN1] Yemeni nationals who each allegedly traveled to Pakistan for reasons "unrelated to any activities of al Qaeda or the Taliban," Pet. ¶ 19, [FN2] such as pursuing religious studies, id. ¶¶ 26, 40, 43, 45, 47; obtaining medical care, id. ¶ 33; and seeking better employment, id. ¶ 36. All were "arrested by Pakistani police as part of a dragnet seizure of Yemeni citizens." Id. ¶ 19. Details of their capture and subsequent movements are hazy, but Petitioners allege that they were seized in 2001 or 2002, id. ¶ 20, "far from the battlefield." Id. ¶ 61. All were then transferred to United States military custody and transported to the United States Naval Base at Guantánamo Bay, Cuba ("Guantánamo"), where they have since been held, "virtually incommunicado," id. ¶ 63, as "enemy combatants." All Petitioners deny that they are enemy combatants or that they have otherwise been "part of or supporting forces hostile to the United States." Id. ¶ 15.

> FN1. The court notes some inconsistency in the parties' briefing regarding the number of Petitioners included in this action. The petition for writ of habeas corpus lists *fourteen* individuals: (1) Mahmoad Abdah; (2) Majid Mahmoud Ahmed; (3) Abdulmalik Abdulwahab Al-Rahabi; (4) Makhtar Yahia Naji Al-Wrafie; (5) Aref Abd Il Rheem; (6) Yasein Khasem Mohammad Esmail; (7) Adnan Farhan Abdul Latif; (8) Jamal Mar'i; (9) Othman Abdulraheem Mohammad; (10) Adil Saeed El Haj Obaid; (11) Mohamed Mohamed Hassan Odaini; (12) Sadeq Mohammed Said; (13) Farouk Ali Ahmed Saif; and (14) Salman Yahaldi Hsan Mohammed Saud. Pet. ¶¶ 22-51 and caption.
> Petitioners' motion for a preliminary injunction identifies *thirteen* Petitioners, Pet'rs' Mot. at 2, while Respondents mention *twelve* detainees, stating they have no records corresponding to Aref Abd Il Rheem. Resp'ts' Opp'n at 2, n. 1.

> FN2. "Pet." refers to Petitioners' petition for writ of habeas corpus filed July 27, 2004.

On June 28, 2004, the Supreme Court determined that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of [the detainees at Guantánamo Bay] who claim to be wholly innocent of wrongdoing." *Rasul v. Bush,* --- U.S. ----, 124 S.Ct. 2686, 2699, 159 L.Ed.2d 548 (2004). Shortly thereafter, the Department of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 2
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

Defense issued an order creating the Combatant Status Review Tribunal ("CSRT") to evaluate the status of each detainee at Guantánamo. _In re Gunatanamo Detainee Cases, 355 F.Supp.2d 443, 450 (D.D.C.2005), appeal docketed,_ No. 05-8003 (D.C.Cir. Mar. 21, 2005). On July 27, 2004, Petitioners filed a petition for writ of habeas corpus, seeking to obtain "a judicial determination of whether there is a factual basis for Respondent's determination that they are 'enemy combatants,' " Pet. ¶ 14, and asserting that the government has "advanced no justification" for their "arrest, transportation and continued incarceration." _Id._ ¶ 16. Their petition was coordinated with ten other habeas cases filed by other Guantánamo detainees to allow Judge Joyce Hens Green, the designated judge, to resolve common issues of law and fact.

*2 On January 31, 2005, Judge Green issued a memorandum opinion and order granting in part and denying in part Respondents' motion to dismiss, finding that the detainees "have the fundamental right to due process of law under the Fifth Amendment," _In re Gunatanamo Detainee Cases, 355 F.Supp.2d at 463,_ and that the CSRT proceedings failed to protect those due process rights. _Id. at 468._

Subsequently, Judge Green issued an order certifying her opinion for interlocutory appeal and staying the proceedings in the eleven cases pending resolution of Respondents' appeal. Petitioners now contend that "Respondents have contemplated or are contemplating removal of some or all Petitioners from Guantánamo to foreign territories for torture or indefinite imprisonment without due process of law." Pet'rs' Mot. for Prelim. Inj. ("Pet'rs' Mot.") at 1. Fearing that any such transfer would "also circumvent[ ] Petitioners' right to adjudicate the legality of their detention," _id._ at 6, Petitioners seek a preliminary injunction requiring Respondents to provide Petitioners' counsel with 30 days' advance notice of "any intended removal of Petitioners from Guantanamo Bay Naval Base," _id._ at 1, to enable counsel to contest the removal if they deem it advisable to do so.

## II. ANALYSIS

### A. Stay of February 3, 2005

Respondents first argue that the stay order Judge Green issued in the eleven coordinated cases prevents this court from considering the merits of the present motion. This argument is unavailing.

On February 3, 2005, Judge Green issued an order in

the eleven habeas cases that "stayed [the cases] for all purposes pending resolution of all appeals in this matter." _In re Guantanamo Detainee Cases,_ No. 04-1254 (D.D.C. Feb. 3, 2005) (order). Courts have consistently recognized that a stay may be necessary preserve the status quo among the parties pending appeal. _See, e.g., Warm Springs Dam Task Force v. Gribble,_ 417 U.S. 1301, 1310, 94 S.Ct. 2542, 41 L.Ed.2d 654 (1974); _United Mun. Distrib. Group v. FERC,_ 732 F.2d 202, 205 (D.C.Cir.1984); _NLRB v. Sav-on Drugs, Inc.,_ 704 F.2d 1147, 1149 (9th Cir.1983); _Metzler v. United States,_ 832 F.Supp. 204, 208 (E.D.Mich.1993). Here, Petitioners are not asking the court to bypass the stay and resume adjudication of their underlying claims. Rather, they seek to prevent Respondents from unilaterally and silently taking actions that may render their claims moot; thus the injunctive relief Petitioners seek would ensure the very same result that the stay itself was entered to secure. _See Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.,_ 412 F.2d 165, 169 (D.C.Cir.1969). The stay order simply cannot be construed to prevent emergency relief consistent with maintenance of the status quo. _See Summit Med. Assocs., P.C. v. James,_ 998 F.Supp. 1339, 1351 (M.D.Ala.1998); _Universal Marine Ins., Ltd. v. Beacon Ins. Co.,_ 577 F.Supp. 829, 832 (W.D.N.C.1984). The court therefore proceeds to consider the merits of Petitioners' request.

### B. Legal Standard

*3 A preliminary injunction is an "extraordinary remedy" that should only issue "when the party seeking the relief, by a clear showing, carries the burden of persuasion." _Cobell v. Norton,_ 391 F.3d 251, 258 (D.C.Cir.2004) (citing _Mazurek v. Armstrong,_ 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). A court considering a preliminary injunction request must examine four factors, namely whether: (1) Petitioners will be "irreparably harmed if an injunction is not granted"; (2) there is a "substantial likelihood" Petitioners will succeed on the merits; (3) an injunction will "substantially injure" Respondents; and (4) the public interest will be furthered by the injunction. _Serono Labs., Inc., v. Shalala,_ 158 F.3d 1313, 1317-18 (D.C.Cir.1998). These four factors "interrelate on a sliding scale" and must be considered in relation to one another, for " 'if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.' " _Id._ at 1318 (quoting _CityFed Fin. Corp. v. Office of Thrift Supervision,_ 58 F.3d 738, 746 (D.C.Cir.1995)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
(Cite as: 2005 WL 711814 (D.D.C.))

Page 3

C. Merits of the Preliminary Injunction Motion

1. Irreparable Injury

The court gives special scrutiny to Petitioners' claims of injury, because "the basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.,* 58 F.3d at 747 (quoting *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). To obtain preliminary injunctive relief, Petitioners must show that the injury threatening them is more than "remote and speculative." *Milk Indus. Found. v. Glickman,* 949 F.Supp. 882, 897 (D.D.C.1996). Petitioners unquestionably make such a showing.

Petitioners allege two irreparable injuries. With respect to the first, they claim that the Department of Defense is actively planning the transfer of detainees from Guantanamo to countries "for torture or indefinite imprisonment without due process of law," Pet'rs' Mot. at 1, and note that the United States has "repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques." *Id.* at 3. Respondents dispute these assertions, dismissing them as "sensationalistic allegations" based upon "hollow speculation" and "largely anonymous sources and innuendo" cited in newspaper and magazine articles, Resp'ts' Opp'n at 19, and statements from a single detainee. Respondents then describe the policy and procedures the United States employs regarding the transfer and repatriation of Guantánamo detainees, including the transfer of detainees to the control of other governments for investigation and possible prosecution. Respondents state that "a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations," Resp'ts' Opp'n at 4, and that "it is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured." *Id.* Respondents also provide declarations from high-level Department of State and Department of Defense officials outlining the consultations and deliberations the agencies undertake prior to transferring a detainee, and indicating that among 211 detainees the military has transferred out of Guantánamo to date, 65 were provided to foreign governments for ongoing detention. *Id.,* Prosper Decl. ¶ 2, Waxman Decl. ¶ 4.

*\*4* These declarations concerning general policy and practice, however, do not entirely refute Petitioners'

claims or render them frivolous. The court has reviewed Petitioners' exhibits, and notes that in addition to citing anonymous sources, the submitted articles quote by name former Guantánamo detainees, former high-level officials from the United Kingdom and Pakistan, and current and former employees of the United States government who were themselves involved in transferring detainees. The court, however, need not determine whether Petitioners' fear of torture constitutes the requisite "irreparable injury" because their second claim of injury clearly satisfies the preliminary injunction standard.

Petitioners contend that if the United States military transfers Petitioners from Guantánamo to overseas custody, it would effectively extinguish those detainees' habeas claims by fiat. Such transfers would eliminate any opportunity for Petitioners to ever obtain a fair adjudication of their "fundamental right to test the legitimacy of [their] executive detention." *Lee v. Reno,* 15 F.Supp.2d 26, 32 (D.D.C.1998). The parties agree that upon transfer, the court will no longer retain jurisdiction to provide any relief Petitioners seek. Hr'g Tr. at 19:7-10; Resp'ts' Opp'n at 6 ("once transferred, a detainee is no longer subject to the control of the United States"), Waxman Decl. ¶ 5. While Respondents contest Judge Green's determination that Petitioners have legally cognizable due process claims properly before the court, pending their appeal they may not act to deprive this court of its jurisdiction over the very "corpus" of this case; indeed, the "federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals." *Abu Ali v. Ashcroft,* 350 F.Supp.2d 28, 54 (D.D.C.2004) (quoting *Alabama Great S.R. Co. v. Thompson,* 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906)).

2. Likelihood of Success

Petitioners argue that they have properly invoked this court's jurisdiction and have stated actionable claims under the Due Process Clause of the Fifth Amendment and the Geneva Convention, thereby demonstrating a likelihood of success. Respondents urge instead that Petitioners fail to make the required showing "that they are likely to succeed in establishing a judicially enforceable entitlement to veto the same repatriation that they previously told the Court Respondents were required to conduct." [FN3] Resp'ts' Opp'n at 11 (emphasis omitted). Although the court would use somewhat different language to characterize the relevant standard, Respondents are correct that *if* there are no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted. Respondents are wrong, however, in arguing that there are in fact no such circumstances present, and that consequently there is no legal basis for judicial involvement in transfer or repatriation decisions regarding Petitioners.

> FN3. This last contention is perplexing, because it seems beyond question that advocating for release into freedom is not equivalent to advocating for transfer from ongoing detention in one locale to ongoing detention in another.

*5 To the contrary, transfer of Petitioners with notice and leave of court is forbidden by Fed. R.App. P. 23(a), which requires that "pending review of a decision in a habeas corpus proceeding _[FN4]_ commenced before a court ... the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule." The Rule "was designed to prevent prison officials from impeding a prisoner's attempt to obtain habeas corpus relief by physically removing the prisoner from the territorial jurisdiction of the court in which a habeas petition is pending." _Hammer v. Meachum,_ 691 F.2d 958, 961 (10th Cir.1982) (citing _Jago v. United States Dist. Court,_ 570 F.2d 618, 626 (6th Cir.1978), and _Goodman v. Keohane,_ 663 F.2d 1044, 1047 (11th Cir.1981)). Respondents' contention that Rule 23(a) is not typically applied in situations involving the transfer of prisoners to the custody of foreign nations, Resp'ts' Br. in Resp. to Pet'rs' Notice of Supp. Auth. at 3, while correct, is of no moment. Its application here is consistent with both the text of the rule and its underlying purpose. Indeed, Rule 23(a) acquires an even greater importance in the context of Petitioners' case. When a prisoner with a pending habeas action is simply transferred from one state to another in violation of Rule 23(a), the transfer "does not divest [the court of its] jurisdiction over the action." _Reimnitz v. State's Attorney of Cook County,_ 761 F.2d 405, 409 (7th Cir.1985). Here, though, Petitioners' transfer to another nation would assuredly deprive the court of its jurisdiction. Petitioners thus demonstrate that they have a clear likelihood of success in blocking a transfer made absent notice to, and approval from, the court.

> FN4. Jurisdiction over a petition for a writ of habeas corpus is determined when the petition is filed. _Barden v. Keohane,_ 921

F.2d 476, 477 n. 1 (3d Cir.1990) (citing accordance with _Ross v. Mebane,_ 536 F.2d 1199 (7th Cir.1976) (per curiam); _Harris v. Ciccone,_ 417 F.2d 479 (8th Cir.1969), cert. denied, 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (1970)).

Respondents further argue against the application of Rule 23(a) by referring to a footnote in _Rasul,_ which remarked that after the Supreme Court granted certiorari, two petitioners in that case, Shafiq Rasul and Asif Iqbal, were "released from custody." _Rasul,_ --- U.S. ----, ---- n. 1, 124 S.Ct. 2686, 2691 n. 1, 159 L.Ed.2d 548. Respondents argue that this reference demonstrates that the Supreme Court "did not give any hint of perceiving any violation" of the Supreme Court's equivalent to Rule 23(a). Resp'ts' Br. in Resp. to Pet'rs' Notice of Supp. Auth. at 4; _see also_ Hr'g Tr. at 7:20-21. The court declines Respondents' invitation to make such an inference, both because there is no indication in _Rasul_ whether the two named petitioners were transferred into foreign custody or released outright, and because neither party presented the issue to the Supreme Court.

3. Harm to Respondents

Respondents assert that granting Petitioners' motion would "illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." Resp'ts' Opp'n at 1. They also argue that granting Petitioners' injunction request would harm the government in "myriad" other ways, by "undermining the United States Government's ability to investigative and resolve allegations of mistreatment or torture"; "undermin[ing] the United States' ability to reduce the numbers of individuals under U.S. control"; impairing the United States' coordination with other governments' efforts in the war on terrorism; and "encumber[ing] ... an already elaborate process leading up to transfers or repatriations." Resp'ts' Opp'n at 22. At the preliminary injunction hearing held on March 22, 2005, Respondents' counsel amplified these contentions, noting that the advance notice requirement would "undermine[ ] the executive's ability to speak with one voice." Hr'g Tr. at 8:10-11. Beyond these vague premonitions, however, the court does not have any indication that notifying Petitioners' counsel 30 days ahead of planned transfers of their clients will intrude upon executive authority. The preliminary injunction Petitioners seek will not require, or even enable, the court to take the two _specific_ actions which Respondents' declarants warn against: forcing State Department officials to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 5
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

"unilaterally ... disclose outside appropriate Executive branch channels its communications with a foreign government relating to particular mistreatment or torture concerns," Resp'ts' Opp'n, Prosper Decl. ¶ 10, and publicly disclosing the facts gathered and analyses prepared by various State Department offices, or bringing these findings "to the attention of officials and others in foreign States ..." *Id.* ¶ 11.

**\*6** In evaluating the alleged injury Respondents would suffer if the preliminary injunction is granted, the court balances the respective hardships imposed upon the parties. *See O'Donnell Constr. Co. v. District of Columbia,* 963 F.2d 420, 429 (D.C.Cir.1992); *George Washington Univ. v. District of Columbia,* 148 F.Supp.2d 15, 18-19 (D.D.C.2001). While the injunction Petitioners seek might restrict or delay Respondents with respect to one aspect of managing Petitioners' detention, such a consequence does not outweigh the imminent threat facing Petitioners with respect to the *entirety* of their claims before the court. [FN5]

> FN5. Respondents' assertion that they are merely "relinquishing" custody of detainees whom the government is simply "no longer interested in detaining," Hr'g Tr. at 9:20-21, is disingenuous. According to Petitioners' allegations, unanswered by the United States, they have been held at Guantánamo for periods of several years, *see, e.g.,* Pet'rs' Mot., Exs. K, M, O, S. The government's invocation of sudden exigency requiring their transfer now cannot trump Petitioners' established due process rights to pursue their habeas action in federal court. *See Rasul,* --- U.S. at ---- - ----, 124 S.Ct. at 2698-99; *In re Guantanamo Detainee Cases,* 355 F.Supp.2d at 464 ("Of course, it would be far easier for the government to prosecute the war on terrorism if it could imprison all suspected 'enemy combatants' at Guantanamo Bay without having to acknowledge and respect any constitutional rights of detainees. That, however, is not the relevant legal test ... constitutional limitations often, if not always, burden the abilities of government officials to serve their constituencies.").

**4. Public Interest**

Finally, the court looks to whether granting the preliminary injunction request implicates the public interest, and if so, whether it confers benefit or produces harm. Respondents simply conflate the public interest with their own position, noting that "the public interest and harm-to-non-movant factors converge." Resp'ts' Opp'n at 21. It is indisputable that the public interest favors vigorously pursuing terrorists and holding them to account for their actions. It is misleading, however, to frame the relevant interest here as the government's ability "to detain enemy combatants to prevent them from returning to the fight and continuing to wage war against the United States." Resp'ts' Opp'n at 21-22. Petitioners' current designation as enemy combatants is not a foregone conclusion; challenges to the accuracy and legitimacy of the government's determination that Petitioners have engaged in hostilities against the United States, or aided those who have, are the very core of Petitioners' underlying habeas claims. Respondents' assertion to the contrary, that "Petitioners' enemy combatant status was recently confirmed in Combatant Status Review Tribunals," Resp'ts' Opp'n at 2, ignores Judge Green's ruling that the CSRTs as so far implemented are constitutionally deficient. Instead, this factor tilts in Petitioners' favor, because the public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process; "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir.1994).

**D. All Writs Act**

Petitioners also ask the court to exercise its authority under the All Writs Act, which provides in relevant part that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction ...," *SEC v. Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C.Cir.1996), and a court may grant a writ under the Act whenever it determines such action necessary "to achieve the ends of justice entrusted to it." *Adams v. United States,* 317 U.S. 269, 273, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Were the court to find adequate "alternative remedies" unavailable, *Clinton v. Goldsmith,* 526 U.S. 529, 537, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999), or "the traditional requirements of an injunction" inapplicable, *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1101 n. 13 (11th Cir.2004), it could employ the Act to order the relief Petitioners seek. Because Petitioners have made a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

clear showing that a preliminary injunction is warranted under the familiar four-part test, though, the court need not take recourse to the All Writs Act.

### III. CONCLUSION

**\*7** For the foregoing reasons, the court finds that Petitioners satisfy the requirements for a preliminary injunction, and therefore grants their present motion. An appropriate order accompanies this memorandum opinion.

Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
**(Cite as: 2005 WL 589812 (D.D.C.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Mahmoad ABDAH, et al., Petitioners,
v.
George W. BUSH, et al., Respondents.
**No. CIVA041254(HHK)(RMC).**

March 12, 2005.
David H. Remes, Covington & Burling, Washington, DC, Marc D. Falkoff, Covington & Burling, New York, NY, for Petitioners.

Lisa Ann Olson, Preeya M. Noronha, Robert J. Katerberg, Terry Marcus Henry, U.S. Department of Justice, Washington, DC, for Respondents.

Charles B. Gittings, Jr., Pro Se, Manson, WA.

MEMORANDUM OPINION

COLLYER, J.

*1 Thirteen Yemeni nationals, designated as "enemy combatants" at the Guantanamo Bay Naval Base ("GTMO") in Cuba, petition for a temporary restraining order ("TRO") to prevent their removal from GTMO and rendition to the custody of another government. They argue that such removal and rendition could have the effect of denying them access to U.S. courts for review of their detainment status and also potentially expose them to interrogation techniques and treatment that would be contrary to the laws of the United States.

Prior to their application for a TRO, the Petitioners had sought a preliminary injunction that would require the Government to give Petitioners' counsel 30- days notice of any such transfer. That matter is set for hearing before Judge Henry Kennedy on March 24, 2005. [FN1] In the meantime, the *New York Times* ran a story on March 11, 2005, describing a proposal by the Pentagon and Secretary of Defense Donald Rumsfeld to transfer more than half of the GTMO detainees to prisons in Saudi Arabia, Afghanistan, and Yemen. [FN2] Petitioners' counsel

also learned from co-counsel at the Center for Constitutional Rights, "citing information from a person, who, for professional reasons, refuses to make her sources public--that the government intends to transfer many detainees very quickly." Petitioners' *Ex Parte* Motion for Temporary Restraining Order to Prevent Respondents From Removing Petitioners From Guantanamo Until Petitioners' Motion for Preliminary Injunction Is Decided ("Pets.' Motion"), Declaration of Marc D. Falkoff ("Falkoff Decl.") ¶ 3. Petitioners seek an *ex parte* TRO "because they are apprehensive that a public filing will provoke respondents to initiate the exact dark-of-night transfers that petitioners seek to prevent." Pets.' Motion at 2.

FN1. The petition for a TRO is before the undersigned as the emergency motions judge for the weekend. It was filed in a manner consistent with secret documents in these cases at approximately 10:30 p.m. on Friday evening, March 11, 2005. Because the motion was filed on a Friday night *ex parte,* and because some of the materials appended to the motion are classified "Secret," the Court has not had the benefit of an opposition to the petition for a TRO or even argument from Petitioners' counsel, there being no available court reporter with clearance. Its decision here is clearly limited by those circumstances. The Court concludes that it can enter this memorandum opinion and order because it bases its analysis largely on the Government's arguments and factual proffer before Judge Kennedy.

FN2. *See* Pets.' Motion, Exh. C (Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba, The New York Times* (March 11, 2003)).

BACKGROUND
The Petitioners' underlying case is one of many *habeas corpus* petitions filed in the District Court for the District of Columbia on behalf of GTMO detainees after the Supreme Court in *Rasul v. Bush* held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." --- U.S. ----, ----,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 2
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
**(Cite as: 2005 WL 589812 (D.D.C.))**

124 S.Ct. 2686, 2699, 159 L.Ed.2d 548 (2004). The Government filed motions to dismiss or for judgment as a matter of law in opposition to many of these *habeas* petitions. Judge Joyce Hens Green, who had been designated to decide common issues of law and fact in eleven of these cases, granted the motion in part and denied it in part. [FN3] In a separate case, Judge Richard Leon granted the motion in its entirety. [FN4] The cases before Judges Green and Leon have been fully briefed in the D.C. Circuit Court of Appeals and are under submission.

> FN3. *In re Guantanamo Detainee Cases,* 2005 WL 195356 (D.D.C. Jan.31, 2005), *appeal docketed,* No. 05-8003 (D.C.Cir. ___).

> FN4. *Khalid v. Bush,* 2005 WL 100924 (D.D.C. Jan.19, 2005), *appeal docketed,* No. 05-5063 (D.C.Cir. ___).

Fearful that the Government would transfer the detainees to other countries to avoid further adverse court rulings, the Petitioners have sought a preliminary injunction from Judge Kennedy to require 30-days prior notice of any such transfer. The Government filed its opposition to that petition on March 8, 2005 and described in detail the nature of its process for considering transfer of GTMO detainees. While that process involves high-level contacts between the U.S. Department of State and a foreign government, as well as consideration of a detainee's status by the U.S. Department of Defense, it does not contemplate any coordination or notice to the courts, where constitutional issues are being litigated, or notice to the detainees' counsel.

## LEGAL STANDARDS

**\*2** A TRO may be granted "without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition...." Fed. R. Civ. P. 65(b). The purpose of a TRO is to preserve the status quo and prevent irreparable harm until a hearing can be held. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters,* 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).

In considering a request for a TRO, the court must examine whether: "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO,* 166 F.3d 356, 360 (D.C.Cir.1999). These factors interrelate on a sliding scale and must be balanced against each other. *Id.* at 361. A strong showing on one factor can outbalance a weaker showing on another.

Where the balance of hardships tips decidedly toward the movant, it will " 'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." ' *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C.Cir.1977) (citation omitted). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Id.* at 844.

## ANALYSIS

The analysis here needs to define the rights at issue. Petitioners have a pending motion for a preliminary injunction ("PI") to obtain prior notice before they may be transferred to a foreign country for continued detention and, perhaps, interrogation by techniques that may be contrary to the laws of this country. Their motion for a PI, in turn, is designed to protect the Petitioners' rights to have the lawfulness of their current detention at GTMO ruled on by the Court of Appeals.

As defined by the Supreme Court, " 'the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." ' *Rasul,* --- U.S. at ----, 124 S.Ct. at 2692 (quoting *INS v. St. Cyr,* 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)). "Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land." *Id.* (quoting *Shaughnessy v. United States ex. rel. Mezei,* 345 U.S. 206, 218-219, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (Jackson, J., dissenting)). The "law of the land" is interpreted and applied in this country by its court systems.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 3
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
**(Cite as: 2005 WL 589812 (D.D.C.))**

\*3 Detainees at GTMO may be transferred to the control of another government, generally to their country of citizenship, for release. Respondents' Memorandum in Opposition to Petitioners' Motion for Order Requiring Advance Notice of Any Repatriations or Transfers From Guantanamo ("U.S.Opp.") at 3; Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman ("Waxman Decl.") ¶ 3; Declaration of Ambassador Pierre-Richard Prosper ("Prosper Decl.") ¶ 3. "The United States also transfers Guantanamo detainees, under appropriate conditions, to the control of other governments for investigation and possible prosecution and continued detention when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies." U.S. Opp. at 3; *see also* Pets.' Motion, Exh. F.

The Petitioners have adequately shown that they could face continued detention at the request of the United States, or as a condition of their release from GTMO set by the United States, in any country to which they might be transferred even if, after the transfer, that foreign nation assumed full responsibility and control over their terms of incarceration and the United States fully relinquished such responsibility and control.

A. *Likelihood of Success on the Merits*

*Habeas corpus* challenges the detention of the petitioner. The Government wants at least some of the GTMO detainees to remain in detention, even if transferred to the control of foreign nation. Once transferred, however, their *habeas* petitions would become moot because the courts in the United States would no longer have control over their warden.

The Government argues to Judge Kennedy, in its opposition to the Petitioners' request for a preliminary injunction, that "[t]here is no legal basis for judicial intervention in the processes by which enemy combatant detainees are repatriated or transferred, and any such interference would illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." U.S. Opp. at 1. Obviously, the Petitioners' request for 30-days advance notice of any transfer is not at issue here and will not be decided. For purposes of the TRO, however, the Court finds that it would not be necessary in any way to intrude into foreign relations or negotiations over repatriation or transfer. The Court need only assess whether removing the

detainees from the jurisdiction of the Court--while insisting on their continued detention--is subject to a temporary injunction so that the legality of that detention *ab initio* can be determined and the trial judge can decide whether prior notice is appropriate. These issues are " 'so serious, substantial, difficult and doubtful" ' as to warrant maintaining the status quo "whether or not movant has shown a mathematical probability of success." *Washington Metro. Area Transit Comm'n,* 559 F.2d at 844 (citation omitted).

\*4 There is no doubt that the district courts have jurisdiction over the Petitioners' *habeas corpus* petitions. *Rasul,* --- U.S. at ----, 124 S.Ct. at 2698. There is also no doubt that "the All Writs Act, 28 U.S.C. § 1651(a), empowers a district court to issue injunctions to protect its jurisdiction...." *SEC v. Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C.Cir.1996). The Government resists this conclusion by arguing that Judge Green stayed these cases "for all purposes" and that there is no jurisdiction remaining in the district court. The Court disagrees.

The appeal from Judge Green's ruling is interlocutory; the rest of the case remains with Judge Kennedy and with the undersigned as the emergency motions judge. Because Judge Green's ruling was so fundamental to the very rights of these litigants in the federal courts--and because Judge Leon's ruling disagreed--Judge Green ordered an administrative stay to save time, money and judicial resources. Such a stay could not be read to also deprive the Petitioners of their rights to seek emergency assistance when faced with continued detention at the request of the United States but no venue in which to challenge its legality.

The Court expresses no opinion on the likelihood that Petitioners will succeed in their request for a 30-day notice prior to any transfer to a foreign country. Instead, it rules that the Petitioners have at least a fifty-fifty chance of prevailing on their constitutional claims before the Court of Appeals and that they raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, while insisting on continued detention, is within the province of the executive.

B. *Irreparable Harm*

Were the Petitioners to be transferred to the control of a foreign country, they would effectively lose their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
**(Cite as: 2005 WL 589812 (D.D.C.))**

rights to pursue their *habeas* claims in this country. The Court finds that their injury would be continued detention outside the jurisdiction of U.S. courts-- courts that are actively reviewing the constitutionality of that very detention. While the Supreme Court has granted them a right of access to our court system, such a transfer would terminate that right, insofar as it sounds in *habeas corpus,* because U.S. courts would no longer have control over their warden. Presumably, the Petitioners would suffer no harm if the Government were to transfer them to Yemen for release; that is the goal of their *habeas* petitions. A transfer with continued indeterminate detention with no right of review or further court access poses a very different set of parameters. With or without the allegation of improper forms of interrogation in a foreign country, the Court concludes that a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners.

Nonetheless, the Court pauses over whether the Petitioners have shown the immediacy of potential harm that justifies a TRO before the Government or its attorney could be heard. Fed. R. Civ. P. 65(b) (TRO may be granted without notice only if "it clearly appears from specific facts ... that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition."). The only evidence of immediacy here is third- or fourth-hand hearsay: co-counsel at the Center for Constitutional Rights told Petitioners' counsel that s/he was informed by an unnamed person that another unnamed source confided that the Government intends to transfer many detainees--who may or may not include any of the instant Petitioners--"very quickly." The reliability of such information cannot be ascertained. Yet the Government has already denied a request from counsel for the Petitioners that it informally agree to give advance notice of any transfer and it clearly regards such notice as an intrusion into the executive sphere of foreign relations. Consequently, the Petitioners state that they filed *ex parte* to avoid precipitating any hasty action by the Government to avoid addressing such transfers-and-continued-detention in a U.S. court.

**\*5** What is evident from the record is that the Pentagon and the State Department are working together to arrange for some numbers of unspecified GTMO detainees to be transferred to foreign nations and detained for uncertain periods. The Government refuses to give any advance notice of such transfers. Approximately 200 detainees have already been

transferred, sixty-five of whom were sent abroad on the condition that they continue to be detained. Prosper Decl. ¶ 2. "Of those 65 detainees who have been transferred to the control of host governments, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to Morocco, 6 to France, 4 to Saudi Arabia, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait, and 1 to Australia." *Id.* That this process continues is acknowledged by the United States. "Among the assurances sought in every transfer case in which continued detention by the government concerned is foreseen is the assurance of humane treatment...." *Id.* ¶ 6. Under these circumstances, the only way that anyone could know that a transfer is about to happen, *i.e.,* be "immediate," is if one is within the chain of command within the federal departments that consult on such matters or if there were information revealed *sotto voce* to a reporter. Based on the totality of the circumstances, the Court finds that the Petitioners face a risk of irreparable harm that is sufficiently immediate to warrant temporary relief.

C. *Injury to the Government*

The Court can see no injury to the Government from granting a temporary injunction here. At most, this injunction will be alive for ten days unless both parties agree to its continuation or Judge Kennedy extends it another ten days. Nothing about this injunction will serve to prevent the Government's diplomatic and other efforts to arrange transfers of Guantanamo Bay detainees but it will ensure that a judicial officer reviews the Petitioners' rights to prior notice and/or retention in this jurisdiction before the Government actually carries out any such transfer.

D. *Injury to the Public Interest*

The Court can see no injury to the public interest from granting a temporary injunction here.

CONCLUSION

For the reasons stated, the *Ex Parte* Motion for a Temporary Restraining Order will be GRANTED. The Temporary Restraining Order accompanies this memorandum opinion.

Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)

**Motions, Pleadings and Filings (Back to top)**

• 1:04cv01254 (Docket) (Jul. 27, 2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
**(Cite as: 2005 WL 589812 (D.D.C.))**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MUHAMMAD AL-ADAHI <u>et al.</u>,          :
                                          :
        Petitioners,                      :
                                          :
        v.                                :        Civil Action No. 05-280 (GK)
                                          :
GEORGE W. BUSH, <u>et al.</u>,            :
                                          :
        Respondents.                      :
                                          :

### <u>ORDER</u>

This matter is before the Court on Petitioners' Motion for Disclosure 30 Days in Advance of any Intended Removal from Guantanamo, which requests a preliminary injunction requiring such notice. On April 4, 2005, the Court entered such a preliminary injunction in <u>Al-Marri v. Bush</u>, No. 04-CV-2035, and <u>Al-Joudi v. Bush</u>, No. 05-CV-301, requiring Respondents to provide Petitioners' counsel and the Court with 30 days' notice prior to transporting or removing Petitioners from Guantanamo Bay Naval Base.

Based on the reasoning set forth in the <u>Al-Marri</u> and <u>Al-Joudi</u> Memorandum Opinions and Orders, it is hereby

**ORDERED** that Petitioners' Motion for Disclosure 30 Days in Advance of any Intended Removal from Guantanamo [#5] is **granted**; it is further

**ORDERED** that the Government shall provide Petitioners' counsel and the Court with 30 days' notice prior to transporting or removing Petitioner from Guantanamo Bay Naval Base; it is further

**ORDERED** that this Order shall remain in effect until the final resolution of Petitioners' habeas claim unless otherwise modified or dissolved; it is further

**ORDERED** that Petitioners' Motion for a Temporary Restraining Order is **denied as moot.**


April 28, 2005
```
    /s/
```
Gladys Kessler
United States District Judge

**Copies to:**  **Attorneys of Record via ECF**

2

Westlaw.

370 F.Supp.2d 188                                                      Page 1
370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.))**

C

**Motions, Pleadings and Filings**

United States District Court,
District of Columbia.
Abdulla Thani Faris AL-ANAZI, et al., Petitioners,
v.
George W. BUSH, et al., Respondents.
**Civ.A. No. 05-0345(JDB).**

April 21, 2005.

**Background:** In habeas proceeding brought by
foreign nationals detained in Guantanamo Bay
military prison, detainees moved for a preliminary
injunction requiring government to give detainees'
counsel thirty days' notice prior to
transferring the detainees to any location outside the
United States.

 **Holding:** The District Court, Bates, J., held that
detainees were not entitled to preliminary injunction.
 Motion denied.

West Headnotes

**[1] Injunction** 🗝138.1
212k138.1 Most Cited Cases
To prevail on a motion for a preliminary injunction,
petitioners must demonstrate: (1) a substantial
likelihood of success on the merits, (2) that they will
suffer irreparable harm absent the relief requested,
(3) that other interested parties will not be harmed if
the requested relief is granted, and (4) that the public
interest supports granting the requested relief.

**[2] Injunction** 🗝132
212k132 Most Cited Cases
Because preliminary injunctions are extraordinary
forms of judicial relief, courts should grant them
sparingly.

**[3] Habeas Corpus** 🗝678.1
197k678.1 Most Cited Cases

**[3] War and National Emergency** 🗝11
402k11 Most Cited Cases
        (Formerly 212k138.60)
Detainees who brought habeas proceeding to

challenge their detention in military facility were not
entitled to preliminary injunction requiring thirty
days' notice of their transfer to foreign countries; no
legal provision prohibited transfer of wartime
detainees to other countries and there was no
evidence that Department of Defense (DOD) was
transferring detainees to foreign countries for any
illicit purpose, and government's foreign relations
would be impeded by potential judicial inquiries.

**[4] Habeas Corpus** 🗝679
197k679 Most Cited Cases
In the interest of judicial economy and avoiding
unnecessary litigation, stay, pending resolution of
appeals in similar cases, was warranted in habeas
proceeding brought by foreign nationals being
detained in military prison facility.

**[5] Habeas Corpus** 🗝688
197k688 Most Cited Cases
Government would be required to produce factual
returns regarding foreign nationals being detained in
military prison facility at Guantanamo Bay; returns
were necessary for detainees' counsel effectively to
represent the detainees in their habeas proceeding.
 *189 David A. Hickerson, Weil, Gotshal & Manges,
L.L.P., Washington, DC, for petitioners.

 Terry Marcus Henry, U.S. Department of Justice,
Civil Division, Washington, DC, for respondents.

***MEMORANDUM OPINION***

 BATES, District Judge.

 **\*\*1** Petitioners Abdulla Thani Faris Al-Anazi, Adel
Egla Hussan Al-Nussairi, N.A.O., [FN1] Abdulaziz
Sa'ad Oshan, and Ibrahim Suleiman Al-Rubaish
(collectively the "petitioners") have filed a petition
for a writ of habeas corpus challenging the legality of
their detention by the United States at the United
States Naval Station at Guantanamo Bay, Cuba
("Guantanamo"). Presently before the Court is
petitioners' motion for a preliminary injunction
pursuant to Fed.R.Civ.P. 65 and the All Writs Act, 28
U.S.C. § 1651, which as it has evolved now seeks an
order requiring respondents to provide petitioners'
counsel with 30-days' notice of any proposed transfer
of petitioners from Guantanamo to any location
outside of the United States. For the reasons that
follow, the Court denies petitioners' motion. [FN2]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188                                                                                                    Page 2
370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.))**

FN1. Petitioner N.A.O. was a minor at the time he was first detained at Guantanamo, and hence is referred to by his initials only.

FN2. Several other issues are also before the Court, including respondents' motion to stay proceedings. Those issues will be addressed in this opinion as well.

## BACKGROUND
**I. Procedural History**

Petitioners have been detained by the United States at Guantanamo for approximately the last three years. On February 17, 2005, they filed a petition for a writ of habeas corpus in this Court seeking, among other forms of relief, their release from the custody of the United States. This petition is similar to many others filed **\*190** by Guantanamo detainees in the United States District Court for the District of Columbia both before and since the Supreme Court held in _Rasul v. Bush_, 542 U.S. 466, 124 S.Ct. 2686, 2698, 159 L.Ed.2d 548 (2004), that the federal habeas statute "confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base."

Late last year, eleven petitions advancing the claims of several dozen detainees were consolidated for further proceedings before Judge Joyce Hens Green, including a petition assigned to this judge, _O.K. v. Bush_, No. 04-CV-1136. On January 31, 2005, Judge Green granted in part and denied in part the government's motion to dismiss, holding that the Guantanamo detainees before her possessed constitutional and other legal grounds to challenge their detention. _See In re Guantanamo Detainee Cases_, 355 F.Supp.2d 443, 481 (D.D.C.2005). Almost simultaneously, on January 19, 2005, Judge Richard Leon of this Court granted the government's motion to dismiss the habeas petitions of two other Guantanamo detainees, concluding that there was no constitutional or other basis to challenge their detention. _See Khalid v. Bush_, 355 F.Supp.2d 311, 314 (D.D.C.2005). Those cases have been consolidated on appeal before the United States Court of Appeals for the District of Columbia Circuit. On February 3, 2005, Judge Green issued a stay in the eleven consolidated cases pending the appeal.

**II. Transfers From Guantanamo**

On March 17, 2005, petitioners filed a motion for preliminary injunction. Although originally framed as an attempt to enjoin respondents from effectuating the transfer of petitioners from Guantanamo, the motion is now confined to the alternative request that respondents provide 30-days' notice (once a transfer has been decided) before a transfer actually occurs. The motion appears to have been prompted by a number of newspaper articles recently published about the transfer of detainees. Petitioners rely most heavily on an article in the March 11, 2005, edition of the New York Times reporting that the Pentagon is seeking to enlist the assistance of other departments in the United States government "in a plan to cut by more than half the population at its detention facility in Guantanamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials." Douglas Jehl, _Pentagon Seeks to Shift Inmates from Cuba Base,_ N.Y. Times, Mar. 11, 2005, at A1.

**\*\*2** Petitioners also cite articles discussing an alleged practice known as "rendition." Under this procedure, the Central Intelligence Agency ("CIA") allegedly transfers foreign nationals from one country to another, where the receiving governments are expected to carry out the will of the United States. In one article, a former detainee alleged that prior to being moved to Guantanamo, he had been transferred to Egypt and questioned there by United States officials. _See_ Megan K. Stack and Bob Drogin, _Detainee Says U.S. Handed Him Over for Torture,_ L.A. Times, Jan. 13, 2005, at A1. Petitioners also cite an article discussing the case of a Syrian-born Canadian citizen who alleged that he was detained by the United States at Kennedy Airport immediately following September 11, 2001, and then transported to Syria, where he was interrogated and tortured before being released and returned to Canada. _See_ Pet'rs' Mem. ¶ 7; Douglas Jehl and David Johnson, _Rule Change Lets CIA Freely Send Suspects Abroad,_ N.Y. Times, Mar. 6, 2005, at A1. Petitioners concede that none of these incidents involve the transfer of detainees out of **\*191** Guantanamo. _See_ Transcript of Motions Hearing ("Tr.") at 12:20-13:5 (April 13, 2005). Even the New York Times article on which they place the greatest weight notes the distinction between Guantanamo transfers and CIA rendition:

Unlike the Pentagon, the C.I.A. was authorized by President Bush after the Sept. 11 attacks to transfer prisoners from one foreign country to another without case-by-case approval from other government departments. Former intelligence officials said that the C.I.A. has carried out 100 to 150 such transfers, known as renditions, since Sept.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188                                                                                         Page 3
370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.))**

11. By contrast, the transfers carried out by the Pentagon are subject to strict rules requiring intraagency approval. Officials said that the transfers do not constitute renditions under the Pentagon's definition, because the government that accept the prisoners are not expected to carry out the will of the United States.
*Id.*

In response to petitioners' claims, respondents have submitted to the Court declarations from two high-ranking Department of Defense and Department of State officials describing the procedures that govern the detention and transfer of Guantanamo detainees. *See* Decl. of Matthew C. Waxman ("Waxman Decl."); Second Decl. of Matthew C. Waxman ("Second Waxman Decl."); Decl. of Pierre-Richard Prosper ("Prosper Decl."). The officials state that the United States has no interest in detaining the 540 foreign nationals presently at Guantanamo any longer than necessary, and that the Department of Defense ("DOD") therefore conducts at least an annual review of whether each detainee merits continued detention. Waxman Decl. ¶ 3.

The officials further explain that when detention is no longer deemed necessary, the DOD may transfer the detainee to the control of another country with the understanding that the country will release the individual. *Id.* Where the "appropriate conditions" exist, the DOD will also transfer detainees "to the control of other governments for investigation and possible prosecution and continued detention when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the United States and its allies." *Id.* Such governments can include the government of a detainee's home country, or a country other than the detainee's home country that may have law enforcement or prosecution interest in the detainee. *Id.*

**\*3** As of April 13, 2005, two hundred and fourteen (214) detainees had been transferred from Guantanamo. *Id.*; Second Waxman Decl. ¶ 2. Of those, one hundred forty-nine (149) were transferred for release and sixty-five (65) were transferred for continued custody. Waxman Decl. ¶ 4; Second Waxman Decl. ¶ 2. [FN3] Each of the 65 detainees transferred for custody has been transferred to his home government. *Id.* ¶ 4. Most of those 65 have subsequently been released as well. *Id.* ¶ 5. Respondents also indicated at the April 13, 2005 motions hearing that some detainees transferred for

release have in fact been detained by their home governments. In the cases where a detainee is transferred for continued detention by the detainee's home government, DOD "does not ask or **\*192** direct the receiving government to detain the individual on behalf of the United States," and "the detainees are no longer subject to the control of the United States once they are transferred." *Id.*

> FN3. An April 19, 2005 DOD News Release indicates that an additional 18 detainees were recently transferred for release, bringing the total to two hundred thirty-two (232) transferred and one hundred sixty-seven (167) transferred for release. *See* Department of Defense, *Detainee Transfer Announced*, Apr. 19, 2005, *available at* http://www.defenselink.mil/releases/2005/nr20050 419-2661.html (last visited April 20, 2005).

Once a transfer is proposed, DOD consults other interested parties in the United States government, and in particular the Department of State. *Id.* ¶ 6. The Department of State is responsible for initiating discussions with the foreign government regarding transfer. Prosper Decl. ¶ 6. The purpose of these discussions is to learn the measures that the foreign government will take to ensure the detainee does not pose a continuing threat to the United States or its allies, and to receive appropriate assurances regarding the transfer. *Id.* The necessary assurances include assurances that the detainee will be humanely treated in accordance with international obligations. *Id.* If the foreign government is a party to the relevant treaties, i.e., the Torture Convention, the Department of State will pursue further assurances. *Id.*

Decisions regarding assurances from a foreign government are made on a case-by-case basis, considering the particular circumstances of the transfer, country, and individual involved and concerns regarding possible torture and persecution. *Id.* ¶ 7. The essential question in evaluating the assurances regarding treatment of a detainee proposed for transfer is whether the Department of State officials "believe it is more likely than not that the individual will be tortured in the country to which he is being transferred." *Id.* ¶ 8. When making this determination, the United States considers the identity, position, and information concerning the official providing the assurances, as well as political or legal developments in the country. *Id.* The Department of State also considers the United States diplomatic relations with the foreign government in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.))**

assessing the sufficiency of assurances received, and will in some instances seek access to the individual by governmental and non-governmental entities in the foreign country in order to monitor the individual's return. *Id.* In the past, DOD has decided against the transfer of detainees because of concerns about torture in countries of origin. Waxman Decl. ¶ 7.

**\*\*4** On the basis of their newspaper articles, and notwithstanding respondents' declarations, petitioners have asked this Court to issue a preliminary injunction ordering respondents to provide 30-days' notice prior to any transfer of a petitioner from Guantanamo. Because such advance notice would be provided only after DOD has decided to transfer a detainee, petitioners concede, as they must, that they are essentially requesting an order preventing the United States from transferring any Guantanamo detainee for 30 days. *See* Tr. at 4:1-4:15. Other Guantanamo detainees have filed similar motions for preliminary injunctions before other judges in this District seeking notice prior to any transfer from Guantanamo. Generally, other judges have ordered some form of the requested 30-days' notice, either by granting the motion for preliminary injunction, *see Abdah v. Bush, No. 04-CV-1254, 2005 WL 711814 (HHK) (March 29, 2005 Order); Al-Joudi v. Bush, No. 05-CV-0301, 2005 WL 774847 (GK) (April 4, 2005 Order)*, by including the 30- days' notice as a condition of granting respondents' motion to stay the case, *see Abdullah v. Bush*, No. 05-CV-0023 (RWR) (March 16, 2005 Order), or by requiring the 30-days' notice pursuant to the All Writs Act, *see Ameziane v. Bush, No. 05-CV-0392, 2005 WL 839542 (ESH) (April 12, 2005 Order)*. In one other case, *Almurbati v. Bush, 366 F.Supp.2d 72 (D.D.C.2005)* (April 14, 2005 Order), the court denied the requested 30-days' notice. In addition to the motion for a preliminary injunction, also before the **\*193** Court are respondent's motion to stay and petitioners' requests for an order to show cause, entry of a protective order, [FN4] and issuance of factual returns.

> FN4. Neither party opposes the entry of protective orders identical to those entered by Judge Green in the cases consolidated before her.

### *LEGAL STANDARD*

[1] To prevail on their motion for a preliminary injunction, petitioners must demonstrate (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm absent the relief requested; (3) that other interested parties will not be

harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. *Cobell v. Norton, 391 F.3d 251, 258 (D.C.Cir.2004); Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C.Cir.2001); Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1505-06 (D.C.Cir.1995); Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C.Cir.1977).* In determining whether to grant urgent relief, a court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C.Cir.1995).* "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* It is particularly important for petitioners to demonstrate a substantial likelihood of success on the merits; where a plaintiff cannot show a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO, 166 F.3d 356, 366-67 (D.C.Cir.1999); Nat'l Head Start Ass'n v. Dep't of Health and Human Servs., 297 F.Supp.2d 242, 246 (D.D.C.2004)* (factors "must be balanced against each other, but it is especially important for the movant to demonstrate a likelihood of success on the merits"). [FN5]

> FN5. The test for a stay or injunction pending appeal is essentially the same, *see United States v. Philip Morris, Inc., 314 F.3d 612, 617 (D.C.Cir.2003)* (citing *Holiday Tours, 559 F.2d at 843)*, although courts often recast the likelihood of success factor as requiring only that the movant demonstrate a serious legal question on appeal where the balance of harms strongly favors a stay, *see Holiday Tours, 559 F.2d at 844* ("fair ground for litigation" or "serious legal question"). *See generally Cuomo v. United States Nuclear Reg. Comm'n, 772 F.2d 972, 978 (D.C.Cir.1985)* (movant must in any event justify the extraordinary remedy).

**\*\*5** [2] Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *Sociedad Anonima Vina Santa Rita v. United States Dep't of the Treasury, 193 F.Supp.2d 6, 13 (D.D.C.2001); see Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C.Cir.1969).* The Supreme Court has stated that " '[i]t frequently is observed that a preliminary injunction is an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188                                                                                                    Page 5
370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.))**

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997); *accord Cobell,* 391 F.3d at 258.

### *ANALYSIS*
### I. Motion for 30-Days' Notice

#### A. Substantial Likelihood of Success on the Merits

[3] Petitioners argue that they have a substantial likelihood of succeeding on the merits of their claims because Judge Green has already denied respondents' motion to dismiss in the consolidated habeas petitions challenging the legality of their detention at Guantanamo. The Court agrees that the appeals from Judge *194 Green's and Judge Leon's decisions raise at least a serious question of law. However, the presence of a sound basis to challenge the legality of one's *detention* does not at all imply that there exists a sound basis to challenge the legality of one's *transfer.* Put differently, the "merits", if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their *transfer* from Guantanamo, not their *detention* at Guantanamo.

Petitioners have not come forward with any legal authority that can be read to prohibit the transfer of Guantanamo detainees to a foreign country; any evidence that the United States is transferring Guantanamo detainees to foreign countries for an illicit purpose; or any reason to doubt the statements in the sworn declarations of high-level Department of Defense and Department of State officials that the United States relinquishes control of the detainees upon transfer to the foreign state and obtains all assurances necessary under the law from the foreign state that the detainee will be treated humanely upon transfer.

Petitioners contend that because they may face torture by a foreign state upon transfer, an injunction should issue. However, they do not identify a single legal provision that prohibits or even limits the transfer of wartime detainees to other countries. They reference in their papers the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note), which states that it "shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are

substantial grounds for believing the person would be in danger of being subjected to torture." FARRA § 2242(a). However, FARRA also expressly states that this "policy" shall not be "construed as providing any court jurisdiction to consider or review claims raised under the Convention [Against Torture] [FN6] or this section ... except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act." *Id.* § 2242(d). Petitioners do not attempt to explain how this language is consistent with the recognition of binding rights under FARRA outside of the context of a final order of removal. *See, e.g., Cornejo-Barreto v. Siefert,* 379 F.3d 1075, 1086 (9th Cir.2004) ("While § 2242(d) plainly contemplates judicial review of final orders of removal for compliance with the Torture Convention and the FARR Act, it just as plainly does not contemplate judicial review for anything else."), *vacated as moot,* 389 F.3d 1307 (9th Cir.2004) (en banc).

> FN6. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 46, U.N. GAOR 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984), reprinted in 23 I.L.M. 1027 (1984).

**6 Counseling even further against judicial interference in the transfer of detainees to other countries is a well-established line of cases in the extradition context holding that courts will not conduct an inquiry into "the procedures or treatment which await a surrendered fugitive in the requesting country." *United States v. Kin-Hong,* 110 F.3d 103, 110 (1st Cir.1997) (quotation omitted). Known as the "rule of non-inquiry," this doctrine is "shaped by concerns about institutional competence and by notions of separation of powers," and stands for the general proposition that "it is the function of the Secretary of State--not the courts--to determine whether extradition should be denied on humanitarian grounds." *Kin-Hong,* 110 F.3d at 110; *Sidali v. INS,* 107 F.3d 191, 195 n. 7 (3d Cir.1997); *see also *195Ahmad v. Wigen,* 910 F.2d 1063, 1067 (2d Cir.1990) ("The interests of international comity are ill-served by requiring a foreign nation ... to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced."); *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir.1980) ("[T]he degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch.") (citations and quotations omitted). The same separation of powers principles

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188                                                                                      Page 6
370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.))**

underlying the rule of non-inquiry have been applied outside of the non-extradition context to limit judicial review of the treatment of individuals in a foreign state. *See Holmes v. Laird,* 459 F.2d 1211, 1215 (D.C.Cir.1972) ("In situations such as this, the controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them we must move with the circumspection appropriate when a court is adjudicating issues inevitably entangled in the conduct of our foreign relations.") (citations and quotations omitted); *see also People's Mojahedin Org. v. Dep't of State,* 182 F.3d 17, 23 (D.C.Cir.1999) (holding that foreign policy decisions by the Executive "are political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry" (quotation omitted)).

Besides requesting an order to block the transfer on humanitarian grounds, petitioners also invoke the broad authority of the Court under the All Writs Act, on the theory that 30-days' notice (followed by judicial review of the grounds of transfer) is necessary to protect the Court's jurisdiction over petitioners' habeas petitions. *See* Pet'rs' Mem. ¶ ¶ 11-13. Petitioners' concern is that upon transfer for continued detention elsewhere, petitioners would lose their rights to have the legality of their detention adjudicated by this Court. *Id.* ¶ 13.

The All Writs Act empowers a district court to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651; *SEC v. Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C.Cir.1996) (All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction"). Like a motion for a preliminary injunction, the All Writs Act is an extraordinary remedy pursuant to which a court may "enjoin almost any conduct which, left unchecked, would have ... the practical effect of diminishing the court's power to bring the litigation to a natural conclusion." *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1102 (11th Cir.2004) (quotation omitted); *see also Alabama Great S. Ry. Co. v. Thompson,* 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906) (federal courts "may and should take such action as will defeat attempts to wrongfully deprive parties of the protection of their rights in those tribunals").

**\*\*7** At the outset, there is no evidence in the record that respondents are seeking to thwart this Court's

jurisdiction. Petitioners have provided the Court with no evidence whatsoever that DOD is transferring (or planning to transfer) Guantanamo detainees as a pretext for continuing United States detention in collusion with a foreign state (or on its own) on foreign soil. Respondents have submitted declarations stating emphatically that this is not the practice of DOD. *See* Waxman Decl. ¶ 5 (DOD "does not ask or direct the receiving government to detain the individual on behalf of the United States. Accordingly, the detainees are no longer subject to the control of the United States once they are transferred."); *id.* ¶ 4 ("[T]here [is no] plan to effect transfers of GTMO detainees in order to thwart the actual or putative **\*196** jurisdiction of any court with respect to the detainees."). [FN7] Even the newspaper articles on which petitioner stake their motion draw a clear distinction between alleged acts of CIA rendition (where the foreign countries are "expected to carry out the will of the United States") and the alleged Guantanamo transfers (where the foreign countries are not "expected to carry out the will of the United States"). *See* Jehl, *supra,* at A1.

> FN7. Of the 232 detainees that have been transferred from Guantanamo as of the date of this opinion, 131 were transferred at least three months prior to the Supreme Court's decision in *Rasul v. Bush* recognizing the jurisdiction of the federal courts over the habeas petitions of Guantanamo detainees, thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer to thwart the jurisdiction of the courts. *See* Department of Defense, *Transfer of Afghani and Pakistani Detainees Complete* (March 15, 2004) *available at* http:// www.defenselink.mil/releases/2004/nr20040 315-0462.html (last visited April 20, 2005).

More importantly though, there is no justification for issuance of an injunction pursuant to the All Writs Act when petitioners are obtaining the same relief through transfer that they could hope to obtain through habeas. In this case, petitioners have properly invoked this Court's jurisdiction under habeas to determine the legality of their detention. *See Rasul,* 124 S.Ct. at 2698; Pet. at 28. Now, however, petitioners want this Court, pursuant to the All Writs Act, to delay or even block their release so that petitioners can fully adjudicate their habeas petitions. *See* Pet'rs' Mem. ¶ 13. But there is no basis for the Court to maintain its jurisdiction to consider such extraordinary relief when the record shows that petitioners would obtain the same level of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-02367-UNA    Document 12-11    Filed 01/04/2006    Page 21 of 41

370 F.Supp.2d 188                                                          Page 7
370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.))**

relief via transfer that they could get from full adjudication of their habeas petition. Were the Court to preserve its jurisdiction over the habeas petitions, and ultimately determine that the United States may no longer detain the petitioners, the parties and the Court would find themselves in precisely the same position in which they find themselves now--with the respondents taking steps to transfer those individuals out of United States control, and the petitioners compelled to come forward with some legal or evidentiary basis to prevent a transfer to an "undesireable" country. If respondents release petitioners now, that in no way prevents the "natural conclusion" of this litigation, i.e., release of petitioners, and therefore there is no basis for this Court to issue an injunction pursuant to the All Writs Act. *See Klay,* 376 F.3d at 1102.

The Court emphasizes that it reaches this result today based on the record with which it is presented--there is no evidence that DOD is transferring Guantanamo detainees to foreign countries for an illicit purpose, and quite a bit of evidence to the contrary (including petitioners' own newspaper articles and, more importantly, the declarations of high level government officials). [FN8] Respondents indicated at the hearing on petitioners' motion that they share the view of the Court that they have an ongoing obligation to inform the Court if DOD were to begin transferring Guantanamo detainees overseas for continuing *197 United States custody (either on its own or in collusion with a foreign state). On the current record, however, there is simply no basis in law or fact to challenge the transfer of Guantanamo Bay detainees to a foreign country. [FN9]

>    FN8. The Court is aware of and sensitive to
>    the fact that petitioners' counsel have not yet
>    had the opportunity to meet with petitioners,
>    and as a more general matter do not have
>    access to the often classified information
>    that would shine light on the detention and
>    possible transfer of petitioners. None of this
>    relieves petitioners of the burden of coming
>    forward with *at least some* information to
>    support their request for the extraordinary
>    relief of a preliminary injunction against the
>    transfer of these detainees. The Court notes
>    that petitioners' counsel indicated at the
>    April 13, 2005 hearing that a meeting with
>    clients will occur after counsel receives the
>    necessary security clearance.

>    FN9. Petitioners have cited this Court's

decision in *Abu Ali v. Ashcroft,* 350 F.Supp.2d 28 (D.D.C.2004), in which the Court held that jurisdiction could potentially exist over a habeas petition by a United States citizen detained in a Saudi prison who alleged that he was being held at the behest and ongoing direction of the United States, as an example of a case where the United States was using a foreign intermediary to avoid the jurisdiction of the United States courts. *See* Pet'rs' Mem. ¶ 9. *Abu Ali* is not particularly instructive here. This Court's decision in *Abu Ali* was at the motion to dismiss stage, where the Court was obliged to accept petitioners' allegations of collusion between the United States and Saudi Arabia as true. *Abu Ali,* 350 F.Supp.2d at 34-35. Here, petitioners bear the heavy burden of proving their entitlement to preliminary injunctive relief. Moreover, the petitioners in *Abu Ali* came forward with a variety of different types of information suggesting United States involvement in the detention, including newspaper articles quoting named United States officials, declarations containing the transcribed text of government documents, and affidavits regarding communications between petitioner's family and Saudi officials. *Id.* at 31-36. Here, petitioners have come forward with no information at all suggesting the collusive transfer of Guantanamo Bay detainees. In addition, although the United States chose not to respond to the evidence proffered by petitioner in that case, *id.* at 37-38, it has produced strong rebuttal evidence here. Finally, unlike the petitioners in this case, the detainee in *Abu Ali* was a United States citizen, a fact that featured prominently in the reasoning of that case. *Id.* at 37-41, 54- 65.

**B. Irreparable harm**

**\*\*8** By the same token, petitioners cannot show that they will suffer irreparable harm in the absence of the injunction they seek. The lynchpin of a request for preliminary injunctive relief is a showing of irreparable injury to the movant in the absence of the requested relief. *See Sociedad Anonima,* 193 F.Supp.2d at 13-14. The harm must be concrete and immediate to warrant extraordinary injunctive relief, and vague or speculative injury will not suffice. *See Wisconsin Gas Co. v. Fed. Energy Reg. Comm'n,* 758 F.2d 669, 674 (D.C.Cir.1985) ("the injury must be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

both certain and great; it must be actual and not theoretical"). In short, the threatened injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, because injunctions are not intended "to prevent injuries neither extant nor presently threatened, but only merely feared." *Comm. in Solidarity v. Sessions, 929 F.2d 742, 745-46 (D.C.Cir.1991)* (quotations omitted).

In this case, the evidence presented by petitioners--or the lack thereof-- balanced with the sworn declarations of high level government officials, fails to establish that petitioners face irreparable harm in the absence of 30-days' advance notice of transfer. As indicated earlier, there is no evidence at all that petitioners are being transferred for the purpose of torture or in inappropriate collusion with a foreign government. Although petitioners express concern about how they might be treated by a foreign state if they are transferred, not only have they identified no legal basis for judicial intervention on their behalf to protect them from the treatment of a foreign state, but they also cannot explain how they would be aided by 30-days' notice of transfer. Petitioners indicated at the motions hearing that they are most concerned about the possibility of United States involvement in the ongoing detention or torture of transferred detainees, but they do not explain how they could possibly obtain any evidence suggesting that was the plan of the United States in the 30-day window they would have before *198 a transfer. To the extent that notice would therefore in reality be a precursor as a matter of course to an objection to transfer and months of discovery into the intent of the United States and the foreign states then the substantial injury to the government (discussed below) becomes all the more pronounced in weighing the respective harms to the parties.

To be sure, if the United States were transferring detainees abroad specifically to thwart this Court's jurisdiction, that might establish irreparable harm. But petitioners would have to provide some evidence of such conduct, for example by showing that detainees were being transferred to other countries at the behest of, and to serve the interests of, the United States. This they have not done. Moreover, as discussed above, petitioners have not shown how they would actually be harmed by an alleged loss of jurisdiction. Every habeas petition, including this one, is ultimately about obtaining release from detention, *see Rasul*, 124 S.Ct. at 2692, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing

more the Court could provide to petitioners. [FN10]

> FN10. This Court has no authority to prevent a foreign sovereign from pursuing an independent law enforcement action against a detainee, or to order the United States to transfer a detainee to the country of his choosing. Such matters involve diplomatic and foreign policy considerations, which are generally the exclusive purview of the Executive.

**\*\*9** Petitioners' showing of irreparable harm is thus highly speculative and well short of the necessary certainty for the issuance of a preliminary injunction. *See Wisconsin Gas Co., 758 F.2d at 674.* At its core, the alleged irreparable harm is founded on fear and mistrust. It may be understandable for petitioners and their counsel to mistrust the Executive, but this Court cannot rule based on petitioners' speculation, innuendo, and mistrust. The role of the judiciary is a simple one--determine facts and apply the law to those facts to reach a decision. The Court will not abdicate that fundamental role here. On the record before the Court, and the applicable legal standard, petitioners have not established the requisite threat of irreparable harm.

### C. Harm to Respondents

The third prong of the preliminary injunction test considers the harm that injunctive relief would impose on other interested parties. *See Cobell, 391 F.3d at 258.* Respondents have explained that the notice, and the judicial review of the transfer that would follow, would render agreements with foreign states contingent and therefore impede the ability of the United States to communicate with foreign nations with a single voice, would chill the frank discussions with foreign governments that are essential to diplomatic relations, and will give foreign states pause before accepting Guantanamo detainees when they are informed that the acceptance carries the condition of a period of delay and then potential inquiry by a United States court into the communications between the United States and the foreign state and even into the treatment the foreign state anticipates providing the detainee following transfer. *See generally* Resp'ts' Opp. at 22; Tr. at 68-69; Prosper Decl. ¶ 12. These are considerable concerns. *See Crosby v. National Foreign Trade Council, 530 U.S. 363, 381, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)* (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with

370 F.Supp.2d 188                                                                                            Page 9
370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.))**

other governments"). Petitioners' only response is that they are unlikely to contest many transfers, which even if true does little to assuage these concerns because it is the *possibility* of judicial review in any particular case that will hamstring discussions *199 with foreign states. The substantial harm to the Executive in carrying out its foreign relations militates strongly against the injunction sought in this case.

**D. Public Interest**

Finally, there is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit--and quite a bit of detriment--to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees. *See* People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."). [FN11]

> FN11. Petitioners have suggested that this Court could make the 30- day notice of a proposed transfer a condition of the stay it is issuing in this case. *See infra.* However, the "standards for evaluating a motion for stay pending appeal are substantially the same as those for issuing a preliminary injunction," and so if the petitioners cannot meet the prerequisites of a motion for preliminary injunction (as the Court concludes), it is unlikely that they should receive that same relief through the backdoor of a stay. Laborers' Intern. Union of North America v. National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Div. of Laborers Intern. Union of North America, 1988 WL 142384, at *1 (D.D.C. Dec., 23, 1988). More to the point, perhaps, petitioners have not identified any legal authority that is likely to be interpreted by the Court of Appeals in its consideration of the legality of the detention of Guantanamo detainees that would bear on the question of the transfer of those detainees. In these circumstances, this Court cannot discern a reason why a stay of a *transfer* decision pending Court of Appeals resolution of the *detention* issue would be appropriate. The Court notes that petitioners did not even attempt to argue in their papers that Federal

Rule of Appellate Procedure 23 requires a stay of a transfer decision, because petitioners' habeas petition is not presently on appeal.

**II. Motion to Stay**

**\*\*10** [4] Respondents have filed a motion to stay this case pending resolution of the appeals in *In re Guantanamo Detainee Cases*, 355 F.Supp.2d 443 (D.D.C.2005), and *Khalid v. Bush*, 355 F.Supp.2d 311 (D.D.C.2005), regarding whether the detention of the detainees in those cases violates any source of law. Petitioners have objected to a stay, arguing that the case should proceed on its merits. Other judges of this Court faced with this question have entered stays. *See, e.g., Abdullah v. Bush*, Case No. 05-CV-0023 (RWR) (March 16, 2005 Order); *Ameziane v. Bush*, Case No. 05-CV-0392 (ESH) (April 2, 2005 Order). In the interest of judicial economy and avoiding unnecessary litigation, the Court will grant respondents' motion to stay the case pending appellate review of important issues relating to the rights of Guantanamo detainees to challenge the lawfulness of their detention. Nothing will be gained by this Court addressing issues the D.C. Circuit is about to decide, particularly since a stay would in any event be entered were petitioners to prevail before this Court on those core issues (just as has transpired before Judge Green). In light of the stay, the Court will issue petitioners' requested order to show cause, but stay respondents' obligation to respond.

[5] Petitioners have also requested that respondents produce their factual returns, which DOD has compiled for each Guantanamo detainee. Respondents counter that the production of any factual returns should await the D.C. Circuit's decision. They note that given the large number of habeas corpus petitions, it would be a waste of resources to require production of factual returns before the D.C. Circuit has decided whether they are even necessary. Furthermore, respondents *200 have raised concerns about the security of the factual returns, noting at the motions hearing that there had been an isolated, inadvertent disclosure of classified information in one case. Although the Court is sensitive to the concerns of respondents, the factual returns appear necessary for petitioners' counsel to effectively to represent petitioners. Indeed, even initial conversations by counsel with their clients may be very difficult without access to that basic factual information. Therefore, this Court will require respondents to produce the factual returns for petitioners within one hundred and twenty (120)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188                                                                                                                Page 10
370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)
**(Cite as: 370 F.Supp.2d 188,  2005 WL 1119602 (D.D.C.))**

days.

### CONCLUSION

For the above reasons, petitioners' motion for a preliminary injunction is denied.  The Court will grant respondents' motion to stay the case pending the resolution of the appeals in *In re Guantanamo Detainee Cases* and *Khalid v. Bush.*  However, respondents must file with the Court and provide to petitioners' counsel the factual returns for all petitioners within 120 days. The Court will also enter by reference the protective orders and supplementary orders previously entered by Judge Green in *In re Guantanamo Detainee Cases,* No. 02-CV-0299.  A separate order has been issued.

### ORDER

**\*\*11** Upon consideration of petitioners' motion for a preliminary injunction and respondents' motion to stay, the memoranda of the parties, and the entire record herein, and for the reasons explained in the Memorandum Opinion issued on this date, it is this 21st day of April, 2005, hereby

**ORDERED** that petitioners' motion for a preliminary injunction is **DENIED**; it is further

**ORDERED** that petitioners' motion for an order to show cause is **GRANTED**; it is further

**ORDERED** that respondents' motion to stay the case is **GRANTED**, and respondents' obligation to show cause why the petition should not be granted is stayed; it is further

**ORDERED** that the case shall be stayed pending resolution of the appeals in *In re Guantanamo Detainee Cases,* 355 F.Supp.2d 443 (D.D.C.2005), and *Khalid v. Bush,* 355 F.Supp.2d 311 (D.D.C.2005).  This stay shall not, however, prevent the parties from availing themselves of the procedures set forth in the Orders entered below, nor shall it bar the filing or disposition of any motion for emergency relief; it is further

**ORDERED** that the Court enters by way of reference the protective order and supplementary orders previously entered in *In re Guantanamo Detainee Cases,* No. 02-CV-0299, *et al.,* by Judge Joyce Hens Green.  These include the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, first issued on November 8, 2004; the Order Addressing Designation Procedures for "Protected Information," entered on November

10, 2004;  and the Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order, issued on December 13, 2004;  and it is further

**ORDERED** that respondents shall provide factual returns to the Court and to petitioners' counsel within one hundred twenty (120) days of the date of this Order.

370 F.Supp.2d 188, 2005 WL 1119602 (D.D.C.)

### Motions, Pleadings and Filings (Back to top)

• 1:05cv00345 (Docket) (Feb. 17, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RAFIQ BIN BASHIR BIN JALLUL     :
ALHAMI <u>et al.</u>,              :
                                :
        Petitioners,            :
                                :
        v.                      :        Civil Action No. 05-359 (GK)
                                :
GEORGE W. BUSH, <u>et al.</u>,    :
                                :
        Respondents.            :
_____:

### <u>ORDER</u>

This matter is before the Court on Petitioners' Motion for Order Requiring Respondents to Provide Counsel for Petitioners and the Court with 30 Days' Advance Notice of any Intended Removal of Petitioners from Guantanamo, which requests a preliminary injunction requiring such notice. On April 4, 2005, the Court entered such a preliminary injunction in <u>Al-Marri v. Bush</u>, No. 04-CV-2035, and <u>Al-Joudi v. Bush</u>, No. 05-CV-301, requiring Respondents to provide Petitioners' counsel and the Court with 30 days' notice prior to transporting or removing Petitioners from Guantanamo Bay Naval Base.

Based on the reasoning set forth in the <u>Al-Marri</u> and <u>Al-Joudi</u> Memorandum Opinions and Orders, it is hereby

**ORDERED** that Petitioners' Motion for Order Requiring Respondents to Provide Counsel for Petitioners and the Court with 30 Days' Advance Notice of any Intended Removal of Petitioners from Guantanamo [#10] is **granted**; it is further

**ORDERED** that the Government shall provide Petitioners' counsel and the Court with 30 days' notice prior to transporting or removing Petitioner from Guantanamo Bay Naval Base; it is further

**ORDERED** that this Order shall remain in effect until the final resolution of Petitioners' habeas claim unless otherwise modified or dissolved.


June 9, 2005

/s/_____
Gladys Kessler
United States District Judge

**Copies to: Attorneys of Record via ECF**

2

Westlaw.

Not Reported in F.Supp.2d                                                                              Page 1
Not Reported in F.Supp.2d, 2005 WL 774847 (D.D.C.)
**(Cite as: 2005 WL 774847 (D.D.C.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Majid Abdulla AL-JOUDI, et al., Petitioners,
v.
George W. BUSH, et al., Respondents.
**No. Civ.A. 05-301(GK).**

April 4, 2005.

Julia L. Tarver, Paul, Weiss, Rifkind, Wharton &
Garrison, New York, NY, for Petitioners.

Terry Marcus Henry, U.S. Department of Justice
Civil Division, Washington, DC, for Respondents.

*MEMORANDUM OPINION*

KESSLER, J.

**\*1** Petitioners, four Saudi Arabian nationals, bring
this action against Defendants, seeking release from
the Guantanamo Bay Naval Station ("GTMO") in
Cuba, where they are being detained. [FN1] This
matter is before the Court on Petitioners' Motion for a
Temporary Restraining Order and Preliminary
Injunction Requiring Respondents to Provide
Counsel for Petitioners and the Court with 30-Days'
Advance Notice of Any Intended Removal from
Guantanamo. Upon consideration of the Motion,
Opposition, Reply, and the entire record herein, and
for the reasons stated below, Petitioners' Motion is
granted.

> FN1. Petitioners are Majid Abdulla Al-
> Joudi, Yousif Mohammad Mubarak Al-
> Shehry, Abdul-Hakim Abdul-Raman Al-
> Moosa, and Abdulla Mohammaed Al-
> Ghanmi. There are four other Petitioners,
> who are Next Friends of the detainees. The
> Next Friends obviously are not subject to
> transfer from Guantanamo. All references
> herein will be to the Petitioners who actually
> are being detained.

I. BACKGROUND

A. Procedural History

Petitioners are being detained at GTMO and have
been classified as enemy combatants. [FN2] On
February 9, 2005, they filed a Petition for Writ of
Habeas Corpus in this Court. They are among many
GTMO detainees who have filed such petitions in the
United States District Court for the District of
Columbia since the Supreme Court held that "the
federal courts have jurisdiction to determine the
legality of the Executive's potentially indefinite
detention of individuals who claim to be wholly
innocent of wrongdoing." *Rasul v. Bush*, --- U.S. ----,
----, 124 S.Ct. 2686, 2699, 159 L.Ed.2d 548 (2004).

> FN2. Petitioners' counsel has not yet been
> able to meet with her clients and therefore
> has very limited knowledge of Petitioners'
> precise circumstances. Upon receiving the
> proper security clearances, which counsel
> hopes to obtain in the near future, she will
> travel to Cuba to meet with her client.
> Transcript of Motions Hearing ("Tr.") at 15
> (March 30, 2005).

On January 19, 2005, Judge Richard Leon granted
the Government's Motion to Dismiss the detainees'
Petition for Writ of Habeas Corpus in *Khalid v. Bush,*
355 F.Supp.2d 311 (D.D.C.2005). On January 31,
2005, Judge Green granted in part and denied in part
the Government's Motion to Dismiss in eleven cases
consolidated pursuant to the September 15, 2004,
Resolution of the Executive Session. *In re
Guantanamo Cases*, 355 F.Supp.2d 443
(D.D.C.2005). [FN3] The cases before Judges Leon
and Green have been fully briefed in the United
States Court of Appeals for the District of Columbia
and are under submission.

> FN3. Judge Green's Memorandum Opinion
> and Order did not apply to the instant case,
> which was filed after the release of her
> Opinion.

On February 3, 2005, Judge Green granted a stay in
the eleven cases to which her January 31, 2005,
Opinion and Order applied. A Motion to Stay the
instant case until resolution of *Khalid* and *In Re
Guantanamo Cases* is pending in this Court.

B. Transfers from GTMO

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 774847 (D.D.C.)
**(Cite as: 2005 WL 774847 (D.D.C.))**

Approximately 540 foreign nationals currently are being held at GTMO. Decl. of Matthew C. Waxman ¶ 2 ("Waxman Declaration"). [FN4] The Department of Defense ("DOD") states it is conducting a review of each detainee's case, at least annually, to determine whether continued detention is warranted. *Id.* at ¶ 3. Since the Government began detaining individuals at GTMO, the DOD has transferred 211 detainees to other countries. *Id.* at ¶ 4.

> FN4. Waxman is the Deputy Assistant Secretary of Defense for Detainee Affairs. *Id.* at ¶ 1.

Detainees are subject to two types of transfer: (1) transfer to the custody of another country, with the understanding that they will be released, Tr. at 22-23; and (2) transfer to the custody of another country with the understanding that the country's government has "an independent law enforcement interest" in them and that they likely will face continued detention and processing by that country's judicial system. *Id.* at 24. In each case, the United States loses all control of the detainees once they are transferred to another country. Waxman Decl. at ¶ 5.

*2 Of the 211 detainees who have been transferred, 146 have been transferred with the understanding that they would be released. *Id.* at ¶ 7. The Government represents that most of those individuals actually have been released, Tr. at 29, but it cannot provide precise numbers. *Id.*

Sixty-five detainees have been transferred to the control of other countries for detention. Waxman Decl. at ¶ 7. Of that group, 29 were transferred to Pakistan; 9 to the United Kingdom; 7 to Russia; 5 to Morocco; 6 to France; 4 to Saudi Arabia; and 1 each to Australia, Denmark, Kuwait, Spain, and Sweden. *Id.*

When transfers for detention are being considered, DOD coordinates with various other Government agencies, including the Department of State ("DOS"). *Id.* ¶ 6. The Government states that, as a matter of policy, it does not "repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured." *Id.*

The Government claims that it ensures compliance with this policy by obtaining "assurances" from officials within the foreign government. The process for obtaining such assurances "involves a frank dialogue, discussion, [and] communication with

officials of the other government." Tr. at 32. The Government evaluates the adequacy of the assurances by considering "the identity, position, or other information concerning the official relaying the assurances," Decl. of Pierre-Richard Prosper at ¶ 8 ("Prosper Declaration"); [FN5] political or legal developments in the country that would provide context for the assurances, *id.;* and U.S. relations with the country. *Id.* Senior Government officials ultimately make the final decision on whether to transfer a detainee. Waxman Decl. at ¶ 7. The Government's papers do not indicate which DOD official has this responsibility.

> FN5. Prosper is the Ambassador-at-Large for War Crimes Issues and has supervised the operation of the DOS Office of War Crimes Issues. *Id.* at ¶ 1.

In recent months, a number of newspaper articles about the transfer and treatment of detainees have been published. Some, for example, quote former employees of the United States government who have been involved in transferring detainees to other countries, including countries that practice torture. *See, e.g.,* Dana Priest, *Jet Is an Open Secret in Terror War,* Wash. Post, Dec. 27, 2004, at A1. In addition, some quote by name former Guantanamo detainees who allege that they have been moved by the United States government to countries where they had been tortured. *See, e.g.* Douglas Jehl and David Johnson, *Rule Change Lets C.I.A. Freely Send Suspects Abroad,* N.Y. Times, Mar. 6, 2005, at A1.

On March 11, 2005, an article in The New York Times reported that DOD plans to transfer "hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan, and Yemen." Douglas Jehl, *Pentagon Seeks to Shift Inmates from Cuba Base,* N.Y. Times, Mar. 11, 2005, at A1.

In response to this article, several petitioners, including the Petitioners in the instant case, filed motions for temporary restraining orders and preliminary injunctions. On March 12, 2005, Judge Rosemary Collyer granted a request for a temporary restraining order in *Abdah v. Bush,* No. 04-CV-1254 (D.D.C. March 12, 2005) (order granting temporary restraining order) and denied a similar request in *John Does 1-570 v. Bush,* No. 05-CV-313 (March 12, 2005) (order denying request for temporary restraining order). On March 29, 2005, Judge Henry H. Kennedy granted a Preliminary Injunction in *Abdah.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 774847 (D.D.C.)
**(Cite as: 2005 WL 774847 (D.D.C.))**

**\*3** After the Motion was filed in the instant case, the Government represented to this Court that none of the parties were scheduled for transfer within the next several weeks. In addition, counsel for all parties agreed to a combined hearing on the request for a temporary restraining order and the request for a preliminary injunction. On March 17, 2005, based on those representations, the Court scheduled the hearing on the Motion for March 30, 2005.

## II. STANDARD OF REVIEW

In considering Petitioners' request for a preliminary injunction, the Court must consider four factors: (1) whether Petitioners would suffer irreparable injury if an injunction were not granted; (2) whether Petitioners have a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. Al-*Fayed v. CIA*, 254 F.3d 300, 303 (D.C.Cir.2001). [FN6] "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C.Cir.1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir.1995).

> FN6. The same factors apply when considering a request for a temporary restraining order. Al-*Fayed*, 254 F.3d at 303, n. 2. However, since the Court has granted the Motion for Preliminary Injunction, it is not necessary to apply these factors to their Motion for Temporary Restraining Order.

When the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." ' *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953)). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Id.* at 844.

## III. ANALYSIS

### A. Harm to Petitioners

Petitioners argue that they will suffer irreparable harm if transferred to the custody of another country that practices torture or other inhumane treatment of prisoners. Respondents argue that there is no potential harm to Petitioners, because there is no credible evidence that detainees are being transferred to countries that practice torture; instead, any transfers will be largely for purposes of release. [FN7]

> FN7. The Government also argues that transferring Petitioners from United States custody provides them with the very relief they seek. Tr. at 40. That argument is overly simplistic, however. Petitioners ultimately seek total freedom from all custody, not just United States custody. They can only obtain such relief in this litigation if the Court determines that their underlying detention was unconstitutional or illegal. Furthermore, a determination by a United States court that Petitioners are not enemy combatants might carry significant weight in their home country, thereby facilitating release from custody if they were transferred for continued detention. Finally, on the most human level, proud people have a strong interest in clearing their names from association with acts of violence and terrorism.

Irreparable harm to the moving party is "the basis of injunctive relief in the federal courts." *CityFed Fin. Corp.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). To obtain preliminary injunctive relief, Petitioners must show that the threatened injury is not merely "remote and speculative." *Milk Indus. Found. v. Glickman*, 949 F.Supp. 882, 897 (D.D.C.1996).

**\*4** In this case, there are two obvious and substantial threats to Petitioners. First, they face the possibility of transfer to a country where they might be tortured or indefinitely confined, which undeniably would constitute irreparable harm. While the Government presents declarations that attempt to mitigate these concerns, they neither refute Petitioners' claims nor render them frivolous. [FN8] Indeed, the Government admits that 65 of the 211 detainees transferred to date have been transferred for detention, not release. Several of the 65 have been transferred to countries that our own State Department has acknowledged torture prisoners, including Pakistan, Saudi Arabia,

Not Reported in F.Supp.2d                                                                                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 774847 (D.D.C.)
**(Cite as: 2005 WL 774847 (D.D.C.))**

and Morocco. *See Country Reports on Human Rights Practices--2004,* available at http://www.state.gov/g/drl/rls/hrrpt/2004. Finally, the Government was unable to provide any details about the type or form of "assurances" given, the scope of the monitoring that takes place after transfer, or the consequences of noncompliance. [FN9] Tr. at 32-33. In short, the threatened injury is not merely remote and speculative; it is a serious potential threat.

> FN8. The Court notes that the Government's affidavits do not address the Central Intelligence Agency's involvement in any transfer or "rendition" programs.

> FN9. Notably, the Government was also unaware of several other important facts, such as the availability of extradition treaties with Qatar or Saudi Arabia, or the consequences if a detainee's home country refuses to accept him.

Second, Petitioners face the threat of irreparable harm based on the potential elimination of their habeas claims. It is unclear at this point whether transferring Petitioners would strip this Court of jurisdiction. *See Abdah v. Bush,* No. 04-CV-1254, Slip op. at 7 (D.D.C. March 29, 2005) (transfer to another country "would effectively extinguish [Petitioners'] habeas claims by fiat"); *but see Abu Ali v. Ashcroft,* 350 F.Supp.2d 28, 54 (D.D.C.2004) (holding that an individual detained in Saudi Arabia could survive a motion to dismiss his habeas claim based on the theory of constructive custody). However, given the danger that, upon transfer, the Court could lose jurisdiction to adjudicate Petitioners' claims, it follows that such a transfer could obviate Petitioners' right to "test the legitimacy of [their] executive detention." *Lee v. Reno,* 15 F.Supp.2d 26, 32 (D.D.C.1998). Since such a turn of events would certainly constitute a threat of irreparable harm, an order preserving the status quo in this case is appropriate. [FN10]

> FN10. The Court has the authority to issue such an injunction pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which "empowers a district court to issue injunctions to protect its jurisdiction." *SEC v. Vison Communications, Inc.,* 74 F.3d 287, 291 (D.C.Cir.1996); *see also Abdah v. Bush,* No. 04-CV-1254, slip op. at 7 (March 12, 2004); *Abu Ali,* 350 F.Supp.2d at 54 (quoting *Alabama Great S.R. Co. v. Thompson,* 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441

(1906)) ("It is well-established that 'the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.' ").

Both threats are imminent. While the Court certainly has relied upon the Government's representations that Petitioners will not be transferred in the next several weeks, the Government is clearly maintaining its right to transfer them at any time after the Court rules upon the instant Motion. Thus, the threats are not distant or speculative, and transfer could occur in the near future.

B. Likelihood of Success on the Merits

Petitioners contend that, given Judge Green's Opinion in *In re Guantanamo Cases,* they have a substantial likelihood of success on the merits of their habeas claim. The Government responds that Petitioners' claim would be barred because the treaties under which they seek review are non-self-executing, and because the review sought would encroach upon the foreign policy authority of the executive.

***5** To justify granting a preliminary injunction, Petitioners need not show "a mathematical probability of success." *Washington Metro. Area Transit Comm'n,* 559 F.2d at 844. Rather, "it will ordinarily be enough" that the questions raised are so "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Id.* (quoting *Hamilton Watch Co.,* 206 F.2d at 740).

The exact chances of success in this case are extremely difficult to assess. It is clear, however, that, at a minimum, Petitioners have raised "fair ground [s] for litigation." *Washington Metro. Area Transit Comm'n,* 559 F.2d at 844. The issues raised in these motions are sensitive and involve complex constitutional questions. Indeed, there are areas of disagreement even among the judges on this Bench about the legal issues raised in these Petitions. Like the issues in *Hamdi v. Rumsfeld, Padilla v. Rumsfeld,* and *Rasul,* there is a strong probability that they ultimately will be resolved by the Supreme Court.

For example, there is disagreement about whether the detainees have any constitutional rights at all. *See Khalid,* 355 F.Supp.2d 311 (holding that Guantanamo detainees have no constitutional rights); *but see In re Guantanamo Cases,* 355 F.Supp.2d 311 (holding that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2005 WL 774847 (D.D.C.)
**(Cite as: 2005 WL 774847 (D.D.C.))**

Guantanamo detainees have some constitutional rights. There is also disagreement over whether the Court will lose jurisdiction over the cases if Petitioners are transferred to another country. [FN11] *See Abdah v. Bush,* No. 04-CV-1254, slip op. at 7 (D.D.C. March 29, 2005); *but see Abu Ali v. Ashcroft, 350 F.Supp.2d at 54.* And, there is disagreement about whether the Geneva Conventions are self-executing. *See Hamdan v. Rumsfeld,* 344 F.Supp.2d 152, 164 (D.D.C.2004).

> FN11. The Government also argues that the Supreme Court in *Rasul* failed to protect its jurisdiction over detainees that were transferred. *Rasul,* --- U.S. at ---- n. 1, 124 S.Ct. at 2690 n. 1 (noting that two petitioners had been "released from custody" to the United Kingdom). However, the issue of transfer was not before the Court, and the *Rasul* petitioners were released to the United Kingdom, not a country known to torture its prisoners. *See Country Reports on Human Rights Practices: United Kingdom,* available at http:// wwws.state.gov/g/drl/rls/hrrpt/2004/41716.htm. ("[t]he [British] Government generally respected the human rights of its citizens").

In short, even though the mathematical probability of success is impossible to assess, there can be no doubt that the questions raised here are so "serious, substantial, difficult, and doubtful," as to make them a "fair ground for litigation." *Washington Metro. Area Transit Comm'n,* 559 F.2d at 844.

C. Harm to Government

Petitioners argue that there is absolutely no harm to the Government if it is required to provide the Court and Petitioners' counsel with 30 days' notice before transferring them to another country. The Government contends, however, that there is great potential harm to its ability to conduct negotiations with foreign governments regarding the transfer and subsequent release of GTMO detainees, because such negotiations are often conducted in secret and divulging their details could seriously impair their success.

The Court fails to see any injury whatsoever that the Government would suffer from granting the requested preliminary injunction. Petitioners request only 30 days' notice of transfer--a narrow and discrete request that would impose no burden on the Government. Beyond "vague premonitions" that such

relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority. *Abdah,* slip op. at 10 (D.D.C. March 29, 2005). For example, granting Petitioners' request for 30 days' notice of transfer would not require the Court to second-guess foreign policy decisions of the Executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice. [FN12]

> FN12. Such issues *could* arise if Petitioners ultimately are scheduled for transfer and actually request additional relief. However, speculation about future requests is no justification for denying the narrow relief requested at this point.

*6 In weighing the respective hardships imposed upon the parties, the balance clearly tilts in favor of Petitioners. The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper. Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioners' claims before this Court.

D. Public Interest

Petitioners argue that the public has a strong interest in protecting the constitutional rights of detainees. The Government responds that the requested relief would be contrary to the public interest, because it could frustrate the Government's ability to conduct foreign policy, which ultimately could harm the nation by impairing the effectiveness of the war on terrorism.

The Government's argument is unpersuasive, however, for it "simply conflate[s] the public interest with [the Government's] own position," *Abdah,* 04-CV-1254, slip op. at 11 (March 29, 2005), and asks the Court to accept its predictions of harm without challenge. This the Court is not prepared to do. It is obvious beyond words that there is a strong public interest in the zealous pursuit of those who wish to commit acts of terrorism against the United States and its citizens. However, the narrow relief sought in this case will not compromise that effort in any way.

In contrast, the public interest undeniably is served by ensuring that Petitioners' constitutional rights can be adjudicated in an appropriate manner. *G & V*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 774847 (D.D.C.)
**(Cite as: 2005 WL 774847 (D.D.C.))**

_Lounge, Inc. v. Mich. Liquor Control Comm'n,_ 23 F.3d 1071, 1079 (6th Cir.1994)_ ("[i]t is always in the public interest to protect the violation of a party's constitutional rights"). Retaining jurisdiction over this case is essential to protecting that public interest. Thus, the public interest clearly favors entering the preliminary injunction sought by Petitioners.

## V. CONCLUSION

Petitioners have requested 30 days' notice of any transfer from GTMO, a concrete, narrow, and minimally burdensome remedy. Based on the Court's analysis of the four relevant factors set forth in the applicable caselaw, it is clear that Petitioners have satisfied their burden. They are faced with an imminent threat of serious harm, which far outweighs any conceivable burden that the Government might face. Furthermore, while it is not possible to demonstrate a "mathematical probability of success," the questions are "serious, substantial, difficult and doubtful." _Washington Metro. Area Transit Comm'n, 559 F.2d at 844._ Certainly, the Government cannot argue that its success on the merits is a foregone conclusion. Finally, the public interest in granting Petitioners the requested relief is strong. Therefore, for the foregoing reasons, Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court with 30-Days' Advance Notice of Any Intended Removal from Guantanamo is granted.

**\*7** An Order will issue with this Opinion.

Not Reported in F.Supp.2d, 2005 WL 774847 (D.D.C.)

**Motions, Pleadings and Filings (Back to top)**

• 1:05cv00301 (Docket) (Feb. 09, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Westlaw.*

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2005 WL 774843 (D.D.C.)
**(Cite as: 2005 WL 774843 (D.D.C.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Jarallah AL-MARRI, et al., Petitioners,
v.
George W. BUSH, et al., Respondents.
**No. Civ.A. 04-2035(GK).**

April 4, 2005.

Timothy S. Susanin, Lawrence S. Lustberg, Mark A. Berman, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, Jonathan L. Hafetz, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, New York, NY, for Petitioners.

Terry Marcus Henry, U.S. Department of Justice, Civil Division, Preeya M. Noronha, U.S. Department of Justice, Washington, DC, for Respondents.

*MEMORANDUM OPINION*

KESSLER, J.

**\*1** Petitioner, Jarallah Al-Marri, brings this action against Defendants, seeking release from the Guantanamo Bay Naval Station ("GTMO") in Cuba, where he is being detained. [FN1] This matter is before the Court on Petitioner's Motion for a Preliminary Injunction and Motion for a Temporary Restraining Order, in which he seeks 30 days' notice before any transfer from GTMO. Upon consideration of the Motions, Opposition, Reply, and the entire record herein, and for the reasons stated below, Petitioner's Motion for a Preliminary Injunction is granted, and Petitioner's Motion for a Temporary Restraining Order is denied as moot.

> FN1. Technically, there are two Petitioners in this case, one of whom is Jarallah Al-Marri's Next Friend, who obviously is not subject to transfer from Guantanamo. All references herein will be to the one Petitioner.

I. BACKGROUND

A. Procedural History

Petitioner, a citizen of Qatar, has been detained at GTMO for more than three years. [FN2] On November 10, 2004, he filed a Petition for Writ of Habeas Corpus. He is one of many GTMO detainees who have filed such petitions in the United States District Court for the District of Columbia since the Supreme Court held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." *Rasul v. Bush*, --- U.S. ----, ----, 124 S.Ct. 2686, 2699, 159 L.Ed.2d 548 (2004).

> FN2. Petitioner's counsel has very limited knowledge of Petitioner's precise circumstances. Counsel has met with Petitioner, but only very briefly and before actual representation began, when counsel was visiting other clients at GTMO. Transcript of Motions Hearing ("Tr.") at 12 (March 30, 2005). Counsel is scheduled to meet with his client in the very near future. *Id.*

On November 30, 2004, the Court transferred this case to Judge Joyce Hens Green for coordination and management, as reflected in the September 15, 2004, Resolution of the Executive Session. On December 28, 2004, Respondents filed a Motion to Dismiss, which became ripe on January 21, 2005.

On January 19, 2005, Judge Richard Leon granted the Government's Motion to Dismiss the detainees' Petition for Writ of Habeas Corpus in *Khalid v. Bush*, 355 F.Supp.2d 311 (D.D.C.2005). On January 31, 2005, Judge Green granted in part and denied in part the Government's Motion to Dismiss in eleven consolidated cases. *In re Guantanamo Cases*, 355 F.Supp.2d 443 (D.D.C.2005). [FN3] The cases before Judges Leon and Green have been fully briefed in the United States Court of Appeals for the District of Columbia and are under submission.

> FN3. Judge Green's Memorandum Opinion and Order did not apply to eight consolidated cases, including the instant case. *In re Guantanamo Cases*, 355 F.Supp.2d at 452 n. 15.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 774843 (D.D.C.)
(Cite as: 2005 WL 774843 (D.D.C.))

On February 3, 2005, Judge Green granted a stay in the eleven cases to which her January 31, 2005, Opinion and Order applied. On March 8, 2005, this Court stayed the instant case until the Court of Appeals resolves the appeals in *Khalid* and *In Re Guantanamo Cases.* [FN4]

> FN4. The stay issued in this case does not preclude the Court from considering the merits of the instant Motion. The stay was entered to preserve the status quo until resolution of issues on appeal in similar cases. The instant Motion does not require the Court to lift the stay or to adjudicate the case on the merits; rather, it seeks emergency relief to prevent Petitioner's habeas claims from being extinguished and to preserve the status quo. *Abdah v. Bush,* No. 04-CV-1254, slip op. at 4 (D.D.C. March 29, 2005).

B. Transfers from GTMO

Approximately 540 foreign nationals currently are being held at GTMO. Decl. of Matthew C. Waxman ¶ 2 ("Waxman Declaration"). [FN5] The Department of Defense ("DOD") states it is conducting a review of each detainee's case, at least annually, to determine whether continued detention is warranted. *Id.* at ¶ 3. Since the Government began detaining individuals at GTMO, the DOD has transferred 211 detainees to other countries. *Id.* at ¶ 4.

> FN5. Waxman is the Deputy Assistant Secretary of Defense for Detainee Affairs. *Id.* at ¶ 1.

Detainees are subject to two types of transfer: (1) transfer to the custody of another country, with the understanding that they will be released, Tr. at 22-23; and (2) transfer to the custody of another country with the understanding that the country's government has "an independent law enforcement interest" in them and that they likely will face continued detention and processing by that country's judicial system. *Id.* at 24. In each case, the United States loses all control of the detainees once they are transferred to another country. Waxman Decl. at ¶ 5.

*2 Of the 211 detainees who have been transferred, 146 have been transferred with the understanding that they would be released. *Id.* at ¶ 7. The Government represents that most of those individuals actually have been released, Tr. at 29, but it cannot provide precise numbers. *Id.*

Sixty-five detainees have been transferred to the control of other countries for detention. Waxman Decl. at ¶ 7. Of that group, 29 were transferred to Pakistan; 9 to the United Kingdom; 7 to Russia; 5 to Morocco; 6 to France; 4 to Saudi Arabia; and 1 each to Australia, Denmark, Kuwait, Spain, and Sweden. *Id.*

When transfers for detention are being considered, DOD coordinates with various other Government agencies, including the Department of State ("DOS"). *Id.* ¶ 6. The Government states that, as a matter of policy, it does not "repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured." *Id.*

The Government claims that it ensures compliance with this policy by obtaining "assurances" from officials within the foreign government. The process for obtaining such assurances "involves a frank dialogue, discussion, [and] communication with officials of the other government." Tr. at 32. The Government evaluates the adequacy of the assurances by considering "the identity, position, or other information concerning the official relaying the assurances," Decl. of Pierre-Richard Prosper at ¶ 8 ("Prosper Declaration"); [FN6] political or legal developments in the country that would provide context for the assurances, *id.;* and U.S. relations with the country. *Id.* Senior Government officials ultimately make the final decision on whether to transfer a detainee. Waxman Decl. at ¶ 7. The Government's papers do not indicate which DOD official has this responsibility.

> FN6. Prosper is the Ambassador-at-Large for War Crimes Issues and has supervised the operation of the DOS Office of War Crimes Issues. *Id.* at ¶ 1.

In recent months, a number of newspaper articles about the transfer and treatment of detainees have been published. Petitioner has submitted as exhibits articles quoting current and former employees of the United States government who have been involved in transferring detainees to other countries, including countries that practice torture. *See, e.g.,* Petr.'s Ex. E (Dana Priest, *Jet Is an Open Secret in Terror War,* Wash. Post, Dec. 27, 2004, at A1). In addition, Petitioner has submitted articles quoting by name former Guantanamo detainees who allege that they have been moved by the United States government to countries where they have been tortured. *See, e.g.* Petr.'s Ex. B (Douglas Jehl and David Johnson, *Rule*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 2005 WL 774843 (D.D.C.)
**(Cite as: 2005 WL 774843 (D.D.C.))**

*Change Lets C.I.A. Freely Send Suspects Abroad,*
N.Y. Times, Mar. 6, 2005, at A1).

On March 11, 2005, an article in The New York
Times reported that DOD plans to transfer "hundreds
of suspected terrorists to prisons in Saudi Arabia,
Afghanistan, and Yemen." Douglas Jehl, *Pentagon
Seeks to Shift Inmates from Cuba Base,* N.Y. Times,
Mar. 11, 2005, at A1.

*\*3* In response to this article, several petitioners,
including the Petitioner in the instant case, filed
motions for temporary restraining orders and
preliminary injunctions. On March 12, 2005, Judge
Rosemary Collyer granted a request for a temporary
restraining order in *Abdah v. Bush,* No. 04-CV-1254
(D.D.C. March 12, 2005) (order granting temporary
restraining order) and denied a similar request in
*John Does 1-570 v. Bush,* No. 05-CV-313 (March 12,
2005) (order denying request for temporary
restraining order). On March 29, 2005, Judge Henry
H. Kennedy granted a Preliminary Injunction in
*Abdah.*

After the Motions were filed in the instant case, the
Government represented to this Court that Petitioner
was not scheduled for transfer within the next several
weeks. In addition, counsel agreed to a combined
hearing on the Motion for Temporary Restraining
Order and Motion for Preliminary Injunction. On
March 17, 2005, based on those representations, the
Court scheduled the hearing on both Motions for
March 30, 2005.

## II. STANDARD OF REVIEW

In considering Petitioner's request for a preliminary
injunction, the Court must consider four factors: (1)
whether Petitioner would suffer irreparable injury if
an injunction were not granted; (2) whether Petitioner
has a substantial likelihood of success on the merits;
(3) whether an injunction would substantially injure
other interested parties; and (4) whether the grant of
an injunction would further the public interest. *Al-
Fayed v. CIA,* 254 F.3d 300, 303 (D.C.Cir.2001).
[FN7] "These factors interrelate on a sliding scale
and must be balanced against each other." *Serono
Labs., Inc. v. Shalala,* 158 F.3d 1313, 1318
(D.C.Cir.1998). "If the arguments for one factor are
particularly strong, an injunction may issue even if
the arguments in other areas are rather weak."
*CityFed Fin. Corp. v. Office of Thrift Supervision,* 58
F.3d 738, 746 (D.C.Cir.1995).

FN7. The same factors apply when

considering a request for a temporary
restraining order. *Al-Fayed,* 254 F.3d at 303,
n. 2. However, since the Court has granted
the Motion for Preliminary Injunction, it is
not necessary to apply these factors to his
Motion for Temporary Restraining Order.

When the balance of hardships tips decidedly toward
the movant, it will "ordinarily be enough that the
[movant] has raised questions going to the merits so
serious, substantial, difficult and doubtful, as to make
them a fair ground for litigation and thus for more
deliberative investigation." ' *Washington Metro. Area
Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841,
844 (D.C.Cir.1977) (quoting *Hamilton Watch Co. v.
Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953)).
"An order maintaining the status quo is appropriate
when a serious legal question is presented, when little
if any harm will befall other interested persons or the
public and when denial of the order would inflict
irreparable injury on the movant." *Id.* at 844.

## III. ANALYSIS

### A. Harm to Petitioner

Petitioner argues that he will suffer irreparable harm
if transferred to the custody of another country that
practices torture or other inhumane treatment of
prisoners. Respondents argue that there is no
potential harm to Petitioner, because there is no
credible evidence that detainees are being transferred
to countries that practice torture; instead, any
transfers will be largely for purposes of release.
[FN8]

FN8. The Government also argues that
transferring Petitioner from United States
custody provides him with the very relief he
seeks. Tr. at 40. That argument is overly
simplistic, however. Petitioner ultimately
seeks total freedom from all custody, not
just United States custody. He can only
obtain such relief in this litigation if the
Court determines that his underlying
detention was unconstitutional or illegal.
Furthermore, a determination by a United
States court that Petitioner is not an enemy
combatant might carry significant weight in
his home country, thereby facilitating
release from custody if he was transferred
for continued detention. Finally, on the most
human level, proud people have a strong
interest in clearing their names from
association with acts of violence and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 4
Not Reported in F.Supp.2d, 2005 WL 774843 (D.D.C.)
**(Cite as: 2005 WL 774843 (D.D.C.))**

terrorism.

**\*4** Irreparable harm to the moving party is "the basis of injunctive relief in the federal courts." *CityFed Fin. Corp.,* 58 F.3d at 747 (quoting *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). To obtain preliminary injunctive relief, Petitioner must show that the threatened injury is not merely "remote and speculative." *Milk Indus. Found. v. Glickman,* 949 F.Supp. 882, 897 (D.D.C.1996).

In this case, there are two obvious and substantial threats to Petitioner. First, he faces the possibility of transfer to a country where he might be tortured or indefinitely confined, which undeniably would constitute irreparable harm. While the Government presents declarations that attempt to mitigate these concerns, they neither refute Petitioner's claims nor render them frivolous. [FN9] Indeed, the Government admits that 65 of the 211 detainees transferred to date have been transferred for detention, not release. Several of the 65 have been transferred to countries that our own State Department has acknowledged torture prisoners, including Pakistan, Saudi Arabia, and Morocco. *See Country Reports on Human Rights Practices--2004,* available at http://www.state.gov/g/drl/rls/hrrpt/2004. Finally, the Government was unable to provide any details about the type or form of "assurances" given, the scope of the monitoring that takes place after transfer, or the consequences of noncompliance. [FN10] Tr. at 32-33. In short, the threatened injury is not merely remote and speculative; it is a serious potential threat.

> FN9. The Court notes that the Government's affidavits do not address the Central Intelligence Agency's involvement in any transfer or "rendition" programs.

> FN10. Notably, the Government was also unaware of several other important facts, such as the availability of extradition treaties with Qatar or Saudi Arabia, or the consequences if a detainee's home country refuses to accept him.

Second, Petitioner faces the threat of irreparable harm based on the potential elimination of his habeas claims. It is unclear at this point whether transferring Petitioner would strip this Court of jurisdiction. *See Abdah v. Bush,* No. 04-CV-1254, Slip op. at 7 (D.D.C. March 29, 2005) (transfer to another country "would effectively extinguish [Petitioner's] habeas claim[ ] by fiat"); *but see Abu Ali v. Ashcroft,* 350 F.Supp.2d 28, 54 (D.D.C.2004) (holding that an

individual detained in Saudi Arabia could survive a motion to dismiss his habeas claim based on the theory of constructive custody). However, given the danger that, upon transfer, the Court could lose jurisdiction to adjudicate Petitioner's claims, it follows that such a transfer could obviate Petitioner's right to "test the legitimacy of [his] executive detention." *Lee v. Reno,* 15 F.Supp.2d 26, 32 (D.D.C.1998). Since such a turn of events would certainly constitute a threat of irreparable harm, an order preserving the status quo in this case is appropriate. [FN11]

> FN11. The Court has the authority to issue such an injunction pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which "empowers a district court to issue injunctions to protect its jurisdiction." *SEC v. Vison Communications, Inc.,* 74 F.3d 287, 291 (D.C.Cir.1996); *see also Abdah v. Bush,* No. 04-CV-1254, slip op. at 7 (March 12, 2004); *Abu Ali,* 350 F.Supp.2d at 54 (quoting *Alabama Great S.R. Co. v. Thompson,* 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906)) ("It is well-established that 'the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.' ").

Both threats are imminent. While the Court certainly has relied upon the Government's representations that Petitioner will not be transferred in the next several weeks, the Government is clearly maintaining its right to transfer him at any time after the Court rules upon the instant Motion. Thus, the threats are not distant or speculative, and transfer could occur in the near future.

B. Likelihood of Success on the Merits

**\*5** Petitioner contends that, given Judge Green's Opinion in *In re Guantanamo Cases,* he has a substantial likelihood of success on the merits of his habeas claim. The Government responds that Petitioner's claim would be barred because the treaties under which he seeks review are non-self-executing, and because the review sought would encroach upon the foreign policy authority of the executive.

To justify granting a preliminary injunction, Petitioner need not show "a mathematical probability of success." *Washington Metro. Area Transit*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 5
Not Reported in F.Supp.2d, 2005 WL 774843 (D.D.C.)
**(Cite as: 2005 WL 774843 (D.D.C.))**

*Comm'n*, 559 F.2d at 844. Rather, "it will ordinarily be enough" that the questions raised are so "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Id.* (quoting *Hamilton Watch Co.*, 206 F.2d at 740).

The exact chances of success in this case are extremely difficult to assess. It is clear, however, that, at a minimum, Petitioner has raised "fair ground[s] for litigation." *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844. The issues raised in these motions are sensitive and involve complex constitutional questions. Indeed, there are areas of disagreement even among the judges on this Bench about the legal issues raised in these Petitions. Like the issues in *Hamdi v. Rumsfeld, Padilla v. Rumsfeld,* and *Rasul,* there is a strong probability that they ultimately will be resolved by the Supreme Court.

For example, there is disagreement about whether the detainees have any constitutional rights at all. *See Khalid*, 355 F.Supp.2d 311 (holding that Guantanamo detainees have no constitutional rights); *but see In re Guantanamo Cases,* 355 F.Supp.2d 311 (holding that Guantanamo detainees have some constitutional rights). There is also disagreement over whether the Court will lose jurisdiction over the cases if Petitioner is transferred to another country. [FN12] *See Abdah v. Bush,* No. 04-CV-1254, slip op. at 7 (D.D.C. March 29, 2005); *but see Abu Ali v. Ashcroft,* 350 F.Supp.2d at 54. And, there is disagreement about whether the Geneva Conventions are self-executing. *See Hamdan v. Rumsfeld,* 344 F.Supp.2d 152, 164 (D.D.C.2004).

> FN12. The Government also argues that the Supreme Court in *Rasul* failed to protect its jurisdiction over detainees that were transferred. *Rasul,* --- U.S. at ---- n. 1, 124 S.Ct. at 2690 n. 1 (noting that two petitioners had been "released from custody" to the United Kingdom). However, the issue of transfer was not before the Court, and the *Rasul* petitioners were released to the United Kingdom, not a country known to torture its prisoners. *See Country Reports on Human Rights Practices: United Kingdom,* available at http://www.state.gov/g/drl/rls/hrrpt/2004/41716.htm ("[t]he [British] Government generally respected the human rights of its citizens").

In short, even though the mathematical probability of success is impossible to assess, there can be no doubt that the questions raised here are so "serious,

substantial, difficult, and doubtful," as to make them a "fair ground for litigation." *Washington Metro. Area Transit Comm'n,* 559 F.2d at 844.

C. Harm to Government

Petitioner argues that there is absolutely no harm to the Government if it is required to provide the Court and Petitioner's counsel with 30 days' notice before transferring him to another country. The Government contends, however, that there is great potential harm to its ability to conduct negotiations with foreign governments regarding the transfer and subsequent release of GTMO detainees, because such negotiations are often conducted in secret and divulging their details could seriously impair their success.

*6 The Court fails to see any injury whatsoever that the Government would suffer from granting the requested preliminary injunction. Petitioner requests only 30 days' notice of transfer--a narrow and discrete request that would impose no burden on the Government. Beyond "vague premonitions" that such relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority. *Abdah,* slip op. at 10 (D.D.C. March 29, 2005). For example, granting Petitioner's request for 30 days' notice of transfer would not require the Court to second-guess foreign policy decisions of the executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice. [FN13]

> FN13. Such issues *could* arise if Petitioner ultimately is scheduled for transfer and actually requests additional relief. However, speculation about future requests is no justification for denying the narrow relief requested at this point.

In weighing the respective hardships imposed upon the parties, the balance clearly tilts in favor of Petitioner. The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper. Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioner's claims before this Court.

D. Public Interest

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 6
Not Reported in F.Supp.2d, 2005 WL 774843 (D.D.C.)
**(Cite as: 2005 WL 774843 (D.D.C.))**

Petitioner argues that the public has a strong interest in protecting the constitutional rights of detainees. The Government responds that the requested relief would be contrary to the public interest, because it could frustrate the Government's ability to conduct foreign policy, which ultimately could harm the nation by impairing the effectiveness of the war on terrorism.

The Government's argument is unpersuasive, however, for it "simply conflate[s] the public interest with [the Government's] own position," *Abdah*, 04-CV-1254, slip op. at 11 (March 29, 2005), and asks the Court to accept its predictions of harm without challenge. This the Court is not prepared to do. It is obvious beyond words that there is a strong public interest in the zealous pursuit of those who wish to commit acts of terrorism against the United States and its citizens. However, the narrow relief sought in this case will not compromise that effort in any way.

In contrast, the public interest undeniably is served by ensuring that Petitioner's constitutional rights can be adjudicated in an appropriate manner. *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir.1994) ("[i]t is always in the public interest to protect the violation of a party's constitutional rights"). Retaining jurisdiction over this case is essential to protecting that public interest. Thus, the public interest clearly favors entering the preliminary injunction sought by Petitioner.

## V. CONCLUSION

Petitioner has requested 30 days' notice of any transfer from GTMO, a concrete, narrow, and minimally burdensome remedy. Based on the Court's analysis of the four relevant factors set forth in the applicable caselaw, it is clear that Petitioner has satisfied his burden. He is faced with an imminent threat of serious harm, which far outweighs any conceivable burden that the Government might face. Furthermore, while it is not possible to demonstrate a "mathematical probability of success," the questions are "serious, substantial, difficult and doubtful." *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844. Certainly, the Government cannot argue that its success on the merits is a foregone conclusion. Finally, the public interest in granting Petitioner the requested relief is strong. Therefore, for the foregoing reasons, Petitioner's Motion for Preliminary Injunction is granted, and his Motion for Temporary Restraining Order is denied as moot.

**\*7** An Order will issue with this Opinion.

Not Reported in F.Supp.2d, 2005 WL 774843 (D.D.C.)

**Motions, Pleadings and Filings** (Back to top)

• 1:04cv02035 (Docket) (Nov. 17, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAHMOOD AL-MOHAMMED, et al.,**<br><br>**Petitioners,**<br><br>v.<br><br>**GEORGE W. BUSH, et al.,**<br><br>**Respondents.** | **Civil Action 05-00247 (HHK)** |

## ORDER

Before the court is Petitioners' motion for a preliminary injunction [#10].

Upon consideration of the motion and the opposition thereto, and for the reasons

stated in this court's opinion in *Abdah v. Bush*, No. 04-1254 (March 29, 2005)

(order granting preliminary injunction), it is this 30th day of March, 2005, hereby

**ORDERED,** that Petitioners' motion for a preliminary injunction is

**GRANTED**; and it is further

**ORDERED,** that Respondents shall provide Petitioners' counsel and the

court with 30 days' notice prior to transporting or removing Petitioner Mahmood

Al-Mohammed from Guantánamo Bay Naval Base; and it is further

**ORDERED**, that this order shall remain in effect until the final resolution

of Petitioners' habeas claim unless otherwise modified or dissolved.


Henry H. Kennedy, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISA ALI ABDULLA ALMURBATI, et al.,    :
                                       :
            Petitioners,               :
                                       :        Civil Action No. 04-1227 (RBW)
GEORGE WALKER BUSH, et al.,            :
                                       :
            Respondents.               :
_____:

## ORDER

In accordance with the Memorandum Opinion being issued contemporaneously herewith,

it is hereby

**ORDERED** that the Petitioners' Motion for Preliminary Injunction [D.E. # 101] is

Denied.  It is further

**ORDERED** that upon the transfer or repatriation of any petitioner, the respondents shall

submit a declaration to this Court certifying that any transfers or repatriations were not made for

the purpose of merely continuing the petitioners' detention on behalf of the United States or for

the purpose of extinguishing this Court of jurisdiction over the petitioners' actions for habeas

relief for a reason unrelated to the decision that the petitioners' detention is no longer warranted

by the United States.

**SO ORDERED** this 14th day of April 2005.

                                    REGGIE B. WALTON
                                    United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

**SUHAIL ABDU ANAM, et al.,**

**Petitioners,**

**v.**

**GEORGE W. BUSH, et al.,**

**Respondents.**

---

**Civil Action 04-1194 (HHK)**

## ORDER

Before the court is petitioners' motion for a preliminary injunction [#116].
Upon consideration of the motion and the opposition thereto, and for the reasons
stated in this court's opinion in *Abdah v. Bush*, No. 04-1254 (March 29, 2005)
(order granting preliminary injunction), it is this 9th day of May, 2005, hereby

**ORDERED**, that petitioners' motion for a preliminary injunction is
**GRANTED**; and it is further

**ORDERED**, that respondents shall provide petitioners' counsel and the
court with 30 days' notice prior to transporting or removing any of the detained
petitioners from Guantánamo Bay Naval Base; and it is further

**ORDERED**, that this order shall remain in effect until the final resolution
of petitioners' habeas claim unless otherwise modified or dissolved.

Henry H. Kennedy, Jr.
United States District Judge