**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**ABDULLAH WAZIR ZADRAN**, *et al.*,

    *Petitioners/Plaintiffs,*

       v.

**GEORGE W. BUSH**, *et al.*,

    *Respondents/Defendants.*

**Case No. 1:05-CV-2367 (RWR)**

**PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION
TO EXAMINE PETITIONERS' PRIVILEGED COMMUNICATIONS**

Respondents' motion should be denied. All seized attorney-client materials should be returned to the Petitioners at once, since despite the passage of more than a month since the three detainee deaths, Respondents have failed to make the requisite individualized showing that any Petitioner's materials are likely to shed any light on those deaths or possible plans for future violence. Rather, the effect of the seizure has inevitably been to damage Petitioners' confidence in the legal process and cloud their future communications with counsel.

Attorney-client communications are protected against seizure and review by opposing parties except in exceptional cases and upon a showing of individualized need. Respondents' wholesale, secret seizure of all of Petitioners' attorney-client materials without the prior approval of the Court or notice to counsel, apparently while counsel in this case were present at Guantanamo, trampled on this privilege. In the name of investigating the deaths, Respondents seized papers from Petitioners who were not held in the same camp as the deceased detainees

and thus likely had little or no contact with them, and who apparently did not speak any language in common with them. In the process Respondents did little to advance their investigation, but they shattered Petitioners' fragile confidence in the confidentiality of their communications with their counsel and in the usefulness of participating in the U.S. legal process. And while Respondents retain those materials, Petitioners are without even their counsel's address and remain unable to communicate with them.

Respondents' suggested method for reviewing the illegally seized communications would further invade the privilege. Should the Court decide not to order the immediate return of all seized materials, it should order Respondents to transfer them to the Court or to a special master. If an individualized showing of need is timely made for access to particular materials, they should be reviewed in the first instance by a magistrate judge or special master without the involvement of any of the Respondents, other federal agencies or agents working with them or under their direction, or counsel for any of those entities.

## ARGUMENT

### A.  Respondents Failed to Notify Counsel or the Court of their Seizure of Privileged Communications Until Forced to Do So by Filings by Detainees

### 1. Respondents Deliberately Seized Privileged Materials in Secret

On June 10, 2006, military officials reported that three detainees at Guantanamo Bay had been found dead in their cells.[1] In his news conference announcing the detainees' deaths, Navy Rear Adm. Harry B. Harris, the commander of Joint Task Force—Guantanamo, denounced the

---

[1]     Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006, *available at* http://www.defenselink.mil/news/Jun2006/20060610_5379.html. *See* Declaration of Rebecca P. Dick, Ex. A. ("Dick Decl.").

deaths as an act of war: "I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantanamo," he said. "We have men here who are committed jihadists. They are dangerous men and they will do anything they can to advance their cause."[2] Colleen Graffy, Deputy Assistant Secretary of State for Public Diplomacy, called the deaths "a good PR move."[3] Admiral Harris requested an investigation by the Naval Criminal Investigative Service (NCIS) to establish the "official cause and manner of death."[4] NCIS is an entity under the direction and control of Respondent Secretary of Defense Donald Rumsfeld.[5]

Nearly a month later, Respondents disclosed that, between June 10 and June 14, as part of the investigation, NCIS had seized and examined over half a ton of written communications between Guantanamo detainees and their lawyers.[6] The fact that the seizures were made over a five-day period demonstrates that no exigent circumstances required Respondents to act without first seeking the approval of the Court and notifying counsel. Respondents claimed that NCIS seized these materials because notes found in the cells of the deceased detainees suggested that some detainees might have used the cloak of the attorney-client privilege in furtherance of a joint suicide plot, which they darkly suggest may have been "encouraged, ordered, or assisted by third

---

[2]    *Id.*

[3]    *Id.*

[4]    Reuters, *Three Guantanamo Detainees Die, US Army,* June 11, 2006, *available at* http://www.cageprisoners.com/articles.php?id=14371. *See* Dick Decl., Ex. B.

[5]    NCIS reports to the Secretary of the Navy, *see* NCIS website, *available at* http://www. ncis.navy.mil/about leadership.asp, who reports to Respondent Secretary of Defense. *See* Department of Defense organization chart, *available at* http://www.defenselink.mil/ odam/omp/pubs/GuideBook/Pdf/DoD.PDF. *See* Dick Decl., Ex. C.

[6]    Kisthardt Decl. ¶¶ 2 – 5, filed with Resps.' Mot.

parties."[7]  Respondents have not provided any details about the notes, filed any of them with the

Court, nor provided any evidence in support of their hint of third-party complicity.

Notably, Respondents sought judicial approval for their actions only after *habeas*

counsel, informed of Respondents' actions by their clients, sought relief from this Court.[8]

Moreover, Respondents repeatedly failed to take opportunities to negotiate privilege issues with

counsel.  Counsel for Petitioners in this action were at Guantanamo on June 11 through June 14

to meet with some of the Petitioners.  If Respondents had had any questions about Petitioners

and their communications, Respondents had an ideal opportunity to speak with counsel in person

with any communication at issue in front of them, and to resolve matters in a manner that did not

violate the privilege.  Instead, Respondents disclosed nothing to counsel but rather prohibited

them entering the camp to meet with three Petitioners, as scheduled, on June 14 because of the

"investigation."[9]  On that day, news reporters were also ordered off the base.[10]

Respondents had other opportunities to raise the issue of privilege but choose not to.  A

conference call with counsel and the Court could have been arranged on June 10, the day the

prisoners' deaths were announced.  In fact, on June 14, Petitioners' counsel, Respondents'

---

[7]     Harris Decl. ¶ 4, filed with Resps.' Mot..

[8]     Mot. to Modify Stay to Direct Resps. to Return Impounded Privileged Legal Material and
for Other Relief, *Abdullah v. Bush*, No. 05-00023 (RWR) (filed July 5, 2006).  *See* Dick
Decl., Ex. D.  Respondents state that their instant motion is an opposition to the *Abdullah*
motion.  Resps.' Mot. at 1 n.1.

[9]     Respondents report that the privileged materials were seized "on or about June 14,"
Resps.' Mot. at 6, the very day counsel was at the base but prevented from meeting with
three Petitioners.  *See* Dick Decl. ¶¶ 2-3.

[10]    *See* Dick Decl., ¶ 4.

counsel, and Magistrate Judge Kay had a telephone conference to discuss Respondents' refusal to allow Petitioners' counsel to meet with Petitioners. During that conference Respondents made no mention of their ongoing seizure of the privileged communications.

The precise effect on Petitioners of having their legal materials seized by their captors can only be imagined, since counsel and Petitioners have been unable to communicate with one another. Inevitably, however, the seizure diminished in Petitioners' eyes the integrity of the legal process, undermined their relationships with counsel, and may have thereby weakened the effectiveness of their future legal representation.

Respondents admit to having seized Petitioners' privileged communications over a five-day period without court approval or supervision, and without prior notice to counsel, and then to having waited nearly a month before disclosing what they had done. Their actions were in contravention of the attorney-client privilege that is a fundamental element of the American legal process. Respondents foresaw that they would face vigorous objections. True to the adage that the best defense is a good offense, they now seek to preempt further requests by obtaining a blanket *post hoc* approval from the Court for their actions.[11] They also ask the Court to permit them to examine the seized materials even more closely.

_____

[11]     Late in the evening prior to the due date for most *habeas* briefs responding to the instant motion, Respondents filed a Notice of Withdrawal of the motion for numerous detainees (but not Petitioners in this action) on the grounds that "it has been determined that petitioners have not had any attorney-client materials impounded for purposes of the ongoing investigation by the [NCIS] described in the motion, or because Respondents have been unable to identify petitioners as detainees currently detained at Guantanamo." *Habib v. Bush*, Notice of Withdrawal, No. 02-cv-1130 (CKK), (D.D.C. July 20, 2006). See Dick Decl., Ex. E. This filing presents more questions than answers. As with many other facts regarding Respondents' recent handling of detainees' legal materials, far more information is due to counsel so they can consider what further response is appropriate. Petitioners seek an order from this Court requiring such disclosure.

**2.    Respondents Have Sought From the Outset to Prevent the Detainees' from Obtaining Effective Legal Representation**

Respondents' recent actions, and their instant motion, should be considered in light of their fierce multi-year effort to obstruct development of detainee-attorney relationships.  Four-and-a-half years ago, when the first next-friend *habeas* petitions were filed, Respondents asserted that the detainees had no right to seek relief in federal court and no rights that a federal court could enforce.  While these issues were being litigated, Respondents denied the detainees access to counsel.

In 2004, two years after Respondents sent the first detainees to Guantanamo, the Supreme Court rejected Respondents' "proposition that Guantanamo Bay is a legal black hole."[12] Unfazed, Respondents insisted that "detainees' access to counsel existed purely at the pleasure of Respondents, with restrictions to be imposed as they saw fit."[13]  Judges of this Court "flatly rejected" Respondents' position and their efforts to impose "significant restrictions on attorney-client communications, including . . . [their] proposal for real-time monitoring of counsel meetings with detainees."[14]  Respondents' seizure of Petitioners' legal materials and their instant motion to review all attorney-client communications formerly in the possession of Petitioners, regardless of their prior contact with the deceased detainees or history of self-destructive acts, is simply a continuation of their policy of attempting to thwart attorney-client relationships between Petitioners and their counsel.

---

[12]    *Adem v. Bush,* 425 F. Supp. 2d 7, 11 (D.D.C. 2006) (citing *Rasul v. Bush,* 542 U.S. 466 (2004)).

[13]    *Id.* at 12.

[14]    *Id.* at 11-12.

**B.     Respondents' Seizure and Examination of Petitioners' Legal Papers Violates the Orders of This Court**

**1.     This Court Has Held that the Detainees Have a Right to Access to Their Attorneys**

This Court has recognized that the detainees—who have not yet been given hearings that comport with the minimal due process protections necessary to foster accurate factual findings, and who thus seek through their counsel to challenge their detention—have a right to access to their counsel and are entitled to a confidential relationship with that counsel. Over Respondents' objections, "[t]he Court [found] that Petitioners are entitled to be represented by counsel."[15] Detainees' right to access to their counsel has been confirmed by the Supreme Court.[16]

Further, "the Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."[17] Specifically, the right to counsel includes a right to the confidentiality of attorney-client communications. As this Court has recognized in the context of the Guantanamo litigation, "[t]he privilege that attaches to communications

---

[15]    *Al Odah v. Bush*, 346 F. Supp. 2d 1, 5 (D.D.C. 2004). *See also Said v. Bush*, Memorandum Order, No. 05-2384 (RWR) at 4 (D.D.C. May 23, 2006) ("Respondents do not argue that the DTA deprives the Guantanamo detainees of a right to counsel . . . Whatever forum is ultimately held to be the proper one to rule on a pre-DTA *habeas* petition, it is hardly sensible to withhold . . . [the access to counsel that] no one disputes petitioners will ultimately be likely to receive"). *See* Dick Decl., Ex. F.

[16]    *Rasul v. Bush*, 542 U.S. 466, 484 n.15 ("Petitioners' allegations—that, although they have engaged neither in combat nor in acts of terrorism against the United States, they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing—unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States'").

[17]    *Al Odah*, 346 F.Supp. 2d at 5.

between counsel and client has long held an exceptional place in the legal system of the United States."[18]

This Court has taken care to protect the privilege for communications between the detainees and their attorneys in designing the access procedures that govern the security of classified materials in this case.[19]  The Court's order makes clear that:  (1) Petitioners' communications with counsel are privileged, and (2) security concerns are to be handled in a manner that preserves that privilege.  The Court should not ratify Respondents' violations of the Court's decisions by permitting them to review further the privileged communications they wrongly seized.

### 2.     Detained Clients' Right to the Privilege Is Well Established

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."[20]  Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[21]  Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention.  "An inmate's need for

---

[18]     *Id.* at 10.

[19]     Protective Order and Procedures for Counsel Access to Petitioners at the United States Naval Base at Guantanamo Bay, Cuba, filed on April 12, 2006.  For example, ¶ 29 of the Protective Order provides for preservation of the privilege despite review of potentially classified legal materials by the Court Security Officer.

[20]     *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981).

[21]     *Swidler & Berlin v. United States,* 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143 – 44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection").

confidentiality in his communications with attorneys through whom he is attempting to redress

his grievances is particularly important."[22]  For such detainees, "contact with an attorney and the

opportunity to communicate privately is a vital ingredient to the effective assistance of counsel

and access to the courts."[23]  Even for prisoners convicted of crimes, the Supreme Court has held,

"[r]egulations and practices that unjustifiably obstruct the availability of professional

representation or other aspects of the right to access the courts are invalid."[24]

Respondents' vague allegations that notes found in a deceased detainee's cell had been

written by another detainee do not provide a "legitimate penological interest" for seizing *all* legal

documents from *all* detainees.  The seizing of legal papers is particularly egregious in this case,

where written communications are unusually important because oral communications are

severely restricted by the detainees' physical isolation and by Respondents' refusal to permit

counsel to talk with them by telephone.

### C.    Any Abrogation of the Privilege Requires a Specific, *Individualized* Showing of a Sufficiently Compelling Justification, which Respondents Did Not Even Attempt in this Case

### 1.    Respondents May Not Seize or Examine Privileged Materials Absent Individualized Justification

---

[22]  *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised").

[23]  *Bach*, 504 F.2d at 1102.

[24]  *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

To give meaning to the attorney-client privilege in this case, the Court's Protective Order provided for Access Procedures, which created avenues of confidential communication between detainees and their attorneys and laid ground rules for in-person meetings and written communications between these parties.[25] Respondents sought the ability to monitor these communications, but their request was rejected squarely by the Court.

Respondents do not attempt to justify their actions under any legal authority, but rather admit that the seized materials "likely will include some number of attorney-client communications potentially subject to attorney-client privilege."[26] But Respondents' abrogation of the privilege would have been unlawful even if it had not directly violated the decisions of this Court. Abrogation of the attorney-client privilege in any context requires a party to make a specific, *individualized* showing that there is a sufficiently compelling justification for invading the privilege.[27] For example, when the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies—*i.e.*, that *that* client "made or received the otherwise privileged communication with the

---

[25]    *See* Exhibit A of the Protective Order entered in this case on April 12, 2006.

[26]    Resps.' Mot. at 9.

[27]    Importantly, none of the cases cited by Respondents justify their substantive review of Petitioners' legal materials. The cases cited by Respondents were searches for readily identifiable contraband and did not involve any review of written materials. *Block v. Rutherford*, 468 U.S. 576, 589-92 (1984) (search of prisoner's cell conducted outside of prisoner's presence); *Hudson v. Reno*, 458 U.S. 517, 527 (1984) (search for drugs and contraband); *Bell v. Wolfish*, 441 U.S. 520, 555-57 (1979) (search for contraband). These cases therefore do not support Respondents' deliberate invasion of the attorney-client privilege but rather support the specification by courts that legal mail "can be opened (although not read) and inspected for contraband." *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003). *See also Evans v. Vare*, 402 F. Supp. 2d 1188, 1192 n.1 (D. Nev. 2005).

intent to further an unlawful or fraudulent act," and actually carried out that act.[28]  Similarly, when the government seizes materials from a location that likely contains privileged papers, its seizure must be supported by an individualized showing, and in addition it must employ appropriate means of protecting truly privileged materials.[29]

Respondents have cited no authority suggesting the privilege may be invaded without an *individualized*, sufficiently rigorous showing that the materials of a particular client or particular attorney may have been or may be used in furtherance of a crime.[30]  Even when such documents are to be reviewed *in camera* by the court—and not by an opposing party or its counsel—"the judge should require a showing of a factual basis to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[31]

---

[28]  *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[29]  *See, e.g., United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

[30]  *See, e.g., United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").

[31]  *United States v. Zolin*, 491 U.S. 554, 572 (1989) (quotations and citations omitted).

### 2.    Respondents Have Made No Individualized Showing with Respect to Petitioners in This Case

Respondents have presented no evidence that any of the Petitioners in this case have misused their attorney-client materials. Indeed, Respondents do not even purport to do so. Four or five documents seized from just a few detainees cannot justify wholesale seizure of over a half-ton of privileged materials from hundreds of detainees. The documents on which Respondents rely to justify their actions, moreover, offer little support for their position that attorney-client materials are being misused—let alone specific evidence that any of Petitioners has misused such materials.

The documents cited by Respondents as justification for their massive invasion of the privilege were found either in the possession of or were written by one of the deceased. But it is unlikely that there was meaningful contact between the deceased and any of the Petitioners in this action. As alleged in the Petition, all of the Petitioners in this case are from Afghanistan. Most of them speak only Pashto, although a few also speak some Dari. Only some Petitioners are educated; counsel believes that not all of them can read or write in any language.[32] The deceased were from Yemen and Saudi Arabia, and the notes that they wrote or that were in their possession were likely written in Arabic or Farsi. Moreover, the deceased reportedly lived in Camp 1 at Guantanamo, while most of the Petitioners until the time of the deaths were held in other camps.[33] A connection between Petitioners and the deceased detainees is therefore implausible.

---

[32]    Dick Decl. ¶ 5.

[33]    "Triple suicide at Guantanamo Camp," BBC News, *available at* http://news.bbc.co.uk/2/hi/americas/5068228.stm. *See* Dick Decl., Ex. G.

In addition, some of the privileged materials held by some of the Petitioners in this case are typewritten letters (albeit in Pashto) from their attorneys. A few Petitioners had counsel's business cards, which are printed. These materials clearly were not prepared by detainees, who lack access to a typewriter, computer, or printer, so they could not be part of any detainee plot. There could be no showing of a basis for the seizure of these materials, because the seizure cannot assist in the investigation of the deaths. Rather, the effect of Respondents' continued holding of these materials is that Petitioners' confidence in the legal process is undermined and they are deprived of access to their counsel's address, so cannot communicate with counsel.

The generalized security concerns advanced by Respondents as justification for their seizure of materials do not constitute the individualized showing necessary to support invasion of the attorney-client privilege. Moreover, these concerns are of the type already rejected by the Court as a basis for breaching the privilege. When they sought to justify the real-time monitoring and recording of attorney-client meetings, Respondents claimed that the detainees would use their meetings with counsel "to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security."[34] The Court rejected these claims, finding them "thinly supported."[35] As for Respondents' speculation that Petitioners' counsel are improperly sharing classified information with their clients, this Court long ago reminded Respondents that "the government's decision to grant an individual attorney a

---

[34]    *Al Odah*, 346 F. Supp. 2d at 4 n.4.

[35]    *Id.* at 10.

13

security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[36]

In short, Respondents have not made the required individualized showing that Petitioners' legal materials were justifiably seized. Nor can they do so.

### 3. The Documents Cited by Respondents Do Not Justify Any Search of Legal Materials and Do Not Demonstrate Abuse of the Privilege by Petitioners

The documents cited by Respondents and the locations in which they were found are telling in what they reveal—not a single inappropriate document was found hidden under the protection of an attorney-client label. First, the document labeled "FOUO" may not have been prohibited to the detainees. "FOUO" or "For Official Use Only" stamps are *not* classification designations; documents so labeled are not necessarily sensitive in any way. "FOUO" is merely an internal Department of Defense designation whose purpose is to indicate whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ."[37] The designation is specifically "not authorized as an anemic form of classification to protect national security interests"[38] and the material so labeled is, by definition, unclassified.

---

[36]     *Id.* at 14.

[37]     DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added). *See* Dick Decl., Ex H.

[38]     *Id.* 5400.7-R: C4.1.1. *See* Dick Decl., Ex I.

The Protective Order does not prevent detainees from possessing FOUO documents. Moreover, such documents by definition ordinarily present no security risks. The Respondents have failed to establish that the FOUO document is a reasonable basis for any action.

Second, the document that is marked with a crossed-out "SECRET" stamp does not appear to be a classified document and therefore, without more, should not concern NCIS investigators. (Respondents have failed to provide counsel or the Court with copies of the documents it relies upon for the instant motion, so counsel can address their content.) Based on *habeas* counsel's experience with handling documents in related cases, it is likely that the document was *once* classified and that – whether by request of counsel, the media, or *sua sponte* by Respondents – the document was declassified and marked accordingly. It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it. The Protective Order does not prevent detainees at Guantanamo from possessing unclassified documents, and there is therefore no reason why a detainee should not legitimately be in possession of such documents. Respondents' intimation that the document may *really* be a classified document that *habeas* counsel smuggled out of the secure facility, doctored, and sent on to one of their clients borders on slander.

Third, the "knot-tying" document found by Respondents is not said to have been labeled "attorney-client" and is not said to have been discovered in a detainee's privileged legal folder. The document therefore appears to have no relevance to the instant motion, which after all seeks review only of privileged items that have been confiscated by Respondents.

Fourth, an apparent suicide note that was handwritten on the back of a piece of paper marked "attorney-client privileged" was quite obviously not being "hidden" by any of the

detainees. The piece of paper was discovered in the mesh of the cell of one of the deceased, not

secreted in the privilege folder of any of the detainees. If one of the deceased was seeking to

keep this document from the prying eyes of the guards by disguising it as a privileged document,

why did he place in the open where it would inevitably be discovered? The answer, most

probably, is that the detainee in fact wanted the note to be discovered and that he drafted it on the

only piece of paper readily available to him. In all likelihood, the only "abuse" of the privilege

system was one detainee's agreement to provide the deceased with a piece of paper from his

privilege folder in order to allow the latter to express his last wishes to his family.

Finally, Respondents alert counsel and the Court to a single document that – as described

– likely should not have been in the possession of a detainee. Remarkably, however, the

document is an *email from JTF-Guantanamo itself* – a document that could not have been

provided to a detainee by counsel, since counsel does not have access to such messages. How

did this document come into possession of a detainee? Counsel respectfully suggests that NCIS

inquire of JTF-Guantanamo and its staff, rather than take advantage of JTF-Guantanamo's

apparent security breakdown as an excuse to inspect the privileged papers of every detainee

Respondents hold at Guantanamo.

### 4.    While Despair Pervades Guantanamo, Respondents Have Consistently Refused to Address It In a Serious Way, and the Seizure of Legal Materials Will Not Reduce the Rate of Suicide Attempts

The Court should not allow or excuse Respondents' examination of seized materials on

the wholly unsubstantiated premise that the three detainees' deaths were acts of "warfare" or a

publicity stunt. The situation that the detainees confront—years of confinement on an isolated

island without being charged with an offense and without being told of the evidence against

them, brutal and contemptuous treatment by some of their keepers, and no end to their confinement in sight—is sufficient to account for any suicidal acts. Indeed, the detainees have long engaged in concerted "self-harm" activity, including widely reported hunger strikes. Respondents, however, have consistently sought to suppress information about such activity and have never taken serious steps to address its causes.

If detainees take their own lives at Guantanamo, it may well be because of what they see as the hopelessness of their situation and, at least in some instances, the effects of Respondents' interrogation techniques on their mental health. Breaking the detainees' spirits and psyches for the purpose of collecting intelligence is Guantanamo's *raison-d'etre*. As Physicians for Human Rights has stated, "psychological torture [is] central to the interrogation process and reinforced through conditions of confinement."[39]

Predictably, these tactics have caused the mental health of many Guantanamo detainees to deteriorate. According to government data, detainees committed 350 acts of "self-harm" in 2003, of which 120 were attempted hangings.[40] In August 2003, 23 men attempted to hang themselves.[41] Respondents chose to describe all but two of these hangings as incidents of "manipulative self-injurious behavior," rather than as suicide attempts.[42] In 2004, also according

---

[39]   Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces* 1 (2005), *available at* http://www.phrusa.org/research/torture/pdf/psych_torture.pdf. *See* Dick Decl., Ex J.

[40]   Mark Denbeaux, *Report: The Guantanamo Detainees During Detention*, at 6 (July 10, 2006), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=916789. *See* Dick Decl., Ex K.

[41]   *Id.*

[42]   *Id.* at 14.

to government data, detainees committed another 110 acts of "manipulative self-injurious behavior," although how many of these 110 incidents were attempted hangings was not reported.[43] Even using their narrow definition, Respondents acknowledge that 29 detainees have attempted suicide a total of 41 times.

The tragic results were foreseeable. Last fall, one *habeas* counsel found his client hanging from the wire meshing of an interview cell, his wrist slashed and a pool of blood gathering under his body. Previously, counsel had sought an injunction requiring, among other things, access to his client's medical records. Respondents opposed this motion, claiming that "the Guantanamo medical staff provide appropriate medical and mental health services to all prisoners through a thorough, coordinated team approach, based on individualized treatment plans that account for each patient's conditions and circumstances."[44]

On May 18, 2006, four more detainees reportedly attempted suicide by overdosing on medicines they had hoarded, but in a statement released the following day, Commander Harris stated that only two of these efforts counted as "suicide attempts," apparently because only two detainees lost consciousness in the attempts.[45] Two others complained of dizziness and nausea, one claiming that he had attempted suicide but did not have enough pills. These latter two

---

[43]    *See id.* at 16.

[44]    Gov. Opp'n to Mot. for TRO & Prelim. Injunction (filed Nov. 16, 2005), *Almurbatti v. Bush*, No. 04-1227 (RBW) at 10. *See* Dick Decl., Ex. L.

[45]    Kathleen T. Rhem, *Skirmish with Guards, Two Suicide Attempts Test Guantanamo Procedures*, May 19, 2006, *available at*: http://www.defenselink.mil/news/May2006/20060519-5177.html. *See* Dick Decl., Ex M.

received medical and psychiatric evaluations, but Commander Harris called these detainees "attention-seeking sympathizers who were not trying to actually commit suicide."[46]

Less than a month later, on June 10, 2006, the three deaths that led to the instant motion occurred. In light of the history, purpose, and nature of Guantanamo, it is impossible to accept Respondents' reflexive assertion that the deaths must have been acts of belligerence rather than of despair.

Petitioners would welcome serious efforts by Respondents to change the conditions that make suicide attractive to detainees. But the wholesale seizure and examination of privileged communications is not likely to reduce suicide attempts. Rather, Respondents' seizure of Petitioners' legal materials should be judged according to its predictable effects—the obstruction of detainees' right of access to their counsel.

**D.    Any Further Review of Petitioners' Legal Papers Should Be by the Court or a Special Master**

If the Court determines that it should permit further review of the detainees' legal papers, the use of a Department of Defense Filter Team would be inappropriate. As Respondents hint in their filing, *see* Resps.' Mot. 21 n.12, courts are reluctant to entrust attorney-client privileged materials to such governmental teams. Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."[47] Just last week, the Sixth Circuit overruled

---

[46]    Dep't of Defense, *Statement on Suicide Attempts at Guantanamo,* May 19, 2006, *available at:* http://www.southcom.mil/PA/Media/Releases/Media%20Advisory%20-%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%20%201%20-%20Press%20briefing.pdf. *See* Dick Decl., Ex N.

[47]    *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318 - 322, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006). *See, e.g., Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district

a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege.[48] Even when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[49]

Especially given Respondents' extensive history of interfering with the attorney-client relationships in this case, as well as their desire to "exploit" what they imagine to be "the 'intelligence value'" of monitored attorney-client communications,[50] "it is important that the procedure adopted in this case not only be fair but also appear to the detainees to be fair."[51] Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of [those involved]."[52] Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[53]

---

judge or his designee" review documents for privilege"); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

[48] *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006), *available at*: http://www.ca6.uscourts.gov/opinions.pdf/ 06a245p-06.pdf. Dick Decl., Ex.O.

[49] *Stewart*, 2002 WL 1300059, at *6.

[50] *Al Odah*, 346 F. Supp. 2d at 10 n.11.

[51] *Stewart*, 2002 WL 1300059, at *8.

[52] *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

[53] *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

Concerns about the appearance of fairness are especially important here, given the Petitioners' circumstances.  Before *Rasul*, Petitioners had "been detained virtually incommunicado for nearly three years without being charged with any crime."[54]  Moreover, "Petitioners face an obvious language barrier, have no access to a law library, and lack a working knowledge of the American legal system."[55]  Worse, as a result of statements from interrogators and other government personnel, many detainees suspect that their civilian attorneys are simply guards or interrogators in disguise.[56]  Petitioners' suspicions are being exacerbated as they realize that their attorney-client materials are being reviewed by the very military personnel who detain and interrogate them, or by the latter's counsel.

Another objectionable aspect of Respondents' proposal is their suggestion that the Filter Team conduct its own review of the seized documents to determine whether they were properly "privileged" in nature and whether the documents are relevant to the NCIS investigation.[57]  If the filter team determines that the documents are not privileged, Respondents propose, then they will be "returned . . . to JTF-Guantanamo for appropriate action."[58]  Such a review for privilege leaves "the government's fox . . . in charge of the henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions" overriding legitimate

---

[54]     *Al Odah*, 346 F. Supp. 2d at 12.

[55]     *Id.*

[56]     *See, e.g.*, Charlie Savage, *Guantanamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005, at A1.  Dick Decl., Ex.P.

[57]     *See* Resps.' Mot. at 11.

[58]     *Id.*

claims of privilege.[59] Moreover, the documents should be returned to Petitioners, not to Guantanamo military personnel.

One other aspect of Respondents' motion bears consideration. In addition to demonstrating to Petitioners their power to invade the privilege by seizing Petitioners' legal materials, Respondents attempt to intimidate *habeas* counsel as well. They suggest that "possibly others"—*i.e.*, outsiders—may have participated in a "manifest abuse of the legal mail system."[60] This unfounded, ugly assertion is a veiled threat to *habeas* counsel, designed to hinder them from communicating effectively with their clients. Indeed, buried in a footnote is Respondents' warning that because counsel is prohibited "from sharing . . . certain types of materials with detainees . . . [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."[61] *Habeas* counsel with access to classified information are aware of applicable security precautions and that they work under the shadow of possible contempt and criminal actions if they do not observe the rules. They hold security clearances. Moreover, all *habeas* counsel are officers of the Court.

---

[59]    *In re Grand Jury Subpoenas*, slip op. at 10. (6th Cir. July 13, 2006).

[60]    Resps.' Mot. at 10. In the press, Respondents have been more direct in their accusations. Jeffrey Gordon, reportedly a Defense Department spokesman, has been quoted as saying "We find it curious that habeas attorneys may have been involved in the deaths." E. Schwartz, "Pentagon Suspects Lawyer Involvement in Deaths," Legal Times.com, *available at* http://www. law/jsp/dc/PubArticleFriendly DC.jsp?id=1152608726099. Dick Decl., Ex. Q. Needless to say, no evidence in support of this charge has been disclosed.

[61]    Resps.' Mot. 11 n.10.

Petitioners also object to Respondents' plan to unilaterally revise procedures for attorney-client communications at Guantanamo going forward. Respondents' plan to no longer permit counsel to provide detainees with notepaper stamped with attorney-client confidentiality markings[62] would seriously impair the already-broken system for forwarding Petitioners' letters to their counsel. If Petitioners are not allowed to write to counsel on paper labeled "attorney-client communication," guards may seize the letters, failing to recognize the privileged nature of the communications. Moreover, in other cases guards may be less careful to forward correspondence to counsel. Before Respondents attempt to renegotiate the procedures currently in place, Respondents' seizure and examination of privileged communications must be addressed and corrected, and the current failings in the system, which have often prevented effective attorney-client communications to date, must be addressed and corrected.

### E. Respondents Should Clarify the Extent of the Harm to Date

The focus cannot only be on how to proceed from here. It appears that Respondents have seriously breached Petitioners' attorney-client privilege, but until Respondents clarify exactly what they have done, fully effective corrective measures cannot be formulated.

To the extent that Respondents have already reviewed Petitioners' documents, they bear the burden of rebutting a presumption that the material was not provided to Respondents' counsel. "[W]here the government chooses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for in camera review by a neutral and detached magistrate or by a court-appointed special master, it bears the

---

[62] Resps.' Mot. at 19.

burden to rebut the presumption that tainted material was provided to the prosecution team."[63]
Respondents should be required to submit within two weeks a detailed statement of how they
have handled and the extent to which they have reviewed Petitioners' legal materials.

Moreover, given the Respondents' past treatment of the detainees and continuing hostility
to counsel access, Respondents also carry the burden of rebutting a presumption that they
retaliated against Petitioners as a result of the existence of content of the legal materials. Such
retaliation could further damage Petitioners' relationships with their counsel. Respondents
should be required to submit within two weeks a detailed statement of whether, or how, they
have used their knowledge of the Petitioners' legal materials in their dealings with Petitioners.

Finally, should the Court decide not to order the immediate return of all privileged
materials to Petitioners, Respondents should immediately deliver to each Petitioner a copy of his
counsel's business card, which counsel will provide, so that Petitioners have counsel's address
and can communicate if they wish.

## CONCLUSION

Respondents' motion to examine privileged materials should be denied. The court should
order the immediate return to Petitioners of all of their seized legal materials. In the alternative,
the Court should order the transfer of all seized materials to the Court or a special master and
provide for *in camera* review of only those materials as to which there is a timely showing of
individualized need. If no such showing is timely made, the materials should be returned to
Petitioners for their use. The Court should further order Respondents to file affidavits
establishing (1) whether and to what extent they or their affiliates have reviewed the seized

---

[63]    *Neill*, 952 F. Supp. at 839.

materials, and (2) whether and to what extent their knowledge of the existence or substance of Petitioners' legal materials has affected Respondents' treatment of Petitioners. Finally, the Court should require Respondents to provide Petitioners with their counsel's address immediately. A proposed form of order is attached.

RESPECTFULLY SUBMITTED,

Dated: July 21, 2006

Rebecca P. Dick
D.C. Bar No. 463197
Carolyn M. Welshhans
D.C. Bar No. 489120
DECHERT LLP
1775 I Street, N.W.
Washington, D.C. 20006
(202) 261-3300
Fax: (202) 261-3333

*Counsel for Petitioners*