# EXHIBIT J

**PHR**

**Physicians for
Human Rights**



# BREAK THEM DOWN

Systematic Use of
Psychological Torture
by US Forces

## Physicians for Human Rights

Physicians for Human Rights (PHR) mobilizes health professionals to advance the health and dignity of all people through action that promotes respect for, protection of, and fulfillment of human rights.

Since 1986, PHR members have worked to stop torture, disappearances, and political killings by governments and opposition groups and to investigate and expose violations, including: deaths, injuries, and trauma inflicted on civilians during conflicts; suffering and deprivation, including denial of access to health care, caused by ethnic and racial discrimination; mental and physical anguish inflicted on women by abuse; exploitation of children in labor practices; loss of life or limb from landmines and other indiscriminate weapons; harsh methods of incarceration in prisons and detention centers; and poor health stemming from vast inequalities in societies.

As one of the original steering committee members of the International Campaign to Ban Landmines, PHR shared the 1997 Nobel Peace Prize.

© 2005 Physicians for Human Rights.
All rights reserved.
Printed in the United States of America.

ISBN: 1-879707-45-4
Cover Design: Visual Communications/Glenn Ruga
www.vizcom.org

Physicians for Human Rights
2 Arrow Street, Suite 301
Cambridge, MA 02138 USA
T 617.301.4200
F 617.301.4250
phrusa@phrusa.org
www.phrusa.org

*Washington Office:*
Physicians for Human Rights
1156 15th Street, NW, Suite 1001
Washington, DC 20005 USA
T 202.728.5335
F 202.728.3053

# CONTENTS

Acknowledgements

| | | |
|---|---|---|
| I. | Executive Summary | 1 |
| II. | Introduction | 17 |
| III. | The Use of Psychological Torture at US-Run Detention Facilities in Afghanistan, Iraq, and Guantánamo | 21 |
| IV. | Health Consequences of Psychological Torture | 48 |
| V. | Justifying and Facilitating Psychological Torture | 72 |
| VI. | Legal Prohibitions against the Use of Psychological Torture and Cruel, Inhuman and Degrading Treatment | 101 |
| VII. | Conclusion | 123 |
| VIII. | Recommendations | 124 |

# Acknowledgements

This report was written by Gretchen Borchelt, JD, Jonathan Fine Fellow, Physicians for Human Rights (PHR).  Christian Pross, MD, Center for the Treatment of Torture Victims, Berlin, Germany and Research Fellow, the Hamburg Foundation for the Advancement of Research and Culture, co-authored the section on the health consequences of psychological torture.  PHR is grateful for the substantial and extensive research assistance over many months by David Gottfried and LaShawndra Pace. Leonard S. Rubenstein, JD, PHR's Executive Director, provided overall guidance for the report.

Andrea Northwood, PhD, LP, Lead Clinician for Psychological Services, Rosa Garcia-Peltoniemi, PhD, LP, Director of Client Services, and Patricia Shannon, PhD, LP, Clinical Psychologist and Trainer with the Center for Victims of Torture, Minneapolis, MN, shared their experience and expertise in treating torture survivors. Along with Drs. Northwood, Peltoniemi, and Shannon, the following individuals reviewed the section on health consequences of psychological torture and made invaluable suggestions: Vincent Iacopino, MD, PhD, PHR's Director of Research; Craig Haney, PhD, JD, Professor of Psychology, University of California, Santa Cruz; Michael A. Grodin, MD, Professor of Health Law, Bioethics, and Human Rights, Boston University School of Public Health; Professor of Socio-Medical Sciences, Community Medicine, and Psychiatry, Boston University School of Medicine; and Co-Director, Boston Center for Refugee Health and Human Rights; and Hernan Reyes, MD.  In addition, PHR would like to thank Sepp Graessner, MD, of the Center for the Treatment of Torture Victims, Berlin, Germany, for his pioneering study on the history of research on solitary confinement and sensory deprivation.

PHR would like to thank M. Gregg Bloche, MD, JD, Professor of Law, Georgetown University, Adjunct Professor, Bloomberg School of Public Health and Jonathan H. Marks, MA, BCL, Barrister, Matrix Chambers, London, Greenwall Fellow in Bioethics, Georgetown University Law Center and Bloomberg School of Public Health for sharing their analysis of some of the documents released by the government pursuant to the Freedom of Information Act.

The following individuals reviewed the entire report: Mr. Rubenstein; Dr. Iacopino; Justice Richard J. Goldstone, Justice of the South African Constitutional Court, Retired; Frank Davidoff, MD, Vice President, PHR Board of Directors; Felton Earls, MD, Professor of Child Psychiatry, Harvard Medical School; Carola Eisenberg, MD, Lecturer on Social Medicine, Harvard Medical School. Barbara Ayotte, PHR Director of Communications, edited the report and prepared it for publication.

Support for this report was provided by the Carr Foundation and the Open Society Institute.

I. Executive Summary

This report is the first to comprehensively examine the use of psychological torture by US personnel in the so- called "war on terror."[1] It reviews the techniques used on detainees, what clinical experience and studies reveal about the long-lasting and extremely devastating health consequences of psychological torture, how a regime of psychological torture came about and was perpetuated, and what the current status of psychological torture is in US policy. Although the evidence is far from complete, what is known warrants the inference that psychological torture was central to the interrogation process and reinforced through conditions of confinement. Evidence exists of its continued use in 2004 and some practices likely remain in place to this day.

The use of psychological torture followed directly from decisions by the civilian leadership as well as high ranking military officers, including those in the Executive branch, and their support of decisions to "take the gloves off" in interrogations and "break" prisoners by employing techniques of psychological torture including sensory deprivation, isolation, sleep deprivation, forced nudity, the use of military working dogs to instill fear, cultural and sexual humiliation, mock executions, and the threat of violence or death toward detainees or their loved ones. These kinds of techniques have extremely devastating consequences for individuals subjected to them and can be just as harmful and are often more long-lasting than physical torture.

The infamous pictures from Abu Ghraib prison in Iraq indelibly brought home how severe forms of psychological coercion—detainees terrorized by snarling dogs and wires dangling from their wrists, subjected to severe sexual humiliation, and disoriented by hooding—are indeed forms of torture. What the images do not show, but what this report reveals, is that psychological torture, even if not as graphic as the images, was at the center of the treatment and interrogation of detainees in US custody in Afghanistan, Guantánamo and Iraq since 2002.

Since the Abu Ghraib scandal broke a year ago, the physical abuse of detainees through beatings, use of stress positions, deprivation of food, and infliction of severely cold and hot temperatures, has understandably gained the most attention, and the United States Army has itself labeled the deaths of 26 detainees as homicides. The evidence now available from witness accounts, documents released under the Freedom of Information Act, official investigations, leaked reports from the International Committee of the Red Cross (ICRC), media reports, and inquiries by Physicians for Human Rights, shows that physical forms of torture and cruel, inhuman and degrading treatment served only to punctuate the pervasive use of psychological torture by US personnel against detainees.

The use of the psychologically abusive interrogation methods is immoral and is illegal under the Geneva Conventions and other sources of international law to which the United States is a party, civil domestic law and the Uniform Code of Military Justice. US courts, international treaty bodies, UN special rapporteurs on torture, and the US State Department have all identified these techniques as a form of torture or cruel, inhuman, or degrading treatment. Indeed, when Congress enacted a law to implement the requirement of the Convention against Torture to criminalize torture, it defined precisely what it meant by the criminal act of mental or psychological torture. The US Congress defined the severe mental pain or suffering that

---

[1] The "war on terror" is the term the US government has given its continued operations in Afghanistan, Iraq, and Guantánamo.

1

constitutes an element of the crime of torture as including threats of death or injury and the administration or application or threatened administration or application of "procedures calculated to disrupt profoundly the senses or the personality."[2] This definition encompasses exactly the procedures that were used.

Psychological torture also violates long-standing instructions for military interrogations. Army Field Manual 34-52, the Army's guide on interrogations, currently being revised, allows psychological methods of interrogation, but draws a very sharp line at psychological coercion and efforts to break down detainees, which it considered both unlawful and ineffective:

> [The] use of force, mental torture, threats, insults, or exposure to unpleasant or inhumane treatment of any kind is prohibited by law and is neither authorized nor condoned by the US Government. Experience dictates that the use of force is not necessary to gain the cooperation of sources for interrogation. Therefore, the use of force is a poor technique, as it yields unreliable results, may damage subsequent collection efforts, and can induce the source to say whatever he thinks the interrogator wants to hear.[3]

The Federal Bureau of Investigation agrees. After the Abu Ghraib scandal, it issued an electronic communication that said that FBI policy "has consistently provided that FBI personnel may not obtain statements during interrogations by the use of force, threats, physical abuse, threats of such abuse or severe physical conditions."[4] It reiterated, "It is the policy of the FBI that no interrogation of detainees, regardless of status, shall be conducted using methods which could be interpreted as inherently coercive, such as physical abuse or the threat of such abuse to the person being interrogated or to any third party, or imposing severe physical conditions."[5] This reiteration of policy came on the heels of a number of complaints from the FBI to the Department of Defense regarding their use of unacceptably aggressive interrogation tactics.[6]

*A Regime of Psychological Torture*

Much of what took place in the closed facilities where detainees were kept and interrogated remains secret. In particular, the policies and practices of the Central Intelligence Agency (CIA) are almost completely shielded from public scrutiny. Yet there is sufficient evidence available now to show a consistent pattern of the use of psychological torture as a key element in the interrogation of detainees by US personnel. Various techniques were often applied in combination, in order to amplify and heighten their effect.

---

[2] 18 U.S.C. §2340(2)(B).

[3] Department of the Army. Army Field Manual 34-52. Intelligence Interrogation. Chapter 1, Interrogation and the Interrogator. May 8, 1987. Available at:
http://www.globalsecurity.org/intell/library/policy/army/fm/fm34-52/. Accessed April 26, 2005.

[4] Electronic Communication to All Divisions. From General Counsel, Federal Bureau of Investigation. Title: Treatment of Prisoners and Detainees. May 19, 2004. Available at:
http://www.aclu.org/torturefoia/released/44A.pdf. Accessed April 27, 2005.

[5] *Id.*

[6] See E-mail. From [redacted]. To T.J. Harrington (Div13)(FBI). Subject: Instructions to GTMO Interrogators. May 10, 2004. Disclosed to Senator Levin by William E. Moschella, Assistant Attorney General, US Department of Justice. March 18, 2005.

*Prolonged Isolation*

The use of prolonged isolation took place in all three theaters of operation throughout the "war on terror" and most likely is continuing today. There are reports from the US-run Bagram Air Force Base in Afghanistan that forces used solitary confinement at the base in 2002 and that the harshest treatment was directed at detainees held in isolation.[7] US personnel also used isolation as an interrogation tactic in Iraq. Based on visits to detention facilities throughout Iraq in 2003, the ICRC found that detainees held at Baghdad International Airport were "held for nearly 23 hours a day in strict solitary confinement in small concrete cells devoid of daylight."[8]

An even more restrictive use of isolation was in place at Abu Ghraib prison in Iraq. The Fay report found the use of total isolation there to be "routine and repetitive" and said that it amounted to abuse.[9] The ICRC visited detainees in the "isolation section" of Abu Ghraib in 2003 and witnessed the practice of "keeping persons deprived of their liberty completely naked in totally empty concrete cells and in total darkness, allegedly for several consecutive days."[10] FBI agents who visited Abu Ghraib confirmed the use of isolation; they reported seeing detainees forced to strip naked and then placed in isolation with no clothes.[11] Apparently the use of isolation did not cease in Iraq after the Abu Ghraib scandal. A Criminal Investigation Command investigation report describes a detainee being kept in a small cell by himself at an unknown facility in Iraq in July 2004.[12]

Isolation was built into the housing system used at Guantánamo. Detainees held there in 2002 reported that "people would be kept [in isolation] for months and months and months."[13] This continued in 2003, with detainees at Guantánamo being kept in isolation for anywhere from two to three months to 18 months.[14] In October 2003, the ICRC brought its concerns that "interrogators attempt to control the detainees through the use of isolation" to the attention of

---

[7] Van Natta Jr. D. "Questioning Terror Suspects In a Dark and Surreal World." *New York Times.* March 9, 2003.

[8] International Committee of the Red Cross. *Report of the International Committee of the Red Cross (ICRC) on the Treatment by the Coalition Forces of Prisoners of War and Other Protected Persons by the Geneva Conventions in Iraq During Arrest, Internment and Interrogation.* February 2004: para. 43. [ICRC February 2004 report].

[9] MG George R. Fay. AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade. 2004: 95. Available at: http://www4.army.mil/ocpa/reports/ar15-6/AR15-6.pdf. Accessed April 26, 2005. [Fay report].

[10] ICRC February 2004 report. Para. 27.

[11] Federal Bureau of Investigation. Memorandum from Inspection. To Inspection. Title: Counterterrorism Division, Inquiry Regarding Activities of FBI Personnel at Abu Ghurayb Prison (AGP) During October 2003–December 2003. May 25, 2004. Available at http://www.aclu.org/torturefoia/released/t2969_3060.pdf. Accessed April 26, 2005. Describing investigation conducted by Supervisory Special Agent [redacted]. Los Angeles, California. May 17, 2004.

[12] Agent's Investigation Report. ROI No. 0234-04-CID259-80271. July 19, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Initial/Final/SSI—0234-04-CID259-80271-/5C2/5Y2E/5X1. August 2, 2004. Available at: http://www.aclu.org/torturefoia/released/5245_5258.pdf. Accessed April 26, 2005.

[13] Detention in Afghanistan and Guantánamo Bay: Statement of Shafiq Rasul, Asif Iqbal and Rhuhel Ahmed. July 26, 2004: para. 161. Available at: http://www.ccr-ny.org/v2/legal/september_11th/docs/Guantanamo_composite_statement_FINAL.pdf. Accessed April 26, 2005. [Tipton Three statement].

[14] See, e.g., O'Neill B. "After Guantanamo." *BBC News.* January 25, 2005. Available at: http://news.bbc.co.uk/2/hi/uk_news/magazine/4203803.stm. Accessed April 26, 2005; Tipton Three statement, paras. 193, 199–202, 231.

US officials at Guantánamo,[15] but practice did not change. In fact, a source with knowledge of detainee operations at Guantánamo told PHR that in mid-2004, up to a quarter of the over 500 detainees were kept in isolation and that a new isolation facility, Camp Five, opened in May 2004.[16] This facility is modeled on US "supermaximum" prisons, which often subject prisoners to near total isolation for years on end, and apparently has over 100 isolation units, where lights are kept on for 24 hours a day.[17]

*Sleep Deprivation*

The use of sleep deprivation appears to have been a common interrogation tactic in Afghanistan, Iraq, and Guantánamo. Detainees held at various locations in Afghanistan in 2002 and 2003 describe being routinely deprived of sleep.[18] The spokesman for the American-led force in Afghanistan admitted in 2003 that sleep deprivation was "probably within the lexicon"[19] and that a "common technique" for keeping detainees awake was to keep bright lights on at all times or to wake detainees every fifteen minutes.[20] At Guantánamo, sleep deprivation also was regularly employed. Personnel familiar with conditions there described how sleep deprivation was implemented at the naval base in 2003:

> [A]n inmate was awakened, subjected to an interrogation in a facility known as the Gold Building, then returned to a different cell. As soon as the guards determined the inmate had fallen into a deep sleep, he was awakened again for interrogation after which he would be returned to yet a different cell. This could happen five or six times during a night.[21]

Its use continued in 2004, according to detainees held there during that time.[22]

Sleep deprivation occurred in detention facilities throughout Iraq as well. One FBI report recounts an incident at Abu Ghraib in 2003 in which an agent witnessed a hooded detainee draped in a shower curtain and handcuffed to a waist high rail. A military policeman was lightly slapping the detainee on his back, which the agent was told was done because the "detainee

---

[15] Joint Task Force 170, Department of Defense. Memorandum for Record. Re: ICRC Meeting with MG Miller on 09 Oct 03. Available at: http://www.washingtonpost.com/wp-srv/nation/documents/GitmoMemo10-09-03.pdf. Accessed April 26, 2005.

[16] PHR Interview.

[17] PHR Interview.

[18] See, e.g., Van Natta Jr. D. "Questioning Terror Suspects In a Dark and Surreal World." *New York Times*. March 9, 2003; Tipton Three statement, paras. 45, 52; *Ali v. Rumsfeld*. No. unassigned. N.D. Ill. filed Mar. 1, 2005. Paras. 19, 158(e). Available at: http://www.humanrightsfirst.org/us_law/etn/lawsuit/PDF/rums-complaint-022805.pdf. Accessed April 26, 2005. [*Ali v. Rumsfeld*].

[19] Van Natta Jr. D. "Questioning Terror Suspects In a Dark and Surreal World." *New York Times*. March 9, 2003. Quoting Colonel Roger King.

[20] Human Rights Watch. *"Enduring Freedom": Abuses by U.S. Forces in Afghanistan*. Vol. 16. No. 3(C). 2004: 36. Available at http://hrw.org/reports/2004/afghanistan0304/. Accessed April 26, 2005. Citing Gannon K. "Prisoners Released from Bagram Forced to Strip Naked, Deprived of Sleep, Ordered to Stand for Hours." *Associated Press*. March 14, 2003.

[21] Lewis NA. "Broad Use of Harsh Tactics is Described at Cuba Base." *New York Times*. October 17, 2004.

[22] See, e.g., Amnesty International. *Human Dignity Denied: Torture and Accountability in the 'War on Terror'*. AI Index: AMR 51/145/2004. 2004:25. Available at: http://web.amnesty.org/library/index/engamr511452004. Accessed April 26, 2005. Citing Interview with Amnesty International, Sweden, 27 July 2004.

was being subjected to sleep deprivation."[23] The ICRC said that sleep deprivation at Abu Ghraib during mid-October 2003 was implemented through "the playing of loud music or constant light in cells devoid of windows."[24] Interviews conducted by Maj. Gen. Taguba and General Fay for their respective reports confirmed the pervasive use of sleep deprivation at Abu Ghraib. Capt. Donald J. Reese, the warden of the hard site at Abu Ghraib, told Maj. Gen. Taguba that "sometimes [military intelligence personnel] would put [detainees] on special sleep deprivation plans."[25] Colonel Thomas M. Pappas, the head of military intelligence at Abu Ghraib, explained that doctors were asked to monitor such plans.[26] Personnel were assigned to keep detainees awake.[27] The use of sleep deprivation was not limited to Abu Ghraib. Detainees held in January, March, and April 2004 in Mosul and Tikrit, Iraq report being subjected to sleep deprivation.[28]

*Severe Sexual and Cultural Humiliation*

The use of humiliation as a means of breaking down the resistance of detainees, including forced nudity and forced grooming, began when the "war on terror" began. In 2002, reports from Afghanistan revealed that detainees were being stripped and photographed "in shameful and obscene positions"[29] or touched inappropriately by female interrogators.[30] Detainees held at Kandahar, Afghanistan in 2002 say they underwent forced grooming and forced cavity searches, which they believe were meant to humiliate them.[31] Detainees held in 2003 and 2004 similarly report being subjected to forced nudity and sexual humiliation.[32]

At Guantánamo, detainees' accounts of forced nudity and sexual humiliation were confirmed by FBI reports. An FBI letter to an Army official states that during late 2002 an agent witnessed a female interrogator at Guantánamo rubbing lotion on a detainee's arms during Ramadan, when

---

[23] Federal Bureau of Investigation. Memorandum from Inspection. To Inspection. Title: Counterterrorism Division, Inquiry Regarding Activities of FBI Personnel at Abu Ghurayb Prison (AGP) During October 2003–December 2003. May 25, 2004. Available at: http://www.aclu.org/torturefoia/released/t2969_3060.pdf. Accessed April 26, 2005. Describing investigation conducted by Supervisory Special Agent [redacted]. Portland, Oregon. May 18, 2004.

[24] ICRC February 2004 report. Para. 27.

[25] Interview by Maj. Gen. Taguba, CFLCC Deputy Commanding General, US Army. With Capt. Donald J. Reese, US Army Reserve. February 10, 2004: 44. Available at: http://www.publicintegrity.org/docs/AbuGhraib/Abu10.pdf. Accessed April 26, 2005.

[26] Article 15-6 Investigation Interview by Maj. Gen. Taguba, CFLCC Deputy Commanding General, US Army. With Col. Thomas M. Pappas, Commander, 205th Military Intelligence Brigade. February 9, 2004: 3.

[27] Maj. Gen. Antonio M. Taguba. Article 15-6 Investigation of the 800th Military Police Brigade. Findings and Recommendations, para. 11(a). Completed February 2004. [Taguba report].

[28] See Agent's Investigation Report. ROI No. 0041-04-CID789. May 30, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final (C)/SSI—0140-04-CID259-80204-/5C1Q2/5Y2E. July 8, 2004. Available at: http://www.aclu.org/torturefoia/released/4852_4872.pdf. Accessed April 26, 2005; Translation of Statement provided by Detainee [redacted]. 0180-04-CID259-80227. June 19, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final (C)/SSI—0180-04-CID259-80227-/5C1C/5Y2E/5X1. July 28, 2004. Available at: http://www.aclu.org/torturefoia/released/1248_1288.pdf. Accessed April 26, 2005; Agent's Investigation Report. ROI No. 0024-04-CID789. May 6, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for: See Distribution. Subject: CID Report of Investigation—Final (C)/SSI—0147-04-CID259-80210-/5C1R2/5Y2E/5X1. July 17, 2004. Available at: http://www.aclu.org/torturefoia/released/5015_5069.pdf. Accessed April 26, 2005.

[29] Goldenberg S, Meek J. "Papers Reveal Bagram Abuse." *Guardian* (U.K.). February 18, 2005.

[30] Bonner R. "Detainee Says He Was Tortured While in U.S. Custody." *New York Times*. February 13, 2005.

[31] Tipton Three statement. Para. 55.

[32] *Ali v. Rumsfeld*. Paras. 18,19,161,164.

"physical contact with a woman would have been particularly offensive to a Moslem male."[33] News reports confirmed that the use of female interrogators violating Muslim taboos regarding sex and contact with women occurred at Guantánamo in 2003 as well.[34] These accounts were confirmed to PHR by a source familiar with conditions there. According to the source, in 2003 female interrogators used sexually provocative acts as part of interrogation. For example, female interrogators sat on detainees' laps and fondled themselves or detainees, opened their blouses and pushed their breasts in the faces of detainees, opened their skirts, kissed detainees and if rejected, accused them of liking men, and forced detainees to look at pornographic pictures or videos.[35] Although the use of female interrogators appeared to decline in 2004, a source told PHR that humiliation and violation of cultural and religious taboos, including forced shaving, persisted.[36]

Humiliation of detainees was pervasive at Abu Ghraib. According to the Fay report, "[Military Intelligence] interrogators started directing nakedness at Abu Ghraib as early as 16 September 2003 to humiliate and break down detainees."[37] Forced nudity was used not as a punishment, nor as an exception, but as an accepted method of interrogation. One captain interviewed by Maj. Gen. Taguba said that when he questioned the use of nudity at the prison, he was told "it's an interrogation method that we use."[38] Statements taken by General Fay from soldiers who worked at Abu Ghraib confirm the pervasive use of nudity.[39] Detainees at Abu Ghraib also were forced to wear women's underwear and forced to assume sexually degrading positions. One soldier told General Taguba, "During my tour at the prison I observed that when the male detainees were first brought to the facility, some of them were made to wear female underwear, which I think was to somehow break them down."[40]

It is important to note that the very extreme forms of sexual humiliation seen in the photographs at Abu Ghraib were not routine. But the very pervasiveness and commonality of the use of forced nudity and other forms of sexual humiliation not only led to the more extreme abuses but created an environment in which even more extreme forms of humiliation and abuse were likely not seen as such.

The humiliation of detainees well documented at Abu Ghraib in 2003 was not isolated to that detention facility. The ICRC, in visits to other detention facilities in Iraq in 2003, found that

---

[33] Letter from T.J. Harrington, Deputy Assistant Director, Counterterrorism Division, Federal Bureau of Investigation. To Maj. Gen. Donald J. Ryder, Department of the Army. July 14, 2004. Available at: http://www.aclu.org/torturefoia/released/FBI_4622_4624.pdf. Accessed April 26, 2005.
[34] Leonnig CD, Priest D. "Detainees Accuse Female Interrogators." *Washington Post.* February 10, 2005.
[35] PHR Interview.
[36] PHR Interview.
[37] Fay report at 69.
[38] Interview by Maj. Gen. Taguba, CFLCC Deputy Commanding General, US Army. With Capt. Donald J. Reese, US Army Reserve. February 10, 2004:127. Available at: http://www.publicintegrity.org/docs/AbuGhraib/Abu10.pdf. Accessed April 26, 2005.
[39] See, e.g., Sworn Statement of [redacted]. Civilian. June 7, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD452_517.pdf. Accessed April 26, 2005; Memorandum for Record. Subject: Telephonic Interview. May 28, 2003. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD863_905.pdf. Accessed April 26, 2005; Sworn Statement of [redacted]. E-4/AR, B Co 325 MI BN. July 20, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD452_517.pdf. Accessed April 26, 2005; Sworn Statement of [redacted]. E-4/AD, A Company, 519th Military Intelligence Battalion, 525th Military Intelligence Brigade. June 15, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD565_615.pdf. Accessed April 26, 2005.
[40] Taguba report. Findings and Recommendations, para. 11(e).

"[b]eing paraded naked outside cells in front of other persons deprived of their liberty, and guards, sometimes hooded or with women's underwear over their head" and "[a]cts of humiliation such as being made to stand naked against the wall of the cell with . . . women's underwear over the head for prolonged periods--while being laughed at by guards, including female guards, and sometimes photographed in this position" were among the methods of ill-treatment most frequently alleged during interrogation.[41]

*Use of Threats and Dogs to Induce Fear of Death or Injury*

Interrogators in Afghanistan, Iraq, and Guantánamo cultivated the fear of injury and death through the use of military working dogs, the threat of beatings or electrocutions, and mock executions.

There is evidence that the use of dogs to instill fear and threaten detainees was used as an interrogation technique in all three theaters of operation, from the beginning of the "war on terror." Detainees held at Bagram Air Force Base and Kandahar, Afghanistan in 2002 report being threatened with dogs.[42] An FBI letter states that in "September or October of 2002 FBI agents observed that a canine was used in an aggressive manner to intimidate [a] detainee"[43] at Guantánamo. There is evidence that use of dogs occurred in Afghanistan in 2003 as well.[44] At Abu Ghraib, the Fay report found that the use of dogs began almost immediately after the arrival of dog teams at Abu Ghraib on November 20, 2003.[45] Statements from dog handlers at Abu Ghraib confirmed the use of dogs to instill fear in detainees.[46]

Aside from the use of dogs, mock executions and death threats were prevalent in Afghanistan and Iraq. A detainee in Kandahar, Afghanistan says that in 2002, a 9mm pistol was held to his temple.[47] A Criminal Investigation Command report describes a compact disc that contains digital images of American soldiers conducting mock executions on Afghan detainees beginning in early December 2003 at Fire Base Tycze, Dah Rah Wood, Afghanistan.[48]

The most frequent use of threats of death or injury occurred in Iraq. Evidence suggests that the earliest use of mock executions from Iraq occurred in April 2003. A soldier stationed in Samarra, Iraq reported that beginning on April 15, 2003 he had "observed staged executions" of several detainees using M16 rifles and 9mm pistols.[49] There are reports of US personnel

---

[41] ICRC February 2004 report. Para. 25.

[42] *See* Goldenberg S, Meek J. "Papers Reveal Bagram Abuse." *Guardian* (U.K.). February 18, 2005; Tipton Three statement. Paras. 46, 55.

[43] Letter from T.J. Harrington, Deputy Assistant Director, Counterterrorism Division, Federal Bureau of Investigation. To Maj. Gen. Donald J. Ryder, Department of the Army. July 14, 2004. Available at: http://www.aclu.org/torturefoia/released/FBI_4622_4624.pdf. Accessed April 26, 2005.

[44] *Ali v. Rumsfeld.* Para. 18.

[45] Fay report at 10.

[46] White J, Higham S. "Use of Dogs to Scare Prisoners Was Authorized." *Washington Post.* June 11, 2004.

[47] Tipton Three statement. Para. 14.

[48] US Army Criminal Investigation Command, Department of the Army. Memorandum for: See Distribution. Subject: CID Report of Investigation—Final (C)/SSI-0133-2004-CID452-63629-5C1A/5M3A/5X3/5Y2D2/5C2B. August 25, 2004. Available at: http://www.aclu.org/torturefoia/released/021605/6176_6311.pdf. Accessed April 26, 2005.

[49] Sworn Statement of [redacted]. SGT/AD, 170th MP Det CID. July 18, 2003. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final (C)—0139-03-CID469-60206-5Y2E2/5Y2P9/9G1. October 13, 2004. Available at: http://www.aclu.org/torturefoia/released/030705/8809_8877.pdf. Accessed April 26, 2005.

holding guns to detainees' heads in Karbala and Taji, Iraq in the summer of 2003.[50] An ICRC report describes the use of death threats at Umm Qasr and Camp Bucca, Iraq. The report states, "Persons deprived of their liberty undergoing interrogation . . . were allegedly subjected to frequent cursing, insults and threats, both physical and verbal, such as having rifles aimed at them in a general way or directly against the temple, the back of the head, or the stomach, and threatened with transfer to Guantanamo, death or indefinite internment."[51] Threats were extended to family members, particularly the wives and daughters, of detainees.[52]

*Combination of Techniques*

The evidence points to a widespread and systematic application of these techniques, often in combination. According to the Fay report, a Criminal Investigation Command investigation found that, "from December 2002, interrogators in Afghanistan were removing clothing, isolating people for long periods of time, using stress positions, exploiting fear of dogs and implementing sleep and light deprivation."[53] Detainees reported that at Guantánamo in late 2002, they observed techniques such as as short-shackling, loud music playing in interrogation, forced shaving of beards and hair, putting people in cells naked, taking away people's comfort items, sleep deprivation, and the use of cold air.[54] Other detainees report being subjected to a range of psychologically abusive interrogation techniques at various locations in Afghanistan in 2003 and 2004.[55] In Iraq in 2003, the ICRC found numerous forms of ill-treatment, including threats, insults, verbal abuse, hooding, sleep deprivation, forced nudity, and sexual humiliation, being used at various detention facilities.[56] Other reports detail a similar combination of techniques used on detainees in Iraq in 2004.[57]

A source familiar with conditions at Guantánamo in 2004 told PHR that US personnel there had devised a system to break people through a combination of humiliating acts, solitary confinement, temperature extremes, and use of forced positions.[58] This was confirmed by an internal FBI e-mail that documented an incident observed by an agent at Guantánamo during February 2004. The agent observed a detainee who was short shackled, in a room with the temperature significantly lowered, and subjected to strobe lights and possibly loud music.[59] The

---

[50] USMC Alleged Detainee Abuse Cases Since 11 Sep 01. Spreadsheet documenting alleged detainee abuse cases as of June 16, 2004. Available at: http://www.aclu.org/torturefoia/released/navy3706.3713.pdf. Accessed April 26, 2005; US Army Criminal Investigation Command, Department of the Army. Memorandum for: See Distribution. Subject: CID Report of Investigation—Final—0152-03-CID469-60212-5C1A/5C2/5T1. February 6, 2004. Available at: http://www.aclu.org/torturefoia/released/105_167.pdf. Accessed April 26, 2005.

[51] ICRC February 2004 report. Para. 31.

[52] *Id.* Para. 34.

[53] Fay report at 29.

[54] Tipton Three statement. Para. 161.

[55] *Ali v. Rumsfeld.* Paras. 18, 19, 21, 164.

[56] ICRC February 2004 report. Paras. 27, 30, 31, 34.

[57] See, e.g., Onishi N, Schmitt E. "U.S. Considers Reopening Inquiry Into Possible Abuse Before Iraqi Prison Scandal." *New York Times.* October 14, 2004; Agent's Investigation Report. ROI No. 0041-04-CID789. May 30, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final (C)/SSI—0140-04-CID259-80204-/5C1Q2/5Y2E. July 8, 2004. Available at: http://www.aclu.org/torturefoia/released/4852_4872.pdf. Accessed April 26, 2005.

[58] PHR Interview.

[59] E-mail. From [redacted]. To [redacted]. Subject: reported incidents. May 5, 2004. Available at: http://www.aclu.org/torturefoia/released/FBI_4985_4987.pdf. Accessed April 26, 2005.

detainee was left in this condition for 12 hours, during which time he was not allowed to eat, pray or use the bathroom.[60]

From the evidence it is clear that the military's own inquiries are incorrect about when abuses began. The 2004 report issued by an independent panel headed by the Honorable James R. Schlesinger, for example, claimed that in Afghanistan through the end of 2002, all forces followed Army Field Manual 34-52, the Army's guide on interrogations.[61] The evidence clearly shows, however, that interrogators in Afghanistan were using psychologically abusive techniques far beyond what was permitted in FM 34-52 from early 2002 on. The executive summary of the report written by Vice Admiral Albert T. Church similarly claimed that interrogators in Guantánamo relied on FM 34-52 in 2002.[62] Again, the evidence paints a different picture: US military personnel were using psychologically coercive tactics, including prolonged isolation, sexual humiliation, and military dogs at Guantánamo throughout 2002.

While the evidence permits the conclusion that the use of psychologically abusive interrogation methods was systematic from 2002 on, the picture remains incomplete. Reports from detainees are limited, since many remain in custody, and international human rights monitoring groups have been kept out of detention facilities. Official investigations released thus far have largely focused on what happened at Abu Ghraib, without undertaking a comprehensive investigation of conditions and abuses at Guantánamo, Afghanistan, and other detention facilities in Iraq. Much more can and should be investigated.

*Health Consequences*

Psychological torture and cruel, inhuman, and degrading treatment can have extremely destructive health consequences for individuals.  Short and long-term effects can include memory impairment, reduced capacity to concentrate, somatic complaints such as headache and back pain, hyperarousal, avoidance, irritability, severe depression with vegetative symptoms, nightmares, feelings of shame and humiliation, and posttraumatic stress disorder.[63] Sources with knowledge of interrogation at Guantánamo told PHR that some detainees there suffer from incoherent speech, disorientation, hallucination, irritability, anger, delusions, and sometimes paranoia.[64] Some detainees who have been released from US-run detention facilities after being subjected to a combination of psychologically abusive interrogation techniques report that they suffer from depression, thoughts of suicide and nightmares, memory loss, emotional problems, and are quick to anger and have difficulties maintaining relationships and employment.[65] Based on past experience, post traumatic stress disorder is likely to be common.

---

[60] *Id.*

[61] Final Report of the Independent Panel to Review DoD Detention Operations. August 2004: 8. Available at: http://www.defenselink.mil/news/Aug2004/d20040824finalreport.pdf. Accessed April 26, 2005.

[62] Naval Inspector General, Vice Admiral Albert T. Church, III. Executive Summary. March 10, 2005:4. [Church executive summary]. Church completed a comprehensive review of interrogation operations, but only the executive summary was made available to the public.

[63] Keller A, Gold J. "Survivors of Torture." In: Sadock B, Sadock V, eds. *Kaplan and Sadock's Comprehensive Textbook of Psychiatry.* Vol. 1. 8th ed. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 2400.

[64] PHR Interview.

[65] *Ali v. Rumsfeld.* Paras. 157–159, 163–169, 170–177.

*Prolonged Isolation*

In the 1950s and 1960s, studies demonstrated that short-term isolation caused an inability to think or concentrate, anxiety, somatic complaints, temporal and spatial disorientation, deficiencies in task performance, hallucinations, and loss of motor coordination.[66] The findings of contemporary research are consistent with the earlier findings of solitary confinement's harmful consequences. Effects include depression, anxiety, difficulty with concentration and memory, hypersensitivity to external stimuli, hallucinations and perceptual distortions, paranoia, and problems with impulse control.[67] People who are exposed to isolation for the first time develop "a predictable group of symptoms, which might almost be called a 'disease syndrome.'"[68] The symptoms include "bewilderment, anxiety, frustration, dejection, boredom, obsessive thoughts or ruminations, depression, and, in some cases, hallucination.[69]

These reports of the severe health effects of solitary confinement parallel reports by government agencies, the ICRC and individual detainees who were subjected to prolonged isolation. In November 2002, FBI agents at Guantánamo observed a detainee after he had been subjected to intense isolation in a cell that was always flooded with light for over three months. They reported that the detainee "was evidencing behavior consistent with extreme psychological trauma (talking to non-existent people, reporting hearing voices, crouching in a corner of the cell covered with a sheet for hours on end)."[70] FBI agents brought this and other concerns about abusive treatment of detainees to the attention of Department of Defense officials in mid 2003, but there is no evidence that the concerns were appropriately addressed.

In late 2003, the ICRC warned the Administration publicly that a system in which detainees were held indefinitely would inevitably lead to mental health problems.[71] When the ICRC visited Guantánamo in June 2004, it found a high incidence of mental illness produced by stress, much of it caused by prolonged solitary confinement.[72] A source familiar with conditions at Guantánamo at that time told PHR that deprivation of sensory stimulation on the one hand and overstimulation on the other were causing spatial and temporal disorientation in detainees. The results were self-harm and suicide attempts.[73]

---

[66] See, e.g., Graessner S. "Gesundheitliche Auswirkungen von Langzeithaft mit Isolation; Historische Wurzeln und Forderungen." In: Birck A, Pross C, Lansen J, eds. *Das Unsagbare*. Berlin, Germany: Springer Verlag; 2002:253–269; Leidermann PH. "Man Alone: Sensory Deprivation and Behavioral Change." *Corrective Psychiatry & Journal of Social Therapy.* 1962;8:64–74.

[67] See, e.g., Haney C. "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement." *Crime & Delinquency.* January 2003;49(1):124–156; Gendreau P, Freedman NL, Wilde GJS, Scott GD. "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement." *Journal of Abnormal Psychology.* 1972;79(1):54–59; Grassian S. "Psychopathological Effects of Solitary Confinement." *American Journal of Psychiatry.* 1983;140:1450–54.

[68] Brief of Professors and Practitioners of Psychology and Psychiatry as *Amicus Curiae* in Support of Respondent at 12–13. *Wilkinson v. Austin.* No. 04-495. S. Ct. filed 2005. Citing Hinckle LE, Wolff HE. "Communist Interrogation and Indoctrination of 'Enemies of the States'." 76 *Archives of Neurology and Psychiatry.* 1956;76:115–174.

[69] *Id.* at 13.

[70] Letter from T.J. Harrington, Deputy Assistant Director, Counterterrorism Division, Federal Bureau of Investigation. To Major General Donald J. Ryder, Department of the Army. July 14, 2004. Available at: http://www.aclu.org/torturefoia/released/FBI_4622_4624.pdf. Accessed April 26, 2005.

[71] Lewis NA. "Red Cross Finds Detainee Abuse in Guantánamo." *New York Times.* November 30, 2004.

[72] *Id.* Summarizing findings from a leaked ICRC report to the US government, based on a June 2004 visit to Guantánamo.

[73] PHR Interview.

*Sleep Deprivation*

The most pronounced impact of total sleep deprivation is cognitive impairment,[74] which can include "impairments in memory, learning, logical reasoning, arithmetic skills, complex verbal processing, and decision making."[75] Sleep-deprived individuals take longer to respond to stimuli, and sleep loss causes "attention deficits, decreases in short-term memory, speech impairments, perseveration, and inflexible thinking."[76] These symptoms may appear after one night of total sleep deprivation, after only a few nights of sleep restriction (5 hours of sleep per night).[77] Sleep restriction also can result in hypertension and other cardiovascular disease.[78] One study correlates sleep deprivation with decreased pain tolerance,[79] which has significant implications for torture and other situations in which sleep restrictions are implemented in tandem with other torture techniques.

Two detainees held at Bagram Air Force Base, Afghanistan in March 2002 said that the sleep deprivation to which they were subjected lasted for several weeks and left them terrified and disoriented.[80]

*Sexual Humiliation*

According to clinicians at the Minnesota-based Center for Victims of Torture (CVT), forced nakedness is intended to create a power differential between detainees and interrogators by stripping the victim of his/her identity, inducing immediate shame, and establishing an environment where the threat of sexual and physical assault is always present. By denying the victim the most basic forms of decency and privacy, forced nudity conveys the message that interrogators have absolute control over the detainees' bodies and can do as they please. Implied in the context of forced nudity is the threat of other, more abusive violations, whether sexual or physical.[81]

There is evidence that US personnel directed sexual humiliation toward detainees because they knew that Arabs are particularly vulnerable to sexual humiliation and sought to exploit that vulnerability.[82] Clinicians at the Center for the Treatment of Torture Victims in Berlin, Germany (Berlin Center), who treat a large population of Muslims, have found that Muslim victims of sexual torture forever carry a stigma and will often be ostracized by the community. They have found that male victims often feel degraded in their manhood, especially if the perpetrator was a woman. They have seen marriages and families break up due to the special concept of honor and dignity in Muslim culture that is violated by sexual torture. With respect to forced nudity,

---

[74] Sadock B, Sadock V, eds. *Kaplan and Sadock's Comprehensive Textbook of Psychiatry*. Vol. 1. 8th ed. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 289.

[75] Nolen-Hoeksema S. *Abnormal Psychology*. 2nd ed. New York: McGraw-Hill; 2005:627.

[76] Sadock B, Sadock V, eds. *Kaplan and Sadock's Comprehensive Textbook of Psychiatry*. Vol. 1. 8th ed. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 289.

[77] *Id.*

[78] Alvarez GG, Ayas NT. "The Impact of Daily Sleep Duration on Health: A Review of the Literature." *Progress in Cardiovascular Nursing*. 2004;19:56–59.

[79] Hakki Onen S, Abdelkrim A, Gross A, Eschallier AE, Dubray C. "The Effects of Total Sleep Deprivation, Selective Sleep Interruption and Sleep Recovery on Pain Tolerance Thresholds in Healthy Subjects." *Journal of Sleep Research*. 2001;10:35–42.

[80] Human Rights Watch. *"Enduring Freedom": Abuses by U.S. Forces in Afghanistan*. Vol. 16. No. 3(C). 2004: 34. Available at: http://hrw.org/reports/2004/afghanistan0304/. Accessed April 26, 2005.

[81] Personal communication with the Center for Victims of Torture.

[82] Hersh S. "The Gray Zone." *New Yorker*. May 24, 2004.

the Berlin Center clinicians have found that merely being stripped naked implies the breaking of a strict taboo, which leaves victims feeling extremely exposed and humiliated.[83]

Erik R. Saar, a translator at Guantánamo from December 2002 to June 2003, wrote that after interrogation sessions, some of which included women interrogators telling detainees they were menstruating and then touching the detainees, the water in the detainee's cell would be turned off so that the detainee could not wash himself. This was done in order to "make the detainee feel that, after talking to [the female interrogator], he was unclean and was unable to go before his God in prayer and gain strength."[84]

Staff members at CVT say that sexual humiliation often leads to symptoms of PTSD and major depression, and that victims often relive the session of humiliation in the form of flashbacks and nightmares long after their detention. In fact, many of their clients who have been sexually humiliated report that their most enduring and disabling symptoms are related to reliving memories of the voices of their torturers using sexually degrading insults or threats.[85] Clinicians at the Berlin Center similarly have found that victims of sexual torture often suffer from severe depression, anxiety, depersonalization, dissociative states, complex posttraumatic stress disorder, and multiple physical complaints such as chronic headaches, eating disorders, and digestive problems.[86] They also have found that suicides may occur unless a strong religious conviction forbids otherwise.[87]

*Threats to Induce Fear of Death or Injury*

According to CVT clinicians, mock executions and other situations where death is threatened force victims to repeatedly experience their last moments before death, create a sense of complete unpredictability, and induce chronic fear and helplessness. Victims who were threatened with death speak of having a sense that one is already dead. They often relive these near-death experiences in their nightmares, flashbacks, and intrusive memories. Reliving these near death encounters can provoke feelings of intense anxiety that cause victims to act inappropriately in work and family settings and, in more extreme cases, cause injury to themselves. Staff members at CVT have dealt with victims of this sort of torture who have pleaded with torturers to kill them, preferring real death over its constant threat and continued intolerable pain.[88]

**Creating a New Legal Framework to Permit Psychological Torture**

Psychological torture was the product of decisions taken at the highest levels to use far more coercive forms of interrogations than had been allowed in the past. To implement this approach, Bush Administration officials ignored previous guidance and set out new legal interpretations followed by new policies and rules. Historically, the United States has adhered

---

[83] Wenk-Ansohn M. "Folgen Sexualisierter Folter – Therapeutische Arbeit mit kurdischen Patientinnen." In: Birck A, Pross C, Lansen J, ed. *Das Unsagbare – Die Arbeit mit Traumatisierten am Behandlungszentrum für Folteropfer Berlin.* Berlin, Germany: Springer Verlag; 2000:57–77.
[84] Associated Press. "Ex-G.I. Writes About Use of Sex in Guantánamo Interrogations." *New York Times.* January 28, 2005. Quoting from Saar's classified manuscript.
[85] Personal communication with the Center for Victims of Torture.
[86] Wenk-Ansohn M. "Folgen Sexualisierter Folter – Therapeutische Arbeit mit kurdischen Patientinnen." In: Birck A, Pross C, Lansen J, ed. *Das Unsagbare – Die Arbeit mit Traumatisierten am Behandlungszentrum für Folteropfer Berlin.* Berlin, Germany: Springer Verlag; 2000:57–77.
[87] *Id.*
[88] Personal communication with the Center for Victims of Torture.

to strict limitations on interrogations, following its own guidance and the rule of law as established in the Geneva Conventions. Administration officials started by disparaging the Geneva Conventions and denying their coverage to detainees. Although they established a standard of "humane treatment" for detainees, this protection was undercut by permitting "military necessity" to override that obligation. The Administration then sought to define what constitutes torture very narrowly, so as to permit interrogators to use techniques considered unlawful by authorities ranging from courts to the State Department's own human rights reports. The most notorious reinterpretation came in a memorandum from the Office of Legal Counsel of the Justice Department in August, 2002.[89]

The new legal approach then became the basis for the approval of interrogation techniques that went far beyond the military's traditional standards and violated the Geneva Conventions and Convention against Torture. In October 2002, commanders at Guantánamo sought approval for a host of interrogation techniques that went far beyond past practice or what is permitted by the Geneva Conventions and FM 34-52.[90] A legal memorandum prepared by Lt. Col. Diane E. Beaver in October 2002 considered the legality of the techniques proposed for use at Guantánamo. The memorandum approved the use of waterboarding, isolation, sensory deprivation, removal of clothing, hooding, and exploitation of detainees' phobias.[91] This approval was based on a combination of reasoning from the 2002 OLC opinion that narrowly interpreted the federal anti-torture statute and the President's February 2002 directive stating that military necessity could overcome the mandate to treat detainees humanely.[92]

This legal analysis and recommendations by other officials eventually led to Defense Secretary Donald Rumsfeld's approval in December 2002 of psychologically abusive interrogation techniques, including sensory deprivation, isolation, hooding, removal of clothing, forced grooming, and use of dogs, for use at Guantánamo.[93] When the General Counsel of the Navy expressed reservations about these techniques, Secretary Rumsfeld rescinded them, but at the same time he also permitted exceptions, telling the Commander of US Southern Command that if one of the techniques was warranted, he should receive a request.[94] Rumsfeld also appointed a Working Group to assess various techniques and their policy implications.[95]

---

[89] Memorandum for Alberto R. Gonzales, Counsel to the President. From Office of Legal Counsel, US Department of Justice. Re: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340–2340A. August 1, 2002.

[90] Memorandum for Commander, Joint Task Force 170. From Jerald Phifer, LTC, USA, Director J2. Subject: Request for Approval of Counter-Resistance Strategies. October 11, 2002. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc3.pdf. Accessed April 27, 2005.

[91] Memorandum for Commander, Joint Task Force 170. From Diane E. Beaver, LTC, USA, Staff Judge Advocate. Subject: Legal Brief on Proposed Counter Resistance Strategies. October 11, 2002. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc3.pdf. Accessed April 27, 2005.

[92] Memorandum for the Vice President, Secretary of State, Secretary of Defense, Attorney General, Chief of Staff to the President, Director of Central Intelligence, Assistant to the President for National Security Affairs, Chairman of the Joint Chiefs of Staff. From President Bush. Subject: Humane Treatment of al Qaeda and Taliban Detainees. February 7, 2002. Available at: http://www2.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/02.02.07.pdf. Accessed April 27, 2005.

[93] Memorandum. For Secretary of Defense. From William J. Haynes II, General Counsel. Subject: Counter-Resistance Techniques. November 27, 2002. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc5.pdf. Accessed April 27, 2005.

[94] Memorandum for Commander USSOUTHCOM. From Donald Rumsfeld, Secretary of Defense. Subject: Counter-Resistance Techniques. January 15, 2003.

[95] Memorandum for the General Counsel for the Department of Defense. From Donald Rumsfeld, Secretary of Defense. Subject: Detainee Interrogations. January 15, 2003. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc6.pdf. Accessed April 27, 2005.

The Working Group's report, released April 4, 2003, approved the use of psychologically abusive techniques, such as isolation, environmental manipulation, hooding, threats to transfer a detainee to a third country where the detainee is likely to fear death, forced grooming, removal of clothing, and inducement of fear.[96] Supposed safeguards were described – including, in some cases, medical examinations - but the overall message was permissiveness. The techniques were recommended despite the Working Group's acknowledgement that alleged safeguards did not ameliorate the danger of going beyond techniques authorized by FM 34-52 and the Geneva Conventions, that certain of the recommended techniques have not historically been used by US military forces, that some have been interpreted to constitute torture or cruel, inhuman, or degrading treatment, and that they could be viewed negatively by other countries. On the basis of this report, Secretary Rumsfeld approved 24 techniques for use at Guantánamo, including environmental manipulation and isolation.[97]  The memo, however, did not exclude the use of techniques not specifically approved, giving latitude to interrogators to vary techniques depending on certain factors, like the detainee's culture. He also qualified the requirement to treat detainees humanely by subjecting it to "military necessity."

The policy directives and legal memorandums ending in Secretary Rumsfeld's April 16, 2003 guidance said that only certain techniques were permitted at Guantánamo. Yet the directives and memorandums also shattered the absolute prohibition on torture by privileging military necessity and defining torture narrowly.  The mixed message and general approval of coercion from the highest levels led to the continued use of psychological torture, including techniques that went far beyond those traditionally permitted and those approved by Rumsfeld for use at Guantánamo.

In Afghanistan, the informal use of psychologically coercive interrogation techniques beyond FM 34-52 became formalized in 2003. Details are classified, but according to the evidence, it appears that sensory deprivation, hooding, removal of clothing, forced grooming, isolation, and use of detainees' phobias were approved.[98]

In Iraq, techniques approved for "unlawful combatants" in Guantánamo were adopted for use against detainees who were clearly covered by the Geneva Conventions.  In September and October 2003, various memorandums approved the use of environmental manipulation, sleep adjustment, false flag, isolation, presence of military working dogs, sleep management, yelling, loud music and light control, deception, and stress positions.[99]  Even when these techniques were rescinded because of concerns that they were too aggressive, the policies in place allowed the use of techniques not officially approved, if approval was secured by a senior commander. Apparently approval was freely given. For example, one soldier told investigators that interrogators "could send the detainee to isolation for thirty days or more as long as they

---

[96] Working Group Report on Detainee Interrogations in the Global War on Terrorism; Assessment of Legal, Historical, Policy, and Operational Considerations. April 4, 2003.
[97] Memorandum for the Commander, US Southern Command. From Donald Rumsfeld, The Secretary of Defense. Subject: Counter-Resistance Techniques in the War on Terrorism. April 16, 2003.
[98] See, e.g., Church executive summary at 6.
[99] See, e.g., Memorandum for Commander, US Central Command. From Ricardo S. Sanchez, Lieutenant General, US Army, Commanding. Subject: CJTF-7 Interrogation and Counter-Resistance Policy. September 14, 2003; Memorandum for C2 and C3, Combined Joint Task Force Seven, Baghdad and Commander, 205th Military Intelligence Brigade, Baghdad. From Ricardo S. Sanchez, Lieutenant General, Commanding, Combined Joint Task Force Seven, Baghdad. Subject: CJTF-7 Interrogation and Counter-Resistance Policy. October 12, 2003.

wrote the right memo. . . . No one was checking to ensure the recommendations were sound with any sort of regularity."[100]

*The Present Situation*

Because of extreme secrecy regarding detention operations and the decision to classify interrogation techniques (which were previously publicly available) it is difficult to ascertain what forms of psychological torture are currently in use. Some of the most egregious practices, such as use of snarling dogs, may have ended, but long-term isolation is still used.

It is especially disturbing, though, that the Bush Administration has recently reaffirmed an interpretation of psychological torture that essentially immunizes perpetrators from liability for it. In December, 2004, the Administration issued a new opinion interpreting the federal criminal statute on torture to replace its long-discredited opinion from August, 2002.[101] That opinion twisted the definition of psychological torture to undermine plain language outlawing techniques "calculated to disrupt profoundly the sense or the personality." The result is to insulate perpetrators of psychological torture from accountability, thus inviting its continuation.

Nor has the Bush Administration abandoned its refusal to abide by the absolute prohibition against torture. In April 2005, a draft of the Administration's new detainee operations policy was leaked.[102] Although the document says that there is no military exception to the requirement that detainees be treated humanely, it contradicts that statement only seven pages later by formalizing the category of "enemy combatant" and declaring that their humane treatment is subject to military necessity. This position is contrary to international and domestic law. It is the position that created the space for the ill-treatment and torture of detainees. This policy, especially when understood in tandem with the Administration's continued interpretation of psychological torture, is a signal that nothing has changed, despite the public outrage over Abu Ghraib. The Administration will continue to seek justifications and legal maneuvers for using coercive interrogation methods.

A report on April 28, 2005 said that the Army is revising its interrogation manual to prohibit specific psychological torture techniques, including stripping prisoners, keeping them in stressful positions for prolonged periods, using military dogs to intimidate prisoners, and sleep deprivation.[103] Based on what was reported, it may not go far enough. The article does not mention whether other psychologically abusive techniques, like isolation, other methods of inducing fear, and other forms of sexual and cultural humiliation, are prohibited. There also is no mention of whether exceptions are permitted. The "unlawful combatant" category permits military necessity to override humane treatment; what does that mean for the specific prohibitions in this new manual? The new manual must be publicly released so that these issues can be identified and solved. Additionally, this manual is applicable only to the Armed

---

[100] Sworn Statement of [redacted]. SGT, B/CO 470th Military Intelligence Group. May 18, 2004. In: Annex to Fay/Jones/Kern report. Available at http://www.aclu.org/torturefoia/released/030905/DOD822_862.pdf. Accessed April 26, 2005.

[101] Memorandum for James B. Comey, Deputy Attorney General. From Daniel Levin, Acting Assistant Attorney General, Office of Legal Counsel, Department of Justice. December 30, 2004.

[102] Department of the Army, Department of the Navy, Department of the Air Force, US Coast Guard, Jt. Chiefs of Staff. Joint Publication 3-63: Joint Doctrine for Detainee Operations. March 23, 2005. On file with PHR.

[103] Schmitt E. "Army, In Manual, Limiting Tactics in Interrogation." *New York Times*. April 28, 2005: A1.

Forces; it does not guide interrogations by the CIA or other agencies. This gap must be addressed.

The Executive Branch must end and prohibit the use of psychological torture, withdraw legal opinions that permit psychological torture and replace them with an interpretation faithful to the federal criminal anti-torture statute, publicly disclose interrogation rules, hold perpetrators accountable, rehabilitate and compensate victims of torture, permit ongoing monitoring, and promote ethical practice by military medical personnel. The US Congress must establish an independent commission to investigate, carry out its oversight responsibilities, and enact appropriate legislation. Given the Administration's refusal to abide by law, its continued resistance to disclosure of its activities or its rules, a truly independent investigation and means of accountability is required.

# II. Introduction

Since at least early 2002, the United States has been engaged in systematic psychological torture, often punctuated by severe physical abuse, against detainees in its custody in the "war on terror."[1] It is understandable that physical abuse, including the 26 cases the US Army has called homicides,[2] has received the most intense attention and scrutiny from policy-makers, the media, and the public. Yet this physical abuse took place in the context of an ongoing regime of psychological torture of detainees, one made possible by new interpretations of laws governing psychological torture by the Departments of Justice and Defense and put into place in directives on authorized interrogation techniques. These interpretations, in truly Orwellian fashion, turned laws meant to protect people from torture into means of authorizing it. As recently as December 2004, the Office of Legal Counsel of the Justice Department reaffirmed an interpretation of psychological torture that gives a green light to the very practices the law was designed to prevent.

Beginning in early 2002, officials at the highest levels of the civilian leadership decided that limitations on interrogations and treatment of prisoners, as embodied in military guidelines and the laws of war, placed too many constraints on interrogations. So they began a process to authorize and to seek to justify legally a range of psychologically abusive interrogation techniques that go far beyond past practice and the protections of international humanitarian law. These techniques include sensory deprivation; isolation; sleep deprivation; humiliation, including sexual humiliation; threats of death, injury, or transfer to a place where they would be at risk of death; and the presence of military working dogs to instill fear. Many of these were frequently used in combination. Because of the government's continued refusal to disclose information about its treatment of detainees or to permit an independent investigation of its practices, it is impossible to determine precisely how many detainees were subjected to which techniques of psychological torture since early 2002.

Based on a review of disclosed documents, comprising Administration memorandums, government documents released pursuant to a Freedom of Information Act (hereinafter FOIA) request, and leaked International Committee of the Red Cross (hereinafter ICRC) reports, as well as PHR's own interviews, it is clear that US personnel have used these techniques systematically at detention facilities in Afghanistan, Guantánamo, and Iraq, from the beginning of the "war on terror" through 2004. Some techniques, like sleep deprivation and nakedness, were designed to part of interrogation plans and strategies for particular detainees; others, like long-term isolation, were part and parcel of the conditions of confinement for many detainees. Because of the close relationship between conditions of confinement and interrogation techniques, the victims could well number in the thousands. The evidence points to a system of consistent psychological torture and ill-treatment, accompanied by physical abuse that was central to the interrogation of detainees. There has been no accountability for the practice of psychological torture among officials responsible for putting the practices into place.

This report explores the system of psychological abuse at US-run detention facilities in Afghanistan, Guantánamo, and Iraq. It examines the techniques of psychological torture and cruel, inhuman, and degrading treatment that were used in the field, in all three theaters of

---

[1] The "war on terror" is the term the US government has given its continued operations in Afghanistan, Iraq, and Guantánamo.

[2] Jehl D, Schmitt E. "U.S. Military Says 26 Inmate Deaths May Be Homicide." *New York Times.* March 16, 2005. This number reflects deaths in American custody in Iraq and Afghanistan since 2002.

operation. It looks at the impact of a system of psychological torture and ill-treatment on individuals. It describes the legal framework and policy directives that led to such a system. It reviews the legal prohibitions on the use of psychologically abusive interrogation methods. Finally, it provides recommendations for ending such a system.

There are legitimate psychological interrogation techniques that have proven effective in obtaining information without inducing psychological trauma. Army Field Manual 34-52 (hereinafter FM 34-52), the Army's guide on gathering information during interrogations, outlines these acceptable uses of psychology to build relationships that will yield information. While making clear that the use of force and mental torture is prohibited, FM 34-52 approves of the use of "psychological ploys, verbal trickery, or other nonviolent and noncoercive ruses used by the interrogator in questioning hesitant or uncooperative sources."[3] FM 34-52 provides guidelines for interrogators on different approaches that use psychology.[4] These include the "silent approach," by which the interrogator says nothing to the source while looking him in the eye, and the "futility technique approach," by which the interrogator plays on doubts already in the source's mind.[5] The manual points out, however, that the most effective approach is the "direct approach," which is the "questioning of the source without having to use any type of approach" at all.[6]

The techniques recommended by FM 34-52, which are based on decades of wisdom and experience, do not cross the line into psychological torture or cruel, inhuman, and degrading treatment. The Field Manual makes this distinction clear when it says, "The psychological techniques and principles outlined should neither be confused with, nor construed to be synonymous with, unauthorized techniques such as brainwashing, mental torture, or any other form of mental coercion to include drugs."[7] This is because the use of torture or cruel, inhuman, and degrading treatment is ineffective, counterproductive, and immoral. FM 34-52 makes this clear:

> The use of force, mental torture, threats, insults, or exposure to unpleasant and inhumane treatment of any kind is prohibited by law and is neither authorized nor condoned by the US Government. Experience indicates that the use of force is not necessary to gain the cooperation of sources for interrogation. Therefore, the use of force is a poor technique, as it yields unreliable results, may damage subsequent collection efforts, and can induce the source to say whatever he thinks the interrogator wants to hear.[8]

FM 34-52 was written to comply strictly with the provisions of the Geneva Conventions,[9] which codify the laws governing conflicts and require warring parties to adhere to a set of basic

---

[3] Department of the Army. Army Field Manual 34-52. Intelligence Interrogation. Chapter 1, Interrogation and the Interrogator. May 8, 1987. Available at: http://www.globalsecurity.org/intell/library/policy/army/fm/fm34-52/. Accessed April 26, 2005. [FM 34-52]. There is an updated version of FM 34-52 from 1992, but it is not available to the public. For purposes of this report, all references to FM 34-52 are from the 1987 version.

[4] *Id.* Appendix H, Approaches.

[5] *Id.*

[6] *Id.*

[7] *Id.* Chapter 1, Interrogation and the Interrogator.

[8] *Id.*

[9] Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field including Annex 1. August 12, 1949. 6 U.S.T. 3114. 75 U.N.T.S. 31; Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of Armed Forces at Sea. August 12, 1949. 6

principles. The Geneva Conventions are clear about the prohibition of torture and other forms of inhumane or degrading treatment and specifically prohibit the use of any form of coercion on protected persons, including prisoners of war (hereinafter POWs).[10] FM 34-52 states that "almost any ruse or deception is usable as long as the provisions of the Geneva Convention are not violated."[11] In its description of techniques, it is careful to point out which approaches, like "fear up (harsh)," should be implemented with extra care, in order to ensure that actions do not violate the Geneva Conventions.[12]

Early on, the Administration, however, took the position that FM 34-52 and the Geneva Conventions are too restrictive. For that reason, it adopted a new legal framework that manipulated the definition of torture in order to permit psychological torture. Torture is defined in the US federal criminal anti-torture statute as "an act committed by a person acting under the color of law specifically intended to inflict *severe* physical or *mental pain or suffering* . . . upon another person within his custody or physical control."[13] This means that psychological torture is prohibited by the statute. The statute defines "severe mental pain or suffering" as:

> the prolonged mental harm caused by or resulting from—
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind-altering substances or *other procedures calculated to disrupt profoundly the senses or the personality*;
> (C) the threat of imminent death; or
> (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality;[14]

The Administration interpreted the statute in such a way as to open the door to a range of psychologically coercive interrogation techniques that, under the plain language of the statute, are prohibited. The Administration also subjected the requirements of humane treatment in

---

U.S.T. 3217. 75 U.N.T.S. 85; Convention Relative to the Treatment of Prisoners of War, including Annexes I–V. August 12, 1949. 6 U.S.T. 3316. 75 U.N.T.S. 135 [Third Geneva Convention]; Convention Relative to the Protection of Civilian Persons in Time of War. August 12, 1949. 6 U.S.T. 3516. 75 U.N.T.S. 287 [Fourth Geneva Convention].

[10] "[N]o physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever. Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to unpleasant or disadvantageous treatment of any kind." Third Geneva Convention, *supra* note 9. Article 17; "No physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties." Fourth Geneva Convention, *supra* note 9. Article 31; "Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms . . . shall in all circumstances be treated humanely. To this end the following acts are and shall remain prohibited at any time and in any place whatsoever . . . [v]iolence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture." Common Article 3(1). See also, Third Geneva Convention, *supra* note 9. Article13. Requiring that prisoners of war must at all times be treated humanely; Fourth Geneva Convention, *supra* note 9. Article 27. Specifying that protected persons shall at all times be treated humanely.

[11] FM 34-52, *supra* note 3. Chapter 3, Interrogation Process.

[12] See, e.g., "Fear Up (Harsh)": "Great care must be taken when doing this so that any actions taken would not violate the Geneva Conventions." FM 34-52, *supra* note 3, Appendix H, Approaches.

[13] 18 U.S.C. § 2340(1). Emphasis added.

[14] 18 U.S.C. §2340(2). Emphasis added.

the Geneva Conventions to so-called "military necessity." These policies led directly to guidelines that encouraged and, in some cases, mandated the use of psychologically abusive interrogation techniques.  The result was the systematic use of psychological torture and cruel, inhuman, and degrading treatment, which led to devastating health consequences for the individuals subjected to them.

Physicians for Human Rights  brings a long history of documenting torture. For nearly twenty years, PHR has documented and exposed acts of torture and ill-treatment and has medically examined torture victims from around the world.  PHR is one of the principal organizers of the United Nations Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Istanbul Protocol), which contains international standards for effective investigation and documentation of torture and ill-treatment.

## III.  The Use of Psychological Torture at US-Run Detention Facilities in Afghanistan, Iraq, and Guantánamo

Techniques of psychological coercion began in prison facilities in Afghanistan in 2002, quickly spread to Guantánamo and then to Iraq, becoming more abusive in each new theater of operation.

### A.  The Use of Psychologically Coercive Tactics—Afghanistan and Guantánamo 2002

According to the 2004 report into DoD detention operations conducted by an independent panel headed by the Honorable James R. Schlesinger (hereinafter Schlesinger report), in Afghanistan "from the war's inception through the end of 2002, all forces used FM 34-52 as a baseline for interrogation techniques."[15] The evidence paints a very different picture. It shows that interrogators at the beginning of the "war on terror" were not strictly following FM 34-52. Rather, it is obvious that the use of psychologically coercive techniques was already occurring in Afghanistan at this early date.

#### 1.  *Bagram Air Force Base, Afghanistan*

As early as 2002, before any official guidance was issued, reports of the use of psychological coercion during interrogations were emerging from Afghanistan. Although few documents have been produced, the evidence available suggests that psychologically coercive techniques were employed in 2002 at the US-run Bagram Air Force Base in Afghanistan. Wesam Abdulrahman Ahmed Al Deemawi, a Jordanian citizen, was detained there beginning on March 15, 2002. In a sworn affidavit, Mr. Deemawi claimed that during a forty-day period of detention at Bagram Air Force Base he was threatened with dogs, stripped and photographed "in shameful and obscene positions," and placed in a cage with a hook and a hanging rope.[16] Another detainee, Mamdouh Habib, stated that while being held there in April 2002, female soldiers "touched [him] in the private areas" while questioning him.[17] Muhammad Shah, an Afghan farmer who was detained at the base for eighteen days, explained how US personnel deprived them of sleep; Mr. Shah reported that the facility is lighted 24 hours a day in order to make sleep almost impossible.[18]

Abdul Jabar and Hakkim Shah, two former detainees at Bagram in 2002, said conditions to which they were exposed were very harsh.[19] They allege that they were forced to stand naked, hooded and shackled for long periods of time, and were deprived of sleep for several consecutive days.[20] Mr. Jabar described how he was kept naked while shackled to the ground with his arms chained to the ceiling. He was allowed to dress only when taken for interrogation or to the

---

[15] Final Report of the Independent Panel to Review DoD Detention Operations. August 2004: 8. Available at: http://www.defenselink.mil/news/Aug2004/d20040824finalreport.pdf. Accessed April 26, 2005. (Schlesinger report).

[16] Goldenberg S, Meek J. "Papers Reveal Bagram Abuse." *Guardian* (U.K.). February 18, 2005. Referring to an affidavit Mr. Deemawi made to a lawyer.

[17] Bonner R. "Detainee Says He Was Tortured While in U.S. Custody." *New York Times*. February 13, 2005.

[18] Van Natta Jr. D. "Questioning Terror Suspects In a Dark and Surreal World." *New York Times*. March 9, 2003.

[19] Gall C. "U.S. Military Investigating Death of Afghan in Custody." *New York Times*. March 4, 2003.

[20] *Id.*

bathroom.[21] Two other detainees held at the Bagram detention facility in March 2002 told Human Rights Watch they were put in a group cell for several weeks where they were stripped to their undershirts and underwear.[22] Bright lights were set up outside the cell and US military personnel kept the detainees awake by banging on the metal walls of the cell.[23] The men told Human Rights Watch that the sleep deprivation, which lasted for several weeks, left them terrified and disoriented.[24] According to accounts provided to the *New York Times*, US forces used solitary confinement at the base in 2002 and reserved the harshest treatment for the detainees kept in isolation.[25]

The accounts of the use of psychologically abusive tactics by detainees held at Bagram Air Force Base in 2002 were confirmed by western intelligence officials who spoke anonymously to the *New York Times*. One intelligence official told the *Times* that one detainee held in a secret Central Intelligence Agency (hereinafter CIA) center at Bagram was "fed very little, while being subjected to sleep and light deprivation, prolonged isolation, and room temperatures that varied from 100 degrees to 10 degrees" during a three-month period at the base in 2002.[26] Reports by detainees have been corroborated by officials. When asked specifically about the use of such techniques, Col. Roger King, spokesman for the American-led force in Afghanistan at the time, claimed that they were acceptable. Col. King said that it was "legitimate to use lights, noise and vision restriction, and to alter, without warning, the time between meals, to blur a detainee's sense of time."[27] He also said that sleep deprivation was "probably within the lexicon"[28] and that a "common technique" for keeping detainees awake was to keep bright lights on at all times or to wake detainees every fifteen minutes.[29]

   2.   *Other Detention Facilities, Afghanistan*

Psychologically coercive techniques have been documented at other detention facilities in Afghanistan throughout 2002. One detainee reported that on his first night of detention in December 2002 at a military base near Jalalabad, he was kept in a freezing cold cell, stripped naked, and doused with cold water.[30] Former detainee Tarek Dergoul recalled that while being detained at Kandahar, Afghanistan for three months in early 2002, "[s]ometimes I was just left sitting in the interrogation tent with nothing, no food or toilet facilities. . . . My body hair was shaved, including my pubic hair. . . ."[31]

---

[21] *Id.*

[22] Human Rights Watch. *"Enduring Freedom": Abuses by U.S. Forces in Afghanistan.* Vol. 16. No. 3(C). 2004: 34. Available at http://hrw.org/reports/2004/afghanistan0304/. Accessed April 26, 2005. [HRW Afghanistan report]. According to Human Rights Watch [HRW], this information was gathered from interviews HRW conducted with the detainees in July 2003 and several interviews with a journalist who had interviewed the detainees prior to that. Names were withheld by HRW for security reasons.

[23] *Id.*

[24] *Id.*

[25] Van Natta Jr., *supra* note 18.

[26] *Id.*

[27] *Id.*

[28] *Id.* Quoting Col. King.

[29] HRW Afghanistan report, *supra* note 22, at 36. Citing Gannon K. "Prisoners Released from Bagram Forced to Strip Naked, Deprived of Sleep, Ordered to Stand for Hours." *Associated Press.* March 14, 2003.

[30] *Id.* at 35. Citing Gannon K. "Prisoners Released from Bagram Forced to Strip Naked, Deprived of Sleep, Ordered to Stand for Hours." *Associated Press.* March 14, 2003.

[31] Amnesty International. *Human Dignity Denied: Torture and Accountability in the 'War on Terror'.* AI Index: AMR 51/145/2004. 2004:25. Available at: http://web.amnesty.org/library/index/engamr511452004.

In a statement to the Center for Constitutional Rights, Shafiq Rasul, Asif Iqbal and Rhuhel Ahmed (hereinafter Tipton Three), three British citizens detained in November 2001 in Afghanistan and later transferred to Guantánamo, state that they were exposed to a range of psychologically coercive interrogation techniques in December 2001 or early 2002 at Sherberghan Prison and at Kandahar, Afghanistan.[32] During an interrogation by the US Army at Sherberghan, Mr. Iqbal states that he had a 9mm pistol held to his temple.[33] Mr. Rasul says that while detained at Kandahar, prison guards "were deliberately stopping us from sleeping."[34] Mr. Rasul also says that "[prison guards] cut off all my clothes and forcefully shaved our beards and heads. . . . I was completely naked with a sack on my head and I could hear dogs barking nearby and soldiers shouting 'get 'em boy.'"[35] Mr. Rasul described how "when the soldiers would come into the tents they came with dogs. If you made any sudden movements the dogs would be brought right up to you snarling and barking very close to your face."[36] While in Kandahar, the three men underwent forced cavity searches, which they believe "were used to degrade and humiliate them."[37] At night, US personnel in Kandahar forced the detainees to move around from tent to tent so as to prevent the detainees from falling asleep. Mr. Ahmed describes how they "shone powerful lights into the tents which made things worse."[38] The men claim that another goal was keeping detainees isolated from each other. Mr. Ahmed says, "You were not allowed to communicate with anyone in the tent. I started to feel crazy from the isolation."[39]

The use of psychologically abusive techniques in Afghanistan in late 2002 was confirmed in the report of Maj. Gen. George R. Fay (hereinafter Fay report).[40] According to the Fay report, a Criminal Investigation Command (hereinafter CID) investigation found that, "from December 2002, interrogators in Afghanistan were removing clothing, isolating people for long periods of time, using stress positions, exploiting fear of dogs and implementing sleep and light deprivation."[41]

---

Accessed April 26, 2005. [Amnesty International report]. Citing Witness statement of Tarek Dergoul. *Abbasi v. Secretary of State for Foreign and Commonwealth Affairs*. [2002] EWCA Civ 1598 69. May 21, 2004.

[32] Detention in Afghanistan and Guantanamo Bay: Statement of Shafiq Rasul, Asif Iqbal and Rhuhel Ahmed. July 26, 2004: paras. 1–36. Available at: http://www.ccr-ny.org/v2/legal/september_11th/docs/Guantanamo_composite_statement_FINAL.pdf. Accessed April 26, 2005. [Tipton Three statement].

[33] *Id.* Para. 14.

[34] *Id.* Para. 45.

[35] *Id.* Para. 46.

[36] *Id.* Para. 55.

[37] *Id.*

[38] *Id.* Para. 52.

[39] *Id.*

[40] MG George R. Fay. AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade. 2004. Available at: http://www4.army.mil/ocpa/reports/ar15-6/AR15-6.pdf. Accessed April 26, 2005. [Fay report]. Maj. Gen. Fay was appointed to investigate allegations that members of the 205th Military Intelligence Brigade were involved in detainee abuse at the Abu Ghraib Detention Facility.

[41] *Id.* at 29.

### 3.  Guantánamo

The executive summary of the report written by Vice Admiral Albert T. Church (hereinafter Church executive summary) says that "[a]t the beginning of interrogation operations at [Guantánamo] in January 2002, interrogators relied upon the techniques in FM 34-52."[42] It is obvious from the evidence that this reliance, if it existed at all, did not last long. Just as in Afghanistan, US military personnel were using psychologically coercive tactics at Guantánamo throughout 2002.

### a.  Prolonged Isolation

According to Shah Mohammed Alikhil, who was one of the first detainees to arrive at Guantánamo, "it was compulsory for a detainee to pass a month in Container Camp [the name of the camp's isolation wing]."[43] Human Rights Watch documented its use as a disciplinary measure, but it appeared that it was imposed for minor "violations" such as having extra items like cups or salt or for exercising in the cell.[44] Tarek Dergoul, who was transferred to Guantánamo on May 1, 2002, says that about fifteen of the twenty-two months he spent at Guantánamo were spent in the isolation block as discipline for breaking rules.[45]

The Tipton Three said that isolation was always being used at Guantánamo, but after the arrival of General Miller in November 2002, "people would be kept there for months and months and months."[46] Documents released by the government pursuant to the FOIA confirm the use of prolonged isolation at Guantánamo in 2002. A letter from an FBI official to an Army official about highly aggressive interrogation techniques being used against detainees at Guantánamo reports that

> in November 2002, FBI agents observed Detainee [redacted] after he had been subjected to intense isolation *for over three months*. During that time period, [detainee] was totally isolated (with the exception of occasional interrogations) in a cell that was always flooded with light.  By late November, the detainee was evidencing behavior consistent with extreme psychological trauma (talking to non-existent people, reporting hearing voices, crouching in a corner of the cell covered with a sheet for hours on end).[47]

---

[42] Naval Inspector General, Vice Admiral Albert T. Church, III. Executive Summary. March 10, 2005:4. [Church executive summary]. Church completed a comprehensive review of interrogation operations, but only the executive summary was made available to the public.

[43] Human Rights Watch. *Guantanamo: Detainee Accounts.* A Human Rights Watch Backgrounder. 2004:15. Available at: http://www.hrw.org/backgrounder/usa/gitmo1004/. Accessed April 26, 2005. [HRW Guantanamo report].

[44] See *id.* at 16.

[45] *Id.* at 17.

[46] Tipton Three statement, *supra* note 32. Para. 161.

[47] Letter from T.J. Harrington, Deputy Assistant Director, Counterterrorism Division, Federal Bureau of Investigation. To Major General Donald J. Ryder, Department of the Army. July 14, 2004. Emphasis added. Available at: http://www.aclu.org/torturefoia/released/FBI_4622_4624.pdf. Accessed April 26, 2005. [Letter from TJ Harringon].

### b. Sexual Humiliation

The Tipton Three describe being routinely stripped naked at Guantánamo. They felt that these practices were intended to humiliate them.[48] Similarly, Mr. Habib, who was transferred to Guantánamo in 2002, states that at the naval base interrogators doctored pictures to make it appear that his wife was naked next to Osama bin Laden.[49] He also said that during one interrogation session, a female interrogator said to him, "You Muslim people don't like to see woman [sic]."[50] Then she reached under her skirt and pulled out what he described as a bloody stick and threw blood in his face.[51]

Again, documents produced by the government parallel detainees' accounts of sexual humiliation. An FBI letter to an Army official states that during late 2002 an agent witnessed a female interrogator at Guantánamo rubbing lotion on a detainee's arms during Ramadan when "physical contact with a woman would have been particularly offensive to a Moslem male."[52] The observing agent then saw the interrogator's hands move toward the detainee's lap and saw the detainee grimace in pain. When asked why the detainee had grimaced, a marine present during the interrogation replied that the interrogator had bent the detainees' thumbs backwards and also grabbed the detainee's genitals. The marine "implied that her treatment of that detainee was less harsh than her treatment of others by indicating that he had seen her treatment of other detainees result in detainees curling into a fetal position on the floor and crying in pain."[53]

### c. Use of Dogs and Other Techniques

US military personnel also used dogs as a method of interrogation at Guantánamo as early as 2002. The FBI letter states that in "September or October of 2002 FBI agents observed that a canine was used in an aggressive manner to intimidate [a] detainee."[54]

The Tipton Three stated that they observed techniques such as short-shackling, loud music playing in interrogation, forced shaving of beards and hair, putting people in cells naked, taking away people's comfort items, sleep deprivation, and the use of cold air beginning in November 2002.[55]

### d. Formalization of Techniques

As will be explained below, military personnel at Guantánamo in October 2002 sought approval for a new interrogation plan for the naval base that included techniques such as sensory deprivation, forced nudity, forced grooming, isolation, and use of detainees' phobias, such as fear of dogs.[56] The request resulted in an approved interrogation policy from Secretary Rumsfeld on December 6, 2002 that permitted the use of these psychologically abusive techniques, all of which went far beyond FM 34-52.

---

[48] See, e.g., Tipton Three statement, *supra* note 32. Para. 60.
[49] Bonner, *supra* note 17.
[50] *Id.* Quoting Mr. Habib.
[51] *Id.*
[52] Letter from T.J. Harrington, *supra* note 47.
[53] *Id.*
[54] *Id.*
[55] Tipton Three statement, *supra* note 32. Para. 161.
[56] See *infra* text accompanying notes 517–548.

## B. Continued Use of Psychologically Coercive Tactics—Afghanistan and Guantánamo 2003

### 1. Afghanistan

The informal use of psychologically coercive interrogation techniques beyond FM 34-52 became formalized in Afghanistan in 2003 and included hooding, removal of clothing, isolation, sensory deprivation, and use of dogs.[57]

Mehboob Ahmad, an Afghan citizen detained at various locations in Afghanistan between June and November 2003, claims that he was subjected to intimidation with a vicious dog, questioning while naked, threats directed at his family, and sensory deprivation.[58] The sensory deprivation consisted of being forced to wear black, opaque goggles almost continuously for the entire first month of his detention and for several days after, and being forced to wear sound-blocking earphones.[59] Said Nabi Siddiqi, an Afghan citizen detained at various locations in Afghanistan between July and August 2003, claims he was subjected to, among other things, verbal abuse of a sexual nature, humiliation by being photographed while naked, and sleep deprivation.[60] According to Mr. Siddiqi, guards prevented him from sleeping by throwing stones at him all night and by awakening him during the night, forcing him to roll around, dousing him with water, and verbally abusing him.[61] In interviews conducted by Amnesty International of detainees who were captured in Afghanistan, one detainee said that he and others were stripped, shaved of their facial and head hair, and photographed before being transferred to Guantánamo.[62]

The use of psychologically coercive techniques in Afghanistan in 2003 and early 2004 has been confirmed by at least one government report. A CID report describes a compact disc that contains digital photos of American soldiers conducting mock executions on Afghan detainees beginning in early December 2003 at Fire Base Tycze, Dah Rah Wood, Afghanistan.[63] The photos depict soldiers pointing pistols and M-4 rifles at the heads of detainees who are bound and hooded. The CID report also contains a statement from an Army team leader saying that similar photos had been destroyed following the publicity surrounding the detainee abuse scandal at Abu Ghraib prison in Iraq in order to avoid "another public outrage."[64]

---

[57] See *infra* text accompanying notes 599–603.

[58] *Ali v. Rumsfeld.* No. unassigned. N.D. Ill. filed Mar. 1, 2005. Para. 18. Available at: http://www.humanrightsfirst.org/us_law/etn/lawsuit/PDF/rums-complaint-022805.pdf. Accessed April 26, 2005.

[59] *Id.* Para. 155(f).

[60] *Id.* Para. 19.

[61] *Id.* Para. 158(e).

[62] Amnesty International report, *supra* note 31, at 25. Citing Interview of Mehdi Ghezali with Amnesty International. Sweden. July 27, 2004.

[63] US Army Criminal Investigation Command, Department of the Army. Memorandum for: See Distribution. Subject: CID Report of Investigation—Final (C)/SSI-0133-2004-CID452-63629-5C1A/5M3A/5X3/5Y2D2/5C2B. August 25, 2004. Available at: http://www.aclu.org/torturefoia/released/021605/6176_6311.pdf. Accessed April 26, 2005. The investigation established probable cause to believe various US personnel committed the offense of dereliction of duty but not the offense of aggravated assault. *Id.*

[64] Sworn Statement of [redacted]. File No. 0122-04-CID452. July 8, 2004. In: US Army Criminal Investigation Command, *supra* note 63.

2. *Guantánamo*

From December 2, 2002 until January 15, 2003, the Bush Administration used isolation, light deprivation, female interrogators to induce stress, and forced grooming at Guantánamo.[65] From January 15 until April 16, 2003, it appears that no policy was in place, although Secretary Rumsfeld was willing to consider the use of the abusive techniques.[66] Beginning on April 16, a new policy went into effect, which permitted isolation and environmental manipulation and gave considerable latitude to interrogators in the choice of techniques, leaving the door open to abuse.[67]

a. Sleep deprivation

Personnel familiar with conditions at Guantánamo described to the *New York Times* how sleep deprivation was implemented in 2003:

> [A]n inmate was awakened, subjected to an interrogation in a facility known as the Gold Building, then returned to a different cell. As soon as the guards determined the inmate had fallen into a deep sleep, he was awakened again for interrogation after which he would be returned to yet a different cell. This could happen five or six times during a night.[68]

b. Sexual and Cultural Humiliation

A *Washington Post* article states that female interrogators at Guantánamo regularly violated Muslim taboos regarding sex and contact with women.[69] At least eight detainees claim that "women rubbed their bodies against [them], wore skimpy clothes in front of them, made sexually explicit remarks and touched them provocatively."[70] According to the *Washington Post*, a Pentagon investigation generally confirms the allegations and uncovered numerous instances in which female interrogators smeared red dye, which they told detainees was menstrual blood, on the bodies of Muslim detainees.[71] According to an official, the dye was smeared on detainees before they were supposed to pray because, according to Islamic beliefs, contact with a woman makes them impure and prevents them from being able to pray.[72]

This account was confirmed to PHR by a source familiar with conditions at the base. According to the source, in 2003 female interrogators used sexually provocative acts as part of interrogation. For example, female interrogators sat on detainees' laps and fondled themselves or detainees, opened their blouses and pushed their breasts in the faces of detainees, opened their skirts, kissed detainees and if rejected, accused them of liking men, and forced detainees to look at pornographic pictures or videos.[73]

---

[65] See *infra* text accompanying note 606.

[66] See *infra* text accompanying notes 552–588.

[67] See *infra* text accompanying notes 588–595.

[68] Lewis NA. "Broad Use of Harsh Tactics is Described at Cuba Base." *New York Times.* October 17, 2004.

[69] Leonnig CD, Priest D. "Detainees Accuse Female Interrogators." *Washington Post.* February 10, 2005.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] PHR interview. PHR does not reveal the identity of sources, to protect against retaliation.

c. Prolonged Isolation

There is evidence of extreme isolation at Guantánamo during 2003.[74] Most detainees were isolated in single cells and allowed out of the cells only twice a week for fifteen minute periods in order to shower and exercise. No physical contact between detainees was permitted.[75] The ICRC brought concerns about the use of isolation to the attention of Maj. Gen. Miller, the commander of the US detention camp in Guantánamo, in October 2003. ICRC representatives told General Miller that they felt "interrogators attempt to control the detainees through the use of isolation."[76]

Detainees' experiences confirm the use of prolonged, extreme isolation at Guantánamo in 2003. Two British citizens—Moazzam Begg and Feroz Abbasi—were put in isolation in 2003 and remained there for 18 months.[77] They say that they were kept in solitary confinement in Camp Echo, a high security facility within Camp Delta. The cells in which they were confined had no natural light and the detainees were cut off from all communication with others; they did not have the right to recreation, group prayers or association with other detainees. Authorities at Camp Echo reportedly removed a guard from outside the cell of Mr. Begg and replaced the guard with a video camera after they discovered that the guard had been conversing with Mr. Begg.[78] They were finally moved out in December 2004, after protests from the Foreign Office about their health.[79]

Similarly, the Tipton Three were subjected to long periods of isolation at Guantánamo in 2003. Mr. Rasul claims that he was kept in isolation for extremely long periods of time. He says, "I remained in isolation. . . for a further two months without any comfort items at all, apart from a blanket and mat."[80] He says that in response to his time in isolation he "was desperate for it to end and therefore eventually [he] just gave in and admitted [what they wanted to hear]. . . . After that [he] remained in isolation for another five or six weeks."[81] Similarly, Mr. Iqbal alleges that he was kept in isolation for at least "two or three months."[82] Mr. Iqbal describes what he had to endure in isolation:

> The conditions in isolation were very hard. The cells were made of metal. They were extremely hot. The air conditioning was broken and hot air would come out. Sometimes the soldiers would put it on really hot. You had to sleep on a metal bunk. In the first few weeks I was given nothing, not a mattress or a blanket and I was denied all comfort items. I couldn't talk to anyone.[83]

---

[74] Van Natta Jr., *supra* note 18.

[75] *Id.*

[76] Joint Task Force 170, Department of Defense. Memorandum for Record. Re: ICRC Meeting with MG Miller on 09 Oct 03. Available at: http://www.washingtonpost.com/wp-srv/nation/documents/GitmoMemo10-09-03.pdf. Accessed April 26, 2005. [ICRC Oct. 2003 meeting].

[77] O'Neill B. "After Guantanamo." *BBC News*. January 25, 2005. Available at: http://news.bbc.co.uk/2/hi/uk_news/magazine/4203803.stm. Accessed April 26, 2005.

[78] *Id.*

[79] *Id.*

[80] Tipton Three statement, *supra* note 32. Para. 193.

[81] *Id.* Paras. 199–202.

[82] *Id.* Para. 231.

[83] *Id.* Para. 232.

d. Other Techniques

The *New York Times* confirmed the Tipton Three's statements about other techniques that began in late 2002. The *New York Times* reported, based on interviews with military guards, intelligence agents, and others, that

> One regular procedure . . . at Camp Delta, the main prison facility at the naval base in Cuba, was making uncooperative prisoners strip to their underwear, having them sit in a chair while shackled hand and foot to a bolt in the floor, and forcing them to endure strobe lights and screamingly loud rock and rap music played through two close loudspeakers, while the air-conditioning was turned up to maximum levels.[84]

## C. Migration of Psychologically Coercive Tactics—Iraq 2003

After the invasion of Iraq in 2003 the interrogation techniques being used in Afghanistan and Guantánamo migrated to Iraq. These techniques were formalized in policy at various points and included the use of dogs, stress positions, isolation, sleep management, and sensory deprivation. While techniques such as environmental manipulation, sleep adjustment, sensory deprivation and stress positions were not approved for use at all times, they were nonetheless permitted with the approval of Lt. Gen. Sanchez, who was the theater commander in Iraq.[85]

The ICRC verified the use of aggressive techniques by US personnel during its visits to detention facilities in Iraq between March and November 2003.[86] At interrogation facilities throughout Iraq, the ICRC found numerous forms of ill-treatment, which were usually applied in combination. These interrogation techniques included such methods of psychological coercion as threats, insults, isolation, verbal abuse, hooding, sleep deprivation, forced nudity, and sexual humiliation.[87]

### 1. Threats

Evidence suggests that the earliest use of psychological abuse on record in Iraq had occurred by the summer of 2003. There are several CID investigation reports from this time of mock executions in which interrogators directly threatened the lives of detainees by pointing loaded weapons at detainees and discharging their weapons in close proximity to the detainees' heads. The earliest incident is from April 2003. A soldier stationed in Samarra, Iraq reported that beginning on April 15, 2003 he had "observed staged executions" of several detainees using M16 rifles and 9mm pistols.[88] According to the statement of an official, the soldier described what was happening in Samarra as a "chamber of horrors."[89]

---

[84] Lewis, *supra* note 68.

[85] See *infra* text accompanying notes 609–641.

[86] International Committee of the Red Cross. Report of the International Committee of the Red Cross (ICRC) on the Treatment by the Coalition Forces of Prisoners of War and Other Protected Persons by the Geneva Conventions in Iraq During Arrest, Internment and Interrogation. February 2004. [ICRC February 2004 Report].

[87] See, e.g., *id.* Paras. 27, 30, 31, 34.

[88] Sworn Statement of [redacted]. SGT/AD, 170th MP Det CID. July 18, 2003. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of

On May 15, 2003, two Marines in Karbala held a 9 mm pistol to the head of a bound detainee while a third Marine took a picture.[90] A similar incident report from Taji, Iraq, dated August 2003, describes an incident in which a lieutenant, whose name is redacted from the report, "committed the offense of Communicating a Threat when he charged his 9mm pistol, positioned it threateningly during his interrogation of Mr. [redacted] and related he would kill Mr. [redacted] if he did not provide the appropriate information."[91] According to the report, when the detainee would not talk, the interrogator took the detainee outside where he was shown six soldiers standing in a line with their weapons in hand and was told, "if you don't talk, they will kill you."[92] The interrogator then placed the head of the detainee into a clearing barrel and fired his pistol near the detainee's head. The detainee "became hysterical and thought he was going to be killed by LTC [redacted]."[93]

Another report of the direct communication of a death threat towards a detainee is described in a CID investigation memo dated October 1, 2003.[94] The memo includes a statement from a soldier who admits that he threatened to have another man shoot and kill the detainee being interrogated in Baghdad, Iraq. The soldier also handed the detainee being interviewed a bullet and told him that it would be the bullet to kill him. The soldier proceeded to make the detainees kneel down with their eyes closed while an unloaded weapon was charged.[95]

A CID investigation into the mistreatment of enemy POWs between April and August 2003 at Camp Red in Baghdad, Iraq describes an extreme technique used to make detainees believe that they would be killed or injured if they did not provide information to interrogators.[96] One soldier describes how he was told that detainees were made to lie down on the extremely hot pavement while Bradley fighting vehicles were backed up on the sidewalk in an effort to make the detainees think that they would be run over. He was told this was done "to spook the detainees."[97]

---

Investigation—Final (C)—0139-03-CID469-60206-5Y2E2/5Y2P9/9G1. October 13, 2004. Available at: http://www.aclu.org/torturefoia/released/030705/8809_8877.pdf. Accessed April 26, 2005.

[89] Sworn Statement of [redacted]. E-8, B Co. 223 Military Intelligence. November 23, 2003. In: US Army Criminal Investigation Command, *supra* note 88.

[90] USMC Alleged Detainee Abuse Cases Since 11 Sep 01. Spreadsheet documenting alleged detainee abuse cases as of June 16, 2004. Available at: http://www.aclu.org/torturefoia/released/navy3706.3713.pdf. Accessed April 26, 2005.

[91] US Army Criminal Investigation Command, Department of the Army. Memorandum for: See Distribution. Subject: CID Report of Investigation—Final—0152-03-CID469-60212-5C1A/5C2/5T1. February 6, 2004. Available at: http://www.aclu.org/torturefoia/released/105_167.pdf. Accessed April 26, 2005.

[92] Agent's Investigation Report. SA, 43rd Military Police Detachment, CID. Tikrit, Iraq. December 10, 2003. In: US Army Criminal Investigation Command, *supra* note 91.

[93] *Id.*

[94] US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final C—0129-03-CID899-63556/5C2. October 1, 2003. Available at: http://www.aclu.org/torturefoia/released/DOA_240_264.pdf. Accessed April 26, 2005. The investigation revealed probable cause to believe that the soldier committed the offense of assault. *Id.*

[95] Sworn Statement of [redacted]. SPC/S-4, HHC, 1/36 Infantry. September 20, 2003. In: US Army Criminal Investigation Command, *supra* note 94.

[96] US Army Criminal Investigation Command, Department of the Army. Memorandum for: See Distribution. Subject: CID Report of Investigation—Final (C)—0353-2003-CID093-45256-5Y2BO. December 19, 2003. Available at: http://www.aclu.org/torturefoia/released/709_744.pdf. Accessed April 26, 2005. The investigation established insufficient evidence to prove or disprove the offense. *Id.*

[97] Sworn Statement of [redacted]. November 14, 2003. In: US Army Criminal Investigation Command, *supra* note 96.

The ICRC report describes the use of death threats at Umm Qasr and Camp Bucca, Iraq. The report states,

> Persons deprived of their liberty undergoing interrogation . . . were allegedly subjected to frequent cursing, insults and threats, both physical and verbal, such as having rifles aimed at them in a general way or directly against the temple, the back of the head, or the stomach, and threatened with transfer to Guantanamo, death or indefinite internment.[98]

Threats were extended to family members, particularly the wives and daughters, of detainees.[99]

Some detainees at Abu Ghraib were threatened with rape. Maj.Gen. Taguba's report on prison conditions confirms the use of rape threats as an interrogation technique.[100] One former detainee at Abu Ghraib, Saddam Saleh Aboud, claims that he was subjected to a combination of psychologically coercive tactics that culminated in the threat of rape.[101] Mr. Aboud claims that during his detention he was held without clothing, brought naked before two snarling dogs, and subjected to 23 hours of isolation with loud music that prevented him from sleeping. Eventually, he was told by an American soldier, "If you do not confess, I will have my soldiers rape you."[102] Another detainee alleged that he was subjected to a variety of techniques including being told by an American soldier that he would rape him on two separate occasions.[103]

    *2. Hooding*

The ICRC report also describes the use of hooding in Iraq.  It says, "Hooding was sometimes used in conjunction with beatings thus increasing anxiety as to when blows would come. . . . Hooding could last for periods from a few hours to up to 2 to 4 consecutive days, during which hoods were lifted only for drinking, eating or going to the toilets."[104]

    *3. Isolation*

US personnel used isolation as an interrogation tactic in Iraq. The ICRC, in its 2003 visits, verified the use of isolation by US personnel in Iraq. It said that one of the methods most frequently alleged during interrogation was

> [b]eing held in solitary confinement combined with threats (to intern the individual indefinitely, to arrest other family members, to transfer the individual to Guantanamo), insufficient sleep, food or water deprivation, minimal access to showers (twice a week), denial of access to open air and prohibition of contacts with other persons deprived of their liberty.[105]

---

[98] ICRC February 2004 Report, *supra* note 86. Para. 31.

[99] *Id.* Para. 34.

[100] Maj. Gen. Antonio M. Taguba. Article 15-6 Investigation of the 800th Military Police Brigade. Findings and Recommendations, para. 7[e]. Completed February 2004. [Taguba report].

[101] Fisher I. "Iraqi Tells of U.S. Abuse, From Ridicule to Rape Threat." *New York Times.* May 14, 2004.

[102] *Id.* Quoting Mr. Aboud quoting a sergeant named Ivan.

[103] Fay report, *supra* note 40, at 80.

[104] ICRC February 2004 Report, *supra* note 86. Para. 25.

[105] *Id.*

The ICRC found that "high value detainees" held at Baghdad International Airport were "held for nearly 23 hours a day in strict solitary confinement in small concrete cells devoid of daylight."[106] According to the ICRC, the regime of isolation strictly prohibited any contact with other detainees, guards, family members, and the rest of the outside world. Detainees were allowed to exercise outside their cells for twenty minutes twice a day and to go to the showers or toilets but always alone and without any contact with others. Most of these detainees had already been subjected to this isolation for five months when the ICRC investigators arrived at the facility.[107]

In mid-October 2003, the ICRC visited detainees in the "isolation section" of Abu Ghraib. There, they witnessed the practice of "keeping persons deprived of their liberty completely naked in totally empty concrete cells and in total darkness, allegedly for several consecutive days."[108] When the ICRC immediately requested an explanation from authorities, it was told by the military intelligence officer in charge of interrogations that this practice was simply "part of the process."[109] Evidently, this was part of a system in which detainees were "drip fed," meaning that they were given new items and privileges (clothing, bedding, light) in exchange for their cooperation.[110]

Statements taken from detainees parallel the ICRC findings. One detainee at Abu Ghraib, Thaar Salman Dawod, says that he was put into solitary confinement on September 10, 2003 and remained there for sixty-seven days of "suffering and little to eat."[111] Another detainee, Saddam Salah Abood Al-Rawi, told the Office of the High Commissioner for Human Rights (hereinafter OHCHR) that he was kept in solitary confinement at Abu Ghraib for three months.[112] Mr. Al-Rawi also told the OHCHR that at the time of an ICRC visit to the prison in January 2004, he was told that if he said anything to the ICRC that the prison guards did not like, "he would not live to regret it."[113]

One officer at Abu Ghraib even complained to Brig. Gen. Janis Karpinski, who was in charge of the military police unit that ran Abu Ghraib and other prisons in Iraq, that ICRC visits interfered with the use of isolation as an interrogation tactic and were therefore to be avoided. Brig.Gen. Karpinski told Maj. Gen. Antonio Taguba

> Major Potter . . . said to me, "The reason we don't want the ICRC to go in there anymore is because it interrupts the isolation process. If we have them in isolation for a week, if they have a chance to interface with a person who is speaking their language, that interrupts the isolation process and we have to start all over again in order to put the pressure on them. So, if we can just have the cooperation of not letting the ICRC."[114]

---

[106] *Id.* Para. 43.

[107] *Id.*

[108] *Id.* Para. 27.

[109] *Id.* Quoting unnamed military intelligence officer.

[110] *Id.*

[111] Translation of Statement Provided By Thaar Salman Dawod. No. 150427. January 17, 2004. Available at: http://media.washingtonpost.com/wp-srv/world/iraq/abughraib/150427.pdf. Accessed April 26, 2005.

[112] Report of the United Nations High Commissioner for Human Rights and Follow-Up to the World Conference on Human Rights: The Present Situation of Human Rights in Iraq. UN ESCOR. 61st Sess. Agenda Item 4. U.N. Doc. E/CN.4/2005/4. 2004: para. 57.

[113] *Id.*

[114] Article 15-6 Investigation Interview by Maj. Gen. Taguba, CFLCC Deputy Commanding General, US Army. With Brig. Gen. Janis L. Karpinski, US Army. Camp Doha, Iraq. February 15, 2004: 91.

The practice of keeping detainees hidden was taken to the extreme by the CIA. In some cases, detainees were not properly documented, so that no one knew of their existence. These detainees were known as "ghost detainees." A sergeant explained to investigators for the Fay report that ghost detainees were brought to Abu Ghraib by the CIA and kept in isolation. He said:

> Ghost detainees were detainees who were brought to our facility by Other Government Agencies (OGA) [name given to identify CIA]. . . . They were kept in isolation to prevent them from being identified by someone else. . . . Some of the detainees in isolation were kept there longer than 30 days and we would request from MI their status but we were not given one.[115]

In another reference to ghost detainees, a soldier told investigators for the Fay report that he knew of detainees "that were off limits for Army interrogators and that some OGA [Other Governmental Agencies] detainees have waited for months for OGA interrogators to see them, violating the 30 [day] isolation limit rule."[116] The Church investigation found 30 cases in which detainees were kept off the books.[117]

As explained below, isolation for periods of longer than thirty days had to be approved,[118] but evidence suggests that such requests were rarely turned down. One soldier told investigators for the Fay report that interrogators "could send the detainee to isolation for thirty days or more as long as they wrote the right memo. . . . No one was checking to ensure the recommendations were sound with any sort of regularity."[119] One detainee told investigators for the Fay report that he was transferred to the Abu Ghraib facility on December 27, 2003 where he stayed in the hard site "and for 55 days no one came to see [him]."[120]

The Fay report details the use of total isolation at Abu Ghraib, which the report calls "routine and repetitive."[121] The report contains multiple references to "the hole" at Abu Ghraib, a small, lightless isolation closet, which was used in an "abusive and unauthorized" manner.[122] The report notes that US personnel subjected detainees to "the complete removal from outside contact other than required care and feeding by MP guards and interrogation by MI."[123] The Fay report states the "[d]ocumentation of this technique in the interrogation reports implies those

---

[115] Sworn Statement of [redacted]. SGT, 372nd Military Police Company, Camp Victory. May 7, 2005. In: Annex to Fay/Jones/Kern report. Available at:
http://www.aclu.org/torturefoia/released/030905/DOD695_737.pdf. Accessed April 26, 2005.
[116] Sworn Statement of [redacted]. SPC/E4, B Company, 2d Military Intelligence Battalion, 66th Military Intelligence Group. May 25, 2004. In: Annex to Fay/Jones/Kern report. Available at:
http://www.aclu.org/torturefoia/released/030905/DOD738_779.pdf. Accessed April 26, 2005.
[117] Church executive summary, *supra* note 42, at 18.
[118] See *infra* text accompanying notes 623–630.
[119] Sworn Statement of [redacted]. SGT, B/CO 470th Military Intelligence Group. May 18, 2004. In: Annex to Fay/Jones/Kern report. Available at http://www.aclu.org/torturefoia/released/030905/DOD822_862.pdf. Accessed April 26, 2005.
[120] Sworn Statement of [redacted]. Baghdad Correction Facility, Abu Ghraib. Undated. In: Annex to Fay/Jones/Kern report. Available at http://www.aclu.org/torturefoia/released/030905/DOD695_737.pdf. Accessed April 26, 2005.
[121] Fay report, *supra* note 40, at 95.
[122] *Id.* at 74.
[123] *Id.* at 10.

employing it thought it was authorized."[124] The report also makes it clear that the isolation amounted to abuse.[125]

The Federal Bureau of Investigation also described the use of isolation at Abu Ghraib in a report that details interviews conducted with 13 FBI employees about abuses they witnessed while working at Abu Ghraib between October and December 2003.[126] According to the report, one agent said that he was aware that "the Department of Defense utilized . . . isolation for prescribed periods of time."[127] Evidently "[i]t was his understanding, those techniques were allowed for limited periods of time."[128] Another agent reported that he did not observe any misconduct or mistreatment of detainees, but did observe detainees, on three or four occasions, who were "ordered to strip and then placed in isolation with no clothes."[129]

### 4. Sleep Deprivation

The FBI report indicates that sleep deprivation was being employed at Abu Ghraib. One agent said that he was aware that "the Department of Defense utilized sleep deprivation . . . for prescribed periods of time."[130] As with solitary confinement, "it was his understanding, those techniques were allowed for limited periods of time."[131] Another FBI employee reported that a detainee complained that he was "stripped naked, kept naked in his cell and subjected to sleep deprivation."[132] He explained that it "was his understanding that those in charge of the prison allowed sleep deprivation, although he was not aware if it was a permissible tactic or not."[133] The report also recounts an incident in which an FBI agent witnessed a hooded detainee draped in a shower curtain and handcuffed to a waist high rail. A military policeman was lightly slapping the detainee on his back, which the agent was told was done because the "detainee was being subjected to sleep deprivation."[134]

Like the FBI, the ICRC documented the use of sleep deprivation at Abu Ghraib during mid-October 2003. In its February 2004 report, the ICRC states that sleep deprivation was implemented through "the playing of loud music or constant light in cells devoid of windows."[135] Interviews conducted by Maj. Gen. Taguba confirmed the use of sleep deprivation at Abu Ghraib. Capt. Donald J. Reese, the warden of the hard site at Abu Ghraib, told Maj.Gen. Taguba that

---

[124] *Id.* at 95.

[125] *Id.*

[126] Federal Bureau of Investigation. Memorandum from Inspection. To Inspection. Title: Counterterrorism Division, Inquiry Regarding Activities of FBI Personnel at Abu Ghurayb Prison (AGP) During October 2003–December 2003. May 25, 2004. Available at http://www.aclu.org/torturefoia/released/t2969_3060.pdf. Accessed April 26, 2005.

[127] *Id.*

[128] *Id.* Describing investigation conducted by AI [redacted]. INSD. New York, NY. May 17, 2004.

[129] *Id.* Describing investigation conducted by Supervisory Special Agent [redacted]. Los Angeles, California. May 17, 2004.

[130] *Id.* Describing investigation conducted by AI [redacted]. INSD. New York, NY. May 17, 2004.

[131] *Id.*

[132] *Id.* Describing investigation conducted by Supervisory Special Agent [redacted]. Los Angeles, California. May 17, 2004.

[133] *Id.*

[134] *Id.* Describing investigation conducted by Supervisory Special Agent [redacted]. Portland, Oregon. May 18, 2004.

[135] ICRC February 2004 Report, *supra* note 86. Para. 27.

"sometimes [MI] would put [detainees] on special sleep deprivation plans."[136] When asked about how MIs would "break new detainees," Sergeant First Class Keith Aaron Comer told interviewers that "[d]etainees were brought in subject to sleep depravation [sic], cold showers every 30 mins. cuffed and forced to stand for long periods of time . . . ."[137] Another member of the military who worked at Abu Ghraib, Specialist Sabrina Harman, told Maj. Gen. Taguba in a sworn statement that "her job was to keep detainees awake."[138]

Sworn statements given to investigators working on the Fay Report show that sleep deprivation was pervasive at Abu Ghraib. One soldier told investigators that "[t]echniques as sleep deprivation were a common thing. Sleep management was part of the extended IROE [Interrogation Rules of Engagement]."[139] Another soldier told investigators that when he first arrived at Abu Ghraib in September 2003 "it was common practice to use sleep deprivation and sleep management with the detainees."[140] A civilian contractor who worked at Abu Ghraib said he heard reports of "sleep management where in a detainee would only be allowed an hour or so sleep in a 24 hour period."[141] According to a civilian contract interrogator, sleep deprivation was accomplished by "keeping lights on in the detainee's cell for 20 of the 24 hours and varying the detainee's feeding schedule to throw off the detainee's biorhythm."[142] Other personnel said military personnel kept detainees awake by making loud noises, making detainees walk, stand, and sit, or putting detainees in different positions.[143] In addition, according to the Fay report, US personnel took detainees out of their cells, stripped them and gave them cold showers to keep them awake.[144] Sleep deprived detainees often would be subjected to interrogation sessions. A description of an interrogation provided by a soldier at Abu Ghraib describes how military personnel were instructed to use the "fear up" approach with a detainee who "had just ended a 72-hour adjusted sleep schedule . . . . The detainee collapsed during questioning."[145]

There are reports of sleep deprivation being used at other Iraq detention facilities. For example, the ICRC report says that one detainee at Camp Cropper at Baghdad International Airport alleged that he had been hooded and cuffed, threatened with torture and death, and deprived of sleep for

---

[136] Interview by Maj. Gen. Taguba, CFLCC Deputy Commanding General, US Army. With Capt. Donald J. Reese, US Army Reserve. February 10, 2004: 44. Available at:
http://www.publicintegrity.org/docs/AbuGhraib/Abu10.pdf. Accessed April 26, 2005.
[137] Sworn Statement of Keith Aaron Comer. E7/Active, 372nd Military Police Company. February 9, 2004. Available at: http://www.publicintegrity.org/docs/AbuGhraib/Abu15.pdf. Accessed April 26, 2005.
[138] Taguba report, *supra* note 100. Findings and Recommendations, para. 11[a]. Quoting SPC Sabrina Harman, 372nd MP Company.
[139] Sworn Statement of [redacted]. E6, 500th MI Grp. CIDET-J OFO. June 14, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD395_451.pdf. Accessed April 26, 2005.
[140] Sworn Statement of [redacted]. B Co. SPC, 321 MI Bn. May 25, 2004. In: Annex to Fay/Jones/Kern report. Available at http://www.aclu.org/torturefoia/released/030905/DOD452_517.pdf. Accessed April 26, 2005.
[141] Sworn Statement of [redacted]. CIV, Titan Corp. June 1, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD452_517.pdf. Accessed April 26, 2005.
[142] Sworn Statement of [redacted]. CIV. June 4, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD395_451.pdf. Accessed April 26, 2005.
[143] See, e.g., Sworn Statement of [redacted]. 320th MP Bn. May 26, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD395_451.pdf. Accessed April 26, 2005; Sworn Statement of [redacted]. E4/Reserve, 325 MI Bn. June 4, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD518_564.pdf. Accessed April 26, 2005.
[144] Fay report, *supra* note 40, at 70.
[145] Sworn Statement of [redacted]. CW2, A/Co.519th Military Intelligence Battalion. May 19, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD863_905.pdf. Accessed April 26, 2005.

four consecutive days.[146] In a sworn statement for the Fay report, a detainee said that at Ruthwania Palace, he was not allowed to sleep for four days.[147]

### 5. Sexual Humiliation

Sexual humiliation was also pervasive during this period. According to the Fay report, "MI interrogators started directing nakedness at Abu Ghraib as early as 16 September 2003 to humiliate and break down detainees."[148] Indeed, graphic photographic evidence of sexual abuse at the Abu Ghraib prison facility dates these incidents from late 2003. The photographs depict naked and semi-naked Iraqi detainees forced into sexually humiliating acts including piling into a human pyramid and being forced to masturbate in front of one another. The detainees also were forced into explicit homosexual acts in order to cause further humiliation through the violation of sexual and cultural taboos. When the photographs surfaced, they were a source of great public outcry, but evidence suggests that sexual humiliation was not new. As detailed above, the technique had previously been employed in Afghanistan and at the detainee holding facilities in Guantánamo during 2002 and 2003. The Fay report confirms this: "The use of nudity as an interrogation technique or incentive to maintain the cooperation of detainees was not a technique developed at Abu Ghraib, but rather a technique which was imported and can be traced through Afghanistan and GTMO."[149]

Forced nudity was used not as a punishment, nor as an exception, but as an accepted method of interrogation at Abu Ghraib. Capt. Reese explained during an interview with Maj. Gen. Taguba that when he questioned the use of nudity at the prison, he was told "it's an interrogation method that we use."[150] It was used even when the detainee was not actually being interrogated. Capt. Reese told Maj. Gen. Taguba that detainees "were in the cells and they would just be standing there without clothes on."[151] This was part of a process to soften them up for interrogation.

Statements taken by General Fay from soldiers who worked in the Abu Ghraib prison facility also suggest that nudity was commonplace and used for interrogation purposes. A civilian interrogator told General Fay simply that "[t]here was a lot of detainee nakedness at [Abu Ghraib]."[152] A military police officer stated that "it was not uncommon to see people without clothing and that the whole nudity thing was an interrogation procedure used by MI."[153] Another soldier states that there were "quite a few others naked in the cell. I did not discuss this with anyone because it was known that the detainees were in their cells naked. It was a call by the

---

[146] ICRC February 2004 Report, *supra* note 86. Para. 34.
[147] Sworn Statement of [redacted]. Baghdad Correction Facility, Abu Ghraib. Undated. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD695_737.pdf. Accessed April 26, 2005.
[148] Fay report, *supra* note 40, at 69.
[149] *Id.* at 10.
[150] Interview by Major General Taguba, *supra* note 136, at 48.
[151] *Id.* at 49.
[152] Sworn Statement of [redacted]. Civilian. June 7, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD452_517.pdf. Accessed April 26, 2005.
[153] Memorandum for Record. Subject: Telephonic Interview. May 28, 2003. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD863_905.pdf. Accessed April 26, 2005.

MPs [Military Police] to keep them naked in the cells."[154] Yet another soldier witnessed nude detainees "on at least four occasions . . . . It was a practice, especially for MI holds to take their clothes in a possible attempt to renew the 'capture shock' of detainees who had been in US custody for an extended period of time or were transferred from other facilities"[155] The Fay report concludes that "removal of clothing was employed routinely and with the belief it was not abuse."[156]

Forced nudity was not the only form of sexual humiliation inflicted upon detainees at Abu Ghraib in 2003. A statement taken from one victim of sexual humiliation for purposes of a CID investigation describes how, beginning on October 3, 2003, he was made to wear women's underwear for a total of 51 days while in isolation.[157] The detainee also notes that other detainees were instructed "to do like homosexuals," meaning that they were to perform sexual acts with one another.[158] According to testimony by Specialist Matthew Wisdom, an MP who transported detainees to Abu Ghraib, he witnessed two naked detainees, one of whom was "masturbating to another kneeling with its [sic] mouth open."[159] Specialist Neil A. Wallin told Major General Taguba, "During my tour at the prison I observed that when the male detainees were first brought to the facility, some of them were made to wear female underwear, which I think was to somehow break them down."[160]

The Fay report details various incidents of extreme sexual humiliation at Abu Ghraib including one entry describing how, on October 25, 2003, three detainees were stripped of their clothing, handcuffed together nude, and forced to lie on top of one another and simulate sex while US soldiers took photographs.[161] Another entry describes how on the night of November 7–8, 2003, seven detainees were placed in a pile and forced to masturbate.[162] One soldier giving a sworn statement for the Fay report described a scene in which three naked detainees "were handcuffed together in such a way to mimic homosexual relations."[163] US personnel then "asked for a confession, promising to stop this punishment if the detainees confessed. Using their feet, [redacted] the MPs shoved the detainees' hips to further mimic sexual relations."[164]

---

[154] Sworn Statement of [redacted]. E-4/AR, B Co 325 MI BN. July 20, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD452_517.pdf. Accessed April 26, 2005.

[155] Sworn Statement of [redacted]. E-4/AD, A Company, 519th Military Intelligence Battalion, 525th Military Intelligence Brigade. June 15, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD565_615.pdf. Accessed April 26, 2005.

[156] Fay report, *supra* note 40, at 88.

[157] Translation of Statement provided by [redacted]. Detainee. January 18, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final (C)/SSI—0132-04-CID259-80198-/6F8A/6X1/5Y2E. July 1, 2004. Available at: http://www.aclu.org/torturefoia/released/030905/294_334.pdf. Accessed April 26, 2005. The investigation was into a claim of forcible sodomy and the investigation did not develop sufficient evidence to prove or disprove the allegation.

[158] *Id.*

[159] Hersh SM. "Torture at Abu Ghraib." *New Yorker.* May 10, 2004. Quoting testimony given by Specialist Matthew Wisdom during an Article 32 hearing on April 9, 2004.

[160] Taguba report, *supra* note 100. Findings and Recommendations, para. 11(e).

[161] Fay report, *supra* note 40, at 72.

[162] *Id.* at 77.

[163] Sworn Statement of [redacted]. SPC, HHD, 504 MIBDF. June 4, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD695_737.pdf. Accessed April 26, 2005.

[164] *Id.*

These examples of sexual abuse and extreme sexual humiliation at Abu Ghraib, including incidents captured in the infamous photographs, were not routine. But the very pervasiveness and commonality of the use of forced nudity and other forms of sexual humiliation not only led to the more extreme abuses but created an environment in which even more extreme forms of humiliation and abuse were not seen as such.

The humiliation that has been well documented at Abu Ghraib prison in 2003, moreover, was not isolated to that detention facility. The ICRC, in visits to other detention facilities in Iraq in 2003, found that "[b]eing paraded naked outside cells in front of other persons deprived of their liberty, and guards, sometimes hooded or with women's underwear over their head" and "[a]cts of humiliation such as being made to stand naked against the wall of the cell with . . . women's underwear over the head for prolonged periods--while being laughed at by guards, including female guards, and sometimes photographed in this position" were among the methods of ill-treatment most frequently alleged during interrogation.[165] A report from Samara, Iraq states that a detainee was subjected to various forms of humiliation and ill-treatment, including being held for three days in a "hole in the ground," having all of his hair shaved, and being stripped of his clothing and sprayed with cold water.[166]

Sexual humiliation was inflicted upon female detainees in Iraq as well. In one CID investigation report, an elderly woman claims that she was held for five days in August 2003 at an unknown location in Iraq.[167] During her detention she said she was made to crawl on her hands and knees as a "large man rode" on her and called her an animal.[168] The report states that she claims he "straddled her and placed ropes in her mouth and across her eyes and attempted to ride her like a horse."[169] She alleges that he also told her that he liked to have sex with "old women."[170] According to the detainee, the sexual humiliation quickly escalated to sexual and physical abuse. The man allegedly used a stick to strike her on the buttocks and inserted the stick into her anus while others in the room laughed.[171] After five continuous days of sexual abuse and humiliation, the woman says she was moved to a different facility and put in a room with two other women. The man from the prior detention facility then arrived and released a dog into the room. The dog attacked one of the women.[172] The Fay report recounts an incident from October 7, 2003, in which three MI personnel allegedly sexually assaulted a female detainee.[173] According to the report, the detainee alleges that while being detained she was taken by three military police officers and forcibly kissed by one of the soldiers.[174] She was then shown a naked

[165] ICRC February 2004 Report, *supra* note 86. Para. 25.

[166] Memorandum. From SAC, 78th Military Police Det [CID]. To Director, USACRC, USACIDC, Fort Belvoir, VA et al. Subject: CID Report—Initial/SSI—0149-04-CID259-80212-/5C1R2/5Y2E/6X1. June 4, 2004. Available at: http://www.aclu.org/torturefoia/released/1458_1508.pdf. Accessed April 26, 2005.

[167] Agent's Investigation Report. 0094-04-CID259-80177. May 30, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for: See Distribution. Subject: CID Report of Investigation—Final "C"/SSI—0094-04-CID259-80177/6F8A/6C1/5C1/7G1A1/5Y2E. June 10, 2004. Available at: http://www.aclu.org/torturefoia/released/335_403.pdf. Accessed April 26, 2005.The investigation did not develop sufficient evidence to prove of disprove the woman's allegations.

[168] Agent's Investigation Report. 0094-04-CID259-80177. May 30, 2004. In: US Army Criminal Investigation Command, *supra* note 167.

[169] *Id.*

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] Fay report, *supra* note 40, at 72.

[174] *Id.*

male detainee and told that the same would happen to her if she did not cooperate. They took her back to her cell where they removed her shirt.[175]

### 6. Use of Dogs

US personnel used military working dogs to exploit the fear of dogs that is common in Arab cultures.[176] According to the Fay report, "[i]nterrogations at Abu Ghraib . . . were influenced by several documents that spoke of exploiting the Arab fear of dogs."[177] The abuse of detainees with military working dogs began almost immediately after the arrival of dog teams at Abu Ghraib on November 20, 2003. According to the Fay report, "[b]y that date, abuses of detainees was [sic] already occurring and the addition of dogs was just one more device."[178] Sgts. Michael J. Smith and Santos A. Cardona, Army dog handlers, told investigators that they were asked multiple times to bring their dogs to prison interrogation sites.[179] Smith claims that military intelligence personnel asked him to instill fear in detainees with his dog and he would, at their request, bring his dog within six inches of the detainees.[180]

One specialist said in a sworn statement for the Fay report that he witnessed an MP guard and dog handler enter a cell holding two juveniles.[181] According to the specialist, the dog was on a leash, but was not muzzled. The soldier then allowed the dog to "go nuts on the kids."[182] The juveniles were screaming in terror and the smaller juvenile attempted to hide behind the other one. The specialist also stated that after this happened, he overheard the dog handler mention a game that was being played to see which handler could scare detainees to the point where they would defecate on themselves.[183] The dog handler "mentioned that they had already made some urinate, so they appeared to be raising the competition."[184]

The use of military dogs at times escalated into physical violence. Ballendia Sadawi Mohammed, a detainee at Abu Ghraib, told investigators that he was removed from his cell and two dogs were released on him.[185] The dogs attacked him after he tried to run and was cornered. The attack caused sufficient injuries to require twelve stitches.[186] Ameen Sa'eed al-Sheikh, another detainee at Abu Ghraib, described in a sworn statement how he was attacked by military working dogs. According to his statement, prison guards would "hang [him] to the door allowing the dogs to try to bite [him]."[187]

---

[175] *Id.*

[176] See *infra* section IV.A.

[177] Fay report, *supra* note 40, at 10. For an explanation of documents that authorized the use of dogs and linked it to Arab fear, see *infra* section V.B.2.

[178] Fay report, *supra* note 40, at 10.

[179] White J, Higham S. "Use of Dogs to Scare Prisoners Was Authorized." *Washington Post.* June 11, 2004.

[180] *Id.*

[181] Sworn Statement of [redacted]. SPC/E-4, B Company, 2d Military Intelligence Battalion, 66th Military Intelligence Group. May 25, 2004. In: Annex to Fay/Jones/Kern report. Available at: http://www.aclu.org/torturefoia/released/030905/DOD738_779.pdf. Accessed April 26, 2005.

[182] *Id.*

[183] *Id.*

[184] *Id.*

[185] White & Higham, *supra* note 179. Referring to documents obtained by the *Washington Post.*

[186] *Id.*

[187] Sworn Statement of Ameen Sa'eed al-Sheikh. Civ/Detainee. Baghdad Correctional Facility, Abu Ghraib. January 16, 2004. Available at: http://media.washingtonpost.com/wp-srv/world/iraq/abughraib/151362.pdf. Accessed April 26, 2005.

*7. Combination of Techniques*

The psychologically coercive techniques were often used in combination in order to inflict a greater degree of humiliation and fear. Sherzad Kamal Khalid, an Iraqi man who was held at various locations in Iraq between July and September of 2003, says that he was placed in front of a mock firing squad with simulated gunfire, was hooded and terrorized with random and unanticipated blows, sexually assaulted and humiliated, and routinely deprived of sleep through frequent beatings.[188] The ICRC describe the approach taken by US personnel at Abu Ghraib:

> In certain cases, such as in Abu Ghraib military intelligence section, methods of physical and psychological coercion used by the interrogators appeared to be part of the standard operating procedures by military intelligence personnel to obtain confessions and extract information. Several military intelligence officers confirmed to the ICRC that it was part of the military intelligence process to hold a person deprived of his liberty naked in a completely dark and empty cell for a prolonged period to use inhumane and degrading treatment, including physical and psychological coercion, against persons deprived of their liberty to secure their cooperation.[189]

## D. Continued Use of Psychologically Coercive Tactics—Afghanistan, Guantánamo, Iraq Early 2004

In early 2004, before the Abu Ghraib scandal became public, despite complaints from the FBI and ICRC, the use of psychologically coercive interrogation techniques continued to be a common practice in all three theatres of operation. As before, various techniques were being used in combination in an effort to obtain information from detainees.

*1. Afghanistan*

The psychologically abusive techniques formalized in 2003 for Afghanistan remained in effect until the Abu Ghraib scandal became public in May 2004.[190]

Several detainees captured and held in Afghanistan in 2004 claim that they suffered a combination of psychologically coercive techniques at the hands of US forces. Mohammed Karim Shirullah, a 45-year-old Afghan citizen, was detained in December 2003 and held for six months at various locations around Afghanistan.[191] Mr. Shirullah claims that for more than two weeks during his detention, he was made to wear black, opaque goggles that prohibited any visual stimulus. In addition to sensory deprivation, he was subjected to solitary confinement for over one month. He also was sexually humiliated by US forces. He claims that he was stripped naked and had his anus probed while he was photographed.[192] Another Afghan detainee, Haji Abdul Rahman, was detained in Afghanistan between December 2003 and May

---

[188] *Ali v. Rumsfeld.* No. unassigned. N.D. Ill. filed Mar. 1, 2005. Paras. 174–75. Available at: http://www.humanrightsfirst.org/us_law/etn/lawsuit/PDF/rums-complaint-022805.pdf. Accessed April 26, 2005.

[189] ICRC February 2004 Report, *supra* note 86. Para. 24.

[190] See *infra* text accompanying notes 604–605.

[191] *Ali v. Rumsfeld.* No. unassigned. N.D. Ill. filed Mar. 1, 2005. Paras. 20, 160. Available at: http://www.humanrightsfirst.org/us_law/etn/lawsuit/PDF/rums-complaint-022805.pdf. Accessed April 26, 2005.

[192] *Id.* Para. 161.

2004.[193] He claims that US forces made him wear "black out goggles" for virtually the entire first month of his detention. Mr. Rahman was then placed in solitary confinement for fifteen days and made to wear headphones which deadened all outside sounds. He was subjected to sleep deprivation by being held in a room that was brightly lit for 24 hours a day and kept awake with loud noises.[194] He was also anally probed on several occasions and photographed naked by US forces.[195]

A memorandum documenting a Counterterrorism Unit interview confirms that isolation was being used in Afghanistan in February 2004. During an interview, the detainee requested to be "moved back to [the] general population" in order to minimize dizzy spells he claims are a result of minimal water intake due to a limited opportunity to use the bathroom – while in isolation, he was allowed to visit the bathroom once every six hours.[196]

    *2. Guantánamo*

In Guantánamo, the April 16, 2003 policy of Secretary Rumsfeld governed interrogations in 2004. As mentioned above and explained further below, this memo approved certain techniques, including isolation and environmental manipulation, but gave great latitude to interrogators and subjected humane treatment of detainees to "military necessity."

Evidence shows that various psychologically coercive interrogation tactics were used in combination at Guantánamo in 2004. In fact, it appears that US personnel at the naval base in 2004 became more insistent on using psychologically coercive techniques against detainees held there. A source familiar with conditions at the naval base told PHR that US personnel at Guantánamo had devised a system to break people through humiliating acts, solitary confinement, temperature extremes, and use of forced positions.[197] The source said that US personnel were using predominantly psychological but also physical means that were intentionally inflicted in order to gather intelligence. Daily life for detainees at Guantánamo in 2004 consisted of humiliation and violations of cultural and religious taboos, including forced shaving. Interrogation methods included exposure to loud and persistent noise and music, prolonged subjection to deliberate cold temperatures, forced positions while shackled, altered sleep patterns, and some beatings.[198]

The source's reports are supported by FBI agents' observations when visiting Guantánamo. An internal FBI e-mail documenting incidents observed by agents at Guantánamo states that during the second or third week of February 2004 a detainee was short shackled, the room temperature was significantly lowered, and strobe lights and possibly loud music were used.[199] The detainee was left in this condition for 12 hours, during which time he was not allowed to eat, pray or use the bathroom.[200]

---

[193] *Id.* Para. 21.
[194] *Id.* Para. 164.
[195] *Id.*
[196] Federal Bureau of Investigation. Memorandum from Counterterrorism, ORS/MLDU/Bagram, Afghanistan. To Counterterrorism, New York. February 29, 2004. Available at: http://www.aclu.org/torturefoia/released/t3482_3483.pdf. Accessed April 26, 2005.
[197] PHR interview.
[198] PHR interview.
[199] E-mail. From [redacted]. To [redacted]. Subject: reported incidents. May 5, 2004. Available at: http://www.aclu.org/torturefoia/released/FBI_4985_4987.pdf. Accessed April 26, 2005.
[200] *Id.*

Sleep deprivation also was used as an interrogation tactic. An Amnesty International interview of Mehdi Ghezali, a Swedish detainee, reveals details of the technique at Guantánamo in 2004:

> They kept doing it for about two weeks around 11 April 2004. The Americans took me to an interrogation that lasted 14-16 hours. Then they brought me back to my cell. Shortly thereafter, just as I was going to bed, the guards came and said that I was going to be moved to another cell. One hour later I was moved once more to another cell. I once saw how the guards treated an Australian prisoner in this way, by moving him from cell to cell and thus preventing him from getting any sleep. At the end, there was blood coming from both his nose and his ears. He was so tired.[201]

### 3. Iraq

In January 2004, a memorandum confirmed that the use of psychologically coercive interrogation techniques beyond FM 34-52 were available for use. While listing such techniques as sleep deprivation, environmental manipulation, the use of dogs, isolation for longer than 30 days, and sensory deprivation, it also left the door open to additional approaches.[202] The evidence shows that these techniques and more were being used in Iraq in 2004.

On January 2, 2004, four Iraqis, all of whom were employees of Western news agencies, were arrested and held at Forward Operating Base Volturno in Iraq for about three days. During this period of time, the Iraqis claim that US soldiers deprived them of sleep, hit them, made them assume painful positions, threatened them with sexual assault, and forced them to simulate sex acts that were photographed by US personnel.[203] An initial inquiry occurred in January 2004, months before the Abu Ghraib detainee abuse scandal came to light. The inquiry concluded, "The detainees were purposefully and carefully put under stress, to include sleep deprivation, in order to facilitate interrogation; they were not tortured."[204]

Another detainee who was captured in January 2004 in Iraq alleges that while being detained at the Mosul Airport he was held with a hood over his head, sprayed with cold water, deprived of sleep, and told that if he did not tell interrogators what they wanted to know they would hurt his brother and father.[205] An Iraqi man detained near Mosul, Iraq reported in a CID investigation that he was deprived of sleep while being held at a US holding facility in March 2004:

> . . .[T]hey turned on a very loud recorder near my head, and that continued for all the detaining period. That way continued for continuous seven days, where I had no sleep except for two limited periods, and that was done by the recorder and cold water, and there was no place assigned for sleep as well,

---

[201] Amnesty International report, *supra* note 31, at 67. Citing Interview with Amnesty International, Sweden, 27 July 2004.

[202] See *infra* text accompanying notes 639–641.

[203] Onishi N, Schmitt E. "U.S. Considers Reopening Inquiry Into Possible Abuse Before Iraqi Prison Scandal." *New York Times*. October 14, 2004.

[204] *Id.* Citing a copy of the inquiry's unclassified executive summary sent to Reuters.

[205] Agent's Investigation Report. ROI No. 0041-04-CID789. May 30, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final (C)/SSI—0140-04-CID259-80204-/5C1Q2/5Y2E. July 8, 2004. Available at: http://www.aclu.org/torturefoia/released/4852_4872.pdf. Accessed April 26, 2005. The investigation did not develop sufficient evidence to prove or disprove the allegations.

and the weather was too cold, and I was completely naked, as well as I got only eight pieces of biscuits along with the first seven days, which resulted in quick prostration of my body.[206]

A detainee held at an unknown facility in Tikrit, Iraq alleged that in mid-April 2004 he was beaten on various parts of his body, kept in a small box which forced him to remain on his knees, and deprived of sleep.[207] He also alleged that soldiers opened capsules of medicine that the detainee had been given and made him watch as they poured the medicine on the floor of the prison.[208]

A CID investigation was opened into detainee abuse at the detention facility at Baghdad International Airport after an interrogator filed a report of abuse that took place in April 2004.[209] The interrogator describes the treatment of detainees as "inhumane," even though all of the techniques had been approved by the commander and the medical staff. The interrogator alleges that detainees were subjected to sleep deprivation and twenty-hour interrogation sessions.[210]

There are also reports of continued sexual humiliation. In a CID investigation file, a detainee claims that he was detained on April 23, 2004 and held for 15-16 days in a house near Adymiah Palace in Iraq. During his detention, US forces witnessed non-US forces forcing him to drink urine and denying him food and water.[211] At one point he claims a US soldier placed his penis on the detainee's head and asked him "how big it was."[212]

There is evidence to suggest that the threat of death or injury to a detainee and his family continued to be employed in 2004 in order to obtain information and as a way of silencing the detainees. Arkan Mohammed Ali, an Iraqi detainee, was held in various locations in Iraq through June 2004.[213] In addition to being deprived of sleep though frequent beatings and locked in a coffin-like box for several days, he claims that US personnel held guns to his head and

---

[206] Translation of Statement provided by Detainee [redacted]. 0180-04-CID259-80227. June 19, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final (C)/SSI—0180-04-CID259-80227-/5C1C/5Y2E/5X1. July 28, 2004. Available at: http://www.aclu.org/torturefoia/released/1248_1288.pdf. Accessed April 26, 2005. The investigation did not develop sufficient evidence to prove or disprove the allegations.

[207] Agent's Investigation Report. ROI No. 0024-04-CID789. May 6, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for: See Distribution. Subject: CID Report of Investigation—Final (C)/SSI—0147-04-CID259-80210-/5C1R2/5Y2E/5X1. July 17, 2004. Available at: http://www.aclu.org/torturefoia/released/5015_5069.pdf. Accessed April 26, 2005.

[208] Id. The investigation did not develop sufficient evidence to prove or disprove the allegations. US Army Criminal Investigation Command, supra note 207.

[209] US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final Referred—0117-04-CID259-80188-5C1Q2/5Y2E. May 31, 2004. Available at: http://www.aclu.org/torturefoia/released/030705/9117_9134.pdf. Accessed April 26, 2005.

[210] Id.

[211] Agent's Investigation Report. ROI No. 0152-04-CID899-81708. May 16, 2004. In: Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Final (C) -0152-04-CID899-81708-5C1L/5Y2P9. July 23, 2004. Available at: http://www.aclu.org/torturefoia/released/595_647.pdf. Accessed April 26, 2005.

[212] Id. The investigation established that the offense of aggravated assault and maltreatment of a prisoner did not occur as initially alleged. Department of the Army, supra note 211.

[213] Ali v. Rumsfeld. No. unassigned. N.D. Ill. filed Mar. 1, 2005. Para. 14. Available at: http://www.humanrightsfirst.org/us_law/etn/lawsuit/PDF/rums-complaint-022805.pdf. Accessed April 26, 2005.

threatened to run him over with a military vehicle.[214] He was also threatened with transfer to Guantánamo, where he was told that soldiers could kill him with impunity. When he was finally released, he claims that a US official told him that if he ever reported the abuse he suffered, US forces would find him and he would never see his family again.[215]

### E. Post Abu Ghraib

Even after the public exposure and outrage over what happened at Abu Ghraib in April 2004, abuses continued, especially in Guantánamo, where the April 16, 2003 memorandum remained in place.

#### 1. *Guantánamo*

A source with knowledge of the detainee operations at the Guantánamo facility told PHR that in mid-2004, up to a quarter of the over 500 detainees were kept in isolation.[216] There are a number of separate units where detainees are isolated.  One of these is Camp Echo, which consists of 8 windowless huts, each of which is divided into two separate compartments containing steel detention cells of eight feet by five feet.[217] Sources tell PHR that the number of isolation units in Camp Echo has been expanded to more than 20.[218]

In May 2004, the US authorities opened Camp Five at Guantánamo, a maximum security unit composed of sealed boxes, made of steel, concrete, and aluminum. These were modeled on supermax prisons, with "overstimulation and monopolization of perception."[219] Detainees in Camp Five are held in solitary confinement in concrete cells for up to 24 hours a day and they are under 24-hour video surveillance.[220] Although there is a limit of a 30-day confinement in the unit, this limit allegedly is regularly ignored. Camp Five reportedly has over 100 isolation units.[221] Sources tell PHR that the lights are kept on in the new facility for 24 hours a day.[222]

A leaked ICRC report to the US government based on June 2004 visits to Guantánamo found a system designed to break the will of the detainees and make them wholly dependent on their interrogators through "humiliating acts, solitary confinement, temperature extremes, use of forced positions."[223] The ICRC said that rather than curtailing the use of such methods after the outrage about what happened at Abu Ghraib, the regime at Guantánamo had become "more refined and repressive."[224]

---

[214] *Id.* Para. 167.

[215] *Id.* Paras. 167–68.

[216] PHR interview.

[217] Brief of Amici Curiae Human Rights First, Physicians for Human Rights, et al. in Support of Petitioner at 15. *Hamdan v. Rumsfeld.* S. Ct. filed Dec. 27, 2004. No. 04–702. Citing Decl. of Lt. Cmdr. Charles Swift. ¶ 3. *Swift v. Rumsfeld.* No. 04 Civ. 0777L. W.D. Wash. filed May 3, 2004.

[218] PHR Interview.

[219] PHR Interview.

[220] Amnesty International report, *supra* note 31, at 75.

[221] *Id.* at 125.

[222] PHR Interview.

[223] Lewis NA. "Red Cross Finds Detainee Abuse in Guantanamo." *New York Times.* November 30, 2004. Quoting summary of leaked ICRC report.

[224] *Id.*

*2. Afghanistan*

The UN Independent Expert on the Situation of Human Rights in Afghanistan, M. Cherif Bassiouni, visited the country in August 2004 and conducted research and consultations. He found that Coalition forces at that time were employing forced nudity, public embarrassment, sleep deprivation, prolonged standing, hooding, and sensory deprivation.[225]
A follow up report in March 2005 repeated the allegations of these abuses.[226]

*3. Iraq*

A CID investigation states that a detainee claims in mid July 2004 he was held at an unknown facility in Iraq in a small cell by himself for 16 days and that he started screaming and crying because of it.[227] Three soldiers entered his cell and restrained him by sandwiching him between two stretchers for three hours.[228]

## F. The Role of Health Professionals

Health personnel employed by the Department of Defense and other agencies in the "war on terror" are bound by international law. In addition, they should abide by ethical standards of the World Medical Association and the American Medical Association. The Declaration of Tokyo, adopted by both bodies, prohibits participation of physicians in torture and all forms of cruel, inhuman, and degrading treatment.[229] This includes providing "knowledge" to "facilitate the practice of torture or other forms of cruel, inhuman or degrading treatment."[230] It also prohibits the physician's presence when any of these practices takes place.[231] This has been interpreted to prohibit examinations prior to or after interrogation because such examinations involve health personnel in calibrating coercive or unlawful techniques of interrogation. The UN Principles of Medical Ethics provide similar guidelines for health personnel charged with the medical care of prisoners and detainees.[232] There is evidence, however, of failure on the part of health professionals to report acts of abuse as well as evidence of health professional complicity in acts of physical and psychological torture. As with incidences of psychological torture, the picture is incomplete and more investigation is needed.[233]

---

[225] Report of the Independent Expert of the Commission on Human Rights on the Situation of Human Rights in Afghanistan. U.N. GAOR. 59th Sess. Agenda Item 105(c). para. 50. U.N. Doc. A/59/370. September 21, 2004.
[226] Advisory Services and Technical Cooperation in the Field of Human Rights: Report of the Independent Expert on the Situation of Human Rights in Afghanistan, M. Cherif Bassiouni. U.N. ESCOR. 61st Sess. Agenda Item 19. para. 44. U.N. Doc. E/CN.4/2005/122. March 11, 2005.
[227] Agent's Investigation Report. ROI No. 0234-04-CID259-80271. July 19, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—Initial/Final/SSI—0234-04-CID259-80271-/5C2/5Y2E/5X1. August 2, 2004. Available at: http://www.aclu.org/torturefoia/released/5245_5258.pdf. Accessed April 26, 2005.
[228] *Id.* The investigation "established probable cause to believe [the detainee] was not abused during his detention." US Army Criminal Investigation Command, *supra* note 227.
[229] World Medical Association. The Declaration of Tokyo. 1975.
[230] *Id.* Para. 2.
[231] *Id.* Para. 3.
[232] UN Principles of Medical Ethics. 1982.
[233] A number of articles review the issue and what evidence is currently known. See Miles SH. "Abu Ghraib: Its Legacy for Military Medicine." *Lancet.* 2004;364:725–729; Bloche MG, Marks JH. "When Doctors Go to War." *New England Journal of Medicine.* 2005;352(1):3–6; Lifton RJ. "Doctors and Torture." *New England Journal of Medicine.* 2004;351(5):415–416.

There is some evidence that medical personnel were aware of abuse but failed to report it. The Fay report cited some medical corps personnel for observing and failing to report instances of abuse at Abu Ghraib.[234] The Fay report recommended an inquiry into whether medical personnel were aware of detainee abuse and failed to properly document and report the abuse.[235]

There is evidence that interrogators had direct access to detainees' medical files. The ICRC raised concerns about this with Maj. Gen. Miller in an October 2003 meeting about treatment of detainees at Guantánamo.[236] In the meeting, ICRC representatives told Maj. Gen. Miller that "medical files are being used by interrogators to gain information in developing an interrogation plan."[237] They expressed concern that "there is a link between the interrogation team and the medical team."[238] The ICRC called this a "breach of confidentiality between a physician and a patient" and explained to Maj. Gen. Miller that "[o]nly medical personnel are supposed to have access to these files."[239] In a leaked report based on visits in June 2004, the ICRC said that medical files of detainees were "literally open" to interrogators.[240] A source with knowledge of operations at Guantánamo confirmed to PHR that confidentiality was openly disregarded by many members of the US medical staff there, and that this was due to an order "from the top."[241]

There is evidence that in addition to sharing medical records, health professionals participated more directly in interrogations. This is not surprising, given that the April 16, 2003 memo by Secretary Rumsfeld explained that interrogation techniques at Guantánamo were to be used only after detainees are "medically . . . evaluated as suitable."[242] This reliance on medical evaluation and approval appears repeatedly in the guidance and directives. For example, it appeared in memorandums governing interrogations in Iraq as well.[243] A January 27, 2004 memorandum for Iraq specifies that dietary manipulation, sleep management, and sensory deprivation all must be "monitored by medics."[244]

Col. Thomas M. Pappas, the head of military intelligence at Abu Ghraib, described to General Taguba how that worked in practice.

> If the interrogation plan falls within the outline set by LTG Sanchez then the O5 Deputy Director or myself approve the plans. Those interrogation plans include

---

[234] Fay report, *supra* note 40, at 136.

[235] *Id.*

[236] ICRC Oct. 2003 meeting, *supra* note 76.

[237] *Id.*

[238] *Id.*

[239] *Id.*

[240] Lewis, *supra* note 223. Quoting summary of leaked ICRC report.

[241] PHR Interview.

[242] Memorandum for the Commander, US Southern Command. From Donald Rumsfeld, Secretary of Defense. Subject: Counter-Resistance Techniques in the War on Terrorism. April 16, 2003.

[243] See, e.g., Memorandum for Commander, US Central Command. From Ricardo S. Sanchez, Lieutenant General, US Army, Commanding. Subject: CJTF-7 Interrogation and Counter-Resistance Policy. September 14, 2003. Specifying that application of the techniques is subject to, *inter alia*, medically evaluating the detainee as suitable; Memorandum for C2 and C3, Combined Joint Task Force Seven, Baghdad and Commander, 205th Military Intelligence Brigade, Baghdad. From Ricardo S. Sanchez, Lieutenant General, Commanding, Combined Joint Task Force Seven, Baghdad. Subject: CJTF-7 Interrogation and Counter-Resistance Policy. October 12, 2003. Specifying that one safeguard is that the "security internee is medically evaluated as a suitable candidate for interrogation."

[244] Memorandum For Record. From Department of the Army, Joint Interrogation & Debriefing Center, Abu Ghurayb Prison, Iraq APO AE 09302. Subject: CJTF-7 Interrogation Rules of Engagement. January 27, 2004.

a sleep plan and medical standards. A physician and a psychiatrist are on hand to monitor what we are doing.

. . .

Typically, the MP has a copy of the interrogation plan and a written note as to how to execute. There should also be files in the detainee files as to what is going on when an exception is needed. The interrogator uses these files to keep a record as to what has happened to the detainee. The doctor and psychiatrist also look at the files to see what the interrogation plan recommends; they have the final say as to what is implemented.[245]

At Abu Ghraib and Guantánamo, "behavioral science consultation teams" (hereinafter BSCT), composed of psychologists and psychiatrists, were formed with the purpose of facilitating interrogation. A source knowledgeable with BSCT's functioning at Guantánamo told PHR that interrogators and heads of medical staff met with BSCT in order to discuss detainees' medical conditions that may cause problems during interrogations.[246] But interrogators did not go through BSCT in all cases; interrogators were able to go directly to medical staff without going through BSCT members.[247] In its leaked report, the ICRC complained to the US about BSCT and the fact that doctors and medical personnel conveyed information about detainees' mental health and vulnerabilities directly to interrogators.[248] Evidently, interrogators found this approach effective. One e-mail about Guantánamo made available through the FOIA lawsuit says, "I've met with the BISC (Biscuit) people several times and found them to be a great resource. They know everything that's going on with each detainee, who they're talking to, who the leaders are, etc. I've encouraged the interview teams to meet with them prior to doing their interviews."[249]

These arrangements compromised the care of detainees at Guantánamo. A source told PHR that detainees refused to discuss their psychiatric problems with US physicians because they knew that the information was passed on to interrogators, who could then use it against them during interrogations.[250] It also damaged the relationship between doctors and detainees. Many detainees were convinced that their health care was actually controlled by interrogators and did not believe the doctors' claim that they were there for the benefit of the detainee. In a report to the US government based on a June 2004 visit to the naval base, the ICRC pointed out these problems to the US government.[251] It called what was happening at Guantánamo a "flagrant violation of medical ethics."[252]

---

[245] Article 15-6 Investigation Interview by Major General Taguba, CFLCC Deputy Commanding General, US Army. With Colonel Thomas M. Pappas, Commander, 205th Military Intelligence Brigade. February 9, 2004: 3.

[246] PHR Interview.

[247] Lewis, *supra* note 223.

[248] *Id.*

[249] E-mail. From [redacted]. To [redacted]. Subject: Re: GTMO. July 31. Available at: http://www.aclu.org/torturefoia/released/t3186_3187.pdf. Accessed April 26, 2005.

[250] PHR Interview.

[251] Lewis, *supra* note 223

[252] Lewis, *supra* note 223. Quoting summary of leaked ICRC report.

## IV. Health Consequences of Psychological Torture

Psychological torture is designed to destroy the victim's sense of privacy, intimacy, trust of others and security, as well as one's sense of self and how one relates to one's surroundings. According to Ian Robbins, head of the Traumatic Stress Service at St. George's Hospital in London and a former interrogator in the Royal Medical Corps, the methods of psychological coercion are meant "to assert complete control over the victim and break down any will they might have to resist the interrogator's demands."[253] Psychological torture often makes victims feel that they are responsible for the pain and suffering that they experience[254] and induces feelings of intense humiliation leading to feelings of worthlessness. Victims often feel that they had a choice, or even that they share in the responsibility of what was done to them, when in reality they were powerless.[255] Victims of these techniques are often told that their lack of cooperation will lead to the torture of others, causing the victim of torture to believe that he or she shares the responsibility for the pain and suffering of others. The effects can be particularly harmful when the victim is forced to witness pain being inflicted on others as a result of not giving information to interrogators. According to clinicians who treat torture survivors, severe psychological pain usually results from various combinations of intense and prolonged fear, shame, humiliation, horror, guilt, grief, and mental and physical exhaustion.[256]

Psychological torture and cruel, inhuman, and degrading treatment can have extremely destructive health consequences for detainees. The effects can include memory impairment, reduced capacity to concentrate, somatic complaints such as headache and back pain, hyperarousal, avoidance, and irritability.[257] Additionally, victims often experience severe depression with vegetative symptoms, nightmares, and "feelings of shame and humiliation" associated with sexual violations, among others.[258]

Although these short- and long-term consequences can be debilitating, the suffering of victims of psychological torture is often disregarded because they do not have physical evidence of the abuse they suffered.[259] The lack of physical signs can make psychological torture seem less significant than physical torture, but the consensus among those who study torture and rehabilitate its victims is that psychological torture can be more painful and cause more severe and long-lasting damage even than the pain inflicted during physical torture. Indeed, as the UN Special Rapporteur on torture pointed out:

> Often a distinction is made between physical and mental torture. This
> distinction, however, seems to have more relevance for the means by which
> torture is practised than for its character. Almost invariably the effect of

---

[253] Robbins I. "We Have Ways...." *New Scientist.* November 20, 2004.

[254] Hodge J, Cooper L. "Roots of Abu Ghraib in CIA Techniques." *National Catholic Reporter.* November 5, 2004. Summarizing comments of Alfred McCoy, professor of history at the University of Wisconsin-Madison and author of "Closer Than Brothers," a study of the impact of the CIA's torture methods on the Philippine military.

[255] Robbins, *supra* note 253.

[256] Personal communication with the Center for Victims of Torture.

[257] Keller A, Gold J. "Survivors of Torture." In: Sadock B, Sadock V, eds. *Kaplan and Sadock's Comprehensive Textbook of Psychiatry.* Vol. 1. 8th ed. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 2400.

[258] *Id.*

[259] When physical evidence is absent, the frustration of being unable to prove that torture occurred can compound the suffering of the victim. On the other hand, when psychological torture is paired with physical torture, the presence of scars can serve as a constant reminder of the traumatic experience, forcing the victim to relive the experience and prolonging the cognitive distress that results from torture.

torture, by whatever means it may have been practised, is physical and psychological. Even when the most brutal physical means are used, the long-term effects may be mainly psychological, even when the most refined psychological means are resorted to, there is nearly always the accompanying effect of severe physical pain. A common effect is the disintegration of the personality.[260]

This result of psychological torture is confirmed by the Human Resource Exploitation Training Manual, a 1983 CIA interrogation manual released to the *Baltimore Sun* in response to a Freedom of Information Act request. The 1983 CIA manual confirms that the goal of psychological torture is to

induce psychological regression in the subject by bringing a superior outside force to bear on his will to resist. Regression is basically a loss of autonomy, a reversion to an earlier behavioral level. As the subject regresses, his learned personality traits fall away in reverse chronological order. He begins to lose the capacity to carry out the highest creative activities, to deal with complex situations, or to cope with stressful interpersonal relationships or repeated frustrations.[261]

The 1983 CIA manual notes that the successful application of psychologically coercive techniques results in debility, dependency on the interrogator, and dread.[262] The result can be "a physiological condition involving impairment of brain function."[263] In this state, "a person is capable of only simple activities, and as it progresses they may become restless, talkative and delirious. Ultimately they become totally confused and can even lapse into unconsciousness."[264] Indeed, the 1983 CIA manual warns that "if the debility-dependency-dread state is unduly prolonged, the subject may sink into a defensive apathy from which it is hard to arouse him."[265]

Symptoms shown by victims of psychological torture are typically those associated with anxiety disorders, including acute stress disorder, depression, and posttraumatic stress disorder (hereinafter PTSD). People who suffer from PTSD experience longer-term suffering than those who suffer from acute stress disorder. Acute stress disorder has similar symptoms to those associated with PTSD, including dissociative and depressive symptoms. The primary difference is that acute stress disorder occurs within one month of a traumatic event and is short-lived, usually lasting no longer than four weeks.[266] Onset of PTSD symptoms usually occurs within

---

[260] Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. U.N. GAOR. 59th Sess. Agenda Item 107(a). 2004; para. 45. U.N. Doc. A/59/324. Quoting the first Special Rapporteur on Torture, Peter Kooijmans.

[261] Central Intelligence Agency. *Human Resource Exploitation Training Manual – 1983*. Coercive Techniques, para. L1. Available at: http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB122/CIA%20Human%20Res%20Exploit%20H0-L17.pdf. Accessed April 22, 2004. [1983 CIA Manual]. See also, "Torture Was Taught by CIA." *Baltimore Sun*. Jan. 27, 1997. Original news article reporting the declassification of the manual. It is unclear whether this manual is still in use.

[262] 1983 CIA Manual, *supra* note 261. Paras. L3–L5.

[263] Robbins, *supra* note 253.

[264] *Id.*

[265] 1983 CIA Manual, *supra* note 261. Para. L5.

[266] "Acute Stress Disorder." First MB, ed. *Diagnostic and Statistical Manual—Text Revision*. 4th ed. Washington, DC: American Psychiatric Association; 2000.

months after trauma (although delays of months or even years have been cited); however, over half of cases last longer than 3 months "with many others having persisting symptoms for longer than 12 months."[267]

One-third of PTSD sufferers fail to recover even after many years.[268] Several studies done on soldiers who fought in World War II have confirmed the chronic nature of PTSD. One study of posttraumatic stress disorder in World War II prisoners of war reported in 1989 found that more than 75% reported some symptom trouble and almost 25% of the subjects reported being continually troubled by PTSD symptoms."[269] Another study of World War II Dutch resistance fighters demonstrated a marked pattern of delayed-onset PTSD symptoms for over 80% of subjects, and over 70% of the study group experienced a progressive chronic or remission-exacerbation manifestation of illness ranging from five to more than 35 years post-initiation.[270]

PTSD is extremely common among survivors of torture. A study of torture survivors from six different countries who were subjected to a wide range of torture techniques showed that there was a high prevalence of PTSD, ranging from sixty-nine to ninety-two percent,[271] compared to the incidence of about 3.6 percent of Americans between the ages of 18 and 54.[272]

PTSD has three distinct sets of symptoms. The first of these is the "repeated re-experiencing of the traumatic event."[273] These symptoms include intrusive images or thoughts, recurring nightmares, or flashbacks of the traumatic event.[274] The second set of symptoms involves "emotional numbing and detachment." People report that they feel removed and unable to relate to others. They often experience a sense of unreality and feel detached even from themselves and their immediate surroundings. The final set of symptoms involves "hypervigilance and chronic arousal." Anything that reminds the PTSD sufferer of the traumatic event can induce a state of panic and a sense of urgency to escape from the situation. PTSD symptoms can persist for years following a traumatic event.[275]

---

[267] "Posttraumatic Stress Disorder." First MB, ed. *Diagnostic and Statistical Manual—Text Revision.* 4th ed. Washington, DC: American Psychiatric Association; 2000.

[268] Kessler R, Sonnega A, Bromet E, Hughes M, Nelson CB. "Posttraumatic Stress Disorder in the National Comorbidity Survey." *Archives of General Psychiatry.* 1995;52:1048–60.

[269] Zeiss RA and Dickman HR. "PTSD 40 years later: Incidence and Person- Situation Correlates in Former POWs." *Journal of Clinical Psychology.* 1989;45:80–87.

[270] Op den Velde W, Falger PRJ, Hovens JE, et al. "Posttraumatic Stress Disorder in Dutch Resistance Veterans from World War II." In: Wilson JP, Raphael B, eds. *International Handbook of Traumatic Stress Syndromes.* New York: Plenum; 1993:219–230.

[271] Moisander PA, Edston E. "Torture and Its Sequel—A Comparison Between Victims from Six Countries." *Forensic Science International.* 2003;137:133–140.

[272] National Institute of Mental Health. "The Numbers Count: Mental Disorders in America." NIH Publication No. 01-4584. 2001. Available at: http://www.nimh.nih.gov/publicat/numbers.cfm. Accessed April 22, 2005. Citing Narrow WE, Rae DS, Regier DA. NIMH Epidemiology Note: Prevalence of Anxiety Disorders. One-year Prevalence Best Estimates Calculated from ECA and NCS Data. Population Estimates based on U.S. Census Estimated Residential Population Age 18 to 54 on July 1, 1998. Unpublished.

[273] "Acute Stress Disorder." First MB, ed. *Diagnostic and Statistical Manual—Text Revision.* 4th ed. Washington, DC: American Psychiatric Association; 2000.

[274] *Id.*

[275] *Id.*

The persistent nature of PTSD symptoms may eventually lead to personality changes in torture survivors,[276] the negative consequence of which can be felt by the associates of those who suffer from PTSD. Many studies addressing the effect of PTSD on victim contacts are restricted to studies of Vietnam War veterans and their families. One study found that children of Vietnam veterans with PTSD were significantly more likely to have behavioral difficulties than children of veterans not suffering from PTSD, and that spouses or partners of the same group of veterans also were more likely to report marital problems.[277] According to another study of children of Vietnam War veterans with PTSD, these behavior issues include "aggression, delinquency, hyperactivity, and difficulty in developing and maintaining close friendships."[278]

It has been argued by researchers in the field that the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), the manual which describes the symptoms of psychological disorders, should be modified to include psychological torture under the PTSD heading.[279] In its current form, the DSM-IV includes as criteria for diagnosing PTSD only "events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others (Criterion A1)."[280] The authors of the proposed change studied political prisoners in East Germany who, though never experiencing any situations in which physical harm or death was threatened, suffer from symptoms of PTSD.[281]

Some researchers have argued that PTSD does not adequately describe the exact nature of the symptoms resulting from torture and have argued for the creation of a specific "torture syndrome," distinguished by memory and concentration impairment, sleep disturbance and nightmares, susceptibility to emotional instability (emotional lability), anxiety, depression, and somatic complaints, including gastrointestinal, cardiopulmonary, and sympathetic distress.[282] Others have argued that torture survivors suffer from complex PTSD, or disorders of extreme stress, which are characterized by depression, impairment in mood regulation, sexual disturbances, amnesia, dissociative disorder, depersonalization, feelings of guilt and shame, self-accusation, self-mutilation, suicidality, excessive fantasies of revenge, disturbed perception of the perpetrator (idealization), social isolation, extreme mistrust, tendency for revictimization, hopelessness, despair, psychosomatic complaints, and conversion syndromes.[283] Survivors of torture often develop substance abuse problems as a means of suppressing traumatic memories and managing the anxiety that results from torture.[284]

---

[276] Pétur Hauksson. Council of Europe. "Psychological Evidence of Torture." November 6, 2003: para. 61. CPT (2003) 91. Available at: http://www.cpt.coe.int/en/working-documents/cpt-2003-91-eng.pdf. Accessed April 22, 2005.Citing ICD-10. WHO's International Classification of Diseases. 10th ed.

[277] Jordan BK, Marmar CR, Fairbank JA, et al. "Problems in Families of Male Vietnam Veterans with Posttraumatic Stress Disorder." *Journal of Consulting and Clinical Psychology*. 1992;60:916–926.

[278] Parsons J, Kehle TJ, Owen SV. "Incidence of Behavior Problems Among Children of Vietnam War Veterans." *School Psychology International*. 1990;11:253–325.

[279] Priebe S, Bauer M. "Inclusion of Psychological Torture in PTSD Criterion A." Letter to the Editor. *American Journal of Psychiatry*. 1995;152(11):1691-92.

[280] "Posttraumatic Stress Disorder." First MB, ed. *Diagnostic and Statistical Manual—Text Revision*. 4th ed. Washington, DC: American Psychiatric Association; 2000.

[281] Priebe S, Bauer M, *supra* note 279.

[282] Sadock B, Sadock V, eds. *Kaplan and Sadock's Comprehensive Textbook of Psychiatry*. Vol. 1. 8th ed. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 2399–40.

[283] *Id.*; van der Kolk B, Roth S, Pelcovitz D, Mandel F. "Complex PTSD: Results of the Field Trials for DSM IV." Washington: American Psychiatric Association Press; 1993; Herman JL. "Sequelae of Prolonged and Repeated Trauma: Evidence for a Complex Posttraumatic Syndrome (DESNOS)." In: Davidson JRT, Davidson FE, eds. *Posttraumatic Stress Disorder: DSM-IV and Beyond*. Washington: American Psychiatric Press; 1994.

[284] Hauksson, *supra* note 276. Para. 10.

These damaging health effects have been observed among detainees who have been subjected to a combination of psychologically coercive interrogation techniques at US-run detention facilities in Afghanistan, Iraq, and Guantánamo.

An official who worked at Camp Delta, the main prison facility at Guantánamo, admitted that sessions involving making uncooperative detainees strip to their underwear and sit in a chair while shackled hand and foot to a bolt in the floor while enduring strobe lights and loud rock and rap music with the air-conditioner turned to maximum levels "fried" the detainees.[285] Another person familiar with the procedures admitted that after the detainees were subjected to such sessions, which could last up to 14 hours, they "were very wobbly. They came back to their cells and were just completely out of it."[286] Similarly, an e-mail from an FBI agent described observing at Guantánamo detainees being chained in a fetal position to the floor and subjected to extreme heat, cold and extremely loud rap music, with no chair, food, or water.[287] The agent says that the detainees had been left there for 18 to 24 hours or more and in most cases, had urinated or defecated on themselves. According to the e-mail, this type of treatment drove at least one of the detainees to self mutilation. The agent witnessed a detainee who "was almost unconscious on the floor, with a pile of hair next to him."[288] The detainee had apparently been "literally pulling his own hair out throughout the night."[289]

A source with knowledge of interrogation at Guantánamo told PHR that isolation, repeated interrogation, deprivation of social contacts, an extremely harsh and overly stringent regime of internment, and constant sources of harassment, cultural or otherwise, were major causes of the deterioration of mental health of detainees at Guantánamo in 2002.[290] These effects continued in 2003. According to the source, detainees held in Guantánamo in 2003 were under a constant state of stress and suffered from garbled conversation, disorientation, hallucination, irritability, anger, delusions, and sometimes paranoia.[291] After observing detainees, the source opined that for some, the prolonged psychological and physical stress of coercive interrogation appeared to have induced dependence on interrogators or regression.[292]

The deterioration of some detainees' mental health at Guantánamo was confirmed by military officials. According to an Army spokesperson, in 2003 alone, there were 350 acts of self-harm, including 120 "hanging gestures."[293] Although the level of self injurious behavior diminished after the opening of a psychiatric ward at the Guantánamo facility in 2003, there were still 110 incidents of self harm in 2004.[294] A New York Times article on March 9, 2003 confirmed reports that as of that date, there had been twenty reported suicide attempts among detainees at Guantánamo.[295] Since then, there have been many more suicide attempts at the naval base, including a mass suicide attempt in August 2003 in which twenty three detainees attempted to

---

[285] Lewis, supra note 68. Quoting unnamed official.

[286] Id. Quoting unnamed "person familiar with the procedure."

[287] E-mail. From [Redacted]. To Valerie E. Caproni (OGC) (FBI). Subject FW: GTMO. August 2, 2004. Available at: http://www.aclu.org/torturefoia/released/FBI.121504.5053.pdf. Accessed April 22, 2005.

[288] Id.

[289] Id.

[290] PHR Interview.

[291] PHR Interview.

[292] PHR Interview.

[293] "Mass Guantanamo Suicide Protest." BBC News. January 25, 2005. Quoting Army spokesman Lt. Col. Sumpter.

[294] Id. Quoting Lt. Col. Sumpter and Army Gen. Jay Hood.

[295] Van Natta Jr., supra note 18.

hang or strangle themselves.[296] Dr. Terry Kupers, a psychiatrist who has studied mental health in prisons, told the *New York Times* that the number of suicide attempts at Guantánamo is an "extraordinarily high number compared with other prison populations."[297]

Reports from detainees confirm the mental health problems they and others faced. The Tipton Three reported, based on their time at Guantánamo, that many detainees held there were prescribed antidepressants.[298] They said that "[f]or at least 50 of those so far as we are aware their behaviour is so disturbed as to show that they are no longer capable of rational thought or behaviour. . . . [I]t is something that only a small child or an animal might behave like."[299] Shah Mohammed Alikhil, a detainee at Guantánamo, told interviewers with Human Rights Watch that he attempted suicide three times while in detention.[300] Another former detainee, Alif Khan, told interviewers that "[t]wo men next to me went crazy. They were trying to kill themselves."[301]

Other detainees explained the long-term effects of a combination of psychologically coercive interrogation techniques used on them in other theaters of operation.[302] Said Nabi Siddiqi, who was subjected to various forms of torture, including sexual humiliation and sleep deprivation in Afghanistan between July and August 2003, claims that, among other things, "he has had depression, thoughts of suicide and nightmares, is quick to anger, and has suffered from memory loss."[303] Haji Abdul Rahman, detained in Afghanistan between December 2003 and May 2004 and subjected to sensory deprivation, sexual humiliation, solitary confinement, and sleep deprivation, claims that he suffers vision problems and memory lapses, has emotional problems and is quick to anger, "which has caused difficulties with his family and work."[304] Arkan M. Ali, subjected to, among other things, prolonged sensory and sleep deprivation, forced nudity, and death threats in Iraq between July 2003 and June 2004, suffers severe depression and has frequent nightmares and episodes of shortness of breath.[305] As a result, Mr. Ali "has been unable to maintain employment and his personal relationships with his family and others have deteriorated."[306] Thahe M. Sabbar, detained in Iraq from July 2003 to January 2004, was subjected to mock executions, hooding, and humiliation, among other things. He suffers from severe nightmares, incontinence, impotence, and uncontrollable bouts of shaking and crying.[307] Among other things, Sherzad K. Khalid was subjected to sexual humiliation, prolonged sleep deprivation, and mock executions in Iraq from July to September 2003. He claims to suffer from severe depression and nightmares that have caused serious difficulties in his work and family relationships.[308]

---

[296] "Mass Guantanamo Suicide Protest," *supra* note 293.

[297] Van Natta Jr., *supra* note 18.

[298] Tipton Three statement, *supra* note 32. Para. 267.

[299] *Id.*

[300] HRW Guantanamo report, *supra* note 43, at 22. Citing Human Rights Watch interview with Shah Mohammed Alikhil. January 3, 2004.

[301] *Id.* Citing "Inside Guantanamo." BBC Panorama. Broadcast October 5, 2003.

[302] These psychological abuses were often punctuated by incidents of physical abuse.

[303] *Ali v. Rumsfeld.* No. unassigned. N.D. Ill. filed Mar. 1, 2005. Paras. 157–159. Available at: http://www.humanrightsfirst.org/us_law/etn/lawsuit/PDF/rums-complaint-022805.pdf. Accessed April 22, 2005.

[304] *Id.* Paras. 163–165.

[305] *Id.* Paras. 166–169.

[306] *Id.* Para. 169.

[307] *Id.* Paras. 170–173.

[308] *Id.* Paras. 174–177.

Tarek Dergoul, a detainee who faced abuse in both Afghanistan and Guantánamo, complained of somatic symptoms as well as psychological suffering as a result of his detention. He told interviewers: "I get migraines, I'm depressed and I suffer from memory loss. There's stuff that happened, embedded in my head, that I can't remember."[309] One former Guantánamo detainee told Human Rights Watch:

> It has left its impression on me: I feel terrified sometimes and see terrible nightmares. I dream I am in prison and then I shout and I wake up, and perspiration is running from my back. Therefore, I visit psychiatrist and take medicines, which is very expensive and I cannot afford it.[310]

While the psychologically abusive interrogation techniques were usually applied in combination and it is difficult to separate out the health consequences for individual techniques, this report will consider four main categories of psychological torture used against detainees by US forces.[311] These are fear of injury or death to self or loved ones, humiliation, sensory deprivation, including isolation, and sleep deprivation. The devastating health consequences of these techniques are evident through literature, observations of clinicians, and reports from victims themselves. It is important to keep in mind that a combinations of such methods of abuse is likely to result in more than a simple, additive effect.

## A.  Threats to Induce Fear of Death or Injury

The 1983 CIA manual teaches interrogators that the threat of coercion is often more effective at weakening resistance than the actual act itself.[312] It states that "the threat to inflict pain can trigger fears more damaging than the immediate sensation of pain."[313] The manual goes on to say that a threat is only effective so long as the detainee is given a reasonable escape route from the threatened pain. Threat of death, on the other hand, induces a state of sheer hopelessness in the detainee. The detainee is likely to feel that he will be killed regardless of his compliance. Crossed out in the manual, but still legible, is a statement that threats of physical coercion must be carried out if the detainee remains uncooperative. Otherwise, subsequent threats will be ineffective.[314] The Army Field Manual agrees. It states that "the inability to carry out a threat of violence or force renders an interrogator ineffective should the source challenge the threat."[315]

According to clinicians who treat torture survivors at the Minnesota-based Center for Victims of Torture (hereinafter CVT), mock executions and other situations where death is threatened force victims to repeatedly experience their last moments before death, create a sense of complete unpredictability (never knowing when death might come), and induce chronic fear

---

[309] HRW Guantanamo report, *supra* note 43, at 23. Citing Rose D. "They Tied Me Up Like a Beast and Began Kicking Me." *Observer* (London). May 16, 2004.

[310] *Id.* Citing Human Rights Watch interview with A. February 6, 2004.

[311] This separation is somewhat artificial, as it is almost impossible to separate out the unique effects of any single technique. Techniques are not chosen or practiced in isolation but rather within an overall context that is designed to achieve certain overarching psychological goals.

[312] 1983 CIA Manual, *supra* note 261. Para. L11.

[313] *Id.*

[314] *Id.* Between 1984 and 1985, the manual was altered to discourage torture after an outrage in Congress and the media about CIA techniques being used in Central America. "Torture Was Taught by CIA," *supra* note 261.

[315] FM 34-52, *supra* note 3. Chapter 1: Interrogation and the Interrogator.

and helplessness.[316] Victims who were threatened with death speak of feeling a sense that one is already dead. They often relive these near-death experiences in their nightmares, flashbacks, and intrusive memories.[317] Reliving these near death encounters can provoke feelings of intense anxiety that cause victims to act inappropriately in work and family settings and, in more extreme cases, cause injury to themselves.[318] Staff at CVT have dealt with victims of this sort of torture who have pleaded with torturers to kill them, preferring real death over its constant threat and continued intolerable pain.[319]

It is clear that interrogators cultivated the fear of injury and death in Afghanistan, Iraq, and Guantánamo through the use of military working dogs, the threat of beatings or electrocutions, and mock executions. Many of these techniques were approved as part of the "fear-up" interrogation technique.[320] The September 14, 2003 CJTF-7 Interrogation and Counter-Resistance Policy made this clear when it acknowledged that the use of military working dogs was meant to "Exploit[] Arab fear of dogs."[321] According to clinicians at the Center for the Treatment of Torture Victims in Berlin, Germany (hereinafter Berlin Center), who treat a large population of men and women from Muslim cultures, the dog is regarded as an unclean animal among Muslims.[322] So if a man has been touched by a dog's mouth, he becomes unclean and is unable to pray.

The Tipton Three describe how one man suffered profound psychological damage after being attacked by a dog at Guantánamo.

> . . . Moussa Madini got bitten in his cell in isolation by a dog very badly, taking, . . . a big chunk of his leg out, the muscle part of his calf . . . . He was very mentally affected and for instance, he would hardly eat. [. . . He was extremely skinny and could eat very little. He would be pacing around his cell really fast for hours. It would consist of stepping back and stepping forward because there was no space at all. . . .][323]

## B. Sexual Humiliation

The use of sexual humiliation is difficult to classify as either purely psychological torture or as physical torture. While many of the sexual acts committed at Abu Ghraib, such as rape and forced sodomy, are clearly forms of physical torture, they can have profound psychological effects. The sexual humiliation practices, including forced nudity, forced assumption of sexually degrading positions, and forced masturbation, used in detention facilities in Afghanistan, Guantánamo, and Iraq are physical in nature but do not necessarily cause physical pain to the victims. Nevertheless, they can have devastating mental health consequences for individuals, particularly Muslims.

---

[316] Personal communication with the Center for Victims of Torture.
[317] *Id.*
[318] *Id.*
[319] *Id.*
[320] Fay report, *supra* note 40, at 10. "Fear up" is a technique approved by Army Field Manual 34-52 and consists of the interrogator behaving in a heavy, overpowering manner with a loud and threatening voice. FM 34-52, *supra* note 3. Appendix H, Approaches. The Field Manual makes clear, however, that "[g]reat care must be taken when doing this so that any actions taken would not violate the Geneva Conventions." *Id.*
[321] Memorandum for Commander, US Central Command. From Ricardo S. Sanchez, Lieutenant General, US Army, Commanding. Subject: CJTF-7 Interrogation and Counter-Resistance Policy. September 14, 2003.
[322] Personal communication with the Center for the Treatment of Torture Victims in Berlin, Germany.
[323] Tipton Three statement, *supra* note 32. Para. 271.

Both male and female victims of sexual torture often experience feelings of shame, grief and fear. These feelings often manifest themselves in symptoms that are commonly associated with PTSD, including difficulty falling asleep, nightmares, flashbacks, jumpiness, and irritability, as well as symptoms of major depression and anxiety, including suicidal ideation.[324] Uwe Jacobs, the executive director of Survivors International, which provides counseling, medical care, and social services to torture survivors, reported on his experience in working with victims:

> Sexual abuse, whatever form it takes, is an extremely damaging form of torture. For tormentors to penetrate this most private realm produces deep feelings of despair and self-loathing; I have heard survivors say they would have preferred to be beaten. When they are forced into humiliating acts, they can feel responsible for participating in their own degradation. The shame they feel eats away at them forever.[325]

In a study done on the treatment and detention of asylum seekers entering the United States, several of the individuals who were interviewed likened sexual humiliation to the physical abuse that they had experienced prior to coming to the United States.[326] Even routine procedures like strip searches can have this impact. One of the individuals told researchers that, "[b]eing strip searched and body cavity searched was like physical abuse."[327] Another told a similar story of humiliation and the physical and psychological suffering that he experienced as a result. He said, "When I was strip-searched it was so painful because there were two of them and they told me to take off my clothes and bend over and they put their hand . . . . I found it very humiliating."[328]

The most widely documented form of sexual humiliation in the "war on terror" has been the practice of forcibly disrobing detainees and keeping them in a state of nakedness over long periods of time. The Kubark Counterintelligence Interrogation manual (hereinafter Kubark manual), a 1963 CIA manual on interrogation, states that clothing allows a detainee to retain a piece of his or her identity and thus increases capacity for resistance.[329]

According to CVT clinicians, forced nakedness is intended to create a power differential between the detainees and interrogators by stripping the victim of his/her identity, inducing immediate shame, and establishing an environment where the threat of sexual and physical assault is always present.[330] Based on their work with torture survivors, they believe that by denying the victim the most basic forms of decency and privacy, forced nudity conveys the message that interrogators have absolute control over the detainees' bodies and can do as they please.[331]

---

[324] Peel M. "Male Sexual Abuse in Detention." In: Peel M, Iacopino V, eds. *The Medical Documentation of Torture.* London: Greenwich Medical Media; 2002:184.

[325] Jacobs U. "Struggling with Our Own Inhumanity." *San Francisco Chronicle.* March 2, 2005.

[326] Physicians for Human Rights, Bellevue/NYU Program for Survivors of Torture. *From Persecution to Prison: The Health Consequences of Detention for Asylum Seekers.* 2003:148.

[327] *Id.*

[328] *Id.* at 148–149.

[329] Central Intelligence Agency. *Kubark Counterintelligence Interrogation –July 1963.* 1963:86. Available at: http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB122/CIA%20Kubark%2061-112.pdf. Accessed April 22, 2005. [1963 CIA manual].

[330] Personal communication with the Center for Victims of Torture.

[331] *Id.*

Implied in the context of forced nudity is the threat of other, more abusive violations, whether sexual or physical.[332] While authorization of nudity may have been rationalized as innocuous, akin to locker-room nudity, the infamous Abu Ghraib photos reveal a very different reality. Simple juxtapositions of nudity and humiliating acts have profound effects, not only on the victims, but all who were indirectly exposed to such acts of torture.[333]

While female interrogators have been implicated in the sexual humiliation from both Abu Ghraib and Guantánamo, the majority of the incidents revealed to date involve the sexual humiliation of male detainees by male interrogators. Researchers who are familiar with male sexual humiliation and abuse say that the abuse is a way of establishing a power hierarchy between abuser and victim. It is meant explicitly to humiliate the victim and to make them feel weak.[334] Sexual humiliation is used in the prison environment as a tool to punish, coerce confessions, or, when done in a public manner, to intimidate the prison population.[335] In the case of the sexual humiliation of males, many survivors do not readily disclose that they have been victims of abuse. Symptoms include loss of appetite, inability to sleep, development of new phobias, and revenge fantasies, all of which can be long lasting.[336]

CVT clinicians have found that sexually humiliating treatment emasculates male victims and destroys their sense of identity and autonomy.[337] In *The Arab Mind*, Raphael Patai describes the view of homosexuality held in Arab culture. He writes that "acceptance of the role of the passive homosexual is considered extremely degrading and shameful because it casts the man or youth into a submissive, feminine role."[338] With respect to masturbation, Patai says that "whoever masturbates . . . evinces his inability to perform the active sex act, and thus exposes himself to contempt."[339] In fact, according to a professor of Middle Eastern studies, homosexual acts are against Islamic law.[340]

Clinicians at the Berlin Center, who treat a large population of Muslims, have found that Muslim victims of sexual torture forever carry a stigma and will often be ostracized by the community.[341] They have found that male victims often feel degraded in their manhood, especially if the perpetrator was a woman. They have seen marriages and families break up due to the special concept of honor and dignity in Muslim culture that is violated by sexual torture.[342] CVT clinicians have found that for Muslim women, sexual humiliation is so shaming that they cannot admit it to their communities and families without fearing rejection or ostracism. Male

---

[332] *Id.*

[333] Vince Iacopino, MD, PhD, Director of Research, Physicians for Human Rights and Principal Organizer of the Istanbul Protocol Project.

[334] Peel M. "Male Sexual Abuse in Detention." In: Peel M, Iacopino V, eds. *The Medical Documentation of Torture*. London: Greenwich Medical Media; 2002:189.

[335] *Id.*

[336] Groth AN, Burgess AW. "Male rape: Offenders and Victims." *American Journal of Psychiatry*. 1980;137: 808–809.

[337] Personal communication with the Center for Victims of Torture.

[338] Raphael Patai. *The Arab Mind*. Revised ed. Hatherleigh Press; 2002:134. Cited in Amnesty International report, *supra* note 31, at 40.

[339] *Id.* at 135.

[340] Hersh S. "Torture at Abu Ghraib." *New Yorker*. April 30, 2004. Citing Bernard Haykel, professor of Middle Eastern studies at New York University.

[341] Wenk-Ansohn M. "Folgen Sexualisierter Folter – Therapeutische Arbeit mit kurdischen Patientinnen." In: Birck A, Pross C, Lansen J, eds. *Das Unsagbare – Die Arbeit mit Traumatisierten am Behandlungszentrum für Folteropfer Berlin*. Berlin, Germany: Springer Verlag; 2000:57–77.

[342] *Id.*

victims can experience similar consequences from this sort of abuse.[343] With respect to forced nudity, the Berlin Center clinicians have found that merely being stripped naked implies the breaking of a strict taboo, which leaves victims feeling extremely exposed and humiliated.[344]

It has been reported that officials knew that Arabs are particularly vulnerable to sexual humiliation and sought to exploit that vulnerability.[345] In fact, *The Arab Mind*, cited above, was reportedly "the bible" among pro-war Washington conservatives in the months before the invasion of Iraq.[346] The evidence shows, however, that the use of nudity and other forms of sexual humiliation was taking place before the Iraq invasion.

The purpose of sexual humiliation was confirmed by Erik R. Saar, a translator at Guantánamo from December 2002 to June 2003. In a manuscript about his time at the naval base, Saar wrote about the military using women as part of psychological interrogation tactics.[347] Saar wrote that after interrogation sessions, some of which included women interrogators telling detainees they were menstruating and then touching the detainees, the water in the detainee's cell would be turned off so that the detainee could not wash himself. This was done in order to "make the detainee feel that, after talking to [the female interrogator], he was unclean and was unable to go before his God in prayer and gain strength."[348]

The Tipton Three reported that the sexual humiliation was targeted at Muslims and produced shame in its victims:

> It did not come about at first that people came back and told about [the sexual humiliation]. They didn't. What happened was that one detainee came back from interrogation crying and confided in another what had happened. That detainee in turn thought that it was so shocking he told others and then other detainees revealed that it had happened to them but they had been too ashamed to admit to it. . . . It was clear to us that this was happening to the people who'd been brought up most strictly as Muslims.[349]

Feelings of shame that were specific to the immediate situation may, over time, become generalized and affect the way in which victims of sexual humiliation view and interact with the world.[350] According to CVT clinicians, survivors often struggle with feelings of shame and self-blame.[351] These experiences can undermine their sense of capability and autonomy, leaving them helpless and without psychological resources to begin to recover.[352] These survivors often are cut off from their spouses and other family members and become isolated as a result of the shame associated with their victimization. Staff members at CVT say that sexual humiliation

---

[343] Personal communication with the Center for Victims of Torture.

[344] Wenk-Ansohn M. "Folgen Sexualisierter Folter – Therapeutische Arbeit mit kurdischen Patientinnen." In: Birck A, Pross C, Lansen J, eds. *Das Unsagbare – Die Arbeit mit Traumatisierten am Behandlungszentrum für Folteropfer Berlin*. Berlin, Germany: Springer Verlag; 2000:57–77.

[345] Hersh S. "The Gray Zone." *New Yorker.* May 24, 2004.

[346] *Id.* Quoting an academic.

[347] Associated Press. "Ex-G.I. Writes About Use of Sex in Guantánamo Interrogations." *New York Times.* January 28, 2005.

[348] *Id.* Quoting from Saar's classified manuscript.

[349] Tipton Three statement, *supra* note 32. Para. 161.

[350] Sadock B, Sadock V, eds. *Kaplan and Sadock's Comprehensive Textbook of Psychiatry.* Vol. 1. 8th ed. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 2401.

[351] Personal communication with the Center for Victims of Torture.

[352] *Id.*

often leads to symptoms of PTSD and major depression, and that victims often relive the session of humiliation in the form of flashbacks and nightmares long after their detention. In fact, many of their clients who have been sexually humiliated report that their most enduring and disabling symptoms are related to reliving memories of the voices of their torturers using sexually degrading insults or threats.[353] Clinicians at the Berlin Center similarly have found that victims of sexual torture often suffer from severe depression, anxiety, depersonalization, dissociative states, complex PTSD, and multiple physical complaints such as chronic headaches, eating disorders, and digestive problems.[354] They also have found that suicides may occur unless a strong religious conviction forbids otherwise.[355]

The policy of forcibly disrobing detainees also can have harmful effects on military police officers charged with the oversight of detainees. The state of forced nudity gave military police officers the idea that the detainees were in some way less than human and allowed for the normal guidelines of human interaction to deteriorate. The Schlesinger report concluded:

> While the removal of clothing may have been intended to make detainees feel more vulnerable and therefore more compliant with interrogations, this practice is likely to have had a psychological impact on guards and interrogators as well. The wearing of clothes is an inherently social practice, and therefore the stripping away of clothing may have had the unintended consequence of dehumanizing detainees in the eyes of those who interacted with them. . . . [T]he process of dehumanization lowers the moral and cultural barriers that usually preclude the abusive treatment of others.[356]

## C. Sensory Deprivation, Including Solitary Confinement

Different forms of sensory deprivation, including solitary confinement, are often used in combination. The confined person can become so desperate to relate to another person and so hungry for sensory stimulus that he or she will gratefully accept any stimulus that is offered. All forms of sensory deprivation can have profound and long-lasting psychological consequences.

Experiments bear this out. In an experiment performed in the mid 1950s, psychologists served as their own subjects and underwent periods of sensory deprivation lasting six days. All three experimenters described disturbances of visual perception as being "unexpectedly profound and prolonged."[357] These disturbances included the apparent movement of fixed objects, distortions of shape, "accentuations of afterimages, perceptual lag, and increase in color saturation and contrast."[358] Experimental work from the same laboratory done three years later showed the same results. Experimenters described "fluctuating curvature of surfaces and lines and disturbances in size constancy . . . [and] a loss of accuracy in tactual perception and

---

[353] *Id.*

[354] Wenk-Ansohn M. "Folgen Sexualisierter Folter – Therapeutische Arbeit mit kurdischen Patientinnen." In: Birck A, Pross C, Lansen J, eds. *Das Unsagbare – Die Arbeit mit Traumatisierten am Behandlungszentrum für Folteropfer Berlin.* Berlin, Germany: Springer Verlag; 2000:57–77.

[355] *Id.*

[356] Schlesinger report, *supra* note 15. App. G at 7.

[357] Heron W, Doane, BK, Scott TH. "Visual Disturbances After Prolonged Perceptual Isolation. *Canadian Journal of Psychology*, 1956;10:13–18.

[358] *Id.*

spatial orientation was noted."[359] Experiments with sensory deprivation were performed in Germany in the 1970s.[360] Subjects were held for a limited period of time in a specially prepared dark and sound-proof room (camera silens). Their behavior and body functions were monitored by a video camera, EEG, and subsequent psychological tests. The researchers found that sensory deprivation caused visual and auditory hallucinations, change of body schemes, change of sense of time, impairment of cognitive functions, impairment of complex thinking to find solutions, slowing down of EEG-activity, a hunger for stimuli, and increased suggestibility.[361]

The effects of sensory deprivation explored in the experiments are confirmed by interrogation manuals. The CIA's Kubark manual says that sensory deprivation forces a person to "turn[] his awareness inward, upon himself and then project[] the contents of his own unconscious outwards, so that he endows his faceless environment with his own attributes, fears, and forgotten memories."[362] The Kubark manual says, "The more completely the place of confinement eliminates sensory stimuli, the more rapidly and deeply will the interrogatee be affected."[363] The later Human Resource Exploitation Training Manual says that extreme sensory deprivation "induces unbearable stress and anxiety and is a form of torture."[364]

All forms of sensory deprivation, in particular solitary confinement, can have profound negative mental and physical health effects, some of which may be long lasting. This has been shown through studies,[365] reports from ex-prisoners subjected to the techniques, and clinical experience.

1. *Solitary Confinement*

In the 1950s and 1960s, studies demonstrated that short-term isolation caused an inability to think or concentrate, anxiety, somatic complaints, temporal and spatial disorientation, deficiencies in task performance, hallucinations, and loss of motor coordination.[366] The findings of contemporary research are consistent with the earlier findings of solitary

---

[359] Doane BK, Mahatoo W, Heron W, Scott TH. "Changes in Perceptual Function After Isolation." *Canadian Journal of Psychology*. 1959;13:210–219.

[360] Kempe P, Gross J. "Deprivationsforschung und Psychiatrie." *Sonderdruck aus Psychiatrie der Gegenwart*, Bd 1 u. 2. 2. Aufl., Springer Verlag Berlin Heidelberg;1980; Kempe P, Schönberger J, Gross J. "Sensorische Deprivation als Methode in der Psychiatrie." *Nervenarzt*. 1974;45:561–568.

[361] The researchers suggested that these effects might be successfully applied as a supplement to psychotherapy to overcome defense mechanisms, obsessive compulsive behavior, and to reduce states of delusion. They hoped that it could also be applied in the treatment of drug addicts, alcoholics, over-eaters, and smokers. However they emphasized the ethical ambivalence of these findings considering that the mechanisms were still rather unclear and that the effects of sensory deprivation could be misused by totalitarian regimes to brainwash and reeducate political dissidents.

[362] 1963 CIA manual, *supra* note 329, at 88.

[363] *Id.* at 90.

[364] 1983 CIA Manual, *supra* note 261. Para. L10. Part of this is handwritten over the original text, which read "Deprivation of social stimuli induces stress and anxiety. The more complete the deprivation, the more rapidly and deeply the subject is affected." The handwritten portion was added by the CIA between 1984 and 1985 in response to Congressional and media outrage about CIA training techniques being used in Central America. "Torture Was Taught by CIA," *supra* note 261.

[365] Ethical concerns now generally prevent experiments on these techniques.

[366] See, e.g., Graessner S. "Gesundheitliche Auswirkungen von Langzeithaft mit Isolation; Historische Wurzeln und Forderungen." In: Birck A, Pross C, Lansen J, eds. *Das Unsagbare*. Berlin, Germany: Springer Verlag; 2002:253–269; Leidermann PH. "Man Alone: Sensory Deprivation and Behavioral Change." *Corrective Psychiatry & Journal of Social Therapy*. 1962;8:64–74.

confinement's harmful consequences.[367] Effects include depression, anxiety, difficulty with concentration and memory, hypersensitivity to external stimuli, hallucinations and perceptual distortions, paranoia, and problems with impulse control.[368] People who are exposed to isolation for the first time develop "a predictable group of symptoms, which might almost be called a 'disease syndrome.'"[369] The symptoms include "bewilderment, anxiety, frustration, dejection, boredom, obsessive thoughts or ruminations, depression, and, in some cases, hallucination.[370] One researcher found that solitary confinement

> results in deep emotional disturbances. Aggression is mobilized in two directions, suicidal and homicidal. A third reaction is a withdrawal into the self leading to a psychotic-like state or a psychosis. Between these three states there is an intermediate condition, a state of rage. It is a kind of crossroads from which the inmate moves in one direction or another. He may return to the crossroads and take another path. These three reactions may thus be interchangeable.[371]

The Kubark manual describes the symptoms most commonly associated with sensory deprivation as "superstition, intense love of any other living thing, perceiving inanimate objects as alive, hallucinations, and delusions."[372]

In fact, early experiences with solitary confinement in US prisons produced such detrimental effects on prisoners' mental health that they did not go unnoticed by the Supreme Court. In an 1890 case, the US Supreme Court considered the severity of solitary confinement.[373] The Court said that "solitary confinement is not, as seems to be supposed by counsel . . . a mere unimportant regulation as to the safe-keeping of the prisoner."[374] Rather, the court found solitary confinement to be "punishment of the most important and painful character."[375] Much of its decision rests on the harmful consequences of solitary confinement, which in the late 18th century consisted of "the complete isolation of the prisoner from all human society, and his confinement in a cell of considerable size, so arranged that he had no direct intercourse

---

[367] Some studies have found neutral or positive effects of solitary confinement. See, e.g., Suedfeld P, Roy C. "Using Social Isolation to Change the Behavior of Disruptive Inmates." *International Journal of Offender Therapy and Comparative Criminology.* 1975;19:90–99; Walters RH, Callagan JE, Newman AF. "Effect of Solitary Confinement on Prisoners." *American Journal of Psychiatry.* 1963;119:771–773. However, researchers have criticized these results and these types of studies are contradicted by overwhelming research showing negative effects.

[368] See, e.g., Haney C. "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement." *Crime & Delinquency.* January 2003;49(1):124–156; Gendreau P, Freedman NL, Wilde GJS, Scott GD. "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement." *Journal of Abnormal Psychology.* 1972;79(1):54–59; Grassian S. "Psychopathological Effects of Solitary Confinement." *American Journal of Psychiatry.* 1983;140:1450–54.

[369] Brief of Professors and Practitioners of Psychology and Psychiatry as *Amicus Curiae* in Support of Respondent at 12–13. *Wilkinson v. Austin.* No. 04-495. S. Ct. filed 2005. Citing Hinckle LE, Wolff HE. "Communist Interrogation and Indoctrination of 'Enemies of the States'." *Archives of Neurology and Psychiatry.* 1956;76:115–174.

[370] *Id.* at 13.

[371] Cormier BM, Williams PJ. "La Privation Excessive de la Liberte." *La Revue de L'assocation des Psychiatres du Canada.* 1966;11(4):484.

[372] 1963 CIA manual, *supra* note 329, at 88. Citing a study by John C. Lilly.

[373] *In re Medley.* 134 U.S. 160. 1890. Holding that a statutory solitary confinement provision adopted after a defendant committed the charged crime constituted additional punishment for *ex post facto* purposes.

[374] *Id.* at 167.

[375] *Id.* at 171.

with or sight of any human being, and no employment or instruction."[376]  The effects of such isolation were noted by the Court:

> A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.[377]

In August 1979, an administrative decision was made at the maximum security Massachusetts Correctional Institution at Walpole to close the steel doors on the cells of prisoners in isolation.[378] Until this date, these doors had been left open, allowing natural light and air to enter the cells and permitting inmates to speak with one another. The decision to close the steel doors resulted in a class action lawsuit brought by fifteen prisoners who charged that the conditions of isolation created by the closing of these doors were a violation of their Eighth Amendment protection against cruel and unusual punishment.[379] The average duration of confinement in isolation for the group of prisoners was two months. A court-ordered psychological evaluation of the inmates found that they had consistent psychiatric symptoms, including perceptual changes, affective disturbances, difficulties with thinking, concentration, and memory, disturbances of thought content, and problems with impulse control.[380] One of the Massachusetts prisoners reported that during isolation, "I can't concentrate, can't read . . . Your mind's narcotized . . . sometimes can't grasp words in my mind that I know. . . . Memory is going. You feel you are losing something you might not get back."[381] Another reported, "I cut my wrists—cut myself many times when in isolation. Now, it seems crazy. But every time I did it, I wasn't thinking—lost control—cut myself without knowing what I was doing."[382] Stuart Grassian, who reviewed the evaluations of the prisoners, found that "rigidly imposed solitary confinement may have substantial psychopathological effects and that these effects may form a clinically distinguishable syndrome."[383] Despite the fact that the Walpole prisoners were not "preselected by overt psychiatric status," the results of the psychiatric evaluations are strikingly similar to earlier German reports on the effects of solitary confinement on populations with psychotic histories.[384]

These negative health effects due to prolonged isolation are evident in "supermax" prisons in the United States. These prisons differ from traditional forms of confinement facilities primarily in the totality and duration of the isolation.  Prisoners are housed in "virtual isolation and subjected to almost complete idleness for extremely long periods of time. Supermax prisoners rarely leave their cells . . . and typically no group or social activity of any kind is permitted."[385] Unlike traditional forms of incarceration, which use short term isolation as

---

[376] *Id.* at 168.

[377] *Id.*

[378] Grassian S. "Psychopathological Effects of Solitary Confinement." *American Journal of Psychiatry.* 1983;140:1450–54.

[379] *Id.*

[380] *Id.*

[381] *Id.*

[382] *Id.*

[383] *Id.*

[384] *Id.*

[385] Haney, *supra* note 368, at 126. The U.N. Committee against Torture expressed concern in May 2000 about the "excessively harsh regime of the 'supermaximum' prisons." Consideration of Reports Submitted by State