IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABDUL HAQ WASIQ, | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2386 (RBW) |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## DECLARATION OF DAVID N. COOPER

Pursuant to 28 U.S.C. § 1746, I, Lieutenant Colonel David N. Cooper, Judge Advocate General's Corps, United States Air Force Reserve , hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.      I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.      I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Abdul Haq Wasiq that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _11 August 2006_

David N. Cooper
Lt Col, JAG Corps, USAFR



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 0 5 0

~~FOR OFFICIAL USE ONLY~~

2 5 FEB 2005

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 004**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #004 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

~~FOR OFFICIAL USE ONLY~~

UNCLASSIFIED

25 Jan 05

MEMORANDUM

From:  Assistant Legal Advisor
To:    Director, Combatant Status Review Tribunal
Via:   Legal Advisor    *SRC*

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN #004

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal #12 of 29 Sep 2004
       (2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

   a.  The detainee was properly notified of the Tribunal process and elected to participate
   in the CSRT by attending the CSRT, and providing a sworn statement, which consisted of
   responses to the allegations set forth in Exhibit R-1 to Encl. (2). In addition, the detainee
   responded to questions posed by his personal representative and by Tribunal members.
   *See* Enclosure (3) to Encl. (2).

   b.  The Tribunal was properly convened and constituted by enclosure (1).

   c.  The Tribunal substantially complied with all provisions of references (a) and (b).

   d.  Note that some information in Exhibit R-18 was redacted. The FBI properly certified
   in Exhibit R-2 that the redacted information would not support a determination that the
   detainee is not an enemy combatant.

   e.  The detainee did not request that any documentary evidence be produced. However,
   the detainee did request that his brother, Abdul Bari, be produced to testify at the CSRT.
   The detainee proffered that his brother could attest to the fact that the detainee was in
   Ghazni during the fighting in Afghanistan, which the Tribunal determined would be
   relevant testimony. As such, the Tribunal forwarded a request to the Afghani Embassy
   through the United States Department of State to locate and produce the witness.
   However, the Afghani government failed to respond to the initial request of 1 November
   2004, or to either of the follow-up requests of 15 and 22 November 2004. Therefore, the
   Tribunal determined that the witness was not reasonably available. This determination
   was proper.

UNCLASSIFIED

UNCLASSIFIED

Subj:   LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 004

f.  The Tribunal's decision that detainee #004 is properly classified as an enemy
combatant was unanimous.

g.  The detainee's Personal Representative was given the opportunity to review the
record of proceedings and declined to submit post-tribunal comments to the Tribunal.

2.  The proceedings and decision of the Tribunal are legally sufficient, and no corrective action is
required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

KAREN M. GIBBS
CDR, JAGC, USNR

2
UNCLASSIFIED



# Department of Defense
## Director, Combatant Status Review Tribunals

29 Sep 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref:   (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

> **MEMBERS:**
>
> ███████████, Colonel, U.S. Marine Corps Reserve; President
>
> ███████████, Lieutenant Colonel, JAGC, U.S. Army; Member (JAG)
>
> ███████████, Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

21 January 2005

MEMORANDUM FOR DIRECTOR, CSRT

FROM:  OARDEC FORWARD Commander ICO ISN 004

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ▮▮▮▮▮▮.

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

### (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: ___#12___

(U) ISN#: ___004___

Ref:    (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
        (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
        (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:    (1) (U) Unclassified Summary of Basis For Tribunal Decision (U/FOUO)
       (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
       (3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
       (4) (U) Copies of Documentary Evidence Presented (S/NF)
       (5) (U) Personal Representative's Record Review (U)

1. (U) This Tribunal was convened on 25 October 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 30 November 2004, after reconvening, the Tribunal determined, by a preponderance of the evidence, that Detainee #004 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is a member of, or affiliated with, al Qaida and Taliban forces that are engaged in hostilities against the United States and its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12____
ISN #: _____004____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal finds that this Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with, al Qaida and Taliban forces that are engaged in hostilities against the United States and its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The initial session of this Tribunal, held on 25 October 2004, was conducted with translation for the Detainee provided in Farsi. In the course of discussions with the Tribunal President, the Detainee indicated that the Farsi translations were inadequate to allow him to understand the proceedings. He requested that the proceedings be translated into Pashtu. To accommodate that request, the Tribunal President recessed the hearing. A Pashtu translator was present at the resumption of the hearing on 30 November 2004.

At the resumed hearing, the Recorder presented Exhibits R-1 and R-2 during the unclassified portion of the Tribunal. The primary exhibit, the Unclassified Summary of Evidence (Exhibit R-1), alleged that: the Detainee was associated with al Qaida and the Taliban in that the Detainee, in a letter to his brother, included greetings to an al Qaida member; the Detainee was the Taliban Deputy Minister of Intelligence; the Detainee used a radio to communicate with the Taliban Chief of Intelligence; the Detainee participated in military operations against the coalition; and the Detainee was involved in the operation to re-establish the front lines in Konduz, Afghanistan. The Recorder called no witnesses.

The Detainee participated actively during the hearing, responding to each of the allegations on the Unclassified Summary of Evidence. Afterwards, he answered questions from the Tribunal members. The Detainee's testimony, including his responses to the questions posed to him, is summarized in Enclosure (3) to the CSRT Decision Report. The Detainee requested that his brother appear as a witness, however, that request was ultimately denied because the witness was not reasonably available. The

UNCLASSIFIED//~~FOUO~~

Detainee requested no documentary evidence. Details concerning the witness request are provided in paragraph 4, below.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and R-1 through R-18.

    b. Testimony of the following Tribunal approved witnesses: none.

    c. Sworn statement of the Detainee. See Enclosure (3) to the CSRT Decision Report.

## 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee requested (no witnesses) (the following witnesses be produced for the hearing):

| Witness | President's Decision | Testified? |
|---|---|---|
| Abdul Bari (Brother of Detainee) | Relevant but not reasonably available | *No |

*As of the date of the commencement of this Tribunal, the Detainee had requested no witnesses. However, during the recess discussed above, the Detainee made a request for one witness, his brother. Based upon the Detainee's proffer, the Tribunal President concluded that the witness' expected testimony appeared to be relevant. In accordance with CSRT procedures, the request was forwarded to the U.S. Department of State, which in turn forwarded it to the Embassy of Afghanistan. The initial request for the witness was made on 1 November 2004 and a follow-up request was sent on 15 November 2004. After the initial suspense date had passed, a third request was made on 22 November 2004. Having received no word from the Government of Afghanistan, the Tribunal President ruled that the witness was not reasonably available at the resumption of the hearing on 30 November 2004.

The Detainee requested no additional evidence be produced.

## 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

    a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this Exhibit is helpful in that it provides a broad outline of what the

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 contained no useful information. Accordingly, the Tribunal had to look to the Detainee's testimony and to the classified exhibits for support of the Unclassified Summary of Evidence.

      b. Essentially the only unclassified evidence the Tribunal had to consider was the Detainee's testimony. The Detainee, in his sworn verbal statement, disagreed with aspects of the Unclassified Summary of Evidence, and concurred with others. Specifically, he denied knowledge of any letter to his brother that included a greeting to an al Qaida member. He also stated that he was not on the frontlines in Konduz, and in fact had never been in Konduz. He did admit that he was a member of the Taliban government as Deputy Minister of Intelligence, and that he used a radio to communicate with the Chief of Intelligence. He stated that the radio was used in lieu of a landline telephone because the Afghanistan phone system was not adequate to support basic, normal communication. A summarized transcript of the testimony, both at the initial session on 25 October 2004 and the resumed session on 30 November 2004, is attached as Enclosure (3) to the CSRT Decision Report.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

**6. Consultations with the CSRT Legal Advisor**

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

**7. Conclusions of the Tribunal**

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

      a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

      b. The Detainee understood and actively participated in the Tribunal proceedings. All of his questions were satisfactorily answered by the Tribunal President.

      c. The Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with, al Qaida and Taliban forces that are engaged in hostilities against the United States and its coalition partners.

UNCLASSIFIED//~~FOUO~~

**8. Dissenting Tribunal Member's report**

None.  The Tribunal reached a unanimous decision.

Respectfully submitted,



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

**Summarized Sworn Detainee Statement**

*The Tribunal was reconvened on 30 November 2004 after a recess from the initial session, which was convened on 25 October 2004.*

*The Tribunal President read the Hearing Instructions to the Detainee, and confirmed he understood the Tribunal process and had no questions.*

*The Recorder then read in full the Unclassified Summary of Evidence to the Tribunal.*

*The Tribunal President explained to the Detainee that the Witness requested was relevant, but not reasonably available despite numerous attempts, and would not be present for the Tribunal.*

*The Tribunal President informed the Detainee he would have the opportunity to respond to the allegations, and he was then administered the Muslim oath by the Recorder.*

*At this time, the Personal Representative read each allegation individually to allow the Detainee the opportunity to respond.*

*3a. and 3a.1. The Detainee is associated with al Qaida and the Taliban. The Detainee, in a letter to his brother, included greetings to an al Qaida member.*

Detainee: What is the proof?

Personal Representative: I can remind you that currently the Tribunal is only aware of the Unclassified Summary and what you tell them; they have not reviewed any additional evidence.

Detainee: Where is the secret document? Before this I have one question: Every member of the Tribunal swore, except him, what happened to him?

Tribunal President: He is the Recorder, and as I indicated to you earlier, the Recorder, Reporter and the Translator had previously been sworn.

Detainee: Why did you go under oath in front of me and not them?

Tribunal President: Because we are the ones deciding your fate today. We have come here with an open mind to determine if you have been properly classified as an enemy combatant. This (holding the Unclassified Summary of Evidence) is all we've seen about you; unlike other Detainees we have not seen you other than on the 25th. Otherwise, we don't see the Detainee prior to the day of the Tribunal.

Detainee: No problem.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Tribunal President: (In regards to) your reference to the classified information; classified information has national security interests, and we have no authorization to make it available to you without a security clearance.

Detainee: What do you mean? If you tell me the security of the nation will be destroyed?

Tribunal President: There could be items of national security interest; yes.

Detainee: Basically I heard a court is where a judge sits, and the prosecutor brings evidence against the Detainee. The prosecutor is supposed to bring proof; what kind of proof does he have?

Tribunal President: First of all, let me clarify; we are not here to punish you today. This is not a court, but an administrative, non-judicial hearing.

Detainee: Most of the time you call me an enemy combatant; if you call me this, I need proof.

Tribunal President: Unfortunately since you have no witnesses, and the Recorder has no witnesses, the only information available in this open session will be the Detainee Election Form, the Unclassified Summary of Evidence and your statement, should you choose to give one.

Detainee: Why did I come here? Of course, I will answer your questions.

Tribunal President: Are you ready to do that?

Detainee: Obviously, he (the Personal Representative) asked me if I would join, and yes, I will join.

Tribunal President: We welcome your participation.

Detainee: The reason I asked him to provide evidence is because he told me I wrote a letter to my brother. I'm asking, where is the letter?

Tribunal President: I have not seen the letter.

Detainee: You ask him because he accused me of writing this letter. I am telling you I did not write such a letter.

Tribunal President: That's fine; you may say that, but if the letter is a part of the classified evidence, no one will see it in this open session. This is where you provide us with all the information you want to in reference to the unclassified evidence.

UNCLASSIFIED//~~FOUO~~

Detainee: My answer is I don't know about the letter, and I did not write the letter.

Tribunal President: OK; thank you. That's not so difficult, is it?

Detainee: I asked my Personal Representative who told him about the letter, and he told me, the interrogators. In the past three years of interrogation, no one has mentioned such a thing. I am surprised that over the past three years no one told me anything except for today.

Tribunal President: We'll probably be surprised, too, when we read more about your case. Please continue.

*3a.2. The Detainee was the Taliban Deputy Minister of Intelligence.*

Detainee: Yes, I was this, and I will tell you why. Before the Taliban captured Kabul, I was in Quetta, Pakistan, studying. When I came home, the Taliban came and recruited people by force to Kabul. Someone by the name of Kalmi Abdul Magduli (ph) sent an individual to tell me that the Taliban will recruit me by force. Why should you come by force, when you can come at your own will? This was a threat, so I went with them because I had to. Because he was from my own province, he liked me and wanted to move me up. More educated people were working for the ministry than me. When his undersecretary was sick, he told me to take his position until he got better. He got sick and didn't get better, so I continued doing the job. I confessed this, and I will confess again. My job was against thieves and bribes; I was fighting against those kinds of people.

*3.a3. The Detainee used a radio to communicate with the Taliban Chief of Intelligence.*

Detainee: He was in charge of the intelligence, and was the governor of the whole province. I did not call him; he called me on the radio because he was in charge of us. He gave us our jobs to do, and we couldn't do anything without his order. You know if you have a boss you have to listen to him. The times he called me on the radio was way before September 11th in America. He was governor, and when he was removed, he went back to his previous job in Kabul. I will say again that the times he called me on the radio were way before what happened in America. If this makes me guilty, then I did that. Because we don't have telephones, we have to use radios to communicate. For example, your guards here don't use telephones; they use radios to communicate with each other. I am asking you, the judge, if this makes me guilty, then I am guilty.

Tribunal President: Just for clarification, I am not a judge; I am a military officer assigned as President of this Tribunal.

Detainee: But I thought you meant you were a judge? You told me you were a judge.

Tribunal President: Just a miscommunication.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Detainee: But you decide the good, or bad; you tell me if I am right, or not right.

Tribunal President: That is what we'll try to do; determine if you've been properly classified as an enemy combatant today; continue, please.

3.b and 3.b1. *The Detainee participated in military operations against the coalition. The Detainee was involved in the operation to re-establish the front lines of Konduz, Afghanistan.*

Detainee: About this charge, I can tell you I was not a military individual; I was a civilian employee. I was not the Defense Minister of Afghanistan, or a military commander. You know the military forces belong to the military, and do military things. The other thing, American forces caught me in the province of Ghazni. You may ask them if they caught me in Ghazni, or in Konduz. All of my life, I never went to Konduz. All I know of Konduz is that it's in the north, and my province is in the south. Since you are accusing me of rebuilding the front line, then how did I do this and go back and get captured there? They are far apart from each other; not like from this block to that block. For the past three years, I was not accused of doing anything in Konduz; not one word have interrogators asked me about this thing.

## Tribunal Member Questions to Detainee

Q: Good afternoon, Mr. Minister. Seldom before have we had someone of such prestige and responsibility.

A: That was my job, whatever you call it.

Q: Earlier you said you were in Quetta, Pakistan, before being called to duty; what were you studying there?

A: I was learning how to pray, and about religious studies. I told my interrogators in detail about this.

Q: How long was your course of study?

A: I previously mentioned the approximate date I studied, but I forgot. I was there when the Russians were in Afghanistan when I was just a little boy.

Q: How long did you live in Pakistan?

A: I can't tell you now exactly, but I told you I told interrogators approximately how long I lived there.

Q: Could you approximate or guess?

UNCLASSIFIED//~~FOUO~~

A: Approximately 2 or 3 years.

Q: Were you studying to become a mullah or religious leader?

A: Who could become a mullah and feed their family? I went because of the Russians, so I could survive. Who could afford to study for a long time to be one? We had an economic problem, so I could not be a mullah.

Q: Ultimately it was your goal to return to Afghanistan when it was safe?

A: When? Of course. Afghanistan was my home. What would I do in a foreign country? I was living in mosques.

Q: Prior to your work in intelligence and religious studies, how did you support yourself or make a living? Before you began religious studies, how did you support yourself?

A: I was a young boy, working on our land. Thank God we had land. If you want to ask, I know how to farm. My grandfather and my father were farmers.

Q: So it sounds as though you had no special skills related to intelligence.

A: No.

Q: When Mr. Ahmadullah called you to work for him, it's because he trusted you, not because you had a background in intelligence?

A: No, the Taliban was recruiting lots of people. Everyone was trying to bring their own people into their own organization.

Q: I would think it would be most difficult for a farmer and religious student to suddenly become Deputy Minister of Intelligence with no background and no training.

A: Basically, many of the interrogators asked the same question, but I said, don't think the Afghanistan government is the same as the U.S. government. Ahmadullah himself was not educated; he is not here, but I tell you he is not educated.

Q: How did you know how to perform your duties then?

A: Basically, it would take me a long time to explain the details about this subject. Afghanistan at the time of the Taliban was not organized. Everybody was recruited to work for the government. Many of the employees in the Ministry were much more educated than me and Ahmadullah.

Q: How long did you serve in that position approximately?

ISN# 004
Enclosure (3)
Page 5 of 12

UNCLASSIFIED//~~FOUO~~

A:  A different subject if you want to interrogate me all over again, because I previously provided that information to interrogators.

Q:  Well, as the President told you, we haven't seen your file.  I'm hoping you'll be patient enough to tell us.

A:  I meant no problem that you are asking, even if you have a hundred questions, but call me more often; it takes a long time for me to provide the information.

Q:  I just wondered if you served the Taliban for two years, or how long you had served?

A:  I told you previously between approximately 2 ½ -3 years I was with the Taliban, but not as an Undersecretary of Intelligence in Kabul.

Q:  Did you serve in other capacities?

A:  I told you again, you can call me tomorrow when we have more time, so I can tell you in more detail.  You probably don't have enough time to listen to my story.

Q:  This is the time we've reserved for you today; I'm hoping you'll be willing to tell these things about you so we can make a more informed decision.

A:  I told you approximately between 2 ½ to 3 years; sometimes Undersecretary of Intelligence, sometimes not.

Q:  Do you want to say what other capacities you served in during that 2 ½ years when you were not the Undersecretary?

A:  I told you before, I was called to be put into the position of intelligence.  He put me in the guesthouse; I was living in the guesthouse.

Q:  What were your duties while you were there?

A:  I told you, according to our culture in Afghanistan, people are given high positions; people go to the guesthouse to greet him.  I was cooking for them.

Q:  Cooking for whom?

A:  No, no.  For example, when you are given a new position, Kabul city people would come to greet and congratulate you.  We would provide food for them at the guesthouse.

Q:  So they had come to congratulate you on your new position; is that what you are referring to?

UNCLASSIFIED//FOUO

A: No, no, no. At that time, I was not in the position of the Undersecretary; it was the same Undersecretary in the guesthouse, and I went to that house; people were coming to greet him.

Q: I'm not sure I quite understand what else you did besides serving in intelligence. Was there something else you did for the Taliban?

A: No, no. I told you that I was working, and took his position only when he was sick. When he was working, I was not doing anything except taking a place in the guesthouse.

Q: Regarding earlier comments concerning Konduz; you said you'd never been there, and in fact were captured in a place far from there; is that correct?

A: You can ask your own soldiers; anything I tell you, you don't believe.

Q: I suppose the way it is worded here (Unclassified Summary), you were part of the operation to re-establish the front lines, and this doesn't require you to have physically been there.

A: I told my interrogators that I was not in Kabul; I was living at home. I told you I'm not military and have nothing to do with the military.

Q: Yes, but as the Minister of Intelligence, as a senior government official, you give orders to men and they follow them.

A: I was working inside of Kabul, and had an employee there; I had no one in Konduz.

Q: So are you saying that whatever this operation was, you were not involved in any way?

A: No.

Q: What is your attitude towards the United States?

A: According to what?

Q: Given everything that has happened over the past few years, good or bad, what is your opinion of the U.S.?

A: You mean that now that you are in Afghanistan?

Q: That or anything else you wish to address.

A: Before my capture I did not know or study about Americans. I heard on the radio on the BBC that Americans respected human rights and I was happy at that time. I also

UNCLASSIFIED//~~FOUO~~

heard Americans would not tell anybody if they could or could not practice their religion, and I learned that here.

Q: Is there anything else you wish to add?

A: You ask me and I answer you.

Q: You operated the guesthouse near Kabul, right?

A: Yes.

Q: You were doing this and sometimes doing the Deputy Minister's job, is that correct?

A: When he was sick?

Q: When he wasn't in the office, you were in charge?

A: Yes, when he was sick, then I was in charge.

Q: So you were familiar with the area of Kabul?

A: Before that, I was not familiar. But, when I went there, I spent time there.

Q: So you were familiar with the area of Kabul?

A: I swear to Allah I spent some time in Kabul, but still don't remember the names of many places in Kabul.

Q: I would expect that you'd have recollection of the more prominent places.

A: I told you I was busy working, and did not go to be familiar with many parts of the city.

Q: But you should know or be familiar with what is around the city.

A: I was not a regular employee to go around the city; I was sitting in my office.

Q: And your office was where?

A: In Kabul; a place called Shardinow (ph).

Q: What did you think of the six al Qaida training camps that were around Kabul, any of them?

UNCLASSIFIED//~~FOUO~~

A:  I don't know.  I swear to Allah that this is the first time I heard from your mouth that there were six training camps outside of Kabul.  I heard from you there were al Qaida training camps.  I don't know, I just now heard this from you now.

Q:  Your capture; did you have enemies that brought evidence against you that led to your capture?

A:  Why not?  Do you not know that in Afghanistan everyone has lots of enemies there?

**Tribunal Member Questions to Detainee**

Q:  When the Deputy Minister of Intelligence was sick and you would fill in, how long a period of time would that be?

A:  Approximately, 6, 7, 8 or 10 months at a time.

Q:  Were you really busy when filling in for the Deputy Minister?

A:  How?

Q:  Busy, as in a lot of work; very involved with the duties of that particular office?

A:  It wasn't like I was very busy; it wasn't like I had nothing to do.

Q:  What were some of the duties or responsibilities of that office that you carried out for the Deputy Minister?

A:  I told you, when the accusation was written my job was to fight against the thieves and people that took bribes.  Because security was very important to the Taliban, they were trying to spend lots of time on these types of matters.

Q:  So this was more of a police type of responsibility?

A:  You asked me a very good question.  Previously, I told my interrogators to ask why the intelligence member is working a police job.  The Taliban had their reasons, and they were these: first, all of the people in the intelligence community with a position in that area were not educated.  The people who were intelligence employees before the Taliban took over kept that position; they told us they didn't have enough money to provide a salary since we were uneducated, but this is why we are using you in this manner.  They were left over from the Communist regime or Massoud's era.  If you ask me why we didn't get rid of them, it was because they knew how to do the job and we needed them. For example, I cannot write any statements about the Tribunal; anybody knows better than me.  This was the reason I did not do this job, and the delegation of the Afghan government asked me the same question.  I told the delegation if you accuse me of being

UNCLASSIFIED//~~FOUO~~

involved with any part of politics, you are wrong, because you know more about me in there.

## Tribunal President Questions to Detainee

Q: During the times that you would carry out those duties as Deputy Minister, did you ever encounter known al Qaida members?

A: No. Before my capture, I heard on the radio that al Qaida members were in Afghanistan. I thought all of them, maybe a few, would be on top of a mountain somewhere. When I came to Cuba I saw all of these al Qaida members and Arabs.

Q: So was it Konduz in which there was no al Qaida?

A: I told you, sir, I didn't go to Konduz; my job was in Kabul.

Q: That's right; that was my mistake there; so in Kabul, where your job was, there was no al Qaida?

A: I did not know. If anyone can prove we had anything to do with al Qaida, then I am guilty. I did not have anything to do with al Qaida in Kabul.

Q: Had they been there, you would've known?

A: How would I know? Kabul is not a small place; it is a huge area for a person who does not know how to take care of the place, how would he know?

Q: Some of the people that worked for you in intelligence or in police work, would they know about that?

A: I told you, I don't know if they knew or didn't. I didn't have a connection, and never even asked if there was al Qaida.

Q: We heard al Qaida would pay large sums of money for support or favor. If your ministry was working on minimizing bribery, I thought you might become aware of those kinds of things.

A: I wish that these oppressors would give me some bribes so I could make some money. We have an old saying that you cannot hide the moon with two fingers. I worked in Kabul; still the employees of ex-intelligence community are working for the government now. You can go look at those files to see if we arrested, investigated or contacted any al Qaida; you could find out. Previous interrogators asked me if I made lots of money as an intelligence officer over there; I said to go see my office, we still have no running water over there. My office did not even have running water, and employees had no restroom. We did not have window, and had to use plastic to shield from the cold. I told the

UNCLASSIFIED//~~FOUO~~

interrogators if we made lots of money we'd at least bring running water to our office. The enemies or wrong accusers are making us look very big to you.

Q: Did your personal home have running water? Where you were working in Kabul?

A: In the beginning I didn't bring my family to my house, but in the end I brought my family. The house we rented in Kabul was from the dirt; and yes, we had water. Three hours in twenty-four hours we had water; we took the water inside the barrel and then we had water.

Q: As I mentioned earlier, the witness you requested was unfortunately not available today; if he had been able to provide information on your behalf, what would he have said?

A: First, my brother is against me. Because when I wanted to work for the government, he told me your father and grandfather didn't work for the government, you should not work for the government. Although he is my enemy because I didn't do what he asked me, he could still tell you where I was at the time of the fighting in Konduz. When there was fighting in Konduz and Kabul, he could tell you where Abdul Haq (the Detainee) was, because he saw that I was home. You could ask your own soldiers because they know this.

Q: So when there was fighting in Kabul, you were not there serving as Deputy Minister?

A: No. At that time, I left my job and was living at home.

Q: What time of year was that?

A: When the bombardment started in Kabul, I left my job and went home.

Q: That's a pretty good indicator that it's time to punch the clock out.

*The Tribunal President then thanked the Detainee for his testimony, and confirmed he had no more questions. One Tribunal Member had one final question of the Detainee:*

Tribunal Member: Do you know what has become of Mr. Qari Ahmadullah?

Detainee: Yes, I know.

Tribunal Member: What happened to him?

Detainee: He is under the grave.

Tribunal Member: Sorry to hear that; I have no further questions.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

*The Tribunal President re-confirmed that the Detainee had no additional information or questions for the Tribunal, and thanked him for his participation and testimony.*

*The Tribunal President then explained the remainder of the Tribunal process to the Detainee, and adjourned the open session.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Colonel, U.S. Marine Corps
Tribunal President

## DETAINEE ELECTION FORM

**Date:** 20 Oct 04

**Start Time:** 0925

**End Time:** 1100

ISN#: _____ 004 _____

**Personal Representative:** ███████████, MAJ
**(Name/Rank)**

**Translator Required?** YES          **Language?**          PASHTU

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** YES

-------------------------------------------------------------------

## Detainee Election:

[X]   **Wants to Participate in Tribunal**

[ ]   **Affirmatively Declines to Participate in Tribunal**

[ ]   **Uncooperative or Unresponsive**

## Personal Representative Comments:

Detainee #004 was very talkative and listened eagerly to the description of the CSRT process. He was frustrated that it has taken 3 years to determine his EC/Non-EC status. The detainee has elected to participate at his tribunal and will make a statement. The classified summary of evidence was read to the detainee and he had issues with several of the points. The detainee admitted that he had been a part of the Taliban when it was a legal government but he never fought against the US. He denied ever writing his brother with a greeting to a Taliban member. He did admit that he had used the radio to talk to the Taliban Minister (not chief) of Intelligence. He stated that he was essentially forced to be part of the Taliban because he could either accept a salary or dishonor his family and possibly be killed. The detainee stated that he had never been to Konduz or has he seen it. He said he was captured in Ghazni where his home was located and he had not fought the Americans or Allies. He stated he has never had any military training. The detainee requested that his brother be contacted as a witness to testify that #004 was at home in Ghazni during the ███████ fighting in Afghanistan.

Personal Representative: ████████████████

Exhibit D-a

~~FOR OFFICIAL USE ONLY~~

**Recorder Exhibit List**
**For**
ISN ███████████

| # | Title | Ref: | Classification |
|---|-------|------|----------------|
| R1 | Unclassified Summary | | UNCLASSIFIED |
| R2 | FBI Request for Redaction of National Security Information  1 OCT 2004 | | UNCLASSIFIED |
| R3 | Intelligence Information Report (IIR) 6 034 0020 02 | | SECRET |
| R4 | Intelligence Information Report (IIR) 6 034 0172 03 | 3.a.1, 2 | SECRET//NOFORN |
| R5 | Intelligence Information Report (IIR) 6 034 0223 02 | | SECRET//NOFORN |
| R6 | Intelligence Information Report (IIR) 6 034 0420 02 | Spt's R18 | SECRET//NOFORN |
| R7 | Intelligence Information Report (IIR) 6 034 0724 02 | 3.a.3 | SECRET//NOFORN |
| R8 | Intelligence Information Report (IIR) 6 034 0853 02 | | SECRET//~~NOFORN~~ |
| R9 | Knowledgeability Brief dtd 07-FEB-2002 | | SECRET |
| R10 | Memorandum for Record (MFR) dtd 17-MAR-2002 | Spt's R4 | SECRET//NOFORN |
| R11 | Memorandum for Record (MFR) dtd 21-SEP-2003 | | SECRET//NOFORN |
| R12 | Memorandum for Record (MFR) dtd 30-MAR-2002 | | SECRET//NOFORN |
| R13 | Baseball Card dtd 28_MAY-2004 | | SECRET//NOFORN |
| R14 | Central Asia Team "Red Memo" dtd 01-SEP-2003 | | SECRET//NOFORN |
| R15 | CITF-CDR Memorandum dtd 12-SEP-2003 | | SECRET//NOFORN |
| R16 | Intelligence Information Report (IIR) 6 034 0062 04 | Spt's R7 | SECRET//NOFORN |
| R17 | JDIMS Baseball Card, ISN 006 | Spt's R6,8 | SECRET//NOFORN |
| R18 | FBI 302, dtd 14 FEB 02 | 3.b.1 | FOUO//LES |

UNCLASSIFIED

**Combatant Status Review Board**

TO: Personal Representative

FROM: OIC, CSRT (04 October 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – WASIQ, Abdul Haq

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is associated with al Qaida and the Taliban and also participated in military operations against the United States and its coalition partners.

    a. The detainee is associated with al Qaida and the Taliban:

        1. The detainee, in a letter to his brother, included greetings to an al Qaida member.

        2. The detainee was the Taliban Deputy Minister of Intelligence.

        3. The detainee used a radio to communicate with the Taliban Chief of Intelligence.

    b. The detainee participated in military operations against the coalition.

        1. The detainee was involved in the operation to re-establish the front lines in Konduz, Afghanistan.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

Exhibit ___ R1

*1 of 1*

## Memorandum



```
To      :   Department of Defense          Date  10/01/2004
            Office of Administrative Review
            for Detained Enemy Combatants
            Col. David Taylor, OIC, CSRT

From    :   FBI GTMO
            Counterterrorism Division
            Asst. Gen. Counsel ████████████

Subject     REQUEST FOR REDACTION OF
            NATIONAL SECURITY INFORMATION
            ███████████████
```

Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

The following documents relative to ISN 004 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 02/14/2002

---

[1]Redactions are blackened out on the OARDEC provided FBI document.

[2]See Executive Order 12958

Exhibit ___R2___

UNCLASSIFIED

Memorandum from ██████████ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 10/01/2004


        If you need additional assistance, please contact Asst.
Gen. Counsel ████████████████████████, ██████ or Intelligence Analyst ██████████████

█Intelligence Analyst█ ████████████████████████████████, █

-2-

UNCLASSIFIED//F̶O̶U̶O̶

# Personal Representative Review of the Record of Proceedings

I acknowledge that on ___15___ January 2005 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #004.

████ have no comments.

___ My comments are attached.

████████ Major, USAF

_____
Name

_15 Jan 2005_
_____
Date

████████████
████████████
Signature