IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDULLAH WAZIR,                          )
                                         )
                                         )
              Petitioner,                )
                                         )
       v.                                )        Civil Action No. 05-2367 (RWR)
                                         )
GEORGE W. BUSH, *et al.,*                )
                                         )
              Respondents.               )
_____  )

## DECLARATION OF DAVID N. COOPER

Pursuant to 28 U.S.C. § 1746, I, Lieutenant Colonel David N. Cooper, Judge Advocate General's Corps, United States Air Force Reserve , hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.      I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC).  In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.      I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Abdullah Wazir that are suitable for public release.  The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member.  This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: _10 August 200_          _____

                                David N. Cooper
                                Lt Col, JAG Corps, USAFR



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: **781**

**27 JAN 2005**

FOR OFFICIAL USE ONLY

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 976**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN # 976 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

FOR OFFICIAL USE ONLY

UNCLASSIFIED

21 Jan 05

MEMORANDUM

From: Assistant Legal Advisor
To:     Director, Combatant Status Review Tribunal
Via:    Legal Advisor

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 976

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal # 12 of 29 September 2004
       (2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

   a. The detainee was properly notified of and actively participated in the Tribunal process.
   The detainee provided a sworn statement at the Tribunal hearing.

   b. The Tribunal was properly convened and constituted by enclosure (1).

   c. The Tribunal substantially complied with all provisions of references (a) and (b).
   Note that some information in exhibits R-5, R-8, and R-15 was redacted. The FBI
   properly certified in exhibits R-2 and R-3 that the redacted information would not support
   a determination that the detainee is not an enemy combatant.

   d. The detainee requested nine witnesses. Eight of the requested witnesses were from
   Afghanistan. The request for these witnesses was submitted to the U.S. Department of
   State and forwarded to the Afghanistan government. The Afghanistan government failed
   to respond. Under the circumstances, the Tribunal President determined that the
   witnesses were unavailable. In my opinion, this was not an abuse of discretion. No
   corrective action is needed.

   Notably, the Tribunal President did not make a relevance determination. Enclosure (1) of
   the Tribunal Decision Report erroneously states that the detainee proffered that the
   witness would testify that the detainee was a respected merchant. While it is possible to
   glean from the detainee's proffer that the witnesses would confirm that the detainee was a
   respected merchant, the detainee actually proffered that the witnesses, having first-hand
   knowledge of the detainee's his time in Afghanistan, could refute the allegations against

UNCLASSIFIED

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 976

him.  Based on this proffer, the witnesses were clearly relevant.  Nevertheless, the non-
responsiveness of the Afghanistan government renders moot any issue of relevance.

The detainee also requested that another detainee be produced.  Due to camp policy at the
time, the Tribunal advised the detainee that this witness was not reasonably available.
The detainee withdrew his request.  Thereafter, the detainee was advised that the policy
had been revised and that his request would be reconsidered.  However, the detainee
stated he no longer desired to have the witness testify and the request remained
withdrawn.

The detainee did not request any other witnesses or evidence.

e.  The Tribunal's decision that detainee # 976 is properly classified as an enemy
combatant was unanimous.

2.  The proceedings and decision of the Tribunal as reflected in enclosure (2) are legally
sufficient and no corrective action is required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

BREE A. ERMENTROUT
CDR, JAGC, USNR



Department of Defense
Director, Combatant Status Review Tribunals

29 Sep 04

From: Director, Combatant Status Review Tribunals

Subj: APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref: (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal
established by "Implementation of Combatant Status Review Tribunal Procedures for
Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004
is hereby convened. It shall hear such cases as shall be brought before it without further
action or referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

        MEMBERS:

        ▮▮▮▮▮▮▮▮▮, Colonel, U.S. Marine Corps Reserve; President

        ▮▮▮▮▮▮▮▮▮, Lieutenant Colonel, JAGC, U.S. Army;
Member (JAG)

        ▮▮▮▮▮▮▮▮▮, Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



# HEADQUARTERS, OARDEC FORWARD
GUANTANAMO BAY, CUBA
APO AE 09360

7 January 2005

MEMORANDUM FOR DIRECTOR, CSRT

FROM:  OARDEC FORWARD Commander ICO ISN 976

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ▓▓▓▓▓

CHARLES E. JAMISON
CAPT, USN

~~SECRET//NOFORN//X1~~

### (U) <u>Combatant Status Review Tribunal Decision Report Cover Sheet</u>

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: ___#12___

(U) ISN#: ___976___

Ref:  (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
      (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
      (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:  (1) (U) Unclassified Summary of Basis For Tribunal Decision (U/~~FOUO~~)
       (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
       (3) (U) Summary of Detainee Testimony (U/~~FOUO~~)
       (4) (U) Copies of Documentary Evidence Presented (S/NF)
       (5) (U) Personal Representative's Record Review (U)

1. (U) This Tribunal was convened on 22 November 2004 by references (a) and (b) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 22 November 2004, the Tribunal determined, by a preponderance of the evidence, that Detainee #976 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this detainee is a member of, or affiliated with, Taliban and al Qaida forces, as well as with associated forces that are engaged in hostilities against the United States or its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//FOUO

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12_____
ISN #: _____976_____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant because he was part of, or supporting, Taliban and al Qaida forces, as well as associated forces that are engaged in hostilities against the United States or its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The Tribunal held this hearing on 22 November 2004. The Recorder presented Exhibits R-1 through R-3 during the unclassified portion of the Tribunal. The primary exhibit, the Unclassified Summary of Evidence (Exhibit R-1), alleged, among other things, that the Detainee is a member of, or associated with, al Qaida and the Taliban. The Detainee associated with a known al Qaida cell leader and explosives expert and was apprehended on 13 August 2002, without papers, with that individual. Additionally, he was apprehended with a satellite cell phone and a large amount of Pakistani and Afghan Rupees. The Detainee received AK-47 training and was identified as a member of the Taliban and was seen working in the Kandahar military district office while carrying a handgun. The Detainee has expressed pro-Taliban views.

The Detainee chose to participate in the Tribunal process and made a sworn verbal statement. The Detainee refuted all of the allegations, asserted that he was a well-known and respected merchant, and denied that he belong to any groups. He explained that he never used or owned an AK-47 and that he was far from Kandahar, Afghanistan, owing to the fact that he lives in Khost (he later explained during Tribunal panel questioning that he lived in Khost province vice the city of Khost). He explained that while traveling to Bannu, Pakistan, to buy inventory (automotive tires and batteries) for his store in Afghanistan, he met a man named Karim. He knew Karim from a 3-day religious retreat that they had both participated in five years prior. He stated that he didn't know much about Karim's background. The Detainee did not think having a cell phone was unusual and stated it was for business purposes.

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

### 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and R-1 through R-22.

    b. Testimony of the following Tribunal-approved witnesses: None.

    c. Statement of the Detainee: See Enclosure (3) to the CSRT Decision Report.

### 4. Rulings by the Tribunal on Detainee Requests for Evidence

The Detainee made a request for eight witnesses located in Afghanistan and one other witness who was a detainee.

Based upon a then-existing policy, the Detainee was initially advised that the detainee witness was not reasonably available. Thereafter, on 18 November 2004, the Detainee withdrew his in-camp witness request. The policy at issue was subsequently revised. The Detainee was advised that the request for the Detainee witness would be reconsidered if he so desired, but the Detainee maintained that he no longer desired the witness and that the request remained withdrawn.

The request for the eight Afghani witnesses was submitted to the U.S. Department of State, who forwarded it to the Embassy of Afghanistan. Thirty days having lapsed from the time the request was submitted without any word from the government of Afghanistan, the Tribunal President ruled that the witnesses were not reasonably available, and so the request was denied. During the hearing, the Detainee was asked to make a proffer on what the witnesses would testify to, were they to address the Tribunal. The Detainee indicated that they would inform the Tribunal that he was a respected merchant. The Tribunal accepted that the witnesses would testify as the Detainee maintained.

The Detainee requested no documentary evidence to be produced.

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

    a. The Recorder offered Exhibit R-1 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this Exhibit is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. The Recorder also offered Exhibits R-2 and R-3 into evidence during the unclassified portion of the proceeding. Both exhibits are requests for redaction

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

from the Federal Bureau of Investigation office at Guantanamo Bay. These exhibits provided no useful information. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

      b. Essentially, the only unclassified evidence the Tribunal had to consider was the Detainee's sworn testimony. A summarized transcript of the Detainee's sworn testimony is attached as Enclosure (3) to the CSRT Decision Report.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the CSRT Decision Report.

## 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

## 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

      a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

      b. The Detainee understood and actively participated in the Tribunal proceedings. The Tribunal President satisfactorily answered all of his questions.

      c. The Detainee is properly classified as an enemy combatant because he was part of, or supporting, Taliban and al Qaida forces, as well as associated forces that are engaged in hostilities against the United States or its coalition partners.

## 8. Dissenting Tribunal Member's report

None. The Tribunal reached a unanimous decision.

Respectfully submitted,



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//FOUO

**Summarized Sworn Detainee Statement**

*The Tribunal President was explaining the hearing instructions to the Detainee. The Tribunal President asked the Detainee if he had any questions about the Tribunal process.*

Detainee: I have a question.

Tribunal President: Any questions concerning what is going to happen in this Tribunal and the process that you will be involved with here today?

Detainee: I talked to my Personal Representative previously, and I had a request for a witness. I gave a name for my witness and he told me it takes a month to get a response back. Two days ago, I talked to my Personal Representative, and he told me again that he did not get a response back for my witness. Then he asked me if I wanted to go to the Tribunal without the witness or without the response for the witness. I told my Personal Representative, that I did not want to go to the Tribunal before he got a response for my witness. What kind of tribunal is this, when you don't know anything about me? It's been more than a month and I still have not gotten a response from the witness. The names that I gave for my witnesses; they are very easy to find. They are all available, they all are in the bazaar, and they all have a shop, so it is not hard to find them. How do you make a determination in the Tribunal without knowing me or what kind of person I am or who I am?

Tribunal President: OK, let me explain the process. We the Tribunal, the three of us, have come here with an open mind, we know very little except your name. We know very little about you. The Recorder on behalf of the United States government will present unclassified evidence. You with the assistance of your Personal Representative will present information or make statements on your own behalf. If witnesses that you requested were relevant and reasonably available, then they would be produced today. In camp witnesses, we can work those logistics here on the island. For request for off-island witnesses, we have to work through the United States State Department. The State Department contacts that embassy of the particular country and that particular country has the request and will work the request and get the information back to the United States State Department. Some countries have responded; some countries are unable to located requested witnesses. After all unclassified evidence is presented to this Tribunal, then we close the open session of the Tribunal hearing. We then convene a closed session, in the absence of the Detainee. Due to national security reasons, the Detainee cannot be present when classified information is presented as evidence. After we have reviewed all of the evidence, the unclassified evidence, the classified evidence, and have heard your statement and any other witness statements or affidavits, then we make a determination as to whether or not you have been properly classified as an enemy combatant. Then we send our decision in a final report to the convening authority in Washington, DC. After the convening authority approves our decision, you will be notified of the results of that decision. We estimate that you will be notified of the results

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

between 30 and 60 days from today. I will explain more later on as we progress but basically if our decision is determined that you are not an enemy combatant you will be released to your home country. But if we confirm your status as an enemy combatant, then you will be eligible for an Administrative Review Board hearing at a future date and I will explain the make-up of that board. Does that give you a better understanding of the process today?

Detainee: Because the accusations they have on me, it is important for the witnesses to be here. I believe it will help me.

Tribunal President: I will address the witness availability here later on, but basically the witnesses that you have requested are not reasonably available. Did you request any in-camp witnesses? And they withdrew that?

Personal Representative: Yes sir, his concern is with as he stated in our follow up interview, the eight out of camp witnesses.

Tribunal President: We made an effort; go ahead. (Directing the translator to translate what the Personal Representative had stated to the Detainee).

Detainee: The person that is in camp only know about one of the five accusations that is charged against me. He did not know anything that could help on the other accusations. I wanted to contact the witnesses in Afghanistan because they would know about all the other allegations.

Tribunal President: I understand. and that is why I approved and determined that the witness request would be relevant. And we made the effort through the State Department, contacting the Afghanistan government but unfortunately, the Afghanistan government is either unable to locate the witnesses or has chosen not to respond to our request. And your Tribunal is scheduled for today and I will not be delayed any longer. We do have the authority that should the affidavits from those requested witnesses come in after we have convened this Tribunal, then we'll take those affidavits and reopen this Tribunal with your presence. But today we will continue with all of the information that we have at this time. Do you have any other questions at this time?

Detainee: No. Go ahead and begin.

Tribunal President: Thank you very much.

*The Tribunal President continued explaining the hearing instructions to the Detainee.*

Detainee: I did not understand the last question about the documents.

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

Tribunal President: That there was no request by you to produce any documents of evidence on your behalf. Documents would be like passports or birth certificates or good conduct certificates.

Detainee: In Afghanistan at that time I was there, the government was not stable and there was no birth certificates, no passports, there were no documents for me to produce.

Tribunal President: And that is what I was indicating that you had made no request for any type of documents like that.

Detainee: My Personal Representative did not ask me about that.

Tribunal President: Personal Representative, would you like to add to that statement?

Personal Representative: Yes sir. (Talking to Detainee) You may not recall, but during our interview we followed a checklist. And in that we asked about witnesses or documentary evidence. We talked about the money that you had on you when you were apprehended, and that you had no passport or papers on you. I remember this conversation because you asked if you would receive, because you had been in here for three years, interest on the money that was taken from you. I did follow up on that request to find out if interest would be provided. And I was told by Detainee property that no, Detainees would only have returned what items they had on them when they arrived. I then scheduled a meeting where I relayed that information with Abdullah. If it wasn't clear during the interview about you being able to have documentary evidence, I apologize for that but we did discuss it.

Detainee: It was a question that you were asking me. The question was when I was captured at the time of the apprehension, if I had any documents with me? But we did not have a passport as a document.

Tribunal President: OK. Just so that you understand, we are not going to hold that against you because you don't have any documents to produce. We just want to make it clear, if you requested any documents, we would make every effort to produce those for today, if they were available. For instance, if the money or whatever you had in your possession when you were captured, if you wanted them here today then we would try them available. We certainly will not hold it against you because you don't have any witnesses or there was no response from the Afghanistan government on helping us produce witnesses for you today. We will take only what we have and what we receive here today into consideration, for instance like you statement and any evidence is before us. Would you like to make your statement under oath?

Detainee: What kind of oath?

Tribunal President: We have a Muslim oath that we are prepared to administer if you would like.

UNCLASSIFIED//~~FOUO~~

Detainee: What about the oath; about what?

Tribunal President: The Muslim oath, when you are promising to tell the truth.

Detainee: Yes. I will.

**Summarized Sworn Detainee Statement**

***The Personal Representative addressed issues in the Summary of Evidence, as was discussed while assisting the Detainee in preparation for the Tribunal.***

Personal Representative: When we read the unclassified evidence, he initially and still disputes all of the items on here and has explanations for them. As he stated, he is a well known, and respected shopkeeper in Afghanistan.

- **3(a) The Detainee is a member of, or associated with, al Qaida and the Taliban.**

  I am not a member or associated with al Qaida or the Taliban.

- **3(a)(1) The Detainee associates with a known al Qaida cell leader and explosives expert.**

  I did not associate with a known al Qaida cell leader.

- **3(a)(2) The Detainee received AK-47 training.**

  I have never fired, owned or used an AK-47 or any other weapon.

- **3(a)(3) The Detainee was identified as a member of the Taliban and was seen working in the Kandahar military district office while carrying a handgun.**

  Kandahar is very far away from my shop is in Khost, Afghanistan. I was constantly at work around the clock. I could not go down to Kandahar, as it is a one-day travel.

- **3(a)(4) The Detainee has expressed pro-Taliban views.**

  I did missionary work every few months for about one or two days. The Taliban did not like missionaries.

- **3(a)(5) The Detainee was apprehended on 13 August 2002 without papers while riding a bus into Pakistan with a known al Qaida cell leader and explosives expert. Additionally, he was apprehended with a satellite cell phone and a large amount of Pakistani and Afghan Rupees.**

ISN# 976
Enclosure (3)
Page 4 of 18

UNCLASSIFIED//FOUO

I did not need any papers to go. I was on a flying coach bus, which carries about 20 to 25 people. I had money on me, but I am a well-known shopkeeper and was going into Pakistan to get my cell phone repaired. What is a big deal about having a cell phone? A lot of people, especially shopkeepers who have some money, have cell phones or satellite phones. When I got to the checkpoint in Pakistan, someone saw my cell phone and I was told that the Pakistani police were corrupt and may try to take my money; if they knew I had money because I had a cell phone. I was sitting at the back of the bus and as I departed the bus, I slipped my cell phone in someone else's seat next to another person.

Personal Representative: Would you like to specifically respond in more details to each one of these pieces of evidence?

Detainee: Do you have any questions for me? Are you going to ask me questions?

Tribunal President: Yes. We will probably have some questions for you to clarify anything that is on our mind.

Personal Representative: (To Detainee) Is there anything based on the meeting we had, that you would like to add or emphasize to the Tribunal?

Detainee: Yes. I want to talk about it.

Personal Representative: Please.

Detainee: Do you want me to start or do you want to ask questions?

Tribunal President: Go right ahead and talk, and then we'll ask questions later.

Detainee: I have a shop in Khost. I was very young and didn't have a beard at the time I started at the shop. I was working as a shopkeeper since the age of 15 years old. That day I was going to Pakistan to buy batteries and tires for my shop.

The glass of my cell phone was broken and I was going to get it repaired when I got to Pakistan. In the province of Khost, most people have a satellite phone and do not have a regular phone. Most shopkeepers or wealthy people have a satellite phone. The regular phone is not readily available and most people have a satellite phone. For communication, they must have one.

The day I was going to buy tires for my shop and have my phone repaired, I departed from Khost and when I arrived in Pakistan, I went to another bus station to get on another bus to buy tires and batteries. There was a driver and a driver assistant. I was trying to get a bus to Bannu. I went to Bannu flying coach bus

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

station. When I got on the bus, Kareem was sitting on the front seat. I sat on the fourth seat.

Before I saw Kareem on the flying coach, I had not seen him in five years. We spent three days preaching together. When I saw him on the bus, I said hello to him. I asked him where was he going, ask he told me he was going to buy some things also. Then the bus took off. It was full of passengers. Before you get to Bannu, there is a bazaar called Mianwali.

At the checkpoint, they call it Kajudi project. When we got to the checkpoint, they stopped and searched the bus. The police boarded the bus and asked everybody, where you were coming from? When they asked me, I told him Khost. Then he told me to get off the bus so I could be searched. When I got off the bus and the police were busy asking the other passengers where they were coming from, I had my cell phone in my pocket and was thinking how much it cost. I spent some time in Pakistan and knew how the police were. If they saw that you had some thing or money, they would ask you for a bribe. Then I thought if they found the phone on me, they would torture me and ask for money. I slowly gave my phone to Kareem and asked him to hold it for two minutes. At the time I gave my phone to Kareem, a soldier on top of the bus saw me give the phone to Kareem. He told another soldier that I had passed something to another person. He searched Kareem and I and found the phone.

The soldier made Kareem and I get off the bus and they took us to jail. In the Pakistan jail they interrogated me. The shop people in Pakistan knew that I was going to get the materials that I needed, so I named them as witnesses. The boss of the jail told me that I would be released tomorrow. In the afternoon, they handcuffed our hands and took us somewhere else. We spent six to seven months at the place they took us.

From there, they brought me here. In here you tell me I'm Taliban, you say that I learned how to use a Kalashnikov, I had a hand gun with me, I supported the Taliban, and that I had an association with Kareem. All these accusations are in writing about me.

I was living in Khost and there were a lot of Americans in Khost at that time. If you wanted to capture me, why didn't you just come to my house in Khost and capture me there? When I was in the shop, the Americans were always walking around in the bazaar and around my shop. They could have come to my shop and arrested me there.

Now because I am a Detainee, my case and file is in your hands. You can write a lot of accusations about me. I have no choice and can do nothing about it. I told my Personal Representative, in the market where I work, it was more than one hundred shops. And those hundred shopkeepers can be my witnesses. I told my

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

Personal Representative he could ask all of them if they saw me with the Taliban, and if I was a member of the Taliban. If they tell him yes, then I would accept it.

Tribunal President: Does this conclude your statement?

Detainee: Yes.

Tribunal President: We may have some questions.

Detainee: Please. Go ahead.

Tribunal President: Personal Representative, do you have any questions for the Detainee?

Personal Representative: If I may, Sir, just a few.

**Personal Representative Questions to Detainee**

Q:      Do you know where Kareem is right now?

A:      You told me that he is in Camp 5 right now.

Q:      Better clarification, please.

A:      I'm not sure if it was you or the Personal Representative for Kareem. He came to me as a witness for Kareem.

Personal Representative: For clarification of the record, I did not tell the Detainee the location of the individual.

A:      I think, but I'm not sure. I think it was Kareem's Personal Representative. He came to talk to me. Kareem wanted to use me as a witness and he told me he was in Camp 5.

Personal Representative: And also for clarification, in the notes from our sessions, you told me that an interrogator told you Kareem was in Camp 5.

A:      The interrogator did not say anything about that.

Personal Representative: I'm just referring to my notes.

Q:      How well did you know Kareem?

A:      Before my capture, five years ago I spent three days preaching with him.

UNCLASSIFIED//~~FOUO~~

Q:      You did not know him very well?

A:      All my life I was with him for the three days of preaching.

Q:      And you withdrew him as a witness request as you said in your statement because he could only dispute only one of the pieces of evidence?

A:      Yes.

Q:      And that piece of evidence was the circumstances of your capture?

A:      Yes.

Q:      When you got on the bus, was Kareem already on the bus?

A:      Yes.

Q:      Did you get on the bus at a different stop?

A:      The bus was at the station.  The assistant of the driver was telling the passengers that this bus was going to Bannu.  I went to the bus and Kareem was already on the bus.

Q:      Are you required to have a passport in order to go into Pakistan?

A:      At the time I was going to Pakistan, there was no stable government, and there was not passports allowed or even ID cards allowed.

Q:      You didn't need a passport, you didn't need an ID card, and you didn't need a visa?

A:      At the time I was going to Pakistan, it was common that everybody was going without their passports, without their visas and without their ID cards.

**Tribunal Members' Questions to Detainee**

Q:      We appreciate the opportunity to speak to you today, so we can try to better understand what happened here.  Did you say earlier that you had only known Kareem only three days in your whole life?

A:      Yes.  Five years prior to my capture, we went together for preaching for three days.

Q:      Is this the person the US government says is an al Qaida cell leader and explosive expert?

ISN# 976<br>
Enclosure (3)<br>
Page 8 of 18

UNCLASSIFIED//~~FOUO~~

A:    The time that I knew him, I only knew him as a preacher.  At that time there was no al Qaida or leader of al Qaida.

Q:    It sounds like that he could be associated with them and you would not have any way of knowing that.

A:    When we go for missionary work and preaching, we are not allowed to talk about other things.  We are there to read the Koran, taught how to read the Koran, how to pray and how to wash your body.  These are the things that were being concentrated on during our preaching.

Q:    We do not know anything about Kareem other than what you are telling us today.  All we know is that you have known him for a short time and that you were with him on this religious retreat.  You said earlier that the Taliban didn't approve of you doing missionary work?

A:    No.

Q:    I thought the Taliban was very forceful in it's thoughts on Islamic matters.  Why wouldn't they want you to do missionary work?

A:    The reason the Taliban did not like you doing missionary work was because they always wanted people to fight for them and they were asking us to fight.  You get in the fight and go to the battle but we did not want to do that and that is the reason they did not like the missionary work.

Q:    Do you have any idea who may have said that you said things that were favorable about the Taliban?

A:    I didn't spend any time with the Taliban and I don't have a lot of information about them because I was busy with my shop.

Q:    Do you have enemies that tried to stay these things about you?

A:    As far as I know, I don't have any enemies.

Q:    No business competitors that might try to get you out of the way so that they could take all of your business?

A:    From an outside view they were all good with me and I could call none of them as an enemy, but I don't know from their hearts and what was inside their hearts for me.

Q:    Besides being a shopkeeper was there any other way that you supported yourself?

UNCLASSIFIED//~~FOUO~~

A:  No.

Q:  You have done this ever since you were a younger man until right before you came here?

A:  Yes.

Q:  How many years approximately was that?

A:  Almost ten years.

Q:  Do you have a family that you support back home?

A:  Yes.

Q:  Was there anything particular special or distinctive about your cell phone or was it just an ordinary satellite phone that many people carried?

A:  When I was in Khost, the cell phone was very common. It was an ordinary phone and everyone had it. Having a phone in Khost was like you drink water in here, everybody had it. Wealthy people had them.

Q:  You said the reason you had the money with you was to buy supplies for your shop in Pakistan?

A:  Yes. It was for buying a supply of tires and batteries.

Q:  While you were running your shop, have the Taliban people ever bothered you or harassed you or tried to get you to do things for them?

A:  No. They did not ask me to go with them or ask for anything else. Sometimes we were busy doing shopping and putting in our shop and selling supplies and we did not pray because we were busy and they would come and beat us up a little asking why we were not going to the mosque to pray?

Q:  During the time of the war, did that affect you and your business?

A:  Which war?

Q:  Between the Taliban and the Northern Alliance most recently.

A:  Khost is far from away from all these wars. It was very quiet in Khost. Khost is close to Pakistan and is far away from the Northern Alliance war.

UNCLASSIFIED//FOUO

Q:    I remembered that you said they were always trying to get people to fight for them. Did they every try to get you to do that?

A:    They were coming to the village a lot and asking for people, drafting people to come with them but they never came to my shop. They didn't ask for the shopkeepers.

Q:    Did they try to get you to pay money instead?

A:    They didn't ask about money and they didn't ask me to go with them to fight.

Q:    Were you ever required to have any kind of military training ever before?

A:    No. I never had any kind of military training. When I was a child, we were in Pakistan at that time and I was going to school there. Since we came to Afghanistan, I started a job as a shopkeeper. I was working at my shop.

**Tribunal Members' Questions to Detainee**

Q:    How much money did you have when you went to Pakistan?

A:    70,000 Afghani rupees, 3,500 Pakistani rupees and 2,700 dollars.

Q:    You converted it for me?

A:    No. I had 2,700 dollars, 3,500 Pakistani rupees, and 70,000 Afghani rupees.

Q:    And you were going to buy batteries and tires?

A:    Yes.

Q:    What type of store do you have?

A:    It was selling tires and batteries.

Q:    Automobiles, motorbikes and things like that?

A:    It was a shop for different cars, different tires like an auto shop. Different batteries for different cars, like Datsuns, Toyotas, and trucks.

Q:    Did you have many employees working for you?

A:    My brother was working with me.

Q:    Did you make the trip to Bannu many times for supplies over the years?

UNCLASSIFIED//~~FOUO~~

A:     When my supplies were getting low I would make a trip.

Q:     That where you would get all your supplies, in Bannu?

A:     Yes.

Q:     You didn't send your brother to get the supplies?

A:     Sometimes my brother would go and sometimes I would go, whenever we needed to go.

Q:     Was most of your life spent in Khost?

A:     No.  I spent 15 years in Pakistan and the rest of my life in Afghanistan.

Q:     You were in business for 10 years, you said.  How long were you working at the store you were operating before you were arrested?

A:     Almost nine to 10 years.

Q:     How old are you?

A:     In Afghanistan sometimes they don't write the exact date of birth.  I'm not sure but I think I was 27.

Q:     Being in business, I imagine you were pretty familiar with what was going on in the town?

A:     Yes.

Q:     There was a place in town referred to as Manan.  Are you familiar with that place?

A:     Is it a name of a person, name of a car or name of a village?

Q:     Name of a village or a place.

A:     No.

Q:     Lezi?

A:     No.

Q:     Khaldan?

UNCLASSIFIED//~~FOUO~~

A:    Khaldan?

Q:    Were there any areas in town where there was training for military?

A:    I don't know anything about that.

Q:    So you are not aware of anything close to your town, Khost?

A:    I don't know about whatever camps they were hiding somewhere. I don't know about that. I was going from my house, a straight street to my shop. There was nothing on this street. I was going from my house to the shop and taking this street.

Q:    I was interested in knowing of anything that may have been going on around the town. Not that you were involved with it, but just whether you were aware that there were some camps in that area?

A:    It's not around my village. I have not seen around our villages. I actually mentioned my village and the Americans are around Khost. So ask them if they see anything around my village; any camp.

**Tribunal President's Questions to Detainee**

Q:    I have only one question. You seem to have gotten into business at a very young age of 15?

A:    Yes.

Q:    How was it that you were able to get into business, you and your brother?

A:    It was inherited from my father. My father use to be a shopkeeper also and he was training us. It was my father's shop.

Tribunal President: We want to thank you for your testimony today.

Detainee: Please consider and get the responses from the witnesses and you can find out about me. I'm sure the witnesses can help in my case. There will be clarification about me being a shopkeeper and I've been here almost three years in jail. It's not fair, it's oppressive.

Tribunal President: I understand. I think we may have one more question.

UNCLASSIFIED//~~FOUO~~

**Tribunal Members' Questions to Detainee**

Q:    If any of the witnesses had been able to come here or had written something for
you, what would you have expected them to say?

A:    They will tell the truth what ever they saw. They know me, and they would tell
the truth about me. The people I provided as my witnesses are not my relatives
and I don't have any contact with them. I'm in jail and don't have any contact or
conversations with them. But I listed them as witnesses because they will tell you
that they saw me in the shop, they didn't see me with the Taliban and they didn't
see any of them with me. They will just clarify me job, my position.

Q:    Thank you. One more question. Is your brother running the shop now?

A:    Yes.

Q:    Have you been able to correspond with your brother at all? Through letters?

A:    Yes.

Q:    When was the last time you heard from your brother?

A:    Three to four months ago. I received a letter from my brother through the Red
Cross but it's been eight months ago since I received it.

Q:    Have you sent him letters?

A:    I sent him a letter but I did not get any response. I sent a lot of letters since I have
been here and only received two letters from there. Some of the letters are not
clear and things are crossed out and not very clear.

Tribunal Member: Thank you, no more questions.

Tribunal President: I think the Personal Representative has another question.

**Personal Representative Questions to Detainee**

Q:    Yes sir, I would like to make a clarification about the dollar figures that he had on
him while he was traveling. Did you ever have any US dollars?

A:    Yes.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Q:      Sir (to the Tribunal President).  That was to clarify what was in my notes because
        we only talked about the Afghani money and the Pakistani money and not US
        dollars.  So I wanted to clarify that.  (To Detainee): How often did you travel a
        year on average to go and pick up supplies?

A:      It depended on business.  If the business sold more tires or other supplies we
        would go sooner and buy more supplies.  Sometimes we didn't sell many supplies
        and we would not have to go.

Q:      Did you always take that flying coach bus to go pick up your supplies?

A:      Actually, these are the city buses.  The buses are used on a regular basis.

Q:      But is this the way you always went to pick up your supplies?

A:      Yes.

Q:      Did you own a car?

A:      No.  I was always going places using the flying coach.

Personal Representative: Thank you, sir.

Tribunal President: I would like to follow up on that train of thought a little more now
that you have brought it up.

### Tribunal President's Questions to Detainee

Q:      I would suppose that you had your supply products delivered to your store in
        Khost?

A:      No.

Q:      You would take back the supplies by yourself?

A:      Yes.  Sometimes, I would go and sometimes my brother would go.

Q:      How, if you were traveling by bus, how would you carry those supplies back?

A:      Actually, it worked like that.  I would go buy the supplies and I would give them
        the money and I would get a receipt.  I would come back by myself.  Actually, the
        place would pile everyone's supplies on a truck and they would bring you the
        supplies.

Q:      They delivered it to your shop?

UNCLASSIFIED//~~FOUO~~

A:  Yes.

Q:  Now, are you familiar with the events that happened on September 11, 2001?

A:  Which events?

Q:  The events where the United States was attacked in New York, in Pennsylvania and in Washington, DC?

A:  Yes, I read it in the newspaper.

Q:  After that time and after the Americans began their presence in Afghanistan, how many times did you travel back and forth across the border to get new supplies for your business?

A:  Actually, when the Americans came to Afghanistan, it was like being in prison for three months because they wanted to make sure all the Taliban were gone and the security came. So we were waiting for security and peace. So for three months I moved everything from my shop and I put it in my house and after three months I moved all the supplies back to my shop and restarted my positions as a shopkeeper.

Q:  So you were captured in August 2002 in Bannu, Pakistan, is that correct?

A:  Yes.

Q:  We here stories from other Detainees, when they attempt to cross from Afghanistan to Pakistan, that's when they were arrested by the Pakistani border patrol, guards and Pakistani police. How is it that after the United States was driving out the Taliban in Afghanistan were you able to so easily to go back and forth across the border to get supplies in Bannu for your business in Khost?

A:  First of all, the Detainees from Afghanistan captured by the Pakistan police were all speaking for their party and will not answer any questions. My relatives and I are from Gardez and that is really close to the border of Pakistan. Whenever people are going from Gardez into Pakistan, they have a relationship with them and will not say anything to them.

Q:  I thought you were from Khost? I thought your business was in Khost?

A:  Khost is a province in the name of the bazaar, but Khost has villages and I'm living in one of these villages.

Q:  OK. Did you have to payoff the Pakistani border guards to get free access, because you didn't have a passport, right?

UNCLASSIFIED//~~FOUO~~

A:     No.  They never took any money from me.

Q:     You were never robbed at anytime?  Never had any trouble carrying so much money on any of your trips going across the border?

A:     No.

Q:     You always traveled by yourself?

A:     Yes.

Q:     Do you have anything else about your story or may have to add to what you've told us to this point in reference to the unclassified summary of evidence?

A:     I told my story.  I told whatever that happened to me and now it is your time and your job to find out and investigate.  It's been three years.  The money I had with me it was for business purposes and I was using it to make money out of it.  How about that money, it is not in the business now.  The money is not being used. How about the interest?  How about the money I had?

Tribunal President:  I don't have authority over any of your property.  All we are here today is to address whether you have been properly classified as an enemy combatant. After that, someone else will deal with the process or the circumstances that our decision present.

Detainee:  Can you talk to them about that?

Tribunal President:  I'm sure that you discussed this with the Detainee control folks and that's whom you need to talk to about that.

Detainee:  Is someone else going to see me about that?

Tribunal President:  Yes, your interrogators.  What have they told you when you asked about it?

Detainee:  The two interrogators, I ask about that and they would talk to me and have a response, but I have not seen it yet.

Personal Representative:  Sir (to the Tribunal President), please also note that I did check into from the Detainee property and the Detainee property people said they do not get interest on their money and is something that would have to be brought up should he be released or through other legal channels.

Detainee:  Why?

UNCLASSIFIED//~~FOUO~~

Tribunal President: Why? That's the way it is, that's why.

Detainee: That's not a good law. Somebody puts you in jail and their money is stopped without making profit for their business. If somebody is guilty, that is OK, if you catch his property and taking his money away, that is fine. But somebody who is innocent, they should get their money back with interest.

Tribunal President: You are talking to the wrong guy, because all I'm concerned about is the information here that is going to confirm your status as an enemy combatant or identify the fact that you have not been properly classified as an enemy combatant.

## **AUTHENTICATION**

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//FOUO

## DETAINEE ELECTION FORM

**Date:** 18 October 2004 (Initial)

**Start Time:** 1430 hrs

**End Time:** 1630 hrs

**ISN#:** 0976

**Personal Representative:** ▆▆▆▆▆▆▆, MAJOR, USAF
(Name/Rank)

**Translator Required?** YES          **Language?** ARABIC

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** YES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### Detainee Election:

[X]  **Wants to Participate in Tribunal**

[ ]  **Affirmatively Declines to Participate in Tribunal**

[ ]  **Uncooperative or Unresponsive**

### Personal Representative Comments:

Detainee desires to participate in the Tribunal. Detainee will address the Tribunal himself and will respond to Tribunal questions. Detainee had 1 detainee witnesses and a number of non-detainee witnesses (8) who have first hand knowledge of his time in Afghanistan and can help refute the evidence against him. (NOTE: On 18 Nov 04, detainee withdrew his in-camp witness request. Detainee had been previously informed that the witness was "not reasonably available" (Camp 5 detainee). However, the recent policy clarification that approval for cross-camp witnesses would be on a case-by-case basis prompted this follow-up interview. Purpose of interview was to provide a status update on the non-detainee witness request and to get specifics on expected witness testimony from the Camp 5 detainee. However, detainee withdrew his in-camp requests and was told that we have not yet received any statements from Afghanistan.)

Personal Representative: ▆▆▆▆▆▆▆▆▆

Exhibit: D-a

UNCLASSIFIED//FOUO

UNCLASSIFIED

**Combatant Status Review Board**

TO: Personal Representative

FROM: OIC, CSRT (30 September 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – WAZIR, Abdullah.

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that he is associated with al Qaida and the Taliban.

    a. The detainee is a member of, or associated with, al Qaida and the Taliban:

        1. The detainee associates with a known al Qaida cell leader and explosives expert.

        2. The detainee received AK-47 training.

        3. The detainee was identified as a member of the Taliban and was seen working in the Kandahar military district office while carrying a hand gun.

        4. The detainee has expressed pro-Taliban views.

        5. The detainee was apprehended on 13 August 2002 without papers while riding a bus into Pakistan with a known al Qaida cell leader and explosives expert. Additionally, he was apprehended with a satellite cell phone and a large amount of Pakistani and Afghan Rupees.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

UNCLASSIFIED

Exhibit ___*R-1*___

## Memorandum



To : Department of Defense          Date 10/08/2004
     Office of Administrative Review
     for Detained Enemy Combatants
     Col. David Taylor, OIC, CSRT

From : FBI GTMO
       Counterterrorism Division ████████
       Asst. Gen. Counsel ████████

Subject: REQUEST FOR REDACTION OF
         NATIONAL SECURITY INFORMATION
         ████████████

     Pursuant to the Secretary of the Navy Order of 29
July 2004, Implementation of Combatant Review Tribunal
Procedures for Enemy Combatants Detained at Guantanamo Bay
Naval Base, Cuba, Section D, paragraph 2, the FBI requests
redaction of the information herein marked[1].  The FBI makes
this request on the basis that said information relates to the
national security of the United States[2].  Inappropriate
dissemination of said information could damage the national
security of the United States and compromise ongoing FBI
investigations.

  CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A
  DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

     The FBI certifies the aforementioned redaction
contains no information that would support a determination
that the detainee is not an enemy combatant.

     The following documents relative to ISN 976 have
been redacted by the FBI and provided to the OARDEC:

FD-302 dated 03/24/2003
FD-302 dated 05/28/2003 (resend, previously provided on 9/14/04)

---

   [1]Redactions are blackened out on the OARDEC provided FBI
document.

   [2]See Executive Order 12958

UNCLASSIFIED

Memorandum from ▚▚▚▚▚▚ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 10/08/2004


        If you need additional assistance, please contact
Asst. Gen. Counsel ▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚, or Intelligence Analyst
▚▚▚▚ Intelligence Analyst ▚▚▚▚▚▚▚▚▚▚▚▚▚▚

2 OF 2

UNCLASSIFIED

**Memorandum**



| | | | |
|---|---|---|---|
| To | : | Department of Defense<br>Office of Administrative Review<br>for Detained Enemy Combatants<br>Col. David Taylor, OIC, CSRT | Date 09/14/2004 |

From : FBI GTMO
Counterterrorism Division
OSC ███████ _9/14/04_

Subject REQUEST FOR REDACTION OF
NATIONAL SECURITY INFORMATION
████████████

          Pursuant to the Secretary of the Navy Order of 29
July 2004, Implementation of Combatant Review Tribunal
Procedures for Enemy Combatants Detained at Guantanamo Bay
Naval Base, Cuba, Section D, paragraph 2, the FBI requests
redaction of the information herein marked[1]. The FBI makes
this request on the basis that said information relates to the
national security of the United States[2]. Inappropriate
dissemination of said information could damage the national
security of the United States and compromise ongoing FBI
investigations.

  CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A
 DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

         The FBI certifies the aforementioned redaction
contains no information that would support a determination
that the detainee is not an enemy combatant.

         The following documents relative to ISN 976 have
been redacted by the FBI and provided to the OARDEC, GTMO:

FD-302 dated 05/02/2003
FD-302 dated 05/28/2003

---

   [1]Redactions are blackened out on the OARDEC provided FBI
document.

   [2]See Executive Order 12958

UNCLASSIFIED

Memorandum from ███████████ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 09/14/2004


          If you need additional assistance, please contact On
Scene Commander ███████████                          ███████████
                                              or Intelligence Analyst
████████████████████████████   ██████████████████████████████

UNCLASSIFIED

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on _01_ December 2004 I was provided the opportunity to review
the record of proceedings for the Combatant Status Review Tribunal involving ISN #976.

███ I have no comments.

___ My comments are attached.

███████, Major, USAF

────────────────────────
Name

██████████████████

Signature

_1 DEC 04_
────────────
Date

ISN #976
Enclosure (5)

UNCLASSIFIED//~~FOUO~~