IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HAFIZULLAH SHABAZ KHUL,                    )
                                           )
                                           )
            Petitioner,                    )
                                           )
      v.                                   )          Civil Action No. 05-2367 (RWR)
                                           )
GEORGE W. BUSH, *et al.*,                  )
                                           )
            Respondents.                   )
_____   )

## DECLARATION OF DAVID N. COOPER

Pursuant to 28 U.S.C. § 1746, I, Lieutenant Colonel David N. Cooper, Judge Advocate General's Corps, United States Air Force Reserve , hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.     I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC).  In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.     I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Hafizullah Shabaz Khul that are suitable for public release.  The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member.  This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _10 August 2006_                        _____
                                               David N. Cooper
                                               Lt Col, JAG Corps, USAFR



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: **778**

~~FOR OFFICIAL USE ONLY~~

**27 JAN 2005**

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 1001**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN # 1001 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

UNCLASSIFIED

24 Jan 05

MEMORANDUM

From: Assistant Legal Advisor
To:   Director, Combatant Status Review Tribunal
Via:  Legal Advisor    JRC

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
      FOR DETAINEE ISN # 1001

Ref:  (a) Deputy Secretary of Defense Order of 7 July 2004
      (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl: (1) Appointing Order for Tribunal # 12 of 29 September 2004
      (2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

    a. The detainee was properly notified of the and actively participated in the Tribunal
process. The detainee provided a sworn oral statement at the Tribunal hearing.

    b. The Tribunal was properly convened and constituted by enclosure (1).

    c. The Tribunal substantially complied with all provisions of references (a) and (b).
Note that some information in exhibit R-3 was redacted. The FBI properly certified in
exhibit R-2 that the redacted information would not support a determination that the
detainee is not an enemy combatant.

    d. The detainee requested five witnesses:

        1. Raz Mohammed Dalili, the former Paktia District Governor;

        2. Hakim Khanwal, a Tribal Elder;

        3. Haji Omar Khan, a Tribal Elder;

        4. Toti Khan, a Tribal Elder; and

        5. Haji Bara, a Tribal Elder.

The Record of Proceedings does not contain a proffer from the detainee describing the
witnesses' expected testimony. The Tribunal President did not make a formal decision on

UNCLASSIFIED

UNCLASSIFIED

Subj:   LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
        FOR DETAINEE ISN # 1001

the relevance of these witnesses. However, as the witnesses were assumed relevant, the detainee was not harmed by the Tribunal President's failure to make a specific determination.

Requests for these witnesses were sent to the Department of State and forwarded to the Afghanistan Government. The Afghanistan Government did not respond. Under the circumstances, the Tribunal President declared the witnesses unavailable. In my opinion, this was not an abuse of discretion and no corrective action is required.

Exhibit D-a indicates that the witness also requested that his Personal Representative contact a sixth witness, Haji Wali Mohammed. The Personal Representative did not realize that the detainee had requested this witness until a follow-on interview when, prompted by the detainee, he consulted his notes. The detainee elected to proceed with the Tribunal hearing rather than delay it by attempting to locate this witness. In any event, since the detainee had no address for this witness, and given the non-responsiveness of the Afghanistan Government, the possibility that this witness could have been located is slim. Even if the witness had been produced, the evidence was sufficient to classify the detainee as an enemy combatant.

In his testimony, the detainee mentioned that he had requested a witness named Taj Mohammed Wardak. He explained that this individual preceded Raz Mohammed Dalili as governor. The Tribunal President did not comment on this. It is not clear whether this individual refers to one of the other witnesses requested. Since the witness had already recognized his Personal Representative's error in not contacting Haji Wali Mohammed, it is unlikely that he would not have noted another error. It is more likely that Taj Mohammed Wardak is an alias for one of the other witnesses. But even assuming that the detainee requested a seventh witness, either to his Personal Representative, or for the first time at his hearing, there was no harm to the detainee in not seeking to contact this witness. First, it is clear that any efforts to contact the witness would have been unsuccessful without the cooperation of the Afghanistan Government. Second, the evidence was sufficient to classify the detainee as an enemy combatant. In my opinion, no corrective action is required.

The detainee did not request any other witnesses or evidence.

e.   The Tribunal's decision that detainee # 1001 is properly classified as an enemy combatant was unanimous. In my opinion, reasonable Tribunal members could determine that the detainee is an enemy combatant based on the evidence presented at the Tribunal. I can find no reason to disturb the determination.

f.   The Personal Representative who initially interviewed the detainee is not the same Personal Representative who reviewed the Record of Proceedings. I contacted Lt Col ██████████ the Chief of Staff, OARDEC Forward, who confirmed that the first Personal Representative transferred off-island before he had a chance to review the Record of

2

UNCLASSIFIED

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 1001

Proceedings.  The second Personal Representative, the Personal Representative Team Lead, was given the opportunity to review the Record of Proceedings and affirmatively declined to submit comments.

2.  The proceedings and decision of the Tribunal as reflected in enclosure (2) are legally sufficient and no corrective action is required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

BREE A. ERMENTROUT
CDR, JAGC, USNR

UNCLASSIFIED



# Department of Defense
## Director, Combatant Status Review Tribunals

29 Sep 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref:    (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

           **MEMBERS:**

███████████, Colonel, U.S. Marine Corps Reserve; President

███████████, Lieutenant Colonel, JAGC, U.S. Army;
Member (JAG)

███████████ Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

14 January 2005

MEMORANDUM FOR DIRECTOR, CSRT

FROM:  OARDEC FORWARD Commander ICO ISN 1001

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ███████.

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

## (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL:  ___#12___

(U) ISN#:  ___1001___

Ref:    (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
        (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
        (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:   (1) (U) Unclassified Summary of Basis For Tribunal Decision (U/FOUO)
        (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
        (3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
        (4) (U) Copies of Documentary Evidence Presented (S/NF)
        (5) (U) Personal Representative's Record Review (U)

1. (U) This Tribunal was convened on 4 December 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 4 December 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #1001 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is a member of, or affiliated with, Taliban and al Qaida forces, as well as with associated forces that are engaged in hostilities against the United States or its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12____

ISN #: _____1001____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this detainee is properly classified as an enemy combatant and is a member of, or affiliated with, al Qaida and the Taliban, as well as with other associated forces engaged in hostilities against the United States and its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The Tribunal hearing was conducted on 4 December 2004. The Recorder presented Exhibits R-1 and R-2 during the unclassified portion of the Tribunal. The primary exhibit, the Unclassified Summary of Evidence (Exhibit R-1), alleged that: the Detainee is a member of the Taliban and participated in military operations against the United States and its coalition partners; the Detainee served as the commander for two separate military units operating in Zormat, Afghanistan, from July 2002 to November 2002; the anti-coalition militia in Zormat District considered themselves al Qaida; between April and June 2002, while serving as the Zormat Assistant Governor, the Detainee had three known al Qaida suspects released from jail after they were captured at a checkpoint; on 31 August 02, the Detainee met with Saifullah Rahman Mansour to organize and receive funding for an attack on coalition forces; in early September 2002, the Detainee lead a 12-man unit of former al Qaida and Taliban in planning an attack on coalition forces; and the Detainee was arrested by Afghan authorities at the command of Abdullah Mujahed, head of security in Zormat, Afghanistan, then turned over the U.S. forces. The Recorder called no witnesses.

The Detainee participated actively during the hearing, responding to each of the allegations on the Unclassified Summary of Evidence. Afterwards, he answered questions from the Tribunal members. The Detainee's testimony, including his responses to the questions posed to him, is summarized in Enclosure (3) to the CSRT Decision Report. The Detainee requested five witnesses, however none were present at the hearing and none provided matters for submission to the Tribunal. The Detainee submitted no documentary evidence. For a detailed discussion of the witness requests, see paragraph 4, below.

UNCLASSIFIED//~~FOUO~~

During the classified session of the Tribunal, the Recorder presented Exhibits R-3 through R-17, without comment. The Personal Representative introduced no classified documents and did not comment on the classified evidence.

### 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

>    a. Exhibits: D-a, and R-1 through R-17.

>    b. Testimony of the following Tribunal-approved witnesses: None.

>    c. Sworn statement of the Detainee. See Enclosure (3) to the CSRT Decision Report.

### 4. Rulings by the Tribunal on Detainee Requests for Evidence

As reflected in Exhibit D-a, the Detainee made a request for five out of camp witnesses. The original request for witnesses was submitted on 27 October 2004. That request was properly forwarded to the U.S. State Department, which forwarded the request for assistance to the Government of Afghanistan. A follow-up request was submitted to the State Department on 9 November 2004, and a third request was sent 22 November 2004. It should be noted that the Tribunal was conducted on 4 December 2004; therefore, an additional 17 days were added to the Detainee's request. Over 30 days having passed without a response from the Government of Afghanistan, on 4 December 2004 the Tribunal President determined that the witnesses were not reasonably available and the requests were denied.

The Detainee requested no documentary evidence be produced, so no rulings were necessary.

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

>    a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this exhibit is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2, an FBI redaction memorandum, contained no useful information. Accordingly, the Tribunal had to look to the Detainee's testimony and the classified exhibits for evidence pertaining to the allegations in the Unclassified Summary of Evidence.

UNCLASSIFIED//~~FOUO~~

b. Essentially, the only unclassified evidence the Tribunal had to consider was the Detainee's sworn testimony. The Detainee responded to the allegations after taking a Muslim oath. He stated that he did not serve as commander for two separate military units in Zormat, and that he did not like al Qaida. He testified that he didn't know Saifullah Rahman Mansour when Mansour was in power. He flatly denied the allegation about leading a twelve-man unit. The Detainee related an account of himself in which he reluctantly accepted a position as Mayor of Zormat, after President Karzai came to power, when village elders asked him to represent them. He indicated that when he was in office there were no problems with local crime and he also cooperated with the Americans. The Detainee was replaced after six months. He was then approached by the Governor to become a part of a fifteen-member commission to address the crime problem. During the questioning by the Tribunal, the Detainee stated that he was educated in pharmacology and was held in very high regard by the people of his village. He said he was a good man, an honest man, and had respect. That is why he was given the original position of mayor. A summarized transcript of the Detainee's sworn testimony is attached as Enclosure (3) to the CSRT Decision Report.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

## 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

## 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

b. The Detainee understood, and actively participated in, the Tribunal proceedings.

c. The Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with, al Qaida and the Taliban, as well as with other associated forces engaged in hostilities against the United States and its coalition partners.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

**8. Dissenting Tribunal Member's report**

None.  The Tribunal reached a unanimous decision.

Respectfully submitted,



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED/~~FOUO~~

### Summarized Unsworn Detainee Statement

*The Tribunal President read the hearing instructions to the Detainee. The Detainee confirmed that he understood the process and had no questions.*

*The Recorder presented Exhibits R-1 and R-2 into evidence and gave a brief description of the contents of the Unclassified Summary of Evidence (Exhibit R-1).*

*The Recorder confirmed that he had no further unclassified evidence or witnesses and requested a closed Tribunal session to present classified evidence.*

*The Tribunal President stated that the Detainee wanted to participate, make an oral statement and has requested five witnesses from Afghanistan. The first witness request was sent to the Department of State on 27 October 2004, the second on 9 November 2004 and a third request was sent on 22 November 2004, all concerning a request for assistance from the Embassy of Afghanistan. As of this date, 4 December 2004, we have not received a response from the embassy on the status of these witnesses. The witnesses have been deemed not reasonably available. The Tribunal President reassured the Detainee that this would not be held against him for any reason.*

Tribunal President: Hafizullah Shabaz Khail, you may now present any evidence or information that you have to this Tribunal and you have the assistance of your Personal Representative in doing so. Do you still want to present information to this Tribunal?

Detainee: I would like my Personal Representative to read the statement, and if there's anything I want to say to give more evidence, I will raise my hand.

Tribunal President: Very well. And before we do that, would you like to take an oath, so that your statements, or answers to any of our questions, are given under oath?

Detainee: I would like to.

*The Reporter administered to the Detainee the Muslim oath.*

*The Personal Representative read the statement the Detainee had prepared to the allegations, and will added comments as needed.*

Detainee: (Personal Representative reads from statement) I've never been part of the Taliban. I have not worked one day under the Taliban. When Karzai came into power, the elders of the city came to my house and asked me to be their representative. I was given the position of mayor of the city because I was trusted. Taj Mohammed Wardak was assigned as governor of Paktia province. When this happened, I sent the paperwork to Kabul. Operation Anaconda was ongoing. I was the representative in that district. While I was mayor in Zormat, there were no problems with the Americans. I met with American commanders several times; their names were Mike and Tony. We even took pictures together. I was mayor for six months there. I wasn't even on the payroll; they

UNCLASSIFIED/~~FOUO~~

weren't paying me anything. I have helped and assisted the Americans. After six months, Karzai assigned someone else as mayor of Zormat.

I gave the new mayor the position without any dispute. I then went home. When I was mayor, there weren't any problems. When the new mayor came into power, crime soared. People stole property. Wardak (the governor) was then replaced by Raz Mohammed Dalili as the new governor of Paktia Province. Then Raz Mohammed Dalili asked me to come in and talk to him and he asked my help to get Zormat back to normal. I did not accept his request the first time. He asked me again to meet with him and bring order back to the city. He sent the elders of Zormat to my home a second time, asking for my help. Finally, I accepted and there was a fifteen-member commission formed with members of the Zormat District. I was the president of the fifteen-member group. Dalili made me the head of the commission. I represented the elders and I sent these names to the interior ministry. Yes, the ministry sent it to the government, and the government sends it to the district and then we send them back. The first decision of our group was to coordinate any police matters that would cross the districts with the representatives of that district. We worked with the security, so that we knew whether they were coming to do a search, investigation or arrest. The delegation of fifteen people in our culture, our tribal culture, didn't fight with the government or district manager of the tribe; when we did something, we would get together and find the right, peaceful way to do something. This was to prevent any misunderstandings so that they would know the difference between the police coming to do a search and robbers robbing them. This way no one would get hurt or killed by accident.

The following story explains the circumstances of why I was falsely imprisoned. There was a reason the fifteen member delegation prompted the government to appoint us to work for the security and safety. The reason was some people under the government worked for the government with a uniform; they blended in with some people under the government. There were employees in uniform, going to houses during the night. There were a lot of problems; they were killing people and robbing the houses all the time. That was a big concern of these people and we would come to find the right way to fight. We needed to separate the people, the people who are for the government, from the troublemakers, who were robbing the people, and stealing the property.

We voted in the fifteen-member delegation that was from different villages, or different areas of this district. We agreed between the government and district manager that each time a group or military people during night or day want to go search somewhere, or some house, or some area, they contact us first and we can go together with them. They didn't want to show us which house or which area. At least we needed to know which area they were coming to and to let us know so we could join them and take them there. I'm a representative of this tribe and for this village, and I would say these people are coming from the government and are not there to rob. They are people who want to search your house. That means they cannot make problems and disputes between these people. This will go smoothly and easily, the right way.

UNCLASSIFIED/~~FOUO~~

The following story explains the circumstances of why I was falsely imprisoned. A businessman was robbed of 200,000 kalgars in the city of Sherbuz (ph). Yes, some business people were going from Khost to Kandahar and from Kandahar to Iraq to buy used or new cars and that was their business to be there at that time. Three or four people were in the car and one of them had 100,000 kalgars on his leg and 100,000 kalgars on his other leg and some money in one pocket at that time. And in the middle of the way, there were people. They stopped the car and they robbed the guys and took the 200,000 kalgars away from him. The robbers ran away. We asked the district manager and our weapons security what we should do. The guys were robbed and the thieves ran away. They did not belong to our area. They belonged to another province, Ghazni, but we still can do security there too. And we asked, why did this happen? After we had a meeting with the district manager, I called the fifteen members. I ordered interrogations and went to the area where the incident happened. We went to the area. There's a small store, a bazaar, and I asked them what people were coming and going. They're telling us that people came with uniforms as a soldier or police officers and they bought from us peanuts and oranges, and then they left. We found the guys when they robbed them. We took the guys with us and asked them "Do you know these people?" They blinded my eye, and I knew the coat; not the faces, but the coat. And they drove away. And we came back from the area, back to the district manager and told the story, and there were people who came with uniforms, police officers, and they're gone. We told the whole story to the district manager. After the district manager, we went to the police station, which is close to the right, and we went to the police officer, to the manager of police officers. We found the car, and the car was out there, and the guy saw the car, and said that was the car. Because the guy went to the bazaar after the incident, he told us they bought an orange and peanuts. We found the peanuts and the orange in this car. That was our hundred percent proof and we told the police officer of this unit and said we want the money; immediately return the money back to the person. After two day's dispute, we said you have to find the money and have to bring it back. After two day's discussion, they returned 150,000 rupees and gave us the 50,000 two or three days later. At that moment, we gave the money to the previous owner. He left and then a government delegation from the internal ministry, and another delegation from the general attorney, came. There were two other delegations from the internal ministry and they just wanted to see their own workers, in our office. When they were working with the delegation from the embassy, they brought help for the three provinces around here, like Bathio, Paktia and Ghazni. We met the delegation in the district managers' office. We talked all day, and we gave an Afghan tribal gift, and they said we would start our talk tomorrow. They took out everybody else, there were police officers, the managers of the police station were there, the district manager were there, and all fifteen delegation elders were there and the representatives were there, everybody was there together. At that time we wanted to ask the governor to join our meeting, but he was not in his office. At that time, after the whole thing, there were two other Americans, they saw me, and they recognized me. The soldiers came, and when the police came they grabbed me and handcuffed me. They took me there and I don't know for how long, and they took me to America. Some people say you helped, but your reward is different. You don't get a reward, you get punished. When Karzai came to power, I tried and gave a lot of help, with them, and with the Americans. America is a superpower; they have all kinds of

knowledge. I hope I can ask the two gentlemen, one name is ███████, how much help I gave to them. Before they arrested me, fifteen days before, I went to talk to another gentlemen, and his name was Mike too, Michael, and I offered my help. Around fifteen, thirty people went full time to greet them, and to offer our help, and he reserved a room for us at the Spinzak Hotel. We stayed there for almost ten days. I hope you don't get upset with me, I will say all the allegations are wrong if I were Taliban or al Qaida or if I was another criminal. I will be in the mountains or in a cave somewhere else, but they arrested me inside the governor's office. It's one thing just talking or writing on someone else, but proof is a different story.  This name, Saifullah Rahman Mansour, he was a government official. He was the one who came and robbed my house and took everything I had and left. If someone, or anybody, proves this meeting, or this thing, if anybody proves that, I accept ten years to stay here in Guantanamo. America is great, and a great superpower. With high technology and these allegations on me, I hope that a picture or radio will help; I need my truck, my wives, I need anything. I hope to have these things. If the evidence were not on my account, even on the evidence of Afghans then I would accept that too. I asked for two witnesses who were high-ranking officials of the Karzai government; one is Raz Mohammed and the other Taj Mohammed Wardak. And there's another person named (inaudible) who campaigned with Americans together. I would like to ask him, and he's easy to find. And I named four or five people in my own district, elders; you guys are free anytime, any day to ask. And I'm sorry; I didn't think I would give you headaches from Bagram all the way to here. I need evidence, any kind of evidence, I will like to accept it. America is a great, great country, and Americans are a great people with high respect. There we were at war with Russia and our best wishes and best hopes are that someday America would come and help us and build our life in our country. Our life was destroyed by the war and that's all. I wish my wife were here, during my old age. They asked me twice for help, I do not accept anything; that was the only reason to help the people for the security, and this is my reward, I am here. I'm not a Mullah. I'm an educated person. I'm a pharmacist. Now I'm sitting here in front of you, with my hands and feet in cuffs. There's an American convoy that came and they blew up the convoy and killed fifteen people or ten people. I hope that it wasn't for that thing happening. But this thing, it's up to you, I'm sitting here to you, to listen to you. And Operation Anaconda when it started, I will guarantee you when this started from Ghazni, to Zormat, from Zormat all the way, if anybody threw a rock, forget the bullets, forget the mines, forget everything, that was because of our help. The operation was for safety and that was because of our help. After this operation, after one month and half months, I went home, and turned over everything to the district manager. I'm not accepting this allegation on me. I hope that if there's any right in notice, any proof on me, on the radio, a picture, any otherwise, I would be glad to accept these allegations.

Personal Representative: There were a couple of points that you missed. When the businessman was robbed of 200,000 kalgars in Sherbuz, when they investigated the robbery, it was determined the thief was the commander of security in the district, Taj Mohammed. When the businessman was robbed of 200,000 kalgars...

Detainee: Yes, the chief or commander returned the money.

UNCLASSIFIED/~~FOUO~~

Personal Representative: And he worked for Abdullah, the chief of security for the district of Zormat.

Detainee: Yes, the only reason the commander of the law arrested me was because of this money.

Personal Representative: Basically, because they confronted the man who stole the money from the merchant, found out this man worked for Abdullah, who was powerful, and Abdullah got him falsely arrested. And he must have come up with a lot of lies so his friend Dalili couldn't even get him released.

Detainee: Yes, when I was arrested, Dalili was in Kabul at that time. He got home during the night, came back to the city and assured me I will be released tomorrow, but for some reason, I wasn't.

Personal Representative: And one other point you forgot to make was that, when you were helping the Americans, you even caught two al Qaida cars.

Detainee: Yes, I captured two al Qaida cars and returned them to the governors. Mr. Wardak was governor at that time. And they say he may still be governor at this time.

***The Personal Representative read the accusations to the Detainee so that he could respond to the allegations. The allegations appear in italics, below.***

*3.a. The Detainee is a member of the Taliban and participated in military operations against the United States and its coalition partners.*

*3.a.1. The Detainee served as the commander for two separate military units operating in Zormat, Afghanistan from July 2002 to November 2002.*

Detainee: This is a false allegation, if I said that before. I need paper, I need documents, I need a radio, I need a picture, anything, and I was not a commander or anything.

*3.a.2. The anti-coalition militia in Zormat District considered themselves al Qaida.*

Detainee: To this point: I never ever worked for any government or anybody and I don't like the al Qaida, I hate the al Qaida and I don't like their name, because they destroyed the whole country.

*3.a.3. Between April and June 2002, while serving as the Zormat Assistant Governor, the Detainee had three known al Qaida suspects released from jail after they were captured at a checkpoint.*

UNCLASSIFIED/~~FOUO~~

Detainee:  From my childhood until now, from the King (inaudible) to the communist government to the Taliban government to the Karzai government, if anybody says if I was assistant governor for one day, yes, will I erase these people.

Personal Representative:  In b., you mentioned to me that you were not the assistant Zormat Governor.

Detainee:  No, never in my lifetime.  Never.

Personal Representative:  And you never knew these people?

Detainee:  Which people?

Personal Representative:  Those three people.

Detainee:  How would I know if I were not assistant governor, would I know these people?

*3.a.4.  On 31 August 2002, the Detainee met with Saifullah Rahman Mansour to organize and receive funding for an attack on coalition forces.*

Detainee:  I don't know this guy even when he was in power in his own term.  He came and robbed my house and took everything that I have.  How do I go about talking to this guy, taking his money?  That's impossible.  And, also, how come he (inaudible) when I came to America?

*3.a.5.  In early September 2002, the Detainee led a 12-man unit of former al Qaida and Taliban in planning an attack on coalition forces.*

Detainee:  It's not acceptable to me, this allegation.  This one never happened, and I don't like al Qaida, I don't like its name, and I don't like him (Osama Bin Laden), and it's up to you to accept it or not.

*3.a.6.  The Detainee was arrested by Afghan authorities at the command of Abdullah Muhajed, head of security in Zormat, Afghanistan, and then turned over to the U.S. Forces.*

Detainee:  Yes, that was a (inaudible) about this guy.  About this whole robbery thing, and stolen money, and we got it collected from him, that was the only thing he finds?  Everything else is against me, and he turned me in to the Americans.  I don't know, he gets money from America too, and I don't know.

Personal Representative:  Is there anything else you'd like to add?

Detainee:  America again, America's great and intelligent and smart.  I ask for advice.  Please be sure to do the right thing and know that our country is so poor and so behind.

UNCLASSIFIED/~~FOUO~~

There are a lot of people; I know they come for no reason, but for personal disputes. There's been twenty years of war there, there's a lot of disputes, there's a lot of killing, there's a lot of robbery, lots of things happen there. But, with your knowledge and your position to do the right thing it will be good for you. I wanted to terminate the Taliban but I didn't, I just kept my pharmacy at my home. I didn't take them out, because I have problems with the Taliban. I just make this business inside a house to give some medicine to people, to support my family. I'm just a poor person, I don't know what to do, I don't know how to support, how to sell. You guys see (inaudible), everything, every letter to my son, to my family, for any reason, for anything you can do, borrow some money, go sell, don't steer wrong. And that was our way that we think throughout most of my family when we grew up without education because of Taliban. And we would like our families to be educated. Forgive me, I'm sorry, I'm giving you a headache. That's my hope and my wish, if you have any proof on me, truly proof, I will accept it from anyone. Otherwise, please help me; release me to go back home. America was our friend in the past, America is our friend now; there's the hope that there's no problem with my country or me. In the future, if there is anything I can do to help America I would do it, anything you want. I don't have any problem with them. Please help us and wisely check my case, and I'm not a criminal, please let me go home.

Tribunal President: We will certainly give everything we receive here today, including your statement, serious consideration and if we should get a late response from the Afghanistan government in relation to the witnesses, we will if necessary reconvene this Tribunal and receive this new evidence.

Detainee: Yes, I tried my best, if I were a criminal, I would not get my evidence to these people, if I was a criminal I would not help the new government, if I were a criminal I will not help Americans. If I were a criminal, I would be in a mountain somewhere, not here in this Tribunal. That's all I can say. And you know, we are doing OK here. We get clothes, we get good food everyday but we left behind people and I don't know what has happened....

Tribunal President: We understand. We may have some questions for you, but does this conclude your statement?

Detainee: Please.

Tribunal President: Thank you for your statement. Personal Representative, do you have any additional questions for the Detainee?

Personal Representative: Sir, I just want to bring one more thing up, make sure its clear, and that is that the Detainee was meeting in the governor's office at his time of arrest.

*The Personal Representative and the Recorder had no further questions.*

Tribunal Members' questions

UNCLASSIFIED/~~FOUO~~

Q. Good afternoon, thank you for coming to speak with us today. We have tried to follow your story as you told it to us. Don't worry; you didn't give us a headache. But, trying to follow all the disputes in Afghanistan is enough to give any man a headache. So I will try to make things a little more clear for us on the panel. You said originally you were a pharmacist by training?
A. Yes. It's all in my file.

Q. So, during the time of the Taliban and before that, you supported yourself by being a pharmacist?
A. Yes.

Q. How did you receive your education and training to become a pharmacist?
A. In Kabul.

Q. They have medical schools for you to learn how to do that there?
A. Yes, I was the assistant pharmacist in the Kabul pharmacy, in Kabul University.

Q. How long did you have to study and train before you became an assistant pharmacist?
A. Fourteen years. At that time I was working in Kandahar when the communist government came to power, and then I left Kandahar. There was a hospital in Kandahar, built by China, and I worked there. I don't know if you have information or knowledge about this hospital.

Q. So, if you are a pharmacist, tell us how you become mayor of Zormat the first time?
A. Maybe two or three things. Maybe I'm a good man, or a respectable man, and also I am an honest man. The whole people of the Zormat district came to me, they respect me. When (inaudible) came the first time, to act as our new governor, they introduced me to him. He was the one to appoint me to be district manager, as an elder, not with money, without pay.

Q. Is this the same person as Raz Mohammed Dalili or a different person?
A. No, there are two different Taj Mohammeds. Well, the first was a governor, but he went back to Kabul to become an interior minister and Raz Mohammed Dalili was the second government person who took over his position.

Q. Were these gentlemen affiliated with President Karzai's government?
A. They were both appointed by the Karzai government.

Q. Now you mentioned the first time you were mayor, President Karzai came and put his own man in there to replace you? Do you know why he chose to do that?
A. I submitted my resume to enter the ministry in Kabul, but the people there did not know me. Someone in the ministry knew the other person, and he had appointed him instead.

Q. This person who replaced you, who seemed not to do very well at his post, do you think he is partially responsible for why you are here?

UNCLASSIFIED/~~FOUO~~

A. No, he was not involved in my arrest, his name was Jan Malum, teacher (Malum Jan Baz). Malum Jan Baz, he went to Bagram to (inaudible) and there was another guy that came and his name was Mohammed, who was another district manager.

Q. So the main person who appears to be responsible for your arrest is the commander, Abdullah Mujahed and also Saifullah Rahman Mansour, or not him?
A. The main person is Abdullah Mujahed (ph) because the people who belong to him are his people. Those were his people, the people who robbed him (the businessman), because we got the money from him, because when the man came he put me in this trouble. But I don't know about this guy, because I don't know; I don't want to be telling you lies.

Q. Does Abdullah Mujahed consider himself to be part of the Karzai government also, or against it?
A. Maybe the Americans can ask the American representative in this district. Maybe they know that, but I'm sure this guy's not part of the internal ministry. He took his position by himself.

Q. Regarding the militia that was operating in the Zormat district, when you were the mayor there, did you know they were operating there?
A. After six months, when I was mayor of the district, there was nothing. Very peaceful and very secure.

Q. So they only came there after you left your position?
A. Yes, when the next one, teacher Jan Baz, as district manager, that's when the problems started.

Q. So, Jan Baz must've been against the American presence there, and the Karzai government?
A. No, he was not popular in the area and the government just appointed him to this position; maybe he doesn't have experience and that's very important to be accepted by the people of the area where you work.

Q. Did you fight against the Russians when they were in Afghanistan?
A. Yes, I did, I belonged to Mohammed, and he has (inaudible).

Q. And how long did you fight in that jihad?
A. The communist government took power in '57-'58 (Islamic calendar), 1976-1977, the next year, after one year, he left his job. We refused to stay in Miluksha (ph); we stayed in Kabul. Some time during the year he came to work on our yard, they gave us wheat or corn sometimes not. Sometime, they met with other brothers, other people, for women, that was the only reason to go back.

Q. So, you fought against all the communist governments, Karmal, Amin, and Najib?

UNCLASSIFIED/~~FOUO~~

A. No, sometime, just once a year we went to an area to work as a guard, and the guys they sometimes need us. Our commander, we help them, otherwise we stayed in Foxtal (ph), and it's not a fight.

Q. Were there times when you yourself saw direct combat against the Russians?
A. No.

Q. Had you ever in your life have any military training?
A. No. Even when I didn't join in Afghanistan, when everybody else went for one or two years to the military, I didn't.

Tribunal President's questions.

Q. What is the largest city near your district, or in your district?
A. Our district is the biggest district because all the cities belong to four provinces, Ghanzi, Paktia, Lugar, and Practil (ph).

Q. Is that near Khost or Kabul?
A. No, I don't get it.

Q. I'm trying to find on the map where you were serving as district manager, near what big city, like near Khost, or Kabul?
A. Close to Ghazni. There are twenty-four kilometers between Zormat and Gardez, which is thirteen or fourteen miles.

Q. Were there any military camps around Ghazni, training camps for military?
A. Are you asking for Afghans or Americans or who?

Q. Afghans, were there ever any?
A. Yes, there were two. One was called Baloyza (ph) upper house, and one was close to north of Ghazni. Yes, Baloyza upper house is the center of Ghazi, and the other place is to the north of Ghazni.

Q. And that was Taliban operated or al Qaida operated?
A. Only I talk about the time I was in Afghanistan, or when president Mohammed (inaudible) after this time, I never went there, and I have never been there during the communist time or Taliban time or anybody else; I didn't know what was going on there.

Tribunal President: I don't have any other questions, thank you. Do you have any other information, or is there anything else that you feel that is important that you want to tell us as we begin to make our determination of your enemy combatant status.

Detainee: Again, I ask you, I ask your forgiveness, and I ask you for knowledge that you will really truly judge from your heart, like you swear, to check my case, if there's anything you think I'm guilty of, I will accept, but, I need help. Please help me.

UNCLASSIFIED/~~FOUO~~

Tribunal President: Thank you for your testimony.

Detainee: Thank you, thank you very much.

*The Tribunal President confirms that the Detainee had no further evidence or witnesses to present to the Tribunal. The Tribunal President explains the remainder of the Tribunal process to the Detainee. The Detainee has one question/comment:*

Detainee: How long will this process take?

Tribunal President: We hope within thirty to sixty days, but certainly as soon as possible.

Detainee: Like I told you, I show you, my evidence to the governor, or one minister and also two Americans, if I were guilty, or did anything wrong, I would not name these people to you.

Tribunal President: Thank you again for your participation.

Detainee: I hope you don't get upset with me and I thank you, and I ask your forgiveness and I give you more time.

Tribunal President: I hope you have a good day.

*The Tribunal President adjourns the Tribunal.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Colonel, U.S. Marine Corps
Tribunal President

## DETAINEE ELECTION FORM

**Date:** _22 Oct 2004_

**Start Time:** _1000 hrs_

**End Time:** _1150 hrs_

**ISN#:** _1001_

**Personal Representative:** MAJOR ███████
(Name/Rank)

**Translator Required?** YES          **Language?** Pashtu

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** YES
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Detainee Election:

[X]   **Wants to Participate in Tribunal**

[ ]   **Affirmatively Declines to Participate in Tribunal**

[ ]   **Uncooperative or Unresponsive**

## Personal Representative Comments:

Wants to participate and make an oral statement.

Witnesses Requested : 5

As of 22 Nov, witnessses were either unable to be contacted or chose not to provide statements.

(1) Raz Mohammed Dalili -Former Paktia District Governor

(2) Hakim Khanwal,  Zumath Afghanistan – Tribal elder

(3) Haji Omar Khan, Solan Khayl, Zumath Afghanistan – Tribal Elder

(4) Toti Khan, Naik Num, Zurmath Afghanistan – Tribal Elder

(5) Haji Barat, Sak Haydari Qala, Zurmath Afghanistan – Tribal Elder

(note:  at follow-on interview 24 Nov 04, detainee indicated that he had asked for a 6th witness, named Haji Wali Mohammed.  After checking my notes, he mentioned the man but did not have an address only that he worked in Urgn District, Paktia province, detainee wanted to proceed with the tribunal anyway instead of trying to contact the 6th witness.)

Personal Representative: ███████████████

UNCLASSIFIED

## Combatant Status Review Board

TO:      Personal Representative

FROM:  OIC, CSRT (06 October 2004)

Subject:  Summary of Evidence for Combatant Status Review Tribunal  -   KHAIL, Hafizullah Shabaz

1.  Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2.  An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.  This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3.  The United States Government has previously determined that the detainee is an enemy combatant.  This determination is based on information possessed by the United States that indicates that he is a member of the Taliban and participated in military operations against the United States and its coalition partners.

   The detainee is a member of the Taliban and participated in military operations against the United States and its coalition partners:

   1.  The detainee served as the commander for two separate military units operating in Zormat, Afghanistan from July 2002 to November 2002.

   2.  The anti-coalition militia in Zormat District considered themselves al Qaida.

   3.  Between April and June 2002, while serving as the Zormat Assistant Governor, the detainee had three known al Qaida suspects released from jail after they were captured at a checkpoint.

   4.  On 31 August 02, the detainee met with Saifullah Rahman Mansour to organize and receive funding for an attack on coalition forces.

   5.  In early September 2002, the detainee lead a 12-man unit of former al Qaida and Taliban in planning an attack on coalition forces.

   6.  The detainee was arrested by Afghan authorities at the command of Abdullah Mujahed, head of security in Zormat, Afghanistan, then turned over the U.S. forces.

UNCLASSIFIED

Exhibit __R1__

UNCLASSIFIED

4.  The detainee has the opportunity to contest his designation as an enemy combatant.  The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

**Memorandum**



To    :    Department of Defense          Date  11/08/2004
           Office of Administrative Review
           for Detained Enemy Combatants
           Capt. Charles Jamison, OIC, CSRT

From  :    FBI GTMO
           Counterterrorism Division
           Asst. Gen. Counsel ▮▮▮▮▮▮▮▮▮▮▮

Subject    REQUEST FOR REDACTION OF
           NATIONAL SECURITY INFORMATION
           ▮▮▮▮▮▮▮▮▮▮

      Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

      The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

      The following documents relative to ISN 1001 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 09/17/03

---

[1]Redactions are blackened out on the OARDEC provided FBI document.

[2]See Executive Order 12958

UNCLASSIFIED

Exhibit *R2*

UNCLASSIFIED

Memorandum from ████████████ to Capt. Charles Jamison
Re:  REQUEST FOR REDACTION, 11/08/2004


        If you need additional assistance, please contact
Asst. Gen. Counsel ██████████████████████,
████████████████████████ or Intelligence Analyst (IA)
████ IA ████████████████████████████████

UNCLASSIFIED

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on ___11 January___ 2005 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #1001.

████ I have no comments.

___ My comments are attached.



████████, LT COL, USAF

Name PERSONAL REP TEAM LEAD

████████████████████

FOR MAJ ██████ PR # 96

___11 Jan 05___
Date

ISN #1001
Enclosure (5)

UNCLASSIFIED//~~FOUO~~